ORIGINAL

FILED
OCT 2 2007
U.S. COURT OF
FEDERAL CLAIMS

# In The United States Court of Federal Claims
# Military Records Correction Board

No. 07-709 C

Ronald J. Menke, Plaintiff

v.

The United States, Defendant

Lower Court No. 2:04-CV-00472 DB
Honorable Judge Dee Benson
District of Utah

---

## BRIEF OF PETITIONER RONALD J. MENKE

---

Submitted By:

Scott H. York
QUINTANA & YORK, PC
3341 South 700 East
Salt Lake City, Utah 84106
(801) 363-7726 Telephone
(801) 521-4625 Facsimile
shyork@owlservices.net

Attorney for Petitioner

# TABLE OF CONTENTS

PETITION OF RONALD J. MENKE
INTRODUCTION .......... 1
JURISDICTION .......... 1
SUMMARY .......... 2
FACTUAL HISTORY .......... 3
ARGUMENT .......... 11
DAMAGE CALCULATIONS .......... 28
CONCLUSION .......... 30

EXHIBITS
1. NGB Form 22 - Report of Separation and Record of Service – R.J. Menke
2. Special Order RU-53
3. Acknowledgement or Rights and Possible Trial
4. Affidavit of Rodmund Brown
5. Administrative Demotion
6. Notification of Intent to Demote
7. Letter of LTC Cook – April 19, 1996
8. Memorandum of Captain Paul V. Erickson – July 22, 1997
9. Transcript – Hearing on Appeal of Adverse Action – Volume II
10. Transcript – Hearing on Appeal of Adverse Action – Volume I
11. Incident/Complaint Report
12. Statement of Robert W. Teinert – September 17, 1999
13. Statement of Terry D. Morstad – September 17, 1999
14. Statement of Matthew D. Jensen – September 18, 1999
15. Salt Lake Police Report of Offenses
16. Cease and Desist Order
17. Proposed Notice of Removal
18. Original Decision to Proposed Notice of Removal
19. Findings and Recommendations in Adverse Action Appeal
20. Final Decision Regarding Adverse Action Appeal
21. Notice of Intent to Discharge
22. Notice of Intent not to Extend Current Enlistment Contract
23. Request for Appointment of Counsel and Administrative Discharge Board
24. Supervisor's Record of Technician Employment
25. Military Outstanding Volunteer Service Medal
26. Employee Performance Plan and Evaluations
27. Application for Temporary Restraining Order and Preliminary Injunction
28. Memorandum of Agreement between State of Utah and R.J. Menke
29. Special Order AW-124 – Notice of Discharge
30. Memorandum Requesting Correction of NGB Form 22
31. Denial of Reenlistment Eligibility
32. Correction of NGB Form 22
33. Order of Dismissal
34. Complaint U.S. Office of Special Counsel

35. Office of Special Counsel File No. MA-02-1117
36. Statement of Timeliness and Jurisdiction of Merit Systems Protection Board
37. Merit Systems Protection Board Initial Decision
38. Receipt of Claim
39. Standard Form 95 Claim for Damage, Injury, or Death
40. Adjutant General's Final Determination
41. Stipulated Motion to Stay – U.S. District Court No. 2:04 CV 00472 DB
42. Notification of Personnel Action
43. Technician Personnel Regulation No. 752
44. Zero Tolerance Policy Letter 99-31
45. Air Force Instruction 36-3209
46. Utah Code of Military Justice – Title 39, Chapter 6
47. Air National Guard Instruction 36-2503
48. Special Order AW-76
49. AC-0009R Wage Rate Schedule
50. Statement of Ronald J. Menke
51. Recoupment of Pay and Premiums
52. Affidavit of Attorneys fees and costs

## TABLE OF AUTHORITIES

CONSTITUTIONAL PROVISIONS
U.S. Constitution, Amendment V
U.S. Constitution, Amendment XIV, Section 1

STATUTES

FEDERAL
5 USCA § 5332
5 USCA § 5341
5 USCA § 5343
10 USC § 672 (*renumbered* § 12301)
10 USCA § 802
10 USCA § 815
10 USCA § 1552
32 USCA § 709

STATE OF UTAH
Utah Code of Military Justice – Title 39, Chapter 6 (EXHIBIT 46)

REGULATIONS
U.S. Department of Defense Instruction 1332.41
Air National Guard Instruction 36-2503 (EXHIBIT 47)
Technician Personnel Regulation No. 752 (EXHIBIT 43)
Air Force Instruction 36-3209 (EXHIBIT 45)
U.S. Code of Federal Regulations 532
U.S. Department of Defense Directive 5120.39

CASELAW
*Gnagy v US*, 634 F.2d 574 (Ct.Cl. 1980)

RECEIVED
OCT 2 2007
OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

# PETITION OF RONALD J. MENKE TO THE AIR FORCE BOARD FOR CORRECTION OF MILITARY RECORDS

## INTRODUCTION

The following petition is respectfully submitted to the Board for Correction of Military Records for review. The Petitioner has made every effort to avoid making this petition overly lengthy or its presentation confusingly convoluted. However, the Petitioner is aware of his duty to provide the Board with all of the information and documentation relevant to this complaint, and that the Board may render a determination without further hearing. The petition and supporting documentation is provided in both paper and digital formats for the Board's convenience.

## JURISDICTION

1. Jurisdiction and venue before this Board is proper pursuant to 10 USCA § 1552 and U.S. Department of Defense Instruction 1332.41.

## ISSUES FOR DETERMINATION

2. *Was Petitioner directly and proximately injured by a deprivation of due process caused by the Utah Air National Guard and/or the United States in 1996?*

3. *Was Petitioner directly and proximately injured by a deprivation of due process caused by the Utah Air National Guard and/or the United States in 1999?*

4. *Was Petitioner deprived of equal protection of the laws through disparate treatment by the Utah Air National Guard?*

5. *Was Petitioner wrongfully terminated from his position of civil employment as a Title 32 technician?*

6. *Did the Adjutant General err in upholding Petitioner's termination on appeal*?

7. *Is Petitioner entitled to correction of his military records*?

8. *Is Petitioner entitled to back pay and benefits in both his military and civilian capacities*?

9. *Is Petitioner entitled to reinstatement in both his military and civilian capacities*?

## SUMMARY

10. Petitioner appeals the May 17, 2000 decision of the Adjutant General which resulted in the Petitioner's termination as a Title 32 Technician, and consequently the deprivation of certain income and benefits as a member of the Utah Air National Guard due to discharge and refusal of reenlistment. Petitioner further complains of the denial of a court marshal as of right prior to the deprivation of certain income and benefits due as a member of the Utah Air National Guard.

11. The Adjutant General's 2000 termination decision was based in substantial part on a prior administrative disciplinary action taken against the Petitioner while serving under Title 10 orders on or about June 2, 1996. The prosecution and penalty associated with this prior administrative action did not comport with the Uniform Code of Military Justice, or with ANG Instruction 36-2503(11), which was erroneously utilized and applied.

12. The imposition of a overly severe penalty in 1996 contributed to an erroneous finding of guilt, the imposition of an overly severe penalty being imposed in 2000 and the discharge of the Petitioner from military service. From the time of first notice, Petitioner has sought review of the Adjutant' General's 2000 termination decision. Petitioner challenges the sufficiency of the evidence in support of the Adjutant General's decision and complains that the penalty imposed exceeds those permitted under the cited sentencing authority Technician Personnel Regulation 752.

13. The erroneous actions against Petitioner's civilian employment in 1999 had a direct and proximate negative impact on Petitioner's military enlistment that was only partially mitigated by an injunction issued by the US District Court for Utah (*See* Civil No. 2:00-CV-0973). Pay, benefits and privileges were withheld, the Utah Air National Guard undertook to discharge Petitioner from military service, and Petitioner was again denied his request for a court-martial in the face of these deprivations. Petitioner's 'whistle-blowing' activities and the failure of certain of Petitioner's superiors to properly adhere to regulations, lead to the imposition of civilian and military penalties that exceeded those permitted by the applicable regulations.

14. In the ensuing years since his termination and discharge, Petitioner has engaged in a seemingly endless effort to obtain review of the Adjutant General's decision or to exhaust administrative remedies so that the matter may be placed before the court. The United States Attorney holds that the exhaustion requirement has not yet been met and that appeal to this Board for Correction of Military Records is necessary. Petitioner knows of no other administrative avenues for relief that have not been attempted. This petition is so filed.

## FACTUAL HISTORY

15. Petitioner enlisted in the US Naval Reserves in January 1977 but served only briefly before being transferred to service in the regular US Navy. (Exhibit 1, p. 2). Petitioner's service in the Navy continued until May 1981, at which time he returned to the Naval Reserves and served for nearly two additional years. (*Id.*). During this time, Petitioner advanced in rank from grade E-1 to grade E-3. (*Id.*).

16. On or about January 10, 1989, Petitioner enlisted for his first term in the Utah Air National Guard as a member of the 151st Air Refueling Wing; concluding the term as a grade E-5 in January 1995. (*Id.*). Petitioner reenlisted at that time and it is during this final term that the

events giving rise to this petition occurred. Also relevant is the fact that during his service with the Utah Air National Guard, Petitioner was employed as a civilian technician under Title 32, in addition to his military enlistment. Petitioner received benefits and income in both civilian and military capacities.

17. By February of 1996, Petitioner had advanced to grade E-6. On February 15, 1996, Petitioner received Special Order RU-53, sending him to Pisa, Italy on active duty. (Exhibit 2). Petitioner arrived in Italy on Friday March 15, 1996. Petitioner was not scheduled for duty until the following Monday, March 18th. (Exhibit 50 ). Petitioner was housed off-base in the Hotel Continental. Petitioner's unit had established a so-called 'hospitality room' where Petitioner was provided alcoholic beverages without charge. (*Id.*).

18. Petitioner and a fellow airman Michael Castagno acquired the assistance of a local Italian resident (Enrico) to drive them to a restaurant. (*Id.*). On their return to the hotel after dinner, Enrico collided with a barricade and then fled the scene of the accident on foot. Petitioner and Airman Castagno began walking the remainder of the distance to the hotel when they were detained by Italian police.

19. Neither the Petitioner nor Castagno were charged with driving under the influence of alcohol or with the accident. However, in the back seat of the vehicle there was a portion of a broken statuette taken from the parking lot of the Hotel Continental. (*Id.*). It is uncertain exactly who had placed the statuette in the car or for what purpose, but it is clear that Petitioner was aware of its origin and presence. Petitioner was charged by the Italian authorities with 'Receiving of Stolen Goods' (Art. 648 of the Italian Penal Code) despite the fact that the Hotel Continental expressed no interest in the return of the broken statuette. (Exhibits 3 & 4). Despite

supplying contact information to the Italian authorities, the petitioner has received no correspondence or notifications regarding this incident.

20. After approximately one hour in the custody of Italian authorities, Petitioner and Airman Castagno were turned over to US military police. Petitioner was taken into custody and detained by 1st Sergeant Allen F. Martineau. (Exhibit 3). Petitioner immediately requested the assistance of legal counsel and trial by court-martial in the event that the military initiated punitive action against him. (Exhibit 50 ).

21. Five days after the original detention on March 21, 1996, Petitioner was finally allowed to speak over the telephone with Area Defense Counsel Capt. Pahl (DNS: 67669086962 at Incirlick AB, Turkey). Sgt. Martineau requested that the Petitioner sign an AR 27-50 form. On Capt. Pahl's recommendation, Petitioner initially refused to sign the AR 27-50 but was later convinced by Base Commander Col. Hill that the document was a mere formality to consummate the transfer of jurisdiction and custody from the Italian authorities to the United States. (Exhibit 50 ). Col. Hill did not contradict Capt. Pahl's legal advise that Petitioner would be subject to the UMCJ even if returned to the United States, nor did Col. Hill inform Petitioner that he would later be denied a court-marshal. Nevertheless, Col. Hill did not honor Petitioner's request for court-marshal, rather demoting Petitioner administratively. (Exhibit 5).

22. On March 23, 1996, Petitioner was transported back to Utah, USA. On April 13, 1996, Petitioner was notified of Commander Capt. Paul Erickson's intent to demote Petitioner from grade E-6 to grade E-2, and the appointment of LTC Craig Cook as local defense counsel. (Exhibit 6). Shortly thereafter LTC Cook left the country with the intent to return prepared to defend the Petitioner. (Exhibit 7). LTC Cook did not and Petitioner was administratively demoted to grade E-3, without the benefit of the court-marshal. (Exhibit 5).

23. The codefendant Airman Castagno received a similar demotion in grade but was in fact restored to grade E-6 after five years as the disciplinary board had promised. (Exhibit 48). Petitioner was not similarly treated, having only regained the rank of E-5 despite assurances by Capt. Erickson that he would "not be penalized further for [his] actions in Italy by the 151st Logistics Support Flight." (Exhibit 8).

24. Petitioner continued his service as both an Air National Guardsman and as a Title 32 jet engine mechanic, primarily working on KC 135 aircraft. TSGT Robert Teinert [Teinert] was a co-worker of the petitioner during this time. Several times during 1998 and 1999, Petitioner suspected Teinert of 'drinking or being intoxicated on the job' while on duty at the Salt Lake City Air National Guard base. Being concerned for the safety of both the ground crews and the flight crews, Petitioner reported Teinert for this to the shop supervisor CMS Michael R. McCowen. (Exhibit 9, p. 459, ln. 13-21; Exhibit 10, p. 68, ln. 10-19). Other superiors were apparently also aware of concern regarding Teinert being intoxicated on duty, such as SMS Chapman. (Exhibit 10, pp. 284-85, ln. 25, ln. 1-2; p. 343, ln. 11-21).

25. Teinert previously suffered adverse action by the Air National Guard for being intoxicated while on duty, and a written reprimand deemed "unscheduled leave" for repeatedly failing to show up to work. (Exhibit 10, pp. 61, ln. 10-25, thru 62, ln. 1-12). CMS McCowen estimated that the last time that Petitioner had reported Teinert for being intoxicated while working on KC 135 aircraft was "September" of 1999. (Exhibit 9, pp. 459-60, ln. 22-25, 1-3 (*see p. 459, ln. 13-14, 22 for date reference*); Exhibit 10, pp. 68, ln 20-25, 1-4).

26. Within weeks, Teinert alleged that Petitioner called him and made a threatening cellular telephone call on September 17, 1999. (Exhibits 11-13). While the contents of the conversation is fervently disputed, it is clear that at least one call was made from Petitioner's home at

approximately 11:45 pm to Teinert, who was drinking at the NCO Club located on the Salt Lake Air National Guard base. (*Id.* & Exhibit 9, p. 566, ln. 12-17). Teinert had a key to the NCO Club building, entered the Club before opening time, and had admittedly been drinking for seven or eight hours before the call is said to have been placed. (Exhibit 10, p. 38, ln. 23; pp. 70, ln. 16-25 thru 71, ln. 1-2).

27. By Teinert's own estimation, Petitioner entered the Club with his wife at "around 7:00, 7:30 [pm]" and left "about 11:00, 11:30;" approximately half of the time that Teinert admits he had been drinking before the alleged "death threat" call. (*Id.*, p. 39, ln. 18-21). Although admittedly unable to hear the contents the conversation, Teinert's underage 'drinking buddy' Airman Matthew D. Jensen supported Teinert's claim that the conversation contain a 'death threat.' (*Id.*, p. 125, ln. 7-11; p. 97, ln. 1; p. 119, ln. 7-11; Exhibit 14). The allegations were reported to Salt Lake City Police officials and Teinert obtained a 'Cease and Desist Order' against Petitioner on September 21, 1999. (Exhibits 15 & 16).

28. On or about November 19, 1999, SMS Allen E. Chapman issued a Proposed Notice of Removal in violation of TPR 752 § 2-15; charging Petitioner with: "(a) Creating a disturbance by threatening to inflict bodily harm resulting in an adverse effect on morale, production and maintenance of proper discipline. (TPR, Table A-5, Rule 9), [and] (b) Use of insulting, abusive, offensive, or obscene language. (TPR 752, Table A-2, Rule 10b)." (Exhibit 17). SMS Chapman was Petitioner's third-level supervisor. (Exhibit 10, p. 284, ln. 18-24). Petitioner's immediate supervisor did not initiate the adverse action. (*Id.*, p. 278, ln. 5-12). Notably, SMS Chapman did not discuss the incident with Petitioner to determine the actual contents of the conversation between Petitioner and Teinert before the termination proposal was made. (Exhibit 10, pp. 292, ln. 25 thru 293, ln. 1-7).

29. On or about December 20, 1999, Squadron Commander LTC Reutlinger affirmed the recommendation, thus terminating Petitioner from his civilian technician position. (Exhibit 18). Petitioner appealed this decision and a hearing was held before acting Adjutant General Col. Michael T. McCabe on February 2nd and 3rd, 2000; which resulted in Col. McCabe's support of the decision to terminate Petitioner. (Exhibits 9, 10 & 19). On or about May 17, 2000, M.G. James M. Miller (the Adjutant General) determined to impose the recommended action of terminating Petitioner's civilian employment with the Utah Air National Guard. (Exhibit 20).

30. Petitioner did not receive actual knowledge of Major General James M. Miller's final determination to terminate his civilian employment until November 20, 2000; and only after being prompted to seek out this final determination when he received a "Notification of Intent to Discharge" from military service on or about October 4, 2000, which referenced the termination of Petitioner's civilian employment. (Exhibit 21). Capt. Erickson originally notified the Petitioner on July 26, 2000 that his enlistment contract would not be extended once it expired. (Exhibit 22). There is no clear indication why Capt. Erickson later chose to pursue an "involuntary discharge action to be effective before expiration of [Petitioner's] current Expiration Term of Service, 9 January 2001." (Exhibit 21, ¶ 1).

31. While Petitioner was appealing the termination of his civilian employment to the Adjutant General, Petitioner was prohibited from entering the premises of the military installation where he worked. Because of Petitioner's exclusion from the 'Base', he was unable to complete the 'drills' required by his military enlistment. Capt. Erickson never acknowledged that Petitioner's "failure to meet Air Force standards of performance" was solely due to the Utah Air National Guard's exclusion of the Petitioner from the Base. (*Id.*, ¶ 2).

32. Capt. Erickson intended to discharge Petitioner "Under Other than Honorable Conditions" and to identify Petitioner as "Ineligible for Reenlistment in the Air National Guard of the United States." (*Id.*, ¶ 3). Petitioner responded by filing a request for appointment of military counsel and for court-marshal before the Administrative Discharge Board on October 4, 2000. (Exhibit 23). Petitioner received neither and no response from Capt. Erickson or the Utah Air National Guard; rather, the Guard attempted to discharge the Petitioner on January 8, 2001 after 17 years, 364 days of faithful and distinguished service to the United States of America. (Exhibits 24-26). This is one day before the natural expiration of his previous term of enlistment and one day short of the 18 years necessary for Petitioner to become vested in his retirement benefits.

33. On or about December 20, 2000, Petitioner filed a complaint in the US District Court naming the Utah Air National Guard, Teinert, and the U.S. Department of Defense. With Petitioner's dishonorable discharge imminent, Petitioner filed a motion for Immediate Temporary Injunctive Relief on or about January 5, 2001. (Exhibit 27). Hearing on the Motion was held on or about January 7, 2001, and a stipulated agreement was entered into between then defendant the Utah Air National Guard and Petitioner on the same date. Pursuant to this agreement, the Guard promised to grant Petitioner an "honorable" discharge and "reenlistable" status, and to refrain from discharging him prior to the vesting of his retirement benefits. (Exhibit 28). With some additional coaxing, the Guard fulfilled these promises and Petitioner removed the Guard and Teinert from the complaint. (Exhibits 29-32).

34. On or about February 12, 2002, the US District Court in and for the State of Utah, dismissed Petitioner's initial complaint primarily because of the assertion by the US Dept. of Defense that Petitioner had not exhausted his administrative remedies; despite the plain language

of 32 U.S.C.A 709(f)(5) and the Adjutant General's ruling that "there is no further administrative review of the Adjutant General's final decision." (Exhibit 33 (*emphasis added*)).

35. Adhering to this decision, Petitioner extensively scanned the Utah Air National Guard and the Office of the Attorney General for any further avenue of appeal. Finding none and at the suggestion of the Attorney General, Petitioner filed a claim with the Office of the Special Counsel On or about March 25, 2002. (Exhibit 34). On or about April 12, 2002, the Office of the Special Counsel declined to pursue Plaintiff's claims; questioning whether the Merit Systems Protection Board (MSPB) would have jurisdiction over the Guard. (Exhibit 35).

36. To ensure that all possible administrative remedies had been exhausted, Petitioner filed a claim with the MSPB (DE-3443-02-0213-I-1) on or about April 18, 2002. (Exhibit 36). On or about July 18, 2002, the MSPB dismissed Petitioner's claim for lack of subject jurisdiction and encouraged the Petitioner to go back to the Adjutant General's Office. (Exhibit 37).

37. On or about October 25, 2002, Petitioner filed a new claim with the Office of the Adjutant General and a Standard Form 95 a few weeks later. (Exhibits 38 & 39). On or about November 21, 2003, the Adjutant General's Office again denied Petitioner's claim, and again stated that this ruling was a "final" determination and that Petitioner "may now file suit in an appropriate United States District Court not later than six months after the date of mailing of this letter." (Exhibit 40).

38. On or about May 21, 2004, Petitioner filed complaint no. 2:04 CV 00472 DB in the US District Court in and for Utah. By the end of 2004 the US Attorney's Office had taken the position that Petitioner had not in fact exhausted all administrative remedies and that petition to the Air Force Board for Correction of Military Records was requisite and appropriate. On or

about January 7, 2005, the parties stipulated to stay the case in the US District Court and to pursue this petition in good faith. (Exhibit 41). This Petition is so submitted.

ARGUMENT

39. The Petitioner is deeply respectful of the military's need for unfetter hierarchical authority; nevertheless, even a national guardsman is entitled to due process and review of the arbitrary and capricious decisions of his superiors. This petition is submitted to this board on the repeated assertion of the United States that this procedure is necessary for the exhaustion of administrative remedies. Petitioner respectfully asks this Board to provide the broadest relief possible under the circumstances of this case.

40. At all times relevant here, Petitioner was engaged both as a member of the Utah Air National Guard [UANG] and by the Guard as a Title 32 civilian technician, under 32 USC § 709. Petitioner was a state employee with regard to the discharge action taken by UANG against his military enlistment in 1999. (*Gnagy v US*, 634 F.2d 574 (Ct.Cl. 1980)). With regard to the reduction in rank resulting from the 1996 incident in Italy, Petitioner was on active duty and therefore a federal employee. (*Id*). At all times, Petitioner was a federal employee with regard to his employment as a civilian technician. (*Id.*; 32 USC § 709(f)(1)(B)).

41. Prior to his termination as a civilian technician in 1999, Plaintiff received compensation and benefits as a federal employee in his position as a civilian technician (WG-8602-10), specifically working as a jet engine mechanic on KC 135 Strato-Tanker aircraft. (Exhibit 42). This compensation was mandated by Congress under 5 USCA §§ 5332 & 5341, among others. Discipline and adverse action taken against the Petitioner's position as a civilian technician is governed by Technician Personnel Regulation § 752 [TPR 752]. (Exhibit 43).

42. SMS Allen E. Chapman charged Petitioner with: "(a) Creating a disturbance by threatening to inflict bodily harm resulting in an adverse effect on morale, production and maintenance of proper discipline. (TPR, Table A-5, Rule 9), [and] (b) Use of insulting, abusive, offensive, or obscene language. (TPR 752, Table A-2, Rule 10b)." (Exhibits 17, ¶ 2(a) & (b); 10, p. 278, ln. 11-12). SMS Chapman was the Petitioner's 'third level' supervisor, not his immediate supervisor. (Exhibit 10, p. 277, ln. 16-23).

43. TPR 752, § 2-15 states in pertinent part;

> "The adverse action process begins with the technician's supervisor and the SPMO representative reviewing the information gathered about the misconduct along with the factors listed in appendix A to decide what if any adverse action should be imposed. When adverse action is decided upon, the technician's immediate supervisor initiates a proposed adverse action notice to inform the technician of the reasons for the adverse action and provide information on procedural rights. Circumstances may require others in the technician's supervisory chain to initiate such notices (e.g., the immediate supervisor may be personally involved in the misconduct)."

TPR 752, § 2-15(*emphasis in original*);(Exhibit 43). No statement of the 'circumstances requiring' a deviation from this explicit procedure have ever been offered by the government. (Exhibits 10, 11 & 17).

44. TPR 2-9(a) states in part; "Harmful error is an error committed by management in the application of its procedures which, if it had not occurred, might have caused management to reach a conclusion different than the one it reached. . . . If the technician can show harmful error occurred, the action cannot be sustained." (Exhibit 43, § 2-9(a)). In the instant case, the 'different conclusion' caused by SMSGT Chapman's failure to follow correct procedure is demonstrable.

45. SMSGT Chapman personally conducted the investigation into the alleged misconduct and unilaterally decided that adverse action should be imposed; not the SPMO and the

Petitioner's immediate supervisor. (Exhibit 10, pp. 288-93). Petitioner's immediate supervisor MSG McDaniel was not involved the investigatory process and the decision to initiate an adverse action. (*Id.*, pp. 193, ln. 23-25 thru 194, ln. 1-10; p. 206, ln. 18-24). On November 16, 1999, Chapman issued a "Proposed Notice of Removal". (Exhibit 17). Had the McDaniel or even the second line supervisor CMS McCowen conducted the investigation and determined the what if any adverse action should be taken against Petitioner, the sanction would not have entailed termination. (Exhibit 10, pp. 215, ln. 20-25 thru 216, ln. 1-5; Exhibit 9, p. 465, ln. 10-17).

46. The reasons that TPR 752 places the responsibility of initiating adverse action on the immediate supervisor is evident in this case. MSG McDaniel and CMS McCowen interacted with both the Petitioner and Teinert following the incident. SMSGT Chapman did not even interrogate the Petitioner to inquire if in fact he had made the alleged 'death threat'. (Exhibit 10, pp. 292, ln. 25 thru 293, ln. 1-7). Pursuant to TPR 2-5(a); "Management has a responsibility to investigate the charges against the technician and/or any defense raised by the technician." (Exhibit 43, § (2-5)(a)). Intimate involvement with Teinert and Petitioner provided MSG McDaniel and CMS McCowen with a unique perspective to determine the veracity of the allegation and the credibility of the threat, which SMSGT Chapman did not have or take the time to obtain.

47. CMS McCowen stated that Teinert made no mention that the incident involved a death threat. (Exhibit 9, p. 461, ln. 3-12). SMS Chapman admitted that the only person who actually heard the alleged threat was Teinert. (Exhibit 10, p. 299, ln. 8-10). CMS McDaniel, the immediate supervisor who was to investigate and to 'decide what if any adverse action should be imposed,' pointed out that he still does not know whether the Petitioner made a credible death threat or not, and that his recommendation of a sanction, if any, would be contingent upon

verification of that allegation. (*Id.*, pp. 195, ln. 21-25 thru 196, ln. 1; p. 215, ln. 19-24; p. 219, ln. 17-25).

48. MSG McDaniel reported that there were no fights, arguments or threats between Teinert and the Petitioner following the incident, which would support the allegation that a credible death threat had been made, or that it had been taken seriously. (Exhibit 10, p. 208, ln. 8-18). CMS McCowen also observed Petitioner and Teinert interact at work and determined that Teinert showed no indicia of being in fear for his life or that Teinert believed the threat, if made, to be credible. (Exhibit 9, pp. 461, ln. 10-25 thru 462, ln. 1-17). SMS Chapman assumed the allegation of a credible threat to be true solely on the basis of conversations with the Security Police Chief and his immediate supervisor LTC Reutlinger (neither of which witnessed the events) and the various incident reports (which are also not direct testimony). (Exhibit 10, pp. 288, ln. 24-25 thru 289, ln. 1-3; p. 305, ln. 6-14).

49. MSG McDaniel noted that; "There are a wide range of potential threats." (Exhibit 10, p. 220, ln. 12-14). Even if some exchange of harsh words occurred over the telephone as the evidence suggests, CMS McCowen was able to distinguish this from a hypothetical where the Petitioner "made the threat and was picked up with a weapon on the way to [Teinert's] house." (Exhibit 9, pp. 469, ln. 24-25 thru 470, ln. 2; p. 474, ln. 1-22). Neither MSG McDaniel nor CMS McCowen believed that the 'off-duty, after hours' incident was having any appreciable impact on the productivity of the shop for which they were personally responsible; and neither intended to initiate "any" adverse action against Petitioner as a result of the incident. (Exhibit 10, pp. 204, ln. 14-25 thru 207, ln. 1; Exhibit 9, p. 465, ln. 2-9).

50. Common sense and a first-hand knowledge of personalities of those involved resulted in the appropriate response by Petitioner's immediate supervisors; to wit, they withheld judgment

and focused on the actual impact of this incident on the Utah Air National Guard. Neither MSG McDaniel nor CMS McCowen witnessed any indicia that a credible death threat was made; based on their first-hand knowledge. (Exhibit 10, p. 208, ln. 8-18; Exhibit 9, pp. 461, ln. 10-25 thru 462, ln. 1-17). LTC Chapman, who never obtained such factual knowledge, glossed over the issues of whether a threat was made and if so, whether it was credible enough to formulate some nexus or negative impact on the productivity of the National Guard.

51. SMS Chapman spent even less time considering whether the threat was credible than he did on his meager investigation to find out whether a threat had occurred at all; holding that all threats involving "life issues" are "serious". (Exhibit 10, p. 311, ln. 7-9). The fact that SMS Chapman was not the immediate supervisor of Petitioner deprived him of the best opportunity (first-hand observation and experience) to assess the factual reality of the incident between Teinert and Petitioner. Despite the fact that SMS Chapman admitted that the Guard's Zero Tolerance Policy applied only to "verified threats," LTC Chapman's own investigation into whether any threat was made, much less a death threat, was inadequate. (*Id.*, p. 293, ln. 19-22; Exhibit 44, ¶ 3).

52. MSG McDaniel and CMS McCowen were aware that Petitioner had reported Teinert repeatedly for being intoxicated while working on National Guard aircraft, the most recent only a week or two before Teinert raised the allegation of a death threat. (Exhibit 9, pp. 459, ln. 13-25 thru 460, ln. 1-2). SMS Chapman was only aware of a "rumor that [he] heard one time" that the Petitioner had reported Teinert, and was completely unaware that Teinert had previously been reprimanded and suspended for drinking on the job. (Exhibit 10, p. 285, ln. 6-20). Nothing in the record indicates that SMS Chapman ever made the connection between the fact that Petitioner's 'whistle-blowing' activities had exposed Teinert's drinking problem to his

immediate superiors and the fact that two weeks later, after eight hours of drinking, Teinert is leveling an allegation against Petitioner.

53. Regulation 752 places the responsibility for investigating and initiating an adverse action against a technician on that technician's immediate supervisor specifically because that person is in the best position to establish the true facts of the matter and to determine what "if any" action will optimize the productivity of that segment of the National Guard in which that technician operates. SMS Chapman erred by usurping the role of fact-finder while maintaining "[his] perspective as a third line supervisor, rather than one who is in the trenches in the engine shop, but one who has a little more perspective from being up in the organization a ways." (Exhibit 10, p. 282, ln 19-22). SMS Chapman made a policy determination, not an accurate finding of fact.

54. SMS Chapman provided no explanation for why the procedures governing the investigation and initiation of an adverse action enumerated in TPR 752, § 2-15 were not followed. (Exhibit 43, TPR 752, § 2-15). Nor did SMS Chapman cite any actual nexus between this alleged 'off-duty, after hours' conduct and the Petitioner's employment as a civilian technician as required by TPR 752, § 2-3. (*Id.*, TPR 752, §2-3). The Petitioner's immediate supervisors did not believe that there was one and there would not have been any adverse action had TPR 752 been followed.

55. But for LTC Chapman's unjustified and unnecessary intervention into this incident, no adverse action would have been initiated unless Petitioner's supervisors witnessed some negative impact on the National Guard; which they in fact did not. But for the failure of LTC Chapman's perfunctory investigation to establish the actual facts surrounding this particular incident, no adverse action would have been initiated. But for LTC Chapman's inability to distinguish inane

drunken banter between two seasoned soldiers over the telephone at 1:00 am from a situation where one co-worker is actually trying harm another, no adverse action would have been initiated. Had the regulatory prerequisite of a "verified threat" been honored, no adverse action would have occurred. The Adjutant General erred in finding, on the results of SMS Chapman's investigation, that a factual basis existed to support the Petitioner's termination under the Guard's Zero Tolerance Policy or TPR 752.

56. TPR 752, § 2-3(b) states; "When a 'cause' involves off-duty misconduct, management must establish a adequate relationship between the grounds for adverse action and the efficiency of the service." (Exhibit 43, TPR 752, § 2-3(b)). SMS Chapman offered the insufficient and rather incongruous explanation that he "just didn't consider [the Petitioner's termination] as a performance-related issue" but, nevertheless, that Petitioner's termination would "absolutely" "promote the efficiency of the service, meaning the Air National Guard." (Exhibit 10, pp. 281, ln. 7-8 & 25 thru 282, ln. 1-3). SMS Chapman's presumption that Petitioner's termination would increase in the efficiency of the service is contradicted by the fact that Petitioner's termination actually damaged the efficiency of the Guard. (Exhibit 10, pp. 211, ln. 15-25 thru 214, ln. 1-24; Exhibit 9, p. 463, ln. 9-25). SMS Chapman offered no concrete evidence or viable argument to support his conclusion that the Petitioner's termination would 'promote the efficiency of the service.'

57. The Adjutant General erred in finding, on the basis of SMS Chapman's investigation, any evidence to support the assertion that Petitioner's termination would promote the efficiency of the Guard. The only possible efficiency promoting outcome of terminating Petitioner was the Guard's utilization of LTC Chapman's twisted version of the facts to incorporate this incident as

a case study for the Guard's subsequent 'Violence in the Workplace' training sessions. (Exhibit 10, pp. 311, ln. 24-25 thru 312, ln. 1-25).

58. Furthermore, had SMS Chapman properly administered the policy considerations of Regulation 752, the outcome of this adverse action would also have been significantly different. Because Chapman did not complete a sufficient investigation into the incident to justify a factual finding that a credible threat had indeed occurred or that the Guard was noticeably affected, his imposition of a penalty in excess of any provided by the regulations is equally unsupportable.

59. SMS Chapman charged Petitioner with; "(a) Creating a disturbance by threatening to inflict bodily harm resulting in an adverse effect on morale, production and maintenance of proper discipline. (TPR, Table A-5, Rule 9), [and] (b) Use of insulting, abusive, offensive, or obscene language. (TPR 752, Table A-2, Rule 10b)." (Exhibit 17 (2)(a-b)). The dual charge implies that SMS Chapman was not even sure whether the telephonic conversation between Teinert and the Petitioner was a threat "to inflict bodily harm" or simply "abusive, offensive, or obscene language." In any event, neither offense prompted the possibility of removal from service until the third event of such an offense. SMS Chapman offers no rational support or specific circumstances for stepping outside of the regulation to impose a sanction not contemplated.

60. As CMS McCowen noted, it is possible to imagine an instance where the Petitioner "made the threat and was picked up with a weapon on the way to [Teinert's] house" which may justify termination, but that is not the case here and there is no evidence in the record to validate such a conclusion. (Exhibit 9, pp. 469, ln. 24-25 thru 470, ln. 1-2; p. 474, ln. 1-22). The question is not whether in the abstract SMS Chapman had the authority to terminate a Guardsman if he needed to; the question is whether SMS Chapman acted arbitrarily and

capriciously against the Petitioner in context of the facts of this particular case. Without actual evidence supporting a reason why this incident would warrant a penalty outside of the regulations enumerated in TPR 752, A-5, SMS Chapman resorted to mischaracterizing Petitioner's employment record and unrelated service record.

61. Whereas TPR 752 provides that the maximum penalty which Petitioner should have suffered was a "15-day suspension," if in fact a credible threat even happened, SMS Chapman was compelled to rely on an incident where Petitioner was actually the victim of violence in the workplace in order to acclaim that this incident was a repeated incidence justifying an extraordinary sanction. (Exhibit 43 § 9(a-b)). In March 1998, Petitioner was physically attacked by a co-worker on duty, at work on the National Guard base. SMS Chapman capriciously utilized this incident against Petitioner in the 1999 termination action, by insinuating that the incident between Teinert and Petitioner was something other than a 'first offense.' (Exhibit 17, § 4(b)). Notably, SMS Chapman made no effort to terminate the perpetrator of the March 1998 attack on Petitioner; and on information and belief, this confirmed violent offender is still working for the Guard. (Exhibit 10, p. 358, ln. 5-14).

62. To bolster the dubious imposition of a penalty not contemplated by the regulations, SMS Chapman also resorted to referencing the so-called 'Italian incident' (evidenced by Exhibits 2-8 and recounted in paragraphs 9-15 above) despite the written assurance of LTC Chapman's and Petitioner's commander Capt. Erickson that he "will not be penalized further for [his] actions in Italy by the 151st Logistics Support Flight." (Exhibit 8). Broken promises aside, what SMS Chapman did not do was to make any connection between the incidents he cited and how that justified termination in the face of an unsubstantiated allegation of a death threat that had no

appreciable impact on the Guard – and certainly offered no justification for exceeding the regulatory guidelines.

63. LTC Chapman's termination of Petitioner was arbitrary and capricious, and substantially a 'one-man-show' from beginning to end. The record shows that without explanation Chapman violated Section 2-15 of TPR 752 and not only personally conducted the factual 'investigation' alone, he excluded the people charged with that duty from the investigatory function. Chapman unilaterally made the determination to initiate an adverse action against Petitioner and only consulted Petitioner's immediate supervisors on what penalty ought to be imposed (assuming that a credible death threat had been made). In addition, SMS Chapman failed to place anything in the record to justify a gross deviation from the regulatory guidelines in TPR 752, A-5. The Adjutant General erred in approving the termination of Petitioner, on the basis of SMS Chapman's recommendation, when such a penalty did not conform to the disciplinary regulations.

64. Conceivably Commander LTC Reutlinger, who approved SMS Chapman's recommendation, believed that the regulations had been followed; specifically that the fact of a verified, credible death threat had been substantiated and that Petitioner's immediate supervisors were in concurrence with the notion that termination was necessary to promote that portion of the Guard for which they were responsible. However, SMS Chapman's violations of the Guard's regulations were open and notorious, and Commander Reutlinger erred in not recognizing this and correcting the deficiencies in the record by determining the truth of the matter and concluding for himself that the efficiency of the Guard would be promoted. Like SMS Chapman, Commander Reutlinger has no clue whether Petitioner actually threatened or even

wanted to cause serious bodily harm to Teinert. Therefore, neither was equipped to determine what "if any" adverse action should be taken against the Petitioner.

65. AFI 36-3209 § 1.22.6 states that it is among the unit commander's duties to "[e]nsure that investigations properly and completely develop, substantiate and document all facts." (Exhibit 45). Commander Reutlinger's investigation into the factual basis of Teinert's allegation was also limited to reading of the incident reports and nothing more. (Exhibit 10, p. 318, ln. 21-24). Commander Reutlinger's investigation was insufficient in that he failed to discover that neither of Petitioner's immediate supervisors initiated the adverse action, that neither detected a credible threat that affected the workplace, or that the Petitioner had 'blown the whistle' on Teinert's drinking only weeks before. (*Id.*, p. 343, ln. 2-25). Commander failed his duty to ensure a 'proper and complete investigation' before approving SMS Chapman's recommendation to terminate Petitioner.

66. Insufficient investigation also lead to Commander Reutlinger to fail to make any distinction between an actual death threat and a euphemism. Convinced at least that a phone call had been made, Commander Reutlinger administered a penalty far outside of the regulatory guidelines simply because Petitioner failed to confess; despite claiming that he did not take any other incidents into account and thus was treating this as a first offense. (Exhibit 10, p. 337, ln. 6-10; p. 340, ln. 19-25; Exhibit 18, ¶ 3). Commander Reutlinger did not 'substantiate and document' that Petitioner in 'fact' made a credible death threat to Teinert.

67. Hearing Officer Col. McCabe never acknowledged that Section 2-15 of TPR 752 had not been followed or that Petitioner's immediate supervisors had no intention of initiating an action, but he did admit that; "Recommending removal for a first offense would not be consistent with the table of penalties for Technician Personnel Regulation (TPR) 752, 'Discipline and Adverse

Action', Rule 9b." (Exhibit 19, § 20(g)(*emphasis added*)). Col. McCabe also stated that; "In Utah, this appears to be a case of first impression dealing with a verbal death threat. Examples of other cases talked about physical violence where penalties imposed were less than termination." (*Id.*, § 20(f)).

68. With regard to a negative impact on the efficiency of the Guard, Col. McCabe noted; "The conclusion must be that there was no adverse effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employees ability to perform assigned duties." (*Id.*, § 20(e)). And despite the fact that Col. McCabe found that Petitioner's supervisors considered him a "good employee" and that it was "notable that the technician record (904-1) is devoid of any information that would be considered derogatory to Ronald Menke," Col. McCabe still supported SMS Chapman and Commander Reutlinger's campaign to terminate the Petitioner. (*Id.*, § 20(c) & (d)). The Adjutant General Maj. Gen. Miller tersely concurred with Col. McCabe's decision, without comment on any of the issues. (Exhibit 20).

69. The most significant statement contained within the Adjutant General's decision is; "In accordance with 32 USC 709e(5), '*there is no further administrative review of The* [sic] *Adjutant General's final decision*'." (*Id.*)(*emphasis in original*). The significance of this statement is that the Petitioner has been trying to obtain judicial review of this "final determination" since a copy of it was obtained. After a federal injunction, petitions to two administrative panels, a return to the Adjutant General's Office and two federal lawsuits, the United States is still claiming that Petitioner has not exhausted all of his administrative remedies, and so he appeals to this Board.

70. Whether or not any reasonable trier of fact could have reached the conclusions of the Col. McCabe (and therefore the Adjutant General) by a preponderance of the evidence is exactly the

question which Petitioner has tried to have reviewed for the last five years. The record does not support the conclusion that a credible death threat was made, that regardless of its nature this incident had any appreciable impact on the Utah Air National Guard, or that imposition of a penalty beyond the scope of the regulatory guidelines was justified and necessary to promote the efficiency of the Guard. (*See* Exhibit 43, TPR 752, § 2-19). An injustice occurred because the regulations were not followed from beginning to end. TPR 752 was not issued just to be ignored and the 'Violence in the Workplace Policy' does not require termination upon any allegation made against an employee, or supersede the regulations. (Exhibit 44).

71. But the injustice visited upon Petitioner was not limited to termination from his civilian employment as a technician. On or about November 16, 2005, SMS Chapman forbad Petitioner from entering the premises of the National Guard base. (Exhibit 17, ¶ 9). SMS Chapman knew or should have known that Petitioner had military-related duties and functions on the base that would be adversely affected by his restrictive order. (32 USC § 709). Predictably, exclusion from the base resulted directly in Petitioner being charged with 'failing to obey his military orders' to attend drills on the base and for the 'administrative misconduct action' pending against him. (Exhibit 22, ¶ 2).

72. By September 14, 2000, the charge against Petitioner metamorphosed into "failure to meet Air Force standards of performance and to demonstrate the qualities of leadership required as a Non-commissioned Officer." (Exhibit 21, ¶ 2). The military sanction moved from an intent not to reenlist Petitioner at the end of his term, to non-reenlistable status and an immediate discharge "under other than honorable conditions" [UOTHC] (*Id.*, ¶ 3). Petitioner's 'whistle blowing' and Teinert's allegation of an off-duty, after-hours telephonic threat did not justify

termination of his civilian employment or the loss of his 18-year military career. Yet, Capt. Erickson cited no other cause for instituting Petitioner's harsh military discharge. (Exhibit 21).

73. Here again, the failure to adhere to regulations (this time military regulations) exacerbated the damage started by Petitioner's civilian supervisors. Air Force Instruction 36-3209 § 4.21 states in pertinent part; "[C]ommanders must act IAW (in accordance with) the guidelines and requirements of attachment 2, this chapter, and the chapter applying to the case." (Exhibit 45, AFI 36-3209 § 4.21). Attachment 2 provides; "A member's service may be characterized as UOTHC only if the member is given an opportunity for a hearing by an administrative discharge board or requests discharge in lieu of trial by court martial." (Exhibit 45, Attachment 2 § A2.2.3). Chapter 4 provides; "An administrative discharge board must be offered to the respondent if the recommended characterization of service in the letter of notification is UOTHC." (Exhibit 45 § 4.10).

74. Here, an administrative discharge board appeared to be offered and pursuant to AFI 36-3209 § 4.10.10, Petitioner in fact submitted the request form enclosed with Capt. Erickson's letter of notification; however no administrative discharge board or UCMJ Article 27(b)(1) qualified military counsel was ever provided to Petitioner. (Exhibit 21, § 4.c; Exhibit 23). The private counsel that Petitioner was forced to retain was also not provided with the "assistant counsel" required by AFI 36-3209 § 4.10.2. (Exhibit 45). Petitioner was never offered "formal counseling concerning deficiencies and [] afforded an opportunity to overcome those deficiencies" before the initiation of discharge procedures, as required by AFI 36-3209 § 3.21. (*Id.*). Nor was Petitioner offered the mandatory opportunity at "Probation and Rehabilitation (P&R)" required by AFI 36-3209 § 3.25. (*Id*).

75. Capt. Erickson failed to apply the regulations in AFI 36-3209 but inexplicably took extraordinary steps to discharge the Petitioner at least one day before the 18th year of the Petitioner's military service and its benefits vested. Only a federal injunction prevented this from happening. (Exhibits 27 & 28). In rushing to discharge Petitioner, Capt. Erickson also ignored the Utah Code of Military Justice which states; "[P]unishment may not be imposed under this section on any person subject to this chapter if the person has, before imposition of the punishment, demanded trial by military court in lieu of the punishment." (Exhibit 46, UCA § 39-6-13). Petitioner's request for a hearing before a military discharge board and the appointment of military counsel was also ignored. (Exhibits 21 & 23). Capt. Erickson's unilateral discharge of Petitioner from military service also exceeded the his punishment authority under Utah Code Ann. § 39-6-14(4). (Exhibit 46, UCA § 39-6-14).

76. At the time of his discharge from military service in the Utah Air National Guard Petitioner was not on active duty and was therefore engaged and compensated only as a state military member. Nevertheless, the loss of income and benefits flowing from his military employment is a direct and proximate consequence of the arbitrary termination of his civilian employment as a federal technician. The only grounds referred to by Capt. Erickson for Petitioner's military discharge involved the adverse action against Petitioner's civilian employment and the fact that Petitioner was excluded from entering the base, even to perform his military drills. (Exhibit 21). Aside from this, no other connection between the alleged after-hours, off-duty threat and Petitioner's discharge from military service has ever been offered. No on-duty, military misconduct occurred under Capt. Erickson's command, yet he offered only the conclusory explanation that the alleged threat was "prejudicial to the good order, discipline, and morale within the Air National Guard." (*Id.*; *see also* Exhibit 45, § 3.21.2).

77. Petitioner was on active duty and an federal employee at the time of his demotion from grade E-6 to E-3 in 1996. (Exhibit 2; 10 USC § 802, Art. 2, (a)(3)). Just as occurred with Capt. Erickson's discharge action, Petitioner was denied the due process of a disciplinary board or court-marshal and the effective assistance of qualified military counsel. The Uniform Code of Military Justice (10 USC § 815, Art. 15, (a)), the Utah Code of Military Justice, ANGI 36-2503, and AFI 36-3209 § 4.10 all guaranteed Petitioner this right. (Exhibit 46, UCA § 39-6-13; Exhibit 47; Exhibit 45)

78. Petitioner was on active duty and Col. Hill erred in demoting the Petitioner under ANGI 36-2503, which states; "It will not be used in lieu of disciplinary actions punishable under the appropriate state military code or the Uniform Code of Military Justice (UCMJ) when applicable." (Exhibit 47, ANGI 36-2503(2)). The Utah Code of Military Justice states; "Members of the Utah National Guard or the unorganized militia in federal service are subject to the federal Uniform Code of Military Justice and all federal and state laws pertaining to them, until released back to state control." (Exhibit 46, UCA § 39-6-16). The UCMJ states that it applies to; "members of the Army National Guard of the United States or the Air National Guard of the United States only when in active federal service," "punishment may not be imposed upon any member of the armed forces under this article if the member has, before the imposition of such punishment, demanded trial by court-martial in lieu of such punishment," "any commanding officer may, in addition to or in lieu of admonition or reprimand, impose the following punishments for minor offenses without the intervention of court-marshal . . . reduction to the next inferior pay grade (among others)." (10 USC § 802, Art. 2(a)(3); § 815, Art. 15(a) & (b)(2)(D)).

79. Col. Hill received the repeated demand for a court-marshal directly from Petitioner. Col. Hill then ignored it and personally demoted the Petitioner to a degree greater than that permitted by the UCMJ. (*See* 10 USC § 815, Part 15, (b)(2)). Even Air National Guard Instruction 36-2503, on which Col. Hill erroneously relied for his demotion authority states; "A reduction of three or more grades should be used only in an extraordinary unique case when there appears to be no reasonable hope that the airman will again exhibit the proficiency, leadership, or fitness previously possessed." (Exhibit 47, ANGI 36-2503, Note to Table 3). Col. Hill made no mention of why he did not properly apply the UCMJ or what 'extraordinary' or 'unique' factors or evidence supported the proposition that there was 'no reasonable hope' for Petitioner's rehabilitation to justify a three grade demotion. Col. Hill only referenced Capt. Erickson's "Commander's report". (Exhibit 5).

80. Capt. Erickson's 'Notification of Intention to Demote' (the report) actually called for a four grade demotion but again failed to justify such a severe penalty, as required by the regulations. (Exhibit 6). There is nothing extraordinary or unique about an off-duty soldier becoming intoxicated; except that in this case, the Air National Guard gratuitously provided the alcohol and then punished Petitioner for being intoxicated and keeping the poor company of his fellow intoxicated airmen. (Id., ¶ 2(c)). Capt. Erickson expressed 'serious doubts' about whether Petitioner could be trusted but never asserted that there was 'no reasonable hope' for Petitioner; and within the year was commending Petitioner for his "efforts to support our unit's mission and provide quality service to our customers." (Exhibit 8). Within two years, Petitioner received a service medal. (Exhibit 25).

81. Col. Hill's three-grade demotion due to the so-called 'Italian incident' was to last for a period of five years, at which time Petitioner was to have been restored to his full E-6 grade and

rank. (Exhibit 50). Airman Castagno was punished identically with Petitioner and was in fact restored to his full rank pursuant to their sentence. (*Id.*). The Petitioner was not similarly restored to grade E-6. (*Id.*). Notably, both Castagno and the Petitioner were denied a court-marshal and received the ineffective assistance of LTC Cook as legal counsel, and unsupported three-degree demotion by Col. Hill. (*Id.*). Neither airman was afforded the required opportunity at 'rehabilitation and probationary action.' (Exhibit 47, ANGI 36-2503(2)).

## DAMAGE CALCULATIONS AND PRAYER FOR RELIEF

82. But for the Respondent's wrongful actions against Petitioner's civilian and military positions, Petitioner would still be serving as a Title 32 employee and a member of the Utah Air National Guard. Therefore, Petitioner's losses and damages are ongoing. The following calculations are representative of Petitioner's damages as of the filing of this pleading, and are subject to amendment by the time a final decision is made in this case.

83. While on active duty, Petitioner's pay was mandated by 10 USC § 672 (*renumbered* § 12301). The Petitioner was initially ordered to serve on active duty in Italy as a grade E-6 for a period of 4 weeks, in 1996. The Petitioner was deprived a court-marshal and was recalled to the United States, placed on in-active duty and administratively demoted. Petitioner lost four weeks or $4,800.00 of active duty pay as a direct and proximate result of Col. Hills deprivation of his due process rights under the Uniform Code of Military Justice.

84. Once on in-active duty in Utah, the Petitioner received compensation and benefits as mandated by Congress under 37 USCA §§ 203 & 1009, among others. From April thru December 1996, the difference between Petitioner's in-active drill pay rate for a grade E-6 and a grade E-3 was $7,313.40 plus subsistence for this period. From December 1996 (when Petitioner was promoted to grade E-4) thru December 1998 , the difference between Petitioner's

in-active drill pay rate was $22,341.60 plus subsistence. From December 1998 (when Petitioner was promoted to Grade E-5) thru November 1999, the difference between Petitioner's in-active drill pay rate was $5,032.50 plus subsistence. Assuming that Petitioner never received a promotion from Grade E-6 after April 1996, Petitioner's wrongful demotion to Grade E-3 resulted in a loss of at least $34,687.50 in drill pay up to November 1999.

85. Petitioner was restored to grade E-5 on December 2, 1998. (Exhibit 1). Petitioner was excluded from performing drills as an in-active duty guardsman on or about November 17, 1999. (Exhibit 17, ¶¶ 8-9). Petitioner was not actually discharged from military service until the termination of his enlistment period on or about January 9, 2001. Nevertheless, Petitioner was required to reimburse the Air National Guard for all wages and benefits received after December 1999. (Exhibit 51). Assuming that Petitioner never received a promotion from Grade E-6 after April 1996, Petitioner's demotion has deprived him of at least $40,714.80 plus benefits, from November 17, 1999 thru January 9, 2001.

86. In his capacity as a federal civilian technician the terms of Petitioner's remuneration are contained in 5 USC § 5343(d), 5 CFR Part 532, and DoD Directive 5120.39. (Exhibit 49). Petitioner was placed on 'excused non-duty pay status' from November 17, 1999 through December 21, 1999, whereupon he was terminated. (Exhibit 17, ¶¶ 8-9; Exhibit 18, ¶ 8). Petitioner's military service, on which his civilian employment was contingent, did not expire until January 9, 2001. Petitioner's civilian pay rate as a grade 5 WG-10 was $24.53 per hour, which applied to his regular pay, regular leave, sick leave, and military leave. (Exhibit 49). In addition, Petitioner received $300.00 in insurance and $98.12 in Thrift Savings Plan [TSP] contributions per 2-week pay period. In the 27 pay periods from December 21, 1999 thru

January 9, 2001, Petitioner lost $52,984.80 in regular and/or leave pay. Petitioner lost another $8,100.00 in insurance and $2,649.24 in TSP contributions.

87. Petitioner built an 18-year career in the military and had every intention of continuing his membership in the Utah Air National Guard for another 15 years, until his retirement. Despite his 'reenlistable' status, Petitioner has been denied reenlistment during his numerous attempts to have his discharge reviewed in the ensuing years; which has cost the Petitioner another $180,308.40 or more in in-active duty since January 2001; and another $18,000 in active duty pay. Added to this is at least $262,961.60 in Title 32 civilian wages, $40,200.00 in insurance and $13,148.08 in TSP contributions since January 2001.

88. It is a loss for both the Guard and the Petitioner that his skills are unutilized and that his career has been ruined. In total, Petitioner's wrongful termination, demotion and discharge have cost Petitioner more than $658,554.42 in military and civilian pay and benefits; an amount not nearly offset by his present income, which has averaged $10 per hour. Petitioner has not been able to regain either his military or civilian positions since January 9, 2001. Nor has Petitioner obtained comparable employment in the private sector; only the military has a need for qualified KC 135 mechanics.

89. Petitioner has incurred in excess of $43,182.32 in legal expenses trying to recover both his military and civilian positions. (Exhibit 52). Therefore, Petitioner prays for $701,736.74 in damages and fees, and reinstatement to both his military and civilian positions with the same grade and pay.

## CONCLUSION

90. Twice Petitioner has been charged with disciplinary violations during his long service to the United States, and twice his superiors have denied him the due process to which he was

entitled. While Petitioner appreciates that efficient operation of the armed services requires military discipline and command authority, this did not allow his commanders unfettered discretion to ignore the Uniform Code of Military Justice, the Utah Code of Military Justice, the Technician Personnel Regulations, the Air Force Instructions, and Air National Guard Instructions which applied to this case. When adhered to, these regulations ensure to the individual airman or technician evenhanded treatment, equal protection and due process.

91. In 1996, Petitioner was charged with participating in the theft of a piece of a broken yard ornament that had no value and that no one wanted. Petitioner was wrongfully denied the court-marshal and effective assistance of military legal counsel required by the UCMJ, UtCMJ and the Air Force Instructions. Rather, Col Hill promised these protections, then summarily punished Petitioner more severely than was permitted by the Air National Guard Instruction upon which he based his own administrative demotion authority.

92. These deprivations of due process and equal protection and due process cost Petitioner thousands of dollars in military pay and benefits over the ensuing years. More damaging however was the impact that this incident had on the allegations made against Petitioner in 1999. For several years, Petitioner made reports to his superiors that a particular coworker (Teinert) was intoxicated while working on KC-135 military aircraft; an allegation supported by Teinert's disciplinary record. Less than two weeks after the last such report, Teinert alleged that Petitioner had made a threatening phone call, which of course only Teinert heard.

93. The ensuing investigation was neither instituted nor conducted in accordance with the applicable Technician Personnel Regulations. Contrary to the conclusions of Petitioner's immediate supervisors that there was no evidence that a credible threat had been made, and ignoring the fact that Petitioner had just 'blown the whistle' on Teinert, SMS Chapman

unilaterally determined that an adverse disciplinary action should be taken. Further ignoring Petitioner's immediate supervisors, SMS Chapman erroneously surmised that termination would promote the efficiency of Petitioner's unit. SMS Chapman then ignored all of the applicable regulations to impose a penalty not provided for. The Commander LTC Reutlinger and the Adjutant General merely rubber stamped Chapman's decision after that.

94. Ever since, Petitioner has been trying to get review of the termination order. Quite simply, the record below does not contain sufficient evidence to support the allegation that Petitioner actually directed a credible death threat at Teinert, and no unbiased trier of fact could so find. The occurrence of the threat was presumed and the negative impact on the Guard was imaginary. Even if the allegation were true, neither the Zero Tolerance Policy nor the Technician Personnel Regulations mandate or authorize Petitioner's termination. And, Petitioner's outstanding service record militates against the imposition of such an extraordinary punishment. The loss of his civilian employment has cost Petitioner no less than $316,309.68 in pay and benefits.

95. Like dominos, the action against Petitioner's civilian employment lead to his exclusion from the National Guard base, which in turn lead to allegations that he was failing to perform his military drills and duties. Again, Petitioner asked for and was denied a trial by court-marshal and the aid of military counsel. Once again, the regulations were ignored and an attempt was made to discharge Petitioner under 'less than honorable conditions' and deem him 'ineligible' for reenlistment. Only an injunction from the US District Court prevented the Utah Air National Guard from carrying out this plan.

96. For many years, Petitioner has been bounced from one agency to the next in an effort to find relief or to exhaust administrative remedies. Each time that an agency or review board

refuses jurisdiction over Petitioner's case the Government has maintained that there is yet another that must be tried; the most recent being petition to this Air Force Board for Correction of Military Records. With no procedure for discovery and no disclosure by Respondent, the compilation of the information contained herein has been as exhaustive and comprehensive as the Petitioner could muster under the circumstances. Nevertheless, should the Board require something that has not been provided, Petitioner will promptly respond and supplement this petition as necessary.

NOW THEREFORE, Petitioner respectfully submits this petition and the exhibits attached hereto for the Board's consideration, and prays for reinstatement and damages in the amount of no less than $701,736.74 , or such relief as is within the Board's authority to grant.

DATED this 15th day of December, 2006.

QUINTANA & YORK, PC

[signature]

Scott H. York
QUINTANA & YORK, P.C.
3341 South 700 East
Salt Lake City, Utah 84106
(801) 363-7726 Telephone
(801) 521-4625 Facsimile
shyork@owlservices.net

Attorney for Petitioner
Ronald J. Menke

refuses jurisdiction over Petitioner's case the Government has maintained that there is yet another that must be tried; the most recent being petition to this Air Force Board for Correction of Military Records. With no procedure for discovery and no disclosure by Respondent, the compilation of the information contained herein has been as exhaustive and comprehensive as the Petitioner could muster under the circumstances. Nevertheless, should the Board require something that has not been provided, Petitioner will promptly respond and supplement this petition as necessary.

NOW THEREFORE, Petitioner respectfully submits this petition and the exhibits attached hereto for the Board's consideration, and prays for reinstatement and damages in the amount of no less than $701,736.74 , or such relief as is within the Board's authority to grant.

DATED this 15th day of December, 2006.

QUINTANA & YORK, PC

Scott H. York
QUINTANA & YORK, P.C.
3341 South 700 East
Salt Lake City, Utah 84106
(801) 363-7726 Telephone
(801) 521-4625 Facsimile
shyork@owlservices.net

Attorney for Petitioner
Ronald J. Menke