ORIGINAL

FILED
OCT 2 2007
U.S. COURT OF FEDERAL CLAIMS

# In The United States Court of Federal Claims
# Military Records Correction Board

No. 07-709 C

Ronald J. Menke, Plaintiff

v.

The United States, Defendant

Lower Court No. 2:04-CV-00472 DB
Honorable Judge Dee Benson
District of Utah

---

# APPENDIX TO
# BRIEF OF PETITIONER RONALD J. MENKE

---

Submitted By:

Scott H. York
QUINTANA & YORK, PC
3341 South 700 East
Salt Lake City, Utah 84106
(801) 363-7726 Telephone
(801) 521-4625 Facsimile
shyork@owlservices.net

Attorney for Petitioner

# TABLE OF CONTENTS

EXHIBITS


1. NGB Form 22 - Report of Separation and Record of Service – R.J. Menke
2. Special Order RU-53
3. Acknowledgement or Rights and Possible Trial
4. Affidavit of Rodmund Brown
5. Administrative Demotion
6. Notification of Intent to Demote
7. Letter of LTC Cook – April 19, 1996
8. Memorandum of Captain Paul V. Erickson – July 22, 1997
9. Transcript – Hearing on Appeal of Adverse Action – Volume II
10. Transcript – Hearing on Appeal of Adverse Action – Volume I
11. Incident/Complaint Report
12. Statement of Robert W. Teinert – September 17, 1999
13. Statement of Terry D. Morstad – September 17, 1999
14. Statement of Matthew D. Jensen – September 18, 1999
15. Salt Lake Police Report of Offenses
16. Cease and Desist Order
17. Proposed Notice of Removal
18. Original Decision to Proposed Notice of Removal
19. Findings and Recommendations in Adverse Action Appeal
20. Final Decision Regarding Adverse Action Appeal
21. Notice of Intent to Discharge
22. Notice of Intent not to Extend Current Enlistment Contract
23. Request for Appointment of Counsel and Administrative Discharge Board
24. Supervisor's Record of Technician Employment
25. Military Outstanding Volunteer Service Medal
26. Employee Performance Plan and Evaluations
27. Application for Temporary Restraining Order and Preliminary Injunction
28. Memorandum of Agreement between State of Utah and R.J. Menke
29. Special Order AW-124 – Notice of Discharge
30. Memorandum Requesting Correction of NGB Form 22
31. Denial of Reenlistment Eligibility
32. Correction of NGB Form 22
33. Order of Dismissal
34. Complaint U.S. Office of Special Counsel
35. Office of Special Counsel File No. MA-02-1117
36. Statement of Timeliness and Jurisdiction of Merit Systems Protection Board
37. Merit Systems Protection Board Initial Decision
38. Receipt of Claim
39. Standard Form 95 Claim for Damage, Injury, or Death
40. Adjutant General's Final Determination
41. Stipulated Motion to Stay – U.S. District Court No. 2:04 CV 00472 DB
42. Notification of Personnel Action
43. Technician Personnel Regulation No. 752
44. Zero Tolerance Policy Letter 99-31
45. Air Force Instruction 36-3209
46. Utah Code of Military Justice – Title 39, Chapter 6
47. Air National Guard Instruction 36-2503
48. Special Order AW-76
49. AC-0009R Wage Rate Schedule
50. Statement of Ronald J. Menke
51. Recoupment of Pay and Premiums
52. Affidavit of Attorneys fees and costs


RECEIVED
OCT 2 2007
OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

# EXHIBIT 1

## NGB FORM 22

### Report of Separation and Record of Service

### Ronald Joseph Menke

DEPARTMENTS OF THE ARMY AND THE AIR FORCE
NATIONAL GUARD BUREAU
REPORT OF SEPARATION AND RECORD OF SERVICE

REPORT OF SEPARATION AND RECORD OF SERVICE IN THE [1] Air NATIONAL GUARD OF UTAH AND AS A RESERVE OF THE [2] Air Force
1. Insert either Army or Air 2. Enlisted personnel only - insert only Army or Air Force

1. LAST NAME - FIRST NAME - MIDDLE NAME: MENKE RONALD JOSEPH
2. DEPARTMENT, COMPONENT AND BRANCH: Air Force--ANGUS
3. SOCIAL SECURITY NUMBER: 528641477

4. DATE OF ENL: YR 95 MO 01 DA 10
5a. RANK: SSG
5b. PAY GRADE: E-5
6. DATE OF RANK: YR 98 MO 12 DA 02
7. DATE OF BIRTH: YR 56 MO 10 DA 2

8a. STATION OR INSTALLATION AT WHICH EFFECTED: UTANG, SALT LAKE CITY UTAH 84116-2999
8b. EFFECTIVE DATE: YR 01 MO 01 DA 0

9. COMMAND TO WHICH TRANSFERRED: N/A

10. RECORD OF SERVICE

| | YRS | MO | DAYS |
|---|---|---|---|
| (a) NET SERVICE THIS PERIOD | 06 | 00 | 0 |
| (b) PRIOR RESERVE COMPONENT SERVICE | 07 | 09 | 2 |
| (c) PRIOR ACTIVE FEDERAL SERVICE | 04 | 02 | 0 |
| (d) TOTAL SERVICE FOR PAY | 18 | 00 | 0 |

11. TERMINAL DATE OF RESERVE/MILITARY SERVICE OBLIGATION: YR 00 MO 00 DA 00

12. MILITARY EDUCATION (Course Title, number of weeks, month and year completed)
NCO PREP COURSE CORRESP 90

13. PRIMARY SPECIALITY NUMBER, TITLE AND DATE AWARDED (Additional speciality numbers and titles)
2A651A AEROSPACE PROPULSION
2A531G AEROSPACE MAINTENANCE

14. HIGHEST EDUCATION LEVEL SUCCESSFULLY COMPLETED
SECONDARY/HIGH SCHOOL 12 YRS(Gr 1-12) COLLEGE 00 YRS

15. DECORATIONS, MEDALS, BADGES, COMMENDATIONS, CITATIONS AND CAMPAIGN RIBBONS AWARDED THIS PERIOD (State Awards may be included)
DECORATIONS
CAMPAIGN RIBBONS
AF TRAINING RBN N/A
HUMANITARIAN SV MDL N/A
ARM FORCES SVC MDL N/A
AF LGV SVC AWD 1 N/A
NTL DEF SVC MDL N/A
AFF MRK SVC MDL 1 N/A
AIR RES MDL N/A
MIL OUT VOL SVC MDL 1 N/A
N/A N/A
N/A N/A
STATE AWARDS
UTNG SVC/10EV

16. SERVICEMAN'S GROUP LIFE INSURANCE COV: [X] YES [ ] NO
AMT $ 200,000

17. PERSONNEL SECURITY INVESTIGATION
a. TYPE: NAC SECRET
b. DATE COMPLETED: 911016

18. REMARKS
Blood Type: O Factor: POS
Pay Dt: 830110 EDIGS: 890110 SAT SVC: 160208 DAFSC: 2A671A
AFQT%: 58 AFQT SCR GP: 3 APTITUDE TEST ID: ASVAB IX (CONV 80)
TEST SCORES: ADMIN: 07 ELECT: 62 GEN: 48 MECH: 64

BLOCK 15 CONTINUED:
FOREIGN AWARDS: N/A, N/A, N/A, N/A, N/A, N/A
UNIT AWARDS: AFOUA 1, N/A, N/A, N/A, N/A

AIRMAN DISCHARGED FROM THE 151 LSF BY SO AW-124, HQ UTNG DATED 9 JAN 2001. AD 5 YEARS 2 MONTHS 8 DAYS AS OF AF FORM 526 DATED 14 MAR 2000. RETIREMENT CLOSEOUT DATE 9 JAN 2000.//////////////SEE CONTINUATION SHEET//////////////

19. MAILING ADDRESS AFTER SEPARATION (Street, RFD, City, County, State and Zip Code)
612 NAVAJO STREET
SALT LAKE CITY, UT 84104-2612

20. SIGNATURE OF PERSON BEING SEPARATED: MEMBER NOT AVAILABLE FOR SIGNATURE

21. TYPED NAME, GRADE AND TITLE OF AUTHORIZING OFFICER
KAREN A. WILLIAMS, MSG, UTANG
MILITARY PERSONNEL TECHNICIAN

22. SIGNATURE OF OFFICER AUTHORIZED TO SIGN: [signature]

23. AUTHORITY AND REASON
AFI 36-3209 PARA 3.12.1 EXPIRATION TERM OF SERVICE (ETS) SPD: KBK

24. CHARACTER OF SERVICE: HONORABLE
25. TYPE OF CERTIFICATE USED: NGB FORM 438
26. REENLISTMENT ELIGIBILITY: INELIGIBLE

27. [ ] REQUEST [ ] DECLINE COPIES OF MY NGB FORM 22 INITIALS NOT PRESENT

# NGB FORM 22 CONTINUATION SHEET

1. **Name:** MENKE, RONALD JOSEPH
2. **Department, component, and branch:** AIR FORCE - ANGUS
3. **Social Security Account Number:** 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

4a. **Grade, Rate, or Rank:** SSG

5b. **Pay Grade:** E-5

**Blocks continued:**

18. Remarks: Prior Service:

| Grade | Periods of Service | Branch/Component | Type of Discharge |
|---|---|---|---|
| E-1 | 11 Jan 77 – 28 Feb 77 | USNR | Honorable |
| E-3 | 01 Mar 77 – 08 May 81 | USN | Honorable |
| E-3 | 09 May 81 – 10 Jan 83 | USNR | Honorable |
| E-5 | 10 Jan 89 – 09 Jan 95 | UTANG | Honorable |

//////////////////////////////////////////////NOTHING FOLLOWS\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\

MEMBER NOT AVAILABLE FOR SIGNATURE
(Signature of separating member)

[signature]
(Signature of official authorized)

RONALD JOSEPH MENKE
(Typed name of member)

KAREN A. WILLIAMS, MSG, UTANG
Military Personnel Technician
(Typed name, grade, title)

# EXHIBIT 2

**SPECIAL ORDER RU - 53**

**February 15, 1996**

**Special Order RU-53 - EXHIBIT 2**

DEPARTMENT OF THE AIR FORCE
STATE OF UTAH, MILITARY DEPARTMENT
151 MAINTENANCE SQUADRON/151 AIRCRAFT GENERATION SQUADRON
765 NORTH 2200 WEST
SALT LAKE CITY, UTAH 84116-2999

Personnel Data-Privacy Act of 1974 (5 USC 552a)

SPECIAL ORDER 15 FEB 96
RU- 53

1. TYPE OF DUTY: Deployed Military Personnel Appropriation

2. PURPOSE: DENY FLIGHT

3. ADDRESSING:

TSG MENKE RONALD J, 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, M21LFN5T, SECRET BAS: H
612 NAVAJO STREET, SALT LAKE CITY, UT 84104

4. AUTHORITY/TITLE: You are to perform indicated duty.
(10 USC 672(d), NGR(AF) 50-1, AFR 35-41, VOL 4)

5. ITINERARY: 14 MAR 96 THRU 02 APR 96
Transportation: Mil Acft
From: HOR
To: PISA, ITALY
RETURN TO: HOR

6. REMARKS:
Individual is attached for discipline/administration during the period of training. Home or place from which called to AD and active duty station IS NOT located within corporate limits of same city or town. Mbr WILL NOT commute. Submit travel voucher within 5 working days after completion of travel. Turn in all promotional items, for example gifts, bonus tickets, etc., to the AFO. Lodging receipts required with travel voucher for per diem entitlements. Military uniform will be worn when traveling by Mil/Govt aircraft. Personnel will use Mil/Govt aircraft when available. Variations in itinerary authorized. Medical treatment is authorized IAW AFR 168-6. Variations in itinerary authorized. Deploy with towels, name labels, laundry bag, a padlock for securing personal items, and other items as deemed necessary. Report to the personnel processing facility upon arrival at the employment location. Use of government charge card or automatic teller machine (ATM) for cash advances is NOT AUTHORIZED. Travel advance by AFO is approved. Advance is 100% of authorized and allowable expenses. All members will be billeted off base in contract quarters at NO COST to the individual. Full perdiem authorized due to the non-availability of adequate messing facilities. Deployed personnel are

encouraged to bring sufficient personal items including laundry detergent to last the duration of TDY. Individual will hand carry the following items: ID card, ID tags with chain, current LES, shot records. Members are advised to deploy with a maximum amount of funds possible. ESP CODE: FL. MEAN CODE: 860 MAN-DAY ID: 6IMQF1LEEB WUC: EB UNIT CONTROL #: A96049

7. CERTIFICATION: WUC EB OA: AGS-96-MT-48 [0/20]
Fund Cite: P&A: 5763500 326 510 530 503725
Tvl/PD: 5763840 586 41K4 2221FL 01 409 414601 ESP FL
CIC: 4 P 641 414601

ESTIMATES: TVL: $0.00 PER DIEM: $1820.00 ADVANCE: $1635.00
HOUSEHOLD GOODS: $0.00

OFFICIAL Certifying Official: /S/TSG DUANE G. COPFER/S/

8. AUTHENTICATION:

BY ORDER OF THE SECRETARY OF THE AIR FORCE

/S/OFFICIAL/S/

STEPHEN L. HATCH, MAJ, UTANG
LOGISTICS GROUP COMMANDER

DISTRIBUTION : A

SO RU- 53 151AGS, 15 FEB 96

RU- 53 STATEMENT OF DUTY

I, ______________________________________, (AND circle name above) hereby
(Signature)
certify that I complied with this order.

BAQ VERIFICATION: (Check each item that applies)
( ) Married ( ) Spouse is a military member
( ) Single - No dependents ( ) Spouse was on active duty
( ) Single - With dependents during this tour.

I DID/DID NOT OCCUPY GOVERNMENT/CONTRACT QUARTERS for the following dates (this should include the last day of your tour) :

______________________________________________________________________

______________________________________________________________________

Member reported at ____________________ and was released ________________.
(time and date) (time and date)

I certify that the above ____________________________________

information is correct ____________________________________ ______________
(Signature of Certifying Official) (Date)
(Printed name, grade, and title)

# EXHIBIT 3

## ACKNOWLEDGEMENTS OF RIGHTS AND POSSIBLE TRIAL

ACKNOWLEDGMENT OF RIGHTS UNDER NATO SOFA AND AR 27-50

1. I, RONALD J. MENKE (NAME), E-6 (RANK), 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 (SSAN)

151st ARW, Utah Air National Guard, Salt Lake City, Utah 84116
(UNIT)

__________ (ETS), __________ (DEROS), __________ (PHONE #)

hereby acknowledge that I am being charged by the Italian authorities of Pisa with the offense(~~s~~) of Receiving of stolen goods (Art. 648 of the Italian Penal Code)

as a result of an incident which occurred on 16 March 1996 at Marina di Pisa/Tirrenia (Pisa), Italy.

2. I have also read and understand my rights under NATO Status of Forces Agreement:

(a) To a prompt and speedy trial.

(b) To be informed, in advance of trial of the specific charge(s) made against me;

(c) To be confronted with the witnesses against me;

(d) To have compulsory process for obtaining witnesses in my favor, if they are within the jurisdiction of the receiving State;

(e) If I consider it necessary, to have the services of a competent interpreter; and,

(f) To communicate with a representative of the government of the sending State and, when the rules of the court permit, to have such a representative present at my trial.

WITNESS
Allan F. Martineau (signature)
ALLAN F. MARTINEAU

(signature)
RONALD J MENKE

HQ AESE Form 27-50A
1 Jan 88

3. Understanding my rights and having reviewed the list of competent Italian attorneys of the Bar Association of ______________________, I hereby request to the appropriate authority, in accordance with Chapter 2, AR 27-50, at no expense to me the services of Attorney ________________ ____________________________ to represent me in the above case.

DATE: ________________ ______________________________ (SIGNATURE OF INDIVIDUAL)

WITNESSED BY: ______________________

DATA REQUIRED BY THE PRIVACY ACT OF 1974

AUTHORITY: Art VII, NATO SOFA: Art 19, NATO Status of Forces Supplement Agreement; 10 USC 3012.

PRINCIPAL PURPOSE(S): To notify appropriate US Forces agencies of the occurrence of a concurrent jurisdiction offende (i.e., an offense subject to the criminal jurisdiction of the US Forces and the host state) in order that a request for an attorney may be sent to the appropriate host country authorities and the US Forces contracting officer.

MANDATORY OR VOLUNTARY DISCLOSURE AND EFFECT ON INDIVIDUAL NOT PROVIDING INFORMATION: Disclosure by the individual is not mandatory due to protection against self-incrimination. If individual does not volunteer information, the individual's commanding officer or the liaison officer would have to obtain the information from US or foreign police files.

TSGT MENKE READ THIS DOCUMENT IN MY PRESENCE AND REFUSED TO SIGN. (AFTER I MADE THIS NOTE HE AGREED TO SIGN)

[signature]

ALLAN F. MARTINEAU, MSGT, CETANG
FIRST SERGEANT

2

## ACKNOWLEDGMENT OF NOTICE OF POSSIBLE TRIAL
(AR 27-50)

See Privacy Act Statement on reverse.

| Last name, first name, middle initial | Grade | Service, ID, passport number or SSN |
|---|---|---|
| MENKE, Ronald J. | E-6 | 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 |

Organization:
151st ARW
Utah Air National Guard, Salt Lake City, Utah 84116

1. I have been informed that I may be tried by the competent Italian judicial authorities for the offense(s) of "Receiving of stolen goods" a violation of Article(s) 648 of the Italian Penal Code, which arose out of an incident which occurred at Marina di Pisa/Tirrenia (Pisa) on 16 March 19 96

2. ALLAN F. MARTINEAU, FIRST SERGEANT has explained to me that I may be tried in absentia and convicted of the above offense(s) if I (depart from Italy and) do not return to Italy for the trial. Knowing this, I (do not) wish (to remain for the trial or) to return to Italy for the trial.

3. I hereby authorize the Command Judge Advocate, Livorno AST, Unit 31301, Box 14, APO AE 09613, or his designees, to accept in my name and on my behalf all court orders and summonses connected with the criminal action pending before the Italian courts as well as any and all communications or notices relative to any civil action which might arise out of this incident.

4. I desire to be represented by a lawyer at Government expense in the disposition of the above incident. (Only members of the military service on active duty at the time of the trial can be afforded a lawyer at Government expense.) I hereby authorize the Staff Judge Advocate, USA Southern European Task Force, to select and appoint a lawyer at Government expense to represent me.

5. Future communications or notices may be forwarded to me at following address: 612 So NAVAJO ST SLC UTAH 84104

Above home address may be released to Italian judiciary authorities, upon their request, when required by Italian law and procedures.

TSGT MENKE READ THIS DOCUMENT IN MY PRESENCE AND REFUSED TO SIGN (AFTER I MADE THIS NOTE HE AGREED TO SIGN)

Allan F. Martineau
ALLAN F. MARTINEAU, MSG, UTANG
FIRST SERGEANT

| Witness | Date | Signature |
|---|---|---|
| Allan F. Martineau | 21 MAR 96 | Ronald J. Menke TSgt |

**DATA REQUIRED BY THE PRIVACY ACT OF 1974**
*(5 U.S.C. 552a)*

| TITLE OF FORM | PRESCRIBING DIRECTIVE |
|---|---|
| ACKNOWLEDGMENT OF NOTICE OF POSSIBLE TRIAL | AR 27-50 |

1. AUTHORITY

10 USC 3012

2. PRINCIPAL PURPOSE(S)

To provide convenient means for giving notice of pending criminal jurisdiction in Italian courts to personnel involved and about to depart from Italy.

To make a record of such notice.

3. ROUTINE USES

Information is retained in Foreign Jurisdiction Case File.

SSN is used for positive identification.

Home address is used to notify individual of eventual results of trial in absentia.

Home address may be released, upon request, to Italian judiciary authorities.

4. MANDATORY OR VOLUNTARY DISCLOSURE AND EFFECT ON INDIVIDUAL NOT PROVIDING INFORMATION

Voluntary. Lack of home address may result in failure to advise individual of the outcome of the criminal proceedings. If form is not completed and/or acknowledged a record of the notice given will be entered in the Foreign Jurisdiction Case File.

# EXHIBIT 4

## AFFIDAVIT OF RODMUND BROWN

## April 1, 1996

MFR: 1 April 1996

I, Rodmund G. Brown, spoke with Mr. Campana, the manager of the Continental Hotel in Tirrenia, Italy, in regards to the statue stolen by Det 2 personnel from the Imperial Club in Tirrenia Italy. Mr. Campana contacted the manager of the Imperial Club to convey our concern for the incident. The manager of the Imperial Club was appreciative of our concern and was not worried about the return of the statue.



# EXHIBIT 5

## ADMINISTRATIVE DEMOTION

**June 2, 1996**

**Administrative Demotion – June 2, 1996 - EXHIBIT 5**

UTAH AIR NATIONAL GUARD
HEADQUARTERS 151ST AIR REFUELING WING

01 Jun 96

MEMORANDUM FOR 151ST MPF/DPMA
151ST LG/CC
151ST LSF/CC
IN TURN

FROM: 151ST ARW/CC

SUBJECT: Decision to Demote

1. I have reviewed the case file on TSgt Ronald J. Menke, 151st Logistics Support Flight, and the recommendation of the Commander to take appropriate demotion action.

2. In accordance with (IAW) ANGI 36-2503, I concur with the recommendation to demote TSgt Menke, to the grade of Airman First Class (E-3), for failure to fulfill Non-Commissioned Officer (NCO) responsibilities. A Commander's report is provided.

3. You should take appropriate action to effect the demotion and notify the Airman, in writing, by certified mail, or personal delivery, of the decision. A copy of the demotion order should be provided with the notification.

GORDON J. HILL, Colonel, UTANG
151st Air Refueling Wing/Commander

Attachments:
1. Letter of Notification to Demote
2. Commander's Written Summary
~~3. Commander's Report~~

1st Ind, 151ST ARW/CC Ltr 01 Jun 1996

MEMORANDUM FOR 151ST LG/CC
151ST LSF/CC
IN TURN

2. Demotion action has been accomplished by this office. You should notify TSgt Menke of this decision, and provide him with a copy of the demotion order, in accordance with (IAW) ANGI 36-2503.

BLAINE E. PACE, Major, UTANG
151st Military Support Flight/Director of Personnel

Attachments:
1. Commander's Report
2. Demotion Order

UTAH AIR NATIONAL GUARD
HEADQUARTERS 151ST AIR REFUELING WING

01 Jun 96

MEMORANDUM FOR TSGT RONALD J. MENKE

FROM: 151ST LSF/CC

SUBJECT: Notification of Demotion

1. You are hereby notified of the decision to demote you to the grade of Airman First Class (E-3), for your failure to fulfill Non-Commissioned Officer (NCO) responsibilities, and to uphold the dignity and high standards required of the members of the Utah Air National Guard, at all times, and in all places.

2. The demotion authority has instructed us to demote you effective 02 June 1996. A copy of the demotion order is provided.

PAUL V. ERICKSON, Captain, UTANG
151st Logistics Support Flight/Commander

UTAH AIR NATIONAL GUARD
HEADQUARTERS 151ST AIR REFUELING WING

01 Jun 96

MEMORANDUM FOR THE RECORD

FROM: 151ST LSF/CC

SUBJECT: Commander's Statement

1. Upon examination of the information available to me, including both written and oral statements, from TSgt Ronald Menke, I recommend that he be reduced in rank to the grade of Airman First Class (E-3). His actions while deployed in Italy reflect behavior unbecoming a Non-Commissioned Officer (NCO). He exercised extremely poor judgment and his actions embarrassed himself, the 151st Logistics Support Flight, the 151st Air Refueling Wing, and the Utah Air National Guard.

2. He has expressed, to me, that he recognizes his mistakes, is sorry, and has resolved to regain and improve his reputation with his peers, as well as his supervisors. I commend him for that attitude and expect him to be successful.

PAUL V. ERICKSON, Captain, UTANG
151st Logistics Support Flight/Commander

MEMORANDUM FOR 151 ARW/CC

FROM: 151 ARW/JA

SUBJECT: Proposed Demotion - TSGT Ronald J. Menke

I have reviewed the referenced demotion action and find that there is sufficient evidence to conclude that the subject demonstrated a lack of wisdom and judgment which impinges on his ability to serve as a noncommissioned officer.

JAMES B. TADJE, Lt Col, UTANG
Staff Judge Advocate

STATE OF UTAH, MILITARY DEPARTMENT
HEADQUARTERS UT NG - OTAG
765 NORTH 2200 WEST
SALT LAKE CITY, UTAH 84116-2999

Personnel Data-Privacy Act of 1974 (5 USC 552a)

SPECIAL ORDER
AW - 246

02 JUN 96

TSG RONALD J MENKE, 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, 151 LOG SUP FLT (M21LFN5T), UTANG, 765 NORTH 2200 WEST, SALT LAKE CITY, UTAH 84116-2999 is demoted to the grade of AIRMAN FIRST CLASS (E-3) in the UTANG effective 02 JUN 96. Authority: NGR(AF) 39-30, para 3C. UOR: 02 Jun 96.

# EXHIBIT 6

## NOTIFICATION OF INTENTION TO DEMOTE

## April 13, 1996

**Notification of Intention to Demote – April 13, 1996 - EXHIBIT 6**

# UTAH AIR NATIONAL GUARD

Headquarters, 151 Air Refueling Wing (AMC)

13 April 96

MEMORANDUM FOR TSGT RONALD J. MENKE

FROM: 151ST LSF/CC

SUBJECT: Notification of Intention to Demote

1. You are hereby advised that under the provisions of ANGI 36-2503, paragraph 4.3, I intend to recommend to the Air Commander of the 151st Air Refueling Wing (ARW), that you be demoted, (and possibly separated, pending further investigation), to the grade of Airman (E2), for failure to fulfill Non-Commissioned Officer (NCO) responsibilities.

2. The specific reasons for this proposed action follow:

a. Shortly after midnight on 16 March 1996, in Marina Di Pisa, Italy, you were arrested by the Italian Carabinieri. You were in Italy, in support of Operation Decisive Endeavor. Your blood alcohol level, as measured by a breath analysis, conducted at Camp Darby, was 0.118 percent. The car you had rented had run off the road, crashing and sustaining substantial damage. I have not been able to determine who was driving. A statue, stolen from a night club located next to your hotel, was found in the back seat of the car. The Italian government charged you with the crime of possessing stolen property, and the incident was reported in a local Italian newspaper.

b. The matter came to the attention of the Italian government, the Italian public, the United States Air Force and Army in Europe, and the National Guard Bureau.

c. As a Technical Sergeant, you are expected to have a high level of maturity and good judgment. You must demonstrate these qualities to subordinates in order to effectively function as a Non-Commissioned Officer (NCO) and to maintain proper discipline within your area of assignment. Additionally, I must have confidence in your abilities. When that confidence is lacking, I cannot entrust to you the full responsibilities that belong to an individual of your grade. Your being drunk in public in a foreign nation and having been in possession of stolen property, demonstrates a serious lack of judgment and maturity. Your behavior causes me to seriously doubt that you can be trusted to fulfill the responsibilities of a Technical Sergeant. Your actions have not only embarrassed the Utah Air National Guard, to include your fellow airmen, but they have brought disgrace upon the United States Air Force, as well.

3. Documents that support this action are available for your review should you desire.

4. I direct that upon receipt of this memorandum you acknowledge such receipt on the attached prepared endorsement within 5 calendar days. I will interpret any failure to meet this suspense date as concurrence with my demotion recommendation. You must also decide whether you concur or nonconcur with the proposed demotion. When you have made your decision, initial the appropriate paragraph on the enclosed endorsement accordingly. You may defer making a decision to concur or nonconcur until the next scheduled Unit Training Assembly (UTA) on 04 May 1996, when you may consult with legal counsel as is your right. However, if you seek counsel, your decision to concur or nonconcur must be received by me no later than the end-of-day roll call following the second UTA (4 hour period) on 04 May 1996. The legal counsel assigned to you, and with whom you may confer, is LTC Craig Cook, UTANG. His phone number is (801) 595-2112.

5. If you concur with the proposed demotion, you will be notified in writing of the demotion authority's decision. If there is no response from you, I am authorized to process your case as if you had concurred. If you nonconcur with the proposed demotion, you may present statements in your own behalf. Written statements to support your position will be submitted within 20 calendar days after you respond indicating your decision. If you desire to present oral statements, your request to do so will accompany the nonconcurrence, and a personal interview with me will be scheduled. You may seek military or civilian legal counsel (civilian counsel will be at your own expense) in preparing your oral or written presentation, and counsel may be present during the personal interview. If travel to the personal interview is required, all costs of your civilian counsel will be at your own expense.

PAUL V. ERICKSON, Captain, UTANG
151st Logistics Support Flight /Commander

RECEIPT ACKNOWLEDGED

2 Attachments:
1. Receipt Endorsement
2. Privacy Act Statement

1st Ind.

TSgt Ronald J. Menke

TO: 151ST LSF/CC

1. The paragraph I have initialed below signifies my intent in this matter.

2. Receipt acknowledged; I concur with the proposed demotion action.

3. Receipt acknowledged. I intend to exercise my right to legal counsel at the next scheduled UTA on 04 May 1996. My decision to concur/nonconcur with this demotion action will then be delivered to your office no later than the end-of-day roll call on Saturday. If I decide to nonconcur with the demotion action, in my written response I will advise you whether or not I will provide documentation on my behalf. I further understand that such documentation must be submitted to you within 20 days after the next UTA or it will not be considered. If I fail to return this endorsement within 5 days, you may interpret such failure to respond as concurrence with the demotion action.

RONALD J. MENKE, TSgt, UTANG

# PRIVACY ACT STATEMENT

AUTHORITY: 10 USC 8012, Privacy Act Statement, and 44 USC 3010

PRINCIPLE PURPOSE: To provide you the opportunity to submit information on your behalf or show cause why your demotion is inappropriate.

ROUTINE USE: Information submitted by you will become part of the case file and be used by the demotion authority in the resolution of your case. This information will also be provided to your counselor or interview officer, as appropriate, and reviewed by authorized personnel who have a need to know for official use. A case file of the demotion action (if demotion is approved) will be filed in your Master Personnel Records Group.

DISCLOSURE OF PERSONAL INFORMATION IS VOLUNTARY: Failure to provide information precludes the demotion authority from considering the same on your behalf.

# YOUR UNIQUE POSITION

As military members, you occupy a unique position in society. You represent the military establishment. This special status brings with it the responsibility to uphold and maintain the dignity and high standards of the United States armed forces at all times and in all places. The armed forces must also be ready at all times for world-wide deployment. The fact carries with it the requirement for military units and their members to possess high standards of morale, good order, discipline, and cohesion. As a result, military laws, rules, customs, and traditions; include restrictions to your personal behavior that may be different from civilian life. Members of the armed forces may be involuntarily separated before their enlistment or term of service ends, for reasons established by law and military regulations. Some unacceptable conduct may be grounds for demotion and/or involuntary separation. For example: your disciplinary infractions and discreditable involvement with both civil and military authorities caused: dissent and disruption, while degrading the mission of your unit. This included conduct of a nature that brought discredit upon the armed forces, in the view of the civilian community, your peers, and others.

# EXHIBIT 7

## LETTER OF LTC COOK

## April 19, 1996

Letter of LTC Cook – April 19, 1996 - EXHIBIT 7

LAW OFFICES OF
Craig Stephens Cook
A PROFESSIONAL CORPORATION

3645 EAST 3100 SOUTH
SALT LAKE CITY, UTAH 84109
(801) 485-8123
FAX (801) 485-2925

April 19, 1996

Michael Castagno
Ronald Menke
151 ST ARGW
765 North 2200 West
Salt Lake City, Utah 84116

Gentlemen:

Thank you for faxing all of the additional information that you had in your file. I have had time to review about half of it but will not be able to complete it before I leave for Germany. However, I am taking your files with me and will work on your case there.

In the meantime, I have formally requested that an effort be made to obtain a translated version of the Italian police report and a status as to whether criminal charges have been pressed against you by the Italians. This may take a little time to obtain but it is certainly necessary in arguing your case.

Your commanders have been very careful in charging you with conduct that is most favorable to your position. In other words, they have not charged you with driving under the infuence, resisting arrest, or any of the other allegations that are contained in the military police report. Instead, they are basically charging you with public intoxication and theft. Since you do not dispute the intoxication we must focus on the alleged theft if we are to attack the substance of their claims. It is for this reason that the statue becomes important both for demotion purposes and for any contemplated discharge.

I am getting the feedback that everyone is fairly sympathetic to your plight since you have had good records in the past. Hopefully, we can come to some satisfactory agreement where you will be punished appropriately without any pending threat of losing your technician jobs or other equally severe punishment. Please notify your commanders that I am presently investigating your case and that until we have obtained the information from Italy we cannot proceed with any demotion proceeding. If they have any problem with this delay, please have them contact me directly when I return from Germany on May 3rd.

If any emergency situation occurs while I am gone, please call the above number and follow the directions on the answering machine. I will return your call as soon as I can.

Until I return stay away from beer halls and museums!!

Very truly yours,

Craig S. Cook

CSC:kd

# EXHIBIT 8

## MEMORANDUM OF
## CAPTAIN PAUL V. ERICKSON

**July 22, 1997**

**UTAH AIR NATIONAL GUARD**
**151ST LOGISTICS SUPPORT FLIGHT**
**UTAH ANG BASE 765 NORTH 2200 WEST**
**SALT LAKE CITY UTAH 84116-2999**

22 July 1997

MEMORANDUM FOR SRA Ronald J. Menke

FROM: 151st LG Support Flight/CC

SUBJECT: Punishment Resulting from Actions During Italy Deployment

1. There seems to have been some misunderstanding about your participation in Unit deployment as part of the punishment for your actions while deployed to Italy during 1996. You will not be penalized further for your actions in Italy by the 151st Logistics Support Flight. Your future participation in Unit deployments will be governed by the same guidelines that apply to all members of this Squadron. Mission needs, unit needs, a recommendation of your supervisor and the commander will be determining factors. Participation in deployments of other units will be in response to a request from that unit through the chain of command. The selection of individuals to fill such requests will be made using the same guidelines.

2. I appreciate your efforts to support our unit's mission and provide quality service to our customers. If you have any questions or concerns, feel free to contact me.

Paul V. Erickson

PAUL V. ERICKSON, Capt, UTANG
Commander

# EXHIBIT 9

## HEARING ON APPEAL OF ADVERSE ACTION

**Volume II**

**February 3, 2000**

2-3-00, ADVERSE ACTION OF RONALD J. MENKE II

PAGE 393 SHEET 1

IN RE: THE ADVERSE ACTION OF

RONALD J. MENKE

(VOLUME II)

FEBRUARY 3, 2000

HELD AT THE UTAH NATIONAL GUARD
STATE HEADQUARTERS
12953 SOUTH MINUTEMAN DRIVE
DRAPER, UTAH

REPORTED BY:
RENEE L. STACY, CSR, RPR

PAGE 394

APPEARANCES

FOR MR. MENKE:
FRANK N. CALL
Attorney at Law
701 McIntyre Building
68 South Main Street
Salt Lake City, UT 84101
(801) 532-9909
Fax (801) 363-2420

FOR THE GUARD:
PAUL M. WARNER
United States Attorney
District of Utah
UNITED STATES ATTORNEY'S OFFICE
185 South State, Suite 400
Salt Lake City, UT 84111
(801) 325-3209
Fax (801) 524-5515

HEARING OFFICER:
MICHAEL T. McCABE
COLONEL, MONTANA ARMY NATIONAL GUARD
Executive Officer
Box 4789
Helena, MT 59604-4789
(406) 841-3000
Fax (406) 841-3011

ALSO PRESENT:
RALPH HANS
CAROL ELKINS
RONALD MENKE

RENEE L. STACY, CSR, RPR
(801) 328-1188 394

PAGE 395

INDEX


WITNESS: TSG JAMES K. LOCK

BY MR. CALL . . . . . 405
BY COLONEL WARNER . . . . . 412
BY MR. CALL . . . . . 414
BY COLONEL WARNER . . . . . 416

WITNESS: MSG EDWARD J. WESEMANN

BY MR. CALL . . . . . 418
BY COLONEL WARNER . . . . . 424
BY MR. CALL . . . . . 430

WITNESS: MSG BLAINE ABBOTT

BY MR. CALL . . . . . 432
BY COLONEL WARNER . . . . . 442

WITNESS: MSG CAROL DENSON

BY MR. CALL . . . . . 446
BY COLONEL WARNER . . . . . 449
BY MR. CALL . . . . . 456
BY COLONEL WARNER . . . . . 456

WITNESS: CMS (RET) MICHAEL R. McCOWEN

BY MR. CALL . . . . . 458
BY COLONEL WARNER . . . . . 467
BY MR. CALL . . . . . 473

WITNESS: ROBERTA MENKE

BY MR. CALL . . . . . 478
BY COLONEL WARNER . . . . . 493
BY MR. CALL . . . . . 520
BY COLONEL WARNER . . . . . 522
BY MR. CALL . . . . . 525


RENEE L. STACY, CSR, RPR
(801) 328-1188 395

PAGE 396


WITNESS: RONALD MENKE

BY MR. CALL . . . . . 526
BY COLONEL WARNER . . . . . 592

WITNESS: TSG DALE SHUPE

BY COLONEL WARNER . . . . . 635
BY MR. CALL . . . . . 640
BY COLONEL WARNER . . . . . 647


00121

RENEE L. STACY, CSR, RPR
(801) 328-1188 396

E X H I B I T S

Exhibit No.

1 Violence in the Workplace Policy
2 Proposed Notice of Removal
3 Original Decision to Proposed Notice of Removal
4 Supervisor's Record of Technician Employment
5 Statement of Teinert
6 Statement of Jensen
7 Statement of Morstad
8 Incident Report
9 Salt Lake Police Department report of offenses
10 AirTouch Cellular bill
11 List of citations
12 Bar layout
13 The Douglas Factors
14 Volunteer Service Medal award
15 Proposed Notice of Suspension
16 Employee Performance Plan





February 3, 2000
9:05 a.m.

P R O C E E D I N G S

HEARING OFFICER McCABE: Let's go on the record. This is the second day of hearing in the adverse action regarding Mr. Menke. Both parties for the agency and the appellant present. Mr. Menke is present.

We've had a procedural issue that was discussed off the record regarding whether or not some witnesses would be called to testify. One of those witnesses would be an Elmer M.J. Martinez and the other witness that would be involved is a Master Sergeant Schiele, which is S-C-H-I-E-L-E. It has come to the hearing examiner's attention from the agency that these two individuals are involved in an adverse action that is still pending with a Notice of Proposed Adverse Action having been issued to Mr. Martinez on 20 January 2000. The question has come up as to the appropriateness of having these witnesses testify.

Mr. Call, would you like to articulate your position after you've had an opportunity to look at the Notice of Proposed Adverse Action?





MR. CALL: Based on the representations that were made off the record by the agency that Mr. Martinez currently has a pending proposed notice of suspension that has actually been served upon him, but yet to which he has not yet replied concerning an alleged assault and threat that he made against Roger Schiele, based off that representation and also off the representation that there is no adverse action pending or expected against Mr. Schiele and that Mr. Schiele appears to be the victim in that case, was not at fault in anything that happened, we were planning to call both Mr. Martinez and Mr. Schiele. We don't want to adversely affect particularly Mr. Martinez's rights without the benefit of having counsel here, both in his agency action and in the fact that, since this does involve an assault, there's potentially a criminal action. I think it would be incumbent upon -- if we did call him to testify, that we'd have to warn him of his Fifth Amendment rights not to testify, but based off those representations, we would be willing to stipulate to the admissibility of the proposed notice of suspension on January -- dated 20 January 2000, that the guard has made these allegations again Mr. Martinez and that the proposed adverse action is a





five-day suspension and would stipulate that part of that condition that the actual notice be admitted as an exhibit in this case, that the references in there be listened to, going to the issue of the fairness of the penalty being imposed against Mr. Menke in light of this is a similar circumstance that you could consider determining if the proposed action against Mr. Menke is appropriate.

With that, that would be our stipulation. If that stipulation were accepted, we would not call Roger Schiele and we would not call Mike Martinez to testify.

Also, I need to disclose, before the agency determines whether or not to accept this -- small world -- the officer proposing this adverse action, a Wendy B. Cline, I believe is a client of mine who I represent in a civil matter that is completely unrelated to any Guard activities and so I needed to disclose to you that I do represent her in some business transactions that she has pending, but they have nothing to do with the Guard, nothing to do with this case. That would be our stipulation, if it's acceptable to the agency.

COLONEL WARNER: Well, it's not acceptable, but I think I can propose a counter-stipulation that

may be.

HEARING OFFICER McCABE: Tell me first what's not acceptable so I can keep track of what's okay and what's not.

COLONEL WARNER: Okay. It's not acceptable because part of his stipulation is that it will be used for purposes of determining the fairness and consistency of the punishment or the discipline that Mr. Menke has vis-a-vis these two individuals. It's the position of the agency that it's apples and oranges, that it really is very tangential to what the issue is in this case. So we would object to that.

Now, we recognize that, you know, that's an objection, but, you know, I'm not going to stipulate to its use. I will stipulate to it being submitted as an exhibit, but I reserve the right -- I'm -- when I say "it," I'm talking about the proposed notice of suspension. I reserve the right not to stipulate to the fact that this is somehow appropriate or that it is applicable for the examiner to consider, because I don't think it is appropriate or applicable. It's an apples and oranges issue. This was a situation much different than a death threat made allegedly by Mr. Menke, so, as far as I'm concerned, if counsel would





like to stipulate that this proposed notice of suspension be entered as an exhibit in lieu of the testimony, then I'll stipulate to that and he can argue whatever he wants about it. I reserve the right to argue it, but the way he -- and I object -- by the way, I object to its use. I don't object to its admissibility. I object to its use in the manner in which he described, and I reserve the right to argue that it is, in fact, irrelevant for purposes of determining the appropriateness of the punishment.

MR. CALL: If I hear what counsel is indicating, it sounds like his objection is to the weight of this evidence as to its similarity. I don't have a problem with him being able to argue that the alleged facts in here are different than the ones involving Mr. Menke's case. I don't have a problem with him making argument that these are not similar circumstances.

My only stipulation would be that the hearing examiner would be able to look at this and make that very determination. Are they apples and oranges or are they oranges and oranges.

COLONEL WARNER: Yeah. And I'm willing to go along with that.

MR. CALL: I'm not asking that it be -- you





accept a stipulation that says the facts as set forth in this proposed notice of suspension are identical or just like those in Mr. Menke's. That's for you to decide. I'm not asking for a stipulation on that. Only that there have been these allegations that have been made and that this was the proposed action against Mr. Martinez for this alleged misconduct.

HEARING OFFICER McCABE: Well, as the hearings examiner, exercising the limited authority I have in this matter, I do not intend to listen to testimony from Mr. Martinez, and, very honestly, there was some indication off the record that there might be some potential action against Master Sergeant Schiele. That's being determined. I don't intend to listen to any testimony from him, either, but I will consider the notice of proposed adverse action as for purposes of looking at treatment of what is alleged to be a similar or like offense.

The similarities and likeness I will rule on in terms of the information that's available in the record based upon the 20 January 2000 memorandum from Mr. Martinez, which is Proposed Notice of Suspension. I will consider that and make a ruling on how that would fit as to being similar or dissimilar as a part of my determination.





I think that's appropriate because we can use IPR-752 and this notice of proposed adverse action to determine the nature of treatment in terms of what's alleged, and that's based on the fact that I know, even though this action against Mr. Martinez is pending, the IPR-752 does not allow a deciding official to increase the penalty beyond what has been proposed in the notice of proposed adverse action. So that's how I'm going to take it. I'll admit it. I believe it will be Exhibit 15.

(Discussion off the record.)

HEARING OFFICER McCABE: We will take the unsigned copy as the record document.

MR. CALL: With that, I think you can tell Mr. Schiele and Mr. Martinez that we won't need their testimony.

My first witness that I intend to call is Mr. Lock. And then also one other procedural matter. Yesterday we had talked about Exhibit 10, which is the telephone records. I have no objection to that record coming in. I initially indicated that I may object to that. I have no objection to that.

HEARING OFFICER McCABE: Very good.

(Discussion off the record.)

(Recess.)

LOCK, EXAM BY CALL

TSG JAMES K. LOCK

called as a witness and sworn, was examined and testified as follows:

HEARING OFFICER McCABE: Please be seated and state your full name for the record, please.

THE WITNESS: James Kent Lock.

HEARING OFFICER McCABE: Thank you very much. You may proceed.

DIRECT EXAMINATION

BY MR. CALL:

Q Mr. Lock, my name is Frank Call. I'm the attorney for Mr. Menke, who is -- you know Mr. Menke?

A I do.

Q You know who he is?

A Yes.

Q How long have you been in the Guard?

A I got in this unit May of -- or January of 1990.

Q And how long have you been a Guard member all total?

A That's it. When I got in there.

Q Since 1990?

A Right.

Q What's your current MOS or position?

A Crew chief.





LOCK, EXAM BY CALL

Q Are you a technician or are you AGR?

A Yes, I'm a technician.

Q And you've been a technician -- that same position for the same length of time?

A A year later.

Q Has anybody talked with you about why you're here today?

A No.

Q Nobody from the agency has told you why you've been called to testify?

A No.

Q Nobody has talked to you about the things we're expecting you to testify about today?

A Nothing.

Q I'm going to give you a little bit of an explanation. There's been an adverse action taken against Mr. Menke, and we're here today on a hearing concerning the incident of him making an alleged threat against another employee, and that's an adverse action being taken against him for that.

One of the particular reasons we wanted to talk with you is about an incident to see -- compare similar instances and how similar punishments were meted out in that incident. Do you know a gentleman named Ed Wesemann?





LOCK, EXAM BY CALL

A Ed Wesemann, I do.

Q How do you know him?

A I work with him on the flight line.

Q He a co-worker?

A Yes, he is.

Q Not a supervisor?

A No.

Q A while back you and he got into a physical confrontation that involved some pushing and hitting and maybe some fighting of sorts?

A Correct.

Q When did that occur?

A You know, I don't even remember. You want exact time?

Q What about ball park as far as month?

A Last month. January.

Q January of 2000?

A Right.

Q Tell me what happened.

A Oh, we just -- it was more than a -- it was just a little scuffle. It was all horseplay. We came in in the morning, and evidently I sat in his chair and he made a comment about, "You going to sit in my chair?" And I'm like, "Sorry. I didn't even know you were sitting here. I didn't see your stuff





LOCK, EXAM BY CALL

on the table." He says, "Well, my coat is on the chair." So I just, in jest, I took his coat and I threw it on the floor. It's something we do out there. We always joke with each other.

Q Sure.

A And he proceeded to grab my head and put it between his legs and he was just squeezing my head, stuff -- horseplay we do all the time. And when he let go, I just went to slap at him a little bit to get him to jump, and I guess the tempers flew a little bit, and that was it. And 20 minutes later we apologized and it was over.

Q So tempers were raised, correct?

A Slightly, yes.

Q Any bruises or injuries or marks --

A None.

Q -- when he put your head between his legs; is that correct?

A That is.

Q I guess I can only tell you what I used to call it when I was a little kid. Give you a motorcycle? Is that what they -- where they rub their knuckles over your head or anything like that?

A No, nothing. Just more squeezing your head.

LOCK, EXAM BY CALL

Q So it involved some wrestling around?
A A little bit, yes.
Q And then when you were able to pull your head out from between his legs you pushed him off or --
A I don't know what you want to call this. I guess I went to slap at his genital region, just as a -- and not even hard or anything. And I ended up getting more than I anticipated, and that's when his temper flared for that moment.
Q Okay.
A And that was it.
Q Were you on duty when that happened?
A I was on active duty.
Q And were you at your work site, obviously.
A Yes.
Q Did the Guard take any sort of adverse action against either you or Mr. Wesenann on that incident?
A Yes.
Q What action was taken against you?
A A letter of reprimand.
Q And that was put in your file?
A Yes.
Q Any other action other than that?





LOCK, EXAM BY CALL

A None.
Q And do you know what incident was put in Mr. Wesenann's file?
A I believe he was given one day off without pay.
Q The fight -- the altercation, did that cause a little bit of disruption in the workplace?
A Between him and I or --
Q Between -- who else saw that? Who else was there?
A Everybody. It was at the morning meeting. Every morning at 6:00 we have a meeting and everybody was there.
Q And so it did cause a disruption to the agency proceedings that were happening at the time?
A We hadn't started yet in the morning, so -- it was beforehand, so it hadn't caused a disruption in the flow as far as the supervisors briefing everybody, but --
Q Did you feel the penalty that was imposed against you for that matter was overly harsh?
A I understood that the supervisors had to do something, but I guess the way it was handled maybe was a little questionable.
Q Do you feel that the penalty that was





LOCK, EXAM BY CALL

imposed against you, in other words, the letter of reprimand, do you think that was too harsh?
COLONEL WARNER: Just objection as to relevancy in this matter.
HEARING OFFICER McCABE: Noted.
Q (BY MR. CALL) You can go ahead and answer the question.
A Again, the question.
Q Did you feel that the adverse action that was taken against you, that letter of reprimand, do you think that was overly harsh for the activities that you were alleged to have engaged in?
A No.
Q And do you think that the penalty that was imposed against Mr. Wesenann was overly harsh for the alleged incidents?
COLONEL WARNER: Objection. Same basis. Relevance in our case.
HEARING OFFICER McCABE: Noted.
Q (BY MR. CALL) You can go ahead and answer the question.
A No.
MR. CALL: Nothing further.
//
//





LOCK, EXAM BY WARNER

CROSS EXAMINATION

BY COLONEL WARNER:
Q Sergeant Lock, we appreciate you being here this morning and we're sorry that you have to rehash this, but it's one of those things. Did you ever threaten anyone's life?
A No, sir.
Q Did you ever threaten Sergeant Wesenann's life?
A No, sir.
Q As I understand it, this wasn't even fisticuffs, was it?
A No, sir.
Q This was some pushing, some shoving, some grabbing, some horseplay?
A If that.
Q And while it may have escalated a little bit, no one ever even punched anyone, did they?
A After the action took place, I stepped back, and when he tried to -- as a retaliation kind of thing, he kind of hit the side of my leg, but that was it, and it didn't hurt.
Q All right. And within 20 minutes, there had been apologies exchanged; is that correct?
A Within the hour.

LOCK, EXAM BY WARNER

Q Okay. And acceptance of responsibility?
A Yes, sir.
Q Indeed, as I understand it, Sergeant Wesenann stepped forward like a man who has a responsibility and accepted it, did he not?
A Yes, sir, he did.
Q He stepped up to the plate, so to speak, and said, "Hey, I made a mistake. I was wrong," right?
A Yes.
Q And stepped up and said, "It's all my fault"?
A Yes, sir.
Q "Because I let the horseplay get out of hand"?
A Yes, sir, he did.
Q He was man enough to do that, wasn't he?
A Yes, sir.
Q Okay. And so you two -- this was never -- were you intoxicated at the time?
A No, sir.
Q And was he intoxicated?
A No, sir.
Q So it was really nothing more than a little horseplay that got a little bit out of hand, was





LOCK, EXAM BY CALL

quickly resolved and you people moved on?
A Yes, sir.
COLONEL WARNER: Thank you very much.

REDIRECT EXAMINATION

BY MR. CALL:
Q Just a couple of follow-up questions. You indicated that Mr. Wesenann did throw a punch or a slap to your leg, correct?
A I did.
Q And, in particular, the allegation that you were punished for was for a violation of -- are you familiar with IPR-752 that sets forth the penalties and --
A I probably should be, but I'm -- I can't say that I am.
Q Were you -- was the letter of reprimand -- I haven't seen it and that's why I kind of want to find out exactly what it was that you were being punished for. Was it for hitting, pushing or other acts against another without causing injury? Is that what you were reprimanded for?
A I can't remember the wording. I guess for what took place. If I remember correctly from what the letter of reprimand said, it was much more entailed than what actually happened, so I would have





LOCK, EXAM BY CALL

to say the explanation that the colonel gave me in the letter of reprimand actually did not reflect what happened.
Q Okay.
A But I accepted that to be done with it.
Q You don't happen to have a copy of that with you here, do you?
A I don't. Sorry.
MR. COOK: I'm wondering if the agency might. It might actually speed the process of my questions to him to find out what he was actually charged with.
COLONEL WARNER: Well, we object. We have on the record. I think -- I mean, at some point we get rather tangential, and it seems to me -- we have Sergeant Lock here. He's testified to the incident. He's testified what the punishment is. I think it goes beyond extraneous to the irrelevant to go much further than we have.
MR. CALL: I'm simply trying to determine which regulation he was accused of violating. He's indicated he doesn't know that. It is indicated in his file. That's all I was after. That would give you opportunity to judge whether this is a case of apples and oranges or oranges and oranges if you can





LOCK, EXAM BY WARNER

actually see what he was accused of doing.
HEARING OFFICER McCABE: Will the agency indicate what section he was charged under?
MS. ELKINS: It was issued on the military side, so --
MR. HAWS: It's a different --
MS. ELKINS: I don't know the exact.
HEARING OFFICER McCABE: Okay. So it was under a military status?
COLONEL WARNER: He was on active duty.
MR. HAWS: He was on active duty so it was like an ADSW versus a technician, so they're in different --
HEARING OFFICER McCABE: So that wouldn't have been done under IPR-7 --
COLONEL WARNER: No, sir.
MR. CALL: Okay. That's all we have.

RECROSS EXAMINATION

BY COLONEL WARNER:
Q I have one more question. Sergeant Lock, knowing full well the incident that you were involved in, did you ever feel your life was threatened?
A No, sir.
Q Okay. If Sergeant Wesenann had issued you a threat on your life and you believed that he was

LOCK. EXAM BY WARNER

serious, would you have considered that to be more serious than what happened in this little horseplay incident?

A Definitely.

COLONEL WARNER: Thank you.

HEARING OFFICER McCABE: May this witness be excused?

MR. CALL: He may.

HEARING OFFICER McCABE: You may be excused. As I've instructed other witnesses, this is a serious matter here involving a technician disciplinary matter. If anybody asks you what went on here, I would just indicate to you, tell them that you were asked to testify. Other than that, it's none of their business and the hearings examiner has instructed you to tell them that.

THE WITNESS: Okay.

HEARING OFFICER McCABE: Thank you very much.

(Recess.)

MSG EDWARD J. WESEMANN

called as a witness and sworn, was examined and testified as follows:

HEARING OFFICER McCABE: Would you state your full name for the record, please.





WESEMANN, EXAM BY CALL

THE WITNESS: Edward John Wesemann.

DIRECT EXAMINATION

BY MR. CALL:

Q And could you spell that for the record, too?

A W-E-S-E-M-A-N-N.

Q Mr. Wesemann, my name is Frank Call. I'm the attorney for Mr. Menke. This is Colonel McCabe. He's our hearing officer today. And this is Colonel Warner, who represents the agency. How long have you been in the Guard?

A The Guard? This Guard? Utah Air Guard?

Q Yes.

A I'm approaching 20 years in November.

Q Twenty years in November. What's your current MOS or position?

A I'm an aircraft crew chief for KC-135.

Q And are you a technician or are you an AGR?

A Technician and --

Q Traditional guardsman?

A Traditional guardsman, yeah.

Q How long have you been in your current position as a technician, your current technician position?

A Twenty years. Well, approaching 20 years





WESEMANN, EXAM BY CALL

in November.

Q Has anybody talked to you about why you're here today?

A Just a notice from --

Q Chief Havs?

COLONEL WARNER: Carol Elkins.

THE WITNESS: Carol Elkins. I lost her name there for a minute.

Q (BY MR. CALL) And what did that notice indicate?

A Pardon?

Q With did that notice indicate? What did it say?

A That I was being requested down here as a witness.

Q Did it go into any substantive issues about what was going to be discussed?

A No.

Q What was going to be asked of you, things like that?

A No.

Q Has anybody from the agency talked with you about what you were expected to testify about today?

A No.

Q Let me tell you why we're here. Mr.





WESEMANN, EXAM BY CALL

Menke -- do you know Mr. Menke?

A Sure.

Q Mr. Menke is a former technician who the Guard has initiated adverse action against and terminated his employment with the Guard, and we're here to kind of determine whether or not an appropriate penalty has been imposed against him, among other things. Do you know Jim Lock?

A Yes.

Q And how do you know Jim Lock?

A As a co-worker.

Q Okay. He's a co-worker. Not a supervisor?

A No.

Q Okay. And a while back, you and he got into a physical confrontation that involved some pushing and some hitting and some shoving, correct?

A Well, I wouldn't say that's correct.

Q Tell me what happened.

A I'd call it nothing more than horseplay. It was interpreted by a third party as a violence occurring.

Q Tell me about what -- a recount of what happened during the incident.

A It was an issue over a chair. I'd got up to get a cup of coffee and he took my chair, and so

WESEMANN, EXAM BY CALL

It developed into a kind of a grab ass thing.
Q Were you on duty at the time that happened, your employment duty?
A Yes.
Q And it happened in the work site?
A Yes.
Q And apparently you came back to a chair and Mr. Lock was in your chair, correct?
A Right.
Q And you asked him to get out of your chair, correct?
A Let me see what exactly was said. I said, yeah, "You're sitting in my chair," something to that effect.
Q And at one point he took your coat, apparently, that was on the chair and threw it on the ground?
A No.
Q Do you ever recall anything like that happening where he took your coat and threw it on the floor?
A I had my coat on the back of the chair, and one of the other guys, he said -- I can't even remember what the discussion was. He said, "Why is this your chair," or something -- "How do you





WESEMANN, EXAM BY CALL

determine that this is your chair?" And there was a third guy that said, "His coat's right there." And -- you know, just a grab ass thing.
Q Okay. Do you recall Mr. Lock grabbing your coat and throwing it on the floor at any time?
A No. That didn't happen.
Q At that point, did you grab him and pull him out of the chair?
A No.
Q Did you put his head between your legs?
A He bent over to -- I'm not sure. He bent over to -- he ignored me. He bent over to tie his shoes or something, and yes, I clamped my legs around -- over his head.
Q And he tried to push you away, correct?
A Yeah. He was scuffling around. I had a cup of coffee in my hand and I said, "Let's cool down because I'm going to spill my coffee here."
Q And then he was able to push away, and when he pushed away, he kind of slapped at you, didn't he?
A He struck me in the groin.
Q And that made you angry, didn't it?
A Well, like I say, it was horseplay. It was like being -- snowball fighting. If you get hit in the head, you get a flash of temper.





WESEMANN, EXAM BY CALL

Q But isn't it true that you got angry, and at that point everybody kind of said, hey, settle down?
A No.
Q What happened after that, then? Did you try and hit him in the leg after he struck you in the groin?
A No. He got up and left the chair.
Q He didn't try to -- or, excuse me, you didn't try and hit him after he hit you in the groin?
A No. I sat down in the chair at that point.
Q Okay.
A He's off to my right. And I struck him in the groin back, and asked him, "How does it feel?"
Q When did that occur? Do you recall what month?
A November.
Q Of '99?
A Yes.
Q Did the Guard take adverse action against you?
A They gave me a day off without pay.
Q Did your supervisor allege that you had engaged in violence in the workplace?





WESEMANN, EXAM BY WARNER

A He had me come in to -- gave me notice that he's entering it in my personnel file. That's the first I heard about it.
Q Okay. But when they took that suspension, you were being suspended for engaging in violence in the workplace, correct?
A Right.
Q Was that under the zero tolerance policy that the Guard has enforced?
A That's what he explained, yes.
Q Let me show you what's been marked as Exhibit 1, and that's the -- do you recognize that as the zero tolerance policy that I'm referring to?
A Right.
MR. CALL: No further questions.

CROSS EXAMINATION

BY COLONEL WARNER:
Q Sergeant Wesemann --
A Yes, sir.
Q -- just a few questions. And we appreciate you taking your time to be here today. First of all, you have characterized this as horseplay.
A Yes.
Q And, in your opinion, it was nothing more than that?

WESEMANN, EXAM BY WARNER

A Yes.
Q You never threatened Sergeant Lock, did you?
A No.
Q And you never threatened his life, in particular, did you?
A No.
Q And he never threatened your life, did he?
A No.
Q In terms of the range in the spectrum of violence, if we can use that term, horseplay versus a threat, a serious threat on one's life, do you see a difference there? If someone made a serious threat against your life, would you consider that more --
A I'm sort of in a cloud as to what they have called violence, because it certainly blindsided me on this.
Q In terms of horseplay?
A Yes.
Q Right. But I'm asking you, do you see a difference between what you were engaged in and someone making a threat on one's life? If someone threatened your life and you took that threat seriously, would that be more serious than what you were engaged in?





WESEMANN, EXAM BY WARNER

MR. CALL: Object to the form of the question. He has asked three questions and hasn't let him answer either one of them yet.
HEARING OFFICER McCABE: If you understand the question, you can answer it. If you'd like to have it rephrased, you have the option to ask Colonel Warner to ask the question again.
THE WITNESS: I understand what you're getting at and it -- when you're dealing with -- this is my opinion. When you're dealing with a bunch of males, there's a lot of testosterone flowing sometimes, and depending on what the pressure is and the situation is, if it was clear-cut straight across the board, somebody that I didn't know come up and threatened me, yes, I would take it as a violent act.
Q (BY COLONEL WARNER) I'm not talking about a violent act. I'm not talking about violent. I'm talking about what's more serious, the horseplay that you were involved in, the grab ass, as you call it -- and I appreciate that term, because when I was in the navy 20 plus years ago, I heard a division officer once tell the guys in ranks, "Quit grab assing and skylarking," and I've never forgotten it, and so I understand exactly what you're talking about.





WESEMANN, EXAM BY WARNER

But you described what you were involved in as horseplay, right?
A Yes.
Q Nobody was intending to hurt anybody?
A No.
Q Now, if someone made a serious threat on your life, would that be more serious than the horseplay that you were involved in?
A Yes.
Q Thank you. Now, you stepped up relatively quickly, within the hour, and apologized for that incident to Lock, and I understand he exchanged an apology with you. Is that correct?
A Yes.
Q And I also understand, Sergeant, that you were man enough to step up and accept full responsibility for the incident with the Command; is that correct?
A Yes.
Q And you did so because you realized that, in your position of responsibility out there, that, irrespective of the horseplay nature, that someone ought to step up and accept responsibility for their conduct, and you did so?
A I stepped up for the reason to get this





WESEMANN, EXAM BY WARNER

thing pushed aside and to focus on the real problem of our leadership and management.
Q And you did indeed step up and accept responsibility for the --
A Yes. In order to push it aside and stay focused on the ball, on the problem.
Q And that was resolved relatively quickly once that was done; is that correct?
A This issue?
Q Yeah. The issue that you were involved in out there.
A This issue was resolved in January, toward the end of January. I wouldn't call that expeditious.
Q I didn't say "expeditious." I said "relatively quickly."
A I wouldn't say quickly, either.
Q I said "relatively quickly."
A I wouldn't say relatively quickly.
Q Okay.
HEARING OFFICER McCABE: Would you say it was resolved?
THE WITNESS: It's still -- as far as my issue of leadership and management, we'll see. I still see recurring problems.

WESEMANN, EXAM BY WARNER

Q (BY COLONEL WARNER) Well, we're not talking about leadership and management. We're talking about the horseplay incident. Okay? You may have issues with the management of the Air Guard, and there will be another day and another opportunity for you to vent your spleen on that, okay? But this hearing isn't designed -- we're already a bit far afield, okay? This hearing really isn't about you or your concerns with the Air Guard management.

A Right, right.

Q But the fact of the matter is that you did step up, accept responsibility, and it's been dealt with?

A Yes.

Q And in your personal opinion -- because it sounds to me like -- if I'm wrong here, you just tell me, but it sounds to me like you think it was such a minor incident in terms of horseplay, in your mind, that management even blew it out of proportion?

A Yes. I agree.

Q Because it was -- you and Lock are probably pretty good friends, aren't you?

A Yes, we are.

Q I mean, you get along?

A Sure.





WESEMANN, EXAM BY CALL

Q And from your point of view, this was -- you never, as an example, intended to hurt him in any way?

A No.

Q So it was just a relatively minor incident of horseplay?

A Yes.

COLONEL WARNER: Thank you.

REDIRECT EXAMINATION

BY MR. CALL:

Q Let me ask you just a couple of follow-up questions. You're friends with Jim Lock?

A Yes.

Q If he would have called you on the phone after that incident and said, "I'm going to kill you," because of that incident, would you consider that horseplay, too?

A I wouldn't consider it serious.

Q Okay. And that's based off of your knowledge of Jim, correct?

A Yes.

Q And your friendship with him, correct?

A Yes.

Q And, in your opinion, it would be overly harsh to terminate him for doing that?





WESEMANN, EXAM BY CALL

A Yes.

Q Wouldn't you think?

A Yes.

MR. CALL: Nothing further.

HEARING OFFICER McCABE: Anything further?

COLONEL WARNER: No.

HEARING OFFICER McCABE: You may be excused as a witness. As I've instructed other witnesses, this is a serious matter. If anybody asks you about being here and testifying, you can indicate that you were asked to testify. Other than that, just simply tell them the hearings examiner has instructed you not to say anything further. Thank you very much.

(Recess.)

MSG BLAINE ABBOTT

called as a witness and sworn, was examined and testified as follows:

HEARING OFFICER McCABE: State your full name for the record, please.

THE WITNESS: Blaine Luis Abbott.

HEARING OFFICER McCABE: And is that L-O-U-I-S?

THE WITNESS: L-U-I-S.

//

//





ABBOTT, EXAM BY CALL

DIRECT EXAMINATION

BY MR. CALL:

Q And your last name?

A Abbott, A-B-B-O-T-T.

Q Mr. Abbott, my name is Frank Call. I'm Mr. Menke's attorney. This is Colonel Paul Warner, who is representing the agency. This is Colonel McCabe, who is our hearing office today. How long have you been in the Guard?

A Thirty-five years.

Q What's your current MOS or position?

A Do you want the actual number? 2B799.

Q And what kind of position is that?

A It's structural maintenance supervisor.

Q You're currently assigned to the Guard base out at the airport?

A Yes, sir.

Q Are you a technician or are you an active duty guard --

A Technician.

Q You're also a traditional guardsman, then?

A You have to be.

Q And your current position, how long have you been in that position?

A Since about '89.





00130

ABBOTT, EXAM BY CALL

Q And through your employment as a technician, you're familiar with Bob Teinert, correct?
A Yes, sir.
Q How do you know Bob?
A From the NCO Club; from just working with him, because we work together. It's all maintenance. All maintenance works together.
Q And do you know Mr. Menke?
A Yes, sir.
Q Let me call your attention to the night of September 17th, 1999. Do you serve sometimes as a bartender at the NCO Club?
A Not really as a bartender. I'm more of a -- I'll go in there and tend bar till the bartender shows up. I do. I used to tend bar all the time, but I gave it up.
Q You frequently come in and open up the club and wait till the full-time bartender comes in, correct?
A Yes, sir.
Q And on the day of September 17th, which was a Friday, 1999, you had occasion to go in and open up the club and --
A For a party.





ABBOTT, EXAM BY CALL

Q What time did you arrive at the club?
A I really don't know. I'm assuming probably around 3:00; 3:30.
Q And was Mr. Teinert in the club?
A I can't honestly say yes or no to that, because I can't remember. It was a long time ago.
Q That's fine.
A He could have been or he could not have been. I don't remember.
Q Do you recall him come -- seeing him in the NCO Club?
A He was there.
Q When was the first time you recollect him being in the club, that you recognized?
A I don't remember. He was just sitting there watching television.
Q Okay. Was he drinking?
A He was probably there -- he was probably there when I got there, but I'm not sure.
Q Was he drinking?
A Yes, sir.
Q And you were there tending bar waiting for the bartender, the normal bartender to replace you?
A Yes, sir.
Q Who is that normal bartender?





ABBOTT, EXAM BY CALL

A I think -- I'm not sure if it was -- I'm a little bit nervous.
Q That's okay. We understand.
HEARING OFFICER McCABE: Relax. None of us bite.
THE WITNESS: It was either Sherri or Darren. I'm not sure which one it was.
Q (BY MR. CALL) Sherri or Darren Lindsay?
A Yes.
Q And while you were waiting for Sherri or Darren Lindsay to come in, you noticed that Ron and Birdie -- are you familiar with Roberta Menke?
A Oh, yes.
Q And you know that they refer to her as Birdie?
A Oh, yes.
Q Ron and Birdie entered the club about seven o'clock, didn't they?
A I'm saying that's probably about -- yeah, probably about 7:00. 6:30, 7:00, as I remember.
Q And when they came in and sat down, you served them drinks?
A No, sir. The bartender was there.
Q Did you indicate to Mr. Menke that you were glad the bartender was -- let's back up. What time





ABBOTT, EXAM BY CALL

did the bartender show up?
A Oh, I don't know. Probably around 5:00.
Q Okay.
A I'm just -- you know, that was a long time ago. Memories get pretty bad.
Q Okay. Did you indicate to Mr. Menke on that evening that you were glad that the bartender had arrived because Bob had been on one all day?
A I could have.
Q You could have said that? Do you recall saying something to that effect?
A I don't recall saying it, but I could have.
Q Do you recall Mr. Teinert being obnoxious while he was there in the club, bothering some of the guests?
A He probably was. If he had been there for a while, he probably was.
Q Had you seen him do that on prior occasions?
A Yes, sir.
Q On the prior occasions when you saw him there, tell me what his --
COLONEL WARNER: Objection as to relevance.

ABBOTT, EXAM BY CALL

HEARING OFFICER McCABE: Noted.
Q (BY MR. CALL) On the prior occasions that you saw him there, tell me about his demeanor in the bar when he's in the club drinking. What's his normal demeanor?
A Depends on how many he's had.
Q Okay. Let's -- if he hasn't had much to drink, what is he like?
A He's the nicest guy in the world.
Q And if he's had some drinks, what is he like?
A He changes.
Q How does he change?
A He gets boisterous, overbearing, sometimes mean.
Q Does he become aggressive?
A Sometimes.
Q Begin using foul language?
A I've never really thought of Bob as using foul language a lot, no.
Q What kind of things -- I guess the question is: What do you consider foul language? He'll swear occasionally, won't he?
A Oh, yes, but doesn't everyone? But he doesn't -- like some of the kids today go on and use





ABBOTT, EXAM BY CALL

the F word over and over and over and over. I've never heard him do that.
Q But you have heard him use it on occasion?
A Oh, yes.
Q His language would be salt and peppered, I think is what they might --
A I guess. Whatever that means.
Q Did Bob appear to be intoxicated that evening?
A Yeah. I'd say probably was on his way.
Q And that leads you to the conclusion that he was probably being obnoxious and overbearing, as you indicated?
A Yeah.
Q What time did you leave?
A I didn't leave too much -- too long after Ron and Birdie showed up, so I'm estimating I probably left around 7:15, maybe 7:30, because I'd been there for quite a while myself.
Q Can you remember any interaction between Bob and Ron prior to the time you left?
A No, because, as I remember -- this is one thing I do remember, for some reason, He walked behind me. I said hi to him. Walked down on the end of the bar where the TV is, and it was about that





ABBOTT, EXAM BY CALL

time when I left.
Q Okay.
A I went down and said good night to the bartender and I went home.
Q Let me show you what's been marked as Exhibit 12, and you see there's a figure that's green that's got an indication of "Bob" by it.
A Okay.
Q Is that where Bob was sitting when you left?
A Uh-huh. He was -- yeah. He was -- yeah. That's where he always sits, anyway.
Q Okay. And you see the indication of "Ron"?
A Uh-huh.
Q Is that where Ron was approximately sitting when you left?
A To be honest with you, I don't know. If he was there -- I don't know. I don't remember.
Q On prior occasions have you ever seen Bob become aggressive towards Mr. Menke?
A Yes, sir.
COLONEL WARNER: Objection. Relevance.
Q (BY MR. CALL) Tell me about those instances.
A Well --





ABBOTT, EXAM BY CALL

COLONEL WARNER: Objection. Relevance.
HEARING OFFICER McCABE: Noted.
COLONEL WARNER: And I think if he's going to do this, I would object for no foundation. I'd like to know when in time, place and so on.
HEARING OFFICER McCABE: I would concur with that. We'd like to be specific so that we have some idea as to the facts, circumstances and sequencing.
Q (BY MR. CALL) How many instances do you think you've seen Ron -- or, excuse me, Bob become aggressive or obnoxious towards Mr. Menke?
A Oh, I couldn't say because I don't know. I can't give you specifics.
Q Could you give me a ball park number? Is this something that frequently happens, infrequently? It's common? I don't want to put words in your mouth, but just kind of give me a ball park.
A Many times it would depend on both the attitude of Mr. Menke and with Bob Telnert. Actual fisticuffs, I never seen that. There was always words. Not all the time. Sometimes there would be -- I'm going to say it. Maybe I shouldn't. But these individuals have had a love-hate relationship for years.

ABBOTT, EXAM BY CALL

Q You recognize that they're friends, correct?
A Yes, sir.
Q And you recognize that their friendship has strains, as all friendships do from time to time?
A Yes, sir.
Q Are you familiar with the phrase, "Mind your P's and Q's," or words to that effect?
A Oh, yes, sir.
Q How are you familiar with that?
A I don't know. That's something I've heard all my life, mind your P's and Q's.
Q Have you ever heard Mr. Menke use that phrase?
A I don't know if I have or not.
Q It's a phrase that bartenders frequently use to mean mind your pints and quarts, correct?
A I don't know. I've just always heard it to mean be good.
Q Mind your business?
A That may be where it came from. I don't know. Yes, sir.
MR. CALL: That's all I have.
//
//





ABBOTT, EXAM BY WARNER

CROSS EXAMINATION
BY COLONEL WARNER:
Q Sergeant Abbott, we appreciate you being here. I've got just a few questions for you.
A Yes, sir.
Q You frequent the club, apparently.
A Yes, sir.
Q There was nothing special about September 17th?
A No, sir.
Q In your mind?
A Other than it was a Friday and it was a party, private party. In fact, sir, I wouldn't even know the date unless you told me.
Q And there was nothing that occurred on the evening of September 17th between the time you arrived at the club, which you're not even sure of, but sometime maybe around 3:00 or 3:30, until the time you left the club, which you're not sure of, but sometime around 7:00 or 7:15?
A Yes, sir, thereabouts.
Q Nothing particularly unusual happened in there, did it?
A No, sir.
Q There was no altercations or --





ABBOTT, EXAM BY WARNER

A Not that I seen.
Q -- anything that got your attention?
A Not that I seen.
Q Nothing that Teinert did or said that got your attention?
A Well, I tend to ignore Bob Teinert.
Q I understand, but nothing that particularly got your attention that stands out in your memory, apparently.
A Not that stands out in my memory, no.
Q And nothing that Sergeant Menke did or said --
A Well, wait a minute. Let me back up just a minute, sir. I did just remember something. At that time, the TV we had belonged to Mr. Teinert and it was an old JVC with the speakers that come out the side. Well, in order to sit in front of it, as he is in this exhibit, you had to have it so loud that nobody in the bar could even -- you couldn't even think to yourself, it was so loud. And he was doing that. He was down there and he had that TV very loud.
Q What time was that?
A Oh, I wouldn't know. That was probably -- sometime while I was there. Probably maybe 5:00 or





ABBOTT, EXAM BY WARNER

6:00. I'm guessing.
Q And at the time, were there a lot of people in the bar?
A It was -- the party was just barely starting to come in.
Q I'm not talking about the party. I'm talking about at the bar.
A Oh, no. There was hardly anyone at the bar. A few.
Q So he was basically watching television by himself at the end of the bar?
A Yes, sir.
Q Now, Sergeant Abbott, you qualified virtually everything you said with "probably," because, quite frankly, it's a fact, isn't it, you don't have any specific recall?
A No, I don't. The 17th -- was it September?
Q Uh-huh.
A Was what, four months ago?
Q Yeah. I'm not -- it's not a criticism. It's just -- we're trying to ascertain what your recall is. You don't recall anything about that night, specifically, do you, in terms of the questions that you were asked?

ABBOTT, EXAM BY WARNER

A Not really.
Q Okay. And so when you say he was probably intoxicated, you don't know, do you?
A No.
Q When I say "he," meaning Telnert or Menke.
A No, sir.
Q And you say that if he got intoxicated, then he probably could have been obnoxious, but you don't have any specific recall of that, do you?
A Not of that night, no, sir.
Q And you don't know anything that happened in the club after 7:15 that night because you left?
A Yes, sir.
Q And so anything that may have happened between Menke and Telnert from 7:15 up through, say, 11:00 p.m., you have no knowledge of?
A No, sir.
Q And so, really, you can't really tell us very much at all from firsthand knowledge or memory of what happened in that club on the 17th, can you?
A No, sir.
COLONEL WARNER: Thank you.
MR. CALL: Nothing further.
HEARING OFFICER McCABE: You may be excused as a witness in this case. As I've indicated to





DENSON, EXAM BY CALL

other witnesses, this is a serious matter. If anybody wants to know what's going on here, what you testified about, just simply indicate that you've been instructed by the hearings examiner not to discuss the matter.
THE WITNESS: Yes, sir.
HEARING OFFICER McCABE: Thank you very much.
(Recess.)
MSG CAROL DENSON
called as a witness and sworn, was examined and testified as follows:
HEARING OFFICER McCABE: Please be seated and state your full name for the record, please.
THE WITNESS: Carol Lee Denson.
HEARING OFFICER McCABE: Thank you very much. Mr. Call, you may proceed.
DIRECT EXAMINATION
BY MR. CALL:
Q Hi, Carol. My name is Frank Call. I'm Mr. Menke's attorney. This is Colonel Warner. He is representing the agency. And this is Colonel McCabe. He's our hearing officer from Montana. How long have you been with the Utah Guard?
A Fifteen years.





DENSON, EXAM BY CALL

Q And what's your current MOS or position?
A AFSE analysis.
Q And do you work at the -- are you a technician or --
A Yes.
Q -- AGR?
A Technician.
Q So are you full time up there?
A Yes.
Q In that position. And you work at the air base at the Salt Lake Airport, correct?
A Yes, adjacent to the airport.
Q How long have you been in your current position there?
A Five years, three months.
Q And you're familiar with Mr. Menke, correct?
A Yes. We work together.
Q And you're familiar with Robert Telnert, correct?
A Yes. I work with him, also.
Q Did you happen to be on the base on the day of September 17th, 1999?
A Yes.
Q Which is a Friday. Were you working that





DENSON, EXAM BY CALL

day?
A I was on active duty.
Q You were on active duty that day. Are you familiar with the kind of vehicle that Mr. Telnert drives?
A Yes. He drives a Ford truck, gray.
Q And isn't it true that you had an occasion to see that truck parked at the NCO Club at about noon?
A 12:30 to be exact.
Q On Friday?
A On Friday.
Q Any reason why that sticks out in your mind?
A Well, Ron was out there, too, and we were walking through -- probably driving, because I don't walk to anywhere on that base, and I just happened to look at the club, over at the club, which is -- and I said to Ron, I said, "Ron, there's Bob's truck. It's at the club." And then I looked at the watch. I said, "It's just 12:30." I said, "Don't you find that unusual?"
Q And Mr. Menke was on active duty, also, wasn't he?
A I thought he was on drill makeup, but --.





00134

DENSON, EXAM BY WARNER

Q Okay. But he was with you at that time?
A He was with me.
MR. CALL: That's my last question.
HEARING OFFICER McCABE: Let me ask a question again. You thought that Mr. Menke was on active duty that day?
THE WITNESS: No. I thought he was on drill status. I was on active duty.
HEARING OFFICER McCABE: Thank you very much. Questions, Colonel?

CROSS EXAMINATION

BY COLONEL WARNER:
Q Just a couple questions, Sergeant Denson, you saw Teinert's truck?
A Yes, sir.
Q Or what appeared to be Teinert's truck; is that correct?
A I saw Bob Teinert's truck, right.
Q I mean, you didn't check the VIN or any of that, but it appeared to be his truck?
A Okay. Yes, it appeared to be his truck.
Q And it was parked in front of the club?
A Where it always is parked, backed in, usual parking space, yes.
Q But you didn't go in the club, did you?





DENSON, EXAM BY WARNER

A No, I didn't go in the club.
Q So you don't know where Bob Teinert was, do you?
A No, I don't.
Q You don't know if he was in the club or anywhere else on the base at the time?
A No.
Q So you are sort of making an assumption here, to say the least, that he was in the club?
MR. CALL: Objection. I never indicated or questioned her if she knew if he was in the club. Only that his truck was in the front of the club.
COLONEL WARNER: So what? I mean, I can go into anything I want here, can't I?
HEARING OFFICER McCABE: I'd certainly indicate that I can't figure out why you'd be talking about that, unless to imply --
MR. CALL: Just that his truck was there. I wasn't asking her to testify if she knew where he physically was.
HEARING OFFICER McCABE: But you're asking me, as a hearings examiner, to draw the conclusion that where the truck is, that is where Mr. Teinert was.
MR. CALL: The reason I'm -- if you're





DENSON, EXAM BY WARNER

interested, the reason I'm asking this is this goes to Mr. Teinert's credibility. He indicated that he was at home with his truck at home and didn't get to the club until three o'clock.
HEARING OFFICER McCABE: I understand that, too.
MR. CALL: So it's more of a credibility thing that I was offering that for.
HEARING OFFICER McCABE: Well, go ahead, Colonel.
Q (BY COLONEL WARNER) Were you making an assumption that he was in the club?
A I was making an assumption I was surprised to see his vehicle parked at the club because Bob Teinert's truck is only in two places on that base, at the engine shop or parked at the club.
Q That's your opinion?
A That's what I've observed for ten years.
Q Okay. And so if he happened to go anywhere else, he would never park his truck anywhere but at the club or --
A That's true.
Q At least that's your knowledge?
A That I've been aware of, yes. When he was at work, his truck was always parked at the engine





DENSON, EXAM BY WARNER

shop. He drove an engine shop van. From that point, from when he got off work, the truck was driven over every day to the club.
Q What I'm saying is this is all based on the best of your knowledge?
A Based on what I -- yes, what I saw that day.
Q What you've observed?
A Right.
Q Now, how would you describe your relationship with Teinert?
A Great.
Q Okay. And how would you describe your relationship with Sergeant Menke?
A We're friends.
Q In fact, your husband was involved in an incident in Italy with Teinert?
A I thought I was here to talk --
MR. CALL: Objection. Relevance. Let me make -- I'm objecting to the question. It's not relevant.
HEARING OFFICER McCABE: I'm going to allow it.
COLONEL WARNER: It goes to bias.
Q Your husband was involved in an incident in

DENSON, EXAM BY WARNER

Italy with Sergeant Menke; is that correct?
A Yes.
Q And was disciplined?
A Okay.
Q And your husband is currently under some disciplinary action with the Guard right now, is he not?
A I guess you'd have to ask my husband that.
Q No. I'm asking you.
HEARING OFFICER McCABE: Are you aware whether or not your husband is under any disciplinary action?
THE WITNESS: Yes, I am aware of it.
HEARING OFFICER McCABE: Is he?
THE WITNESS: I -- like I'm going to state one more time, you want to know anything about my husband, you need to talk with him.
COLONEL WARNER: Well, then I move to strike her entire testimony. If she refuses to answer a question, I think her entire testimony should be struck.
MR. CALL: Your Honor, I think that would be overly harsh.
COLONEL WARNER: That's the standard.
MR. CALL: If she can testify about the





DENSON, EXAM BY WARNER

issues -- he's involving an issue that is currently pending against --
COLONEL WARNER: I'm not asking the nature of --
MR. CALL: Let me finish my objection, please. He's asking questions about ongoing actions against him, just like with Mr. Schiele, and the concern about testifying about those matters and protecting his interests. I think if she -- she can testify about the things in her personal knowledge that she knows about, and we'd ask her to testify about those things, but if he wants her to testify about what does your husband think, what is this, I don't think that's appropriate to ask her because she wouldn't have the basis of that information.
COLONEL WARNER: I'm not asking that at all. I'm asking a simple question that goes to her bias, and the bias -- and the question is: Isn't it true that your husband is under disciplinary action from the Air Guard right now? We're not going to into the details of it. We're not going into the action, the proposed action. It's just a fact. Now, if she chooses not to answer, we move to strike her testimony.
THE WITNESS: I said yes, he is.





DENSON, EXAM BY WARNER

MR. CALL: I think she did answer that. Now he's going beyond that.
HEARING OFFICER McCABE: I think we're a getting a little argumentative on this. I'm just going to simply indicate that what's good for the goose is good for the gander, and in this case, bias and credibility have been an issue, and that's an issue with every witness that's here, and so I'm going to allow both sides the opportunity to address that.
As far as I understand it, the question has been asked and answered relating to he is under some disciplinary action at this point. I will indicate to the witness that an argumentative behavior with me does not do much for your credibility with me as a hearings examiner.
THE WITNESS: I was just instructed --
HEARING OFFICER McCABE: Ma'am, I'm just telling you how I react as a human being when somebody refuses to cooperate in a hearing I'm conducting.
THE WITNESS: Okay. I will cooperate with you and answer anything you want, but I will also state that I was told that I cannot answer anything about what's happening to my husband.





DENSON, EXAM BY CALL AND WARNER

HEARING OFFICER McCABE: I understand.
THE WITNESS: So that's all I'm saying. I am not really free to say anything.
COLONEL WARNER: We're not trying to get into the details. Indeed, I have no further questions.

REDIRECT EXAMINATION

BY MR. CALL:
Q Only one follow-up question. The alleged incident in Italy didn't involve Mr. Teinert, correct?
A No, it did not.
Q And is your testimony here today at all biased in favor of Mr. Teinert over Mr. Menke?
A No.
Q And you've been honest in your answers concerning the questions that I asked you?
A Totally.
MR. CALL: Nothing further.

RECROSS EXAMINATION

BY COLONEL WARNER:
Q Well, just a follow-up. Actually, the incident in Italy isn't alleged inasmuch as there was official action taken on it; isn't that true?
MR. CALL: Objection as to the basis of her

DENSON, EXAM BY WARNER

knowledge of whether or not action was taken and whether that was militarily or employment.

Q (BY COLONEL WARNER) Was any action taken -- any disciplinary action taken on your husband for the incident in Italy?

A Yes.

COLONEL WARNER: Thank you.

MR. CALL: Nothing further.

HEARING OFFICER McCABE: You may be permanently excused as a witness. What I would indicate, as I've told other witnesses, if anybody asks you what went on here today, you have -- I would instruct you to simply respond the hearings examiner has said please -- I'm not at liberty to discuss it.

THE WITNESS: Okay. I will do that.

HEARING OFFICER McCABE: Thank you very much for appearing here and testifying. Why don't we take a ten-minute break.

(Recess.)

CMS (RET) MICHAEL R. McCOWEN

called as a witness and sworn, was examined and testified as follows:

HEARING OFFICER McCABE: After a break, we'll go back on the record.

HEARING OFFICER McCABE: Will you state





McCOWEN, EXAM BY CALL

your full name for the record, please.

THE WITNESS: It's Michael Ray McCowen.

HEARING OFFICER McCABE: Thank you very much. Mr. Call, you may proceed.

DIRECT EXAMINATION

BY MR. CALL:

Q Mr. McCowen, as you know, my name is Frank Call. I'm the attorney for Mr. Menke. This is Colonel Warner. He's the attorney for the agency. And this is Colonel McCabe. He's our hearing officer here today.

You previously worked for the Guard, correct?

A That's correct.

Q How long did you work for the Guard?

A Well, for the Utah Air National Guard, I was there, I'd say, about 20 years.

Q Twenty years?

A Well, I started there in 1984, so whatever that -- and retired in '99, so about --

Q And you just recently retired from that position, correct?

A I did.

Q The Utah Air National Guard?

A Yes.





McCOWEN, EXAM BY CALL

Q And you retired on October 9th, 1999; is that correct?

A That's correct.

Q At the time of your retirement, what position did you hold?

A I was the engine shop supervisor.

Q And in that position, you were Mr. Menke's second --

A Second line supervisor.

Q And you were also Mr. Teinert's second line supervisor, correct?

A That's correct.

Q Isn't it true that on various occasions during last year, Mr. Menke reported to you that Mr. Teinert might be drinking on the job? Going to the NCO Club and drinking on the job?

A He did mention that to me a few times, yes.

Q How many times do you recall him last year mentioning that to you?

A Oh, I wouldn't know for sure how many. I would say three or four times, probably.

Q When was the most recent that you recall? Do you recall what month that was?

A Not exactly.

Q Could that have been -- excuse me. Were





McCOWEN, EXAM BY CALL

you done?

A Maybe September.

Q Maybe September. Okay. And how long had you been Mr. Teinert's second line supervisor?

A Ten years.

Q And, in fact, you previously reprimanded or suspended, I believe, Mr. Teinert for drinking on the job, correct?

A That's correct.

Q Did you ever approach Bob and talk to him about whether he was drinking on the job again after Mr. Menke mentioned this to you?

A I did ask him about it a few times.

Q And how did he respond to those?

A That he was not drinking. He was at the club taking care of his fish.

Q Okay. Did you make any report of that, any written report of that?

A No.

Q To document that you had talked with him about that?

A No.

Q Now, you're aware that there was apparently an incident in the NCO Club on September 17th, 1999 between Mr. Teinert, who was there, and an alleged

McCOWEN, EXAM BY CALL

death threat that Mr. Menke is being accused of making to him, correct?
A I'm not aware it was a death threat, but I'm aware of an incident, yes.
Q On the Monday -- that was a Friday. On the Monday following, did you have an opportunity to talk to Bob about that incident?
A Bob did come in and tell me that there was an incident that had occurred at the club Friday.
Q At no time did Bob mention a death threat, did he?
A No.
Q He just mentioned a threat; isn't that true?
A That's true.
Q He didn't say it was a death threat?
A No.
Q When you were talking with him, he indicated it was more of an argument, as you understood it, correct?
A When it was first brought to my attention, I assumed that's what it was, was just an argument between Ron and Bob.
Q You assume that. Did you assume that based off of the things that Bob had told you?





McCOWEN, EXAM BY CALL

A Just what Bob was telling me.
Q More of a verbal dispute than anything else, correct?
A Yes.
Q Did Bob appear to be in apprehension of any harm from Ron at the time he was talking to you?
A No. He didn't express that there was any fear. He was probably a little uncomfortable, but no real fear.
Q So from your conversation with him, he didn't express that he was afraid of Ron?
A No.
Q He didn't say, "Ron is going to kill me"?
A No.
Q "I fear for my safety"? He didn't say anything like that, correct?
A Huh-uh.
Q After September 17th, when this alleged threat took place, you didn't notice any noticeable impact in the engine shop, correct, from that event?
A No, other than just maybe there was a little bit of uncomfortableness, but both of them performed their assigned tasks.
Q So it was business as normal?
A Pretty much.





McCOWEN, EXAM BY CALL

Q And Mr. Teinert was able to continue with his duties and fulfill them? The alleged threat didn't have any impact on that, did it?
A No.
Q And the alleged threat didn't have any impact on the way that Mr. Menke was performing his duties, did it?
A No.
Q And you've rated Mr. Menke's performance over the years, haven't you?
A I have.
Q Isn't it true that he's been a good employee for you?
A Yes, he's a good employee.
Q And isn't it true that you rate him, on a scale of one to ten, probably about an eight on that scale?
A I would say that. It's hard to rate people, but he's one of the better employees as far as performance goes, yeah.
Q Good mechanic, also?
A He's a good mechanic.
Q Very skilled with the computer system that they use over there in the shop?
A Oh, yes.





McCOWEN, EXAM BY CALL

Q And to the point when you retired on October 9th, there was no noticeable disruption to the normal affairs of the shop after that alleged threat, were there?
A No.
Q And during that period of time, from the alleged threat to the point that you retired -- because I'm assuming you stopped going to work at that point. Correct?
A When I retired, I did.
Q I hope they didn't keep you there after you retired.
A I did quit going to work.
Q Some habits die hard.
A I've got some pictures that I refer to once in a while, but --
Q During that period of time, you didn't notice any -- you didn't observe any sort of fights or arguments between Ron or Bob, did you?
A No.
Q There were no attempts by Mr. Menke to inflict any sort of harm on Mr. Teinert, were there?
A No.
Q You didn't notice any notoriety about the event at that point, did you?





00129

A Not really.
Q At that time, you didn't see this alleged threat as having anything to do with the employment, did you?
A No, I didn't.
Q And that was because it happened off hours?
A Out of the work area.
Q And it wasn't in the work area, correct?
A Right.
Q And do you remember a meeting that you had with Colonel Reutlinger where you were asked to make a recommendation about your -- what you thought should happen because of the alleged threat?
A I do remember that.
Q And isn't it at that point that you recommended that he not be terminated?
A It is what I recommended.
Q In your experience working out there as a supervisor, is it important for you as a supervisor in supervising your employees that your employees have the perception that the Guard is fair to the technicians?
A Oh, of course, it is.
Q Is it important that the employees feel that their employer won't take unfair actions or







arbitrary or capricious actions against one of them as opposed to another, correct?
A Could you say that again?
Q In other words, it's detrimental to have your employees thinking that the Guard, as its employer, acts arbitrary in different circumstances, correct? In other words, fairness is important to them, correct?
A Sure, it is.
Q And it improves their morale if they believe they have a fair employer, correct?
A That's correct.
Q Isn't it true that you think it would be unfair to terminate Mr. Menke's employment based off of the information you have about this case?
A I definitely think it would be unfair.
Q Do you think that unfairness would create a perception among employees out there in the shop that perhaps the Guard is being a little bit overly harsh here?
A Yes.
Q And that would be detrimental to the workforce out there, wouldn't it?
A It would.
Q Have you ever heard the phrase, "Mind your







P's and Q's"?
A Sure.
Q As you understand it, that means mind your business, correct?
A Right.
Q Does that sound like something that Ron might say?
A It sounds like something that we might all say.
Q So it wouldn't strike you as odd that he said that, perhaps?
A No.
MR. CALL: Okay. I have nothing further.

CROSS EXAMINATION

BY COLONEL WARNER:
Q Mr. McCowen, thank you for taking some time to be here today.
A Sure.
Q First of all, let's clarify a couple things. You were not in the club on the night of the 17th, were you?
A I was not.
Q And so you have no personal knowledge, firsthand personal knowledge of anything that happened in the club that night, do you?







A No.
Q You weren't there. You didn't observe anything, you didn't see anything, you didn't hear anything?
A No.
Q So everything that you know about this incident between Teinert and Mr. Menke is secondhand? You're hearing it from either Teinert or from Menke or from other people involved, correct?
A That's correct.
Q And the fact of the matter is, you don't have all of the facts at your disposal, do you?
A No.
Q And so all of the opinions that you've offered here today are based on the limited amount of information that you have and from the perspective of those that have told you that information; is that correct?
A That's correct.
Q All right. And as for the fairness or the unfairness of the decision, would you agree that, while it is true that you may perceive a decision to be unfair, that if additional facts were there that you're not aware of, that indeed the decision might be very fair?

McCOWEN, EXAM BY WARNER

A I don't know that -- I guess I don't know what fair is. If it occurred through — no. I don't think it would be fair.
Q Okay. So there's no set of facts -- let's just make sure we understand. There is no conceivable set of facts in this circumstance that you could ever determine that terminating Mr. Menke would be fair; is that right?
A Say that again. You mean if I had -- sure, I might be able to be given some facts that would -- that I would say yeah, that would be fair.
Q In terms of the circumstances surrounding this incident?
A It would depend on the facts.
Q Exactly. And so what I'm saying is that, based on your limited knowledge of the facts, since you have no firsthand information, you've determined that you thought the termination was unfair?
A Unfair.
Q And I'm saying, but it's also possible, isn't it, that if perhaps you had additional or other information, that opinion might change?
A Well, I don't know what additional information. I guess maybe if facts came out that he made the threat and was picked up with a weapon on





McCOWEN, EXAM BY WARNER

his way to Bob's house, yeah, maybe I would say it is.
Q That's the point I'm thinking, is that there could be additional facts that you may not be aware of that may change your opinion?
A Yeah. Right.
Q Now, you say that you don't know the details of this threat, do you?
A No, I don't.
Q Because Teinert didn't give you the details of the threat?
A No.
Q He just indicated that there had been a threat?
A Right.
Q And you didn't even know for sure that it was a death threat, did you?
A No, I did not.
Q Is that a serious threat, a death threat?
A A death threat, it is.
Q And if someone threatened your life, would you take that seriously?
A I would take that seriously, sure.
Q And would that make you feel uncomfortable?
A Yeah.





McCOWEN, EXAM BY WARNER

Q You indicated there was some uncomfortableness in the shop.
A Well, sure there is, but not only in that instance, but there's -- I mean, there have been other people in the shop that have had arguments and it creates an uncomfortable situation at any time.
Q Sure. I understand that. Indeed, you've argued with Mr. Menke in the shop, haven't you?
A Uh-huh.
Q And that's been uncomfortable?
A That's uncomfortable. I've argued with him in my position. I've argued with all the employees in the shop. I don't know that I'd call it an argument. It's more like a discussion between a supervisor and a worker and a difference of opinion.
Q Well, okay. Have you ever had an argument with Sergeant Menke, aside from a discussion? Have you ever had an argument where, say, either one of you raised your voice?
A Yes.
Q Okay. How many times?
A Oh, I don't know.
Q Well, make a ball park --
A Two or three.
Q Okay. And that obviously made people





McCOWEN, EXAM BY WARNER

uncomfortable in the shop.
A Sure, it did.
Q Now, you understand here that this disciplinary matter has nothing to do with performance; is that correct?
A Yeah. That's to my understanding, yes.
Q We're not talking about whether he's a good jet engine mechanic.
A Uh-huh.
Q We're talking about whether or not he made a death threat. You understand that?
A Right.
Q So whether he's the best mechanic in the world or whether he's the lousiest isn't what we're trying to get to in this hearing. Do you understand?
A I understand.
Q Now, in terms of its impact on the organization, I appreciate your opinion, and obviously you're entitled to it, but you're also looking at it from the standpoint of a manager in the engine shop, right?
A Yes.
Q With six employees?
A Yes.
Q And you're bringing that perspective to

McCOWEN, EXAM BY CALL

this hearing, correct?
A Correct.
Q You're not talking about from the perspective of the entire Air National Guard because you don't speak for the Air National Guard, do you?
A No.
Q You only speak for -- with the impact in that little shop area?
A Uh-huh.
Q And I think it would be fair to say that, while you say it made people a little uncomfortable, that kind of an incident, a death threat between employees, has to have a morale impact, don't you believe?
A A death threat does, sure.
Q And that certainly can have an impact on the workplace. Would you agree with that?
A I agree with that.
COLONEL WARNER: All right. Thank you very much.

REDIRECT EXAMINATION

BY MR. CALL:
Q Mr. McCowen, you recognize that there's a wide range of death threats, correct?
A That's correct.





McCOWEN, EXAM BY CALL

Q And there's a wide range of -- some death threats are not even credible, correct?
A Sure.
Q For instance, if you were to have gotten in an argument with Bob, you got into a verbal argument, and later on, say, for instance, he was intoxicated and called you and said, "I'm going to kill you," you wouldn't take that seriously, would you?
A It would depend on a lot of circumstances. I suppose I might.
Q Exactly, but it's going to depend on -- it's based on a lot of things. Your circumstances, your knowledge of who it is, your relationship with that person. It's a subjective thing, right?
A Uh-huh.
Q A death threat -- all death threats aren't equal, correct?
A I'd hope not. My brothers have threatened to kill me.
Q And you didn't take those seriously, did you?
A No, I didn't.
Q Because of your relationship with him?
A Because I knew him. That's right.
Q And so, because there's a wide range of --





McCOWEN, EXAM BY CALL

variety of death threats and their severity, isn't it true that some of those you would feel that termination would be the appropriate remedy, and others, maybe a letter of reprimand would be more appropriate, correct?
A Correct. I agree with that.
Q You've indicated that on occasions you've had some raised voice discussions with Mr. Menke, correct?
A That's correct.
Q And that's common anywhere you work, correct?
A I would like to think so.
Q Okay. In fact --
A I would like to think so, but I wouldn't like to think that it's just me.
Q But you've noticed it among other employees under your supervision over the years? You've noticed that they butt heads occasionally, correct?
A Occasionally.
Q It's human nature, right?
A I've butted heads with some of the other employees, too.
Q And at the times that you've kind of butted heads with Mr. Menke, he's demonstrated an ability to





McCOWEN, EXAM BY CALL

put that behind him and continue on with the business of the Air Guard, correct?
A Sure.
Q Doesn't hold a grudge?
A No.
Q He's able to basically be rehabilitated from that standpoint and continue on with kind of the bumps that come along in our employment lives, correct?
A Uh-huh.
MR. CALL: Nothing further.
COLONEL WARNER: No questions.
HEARING OFFICER McCABE: Mr. McCowen, you may be excused as a witness in this case. On behalf of the Utah National Guard and me as a hearings examiner and not part of the Utah National Guard, I'd like to thank you very much for being here and devoting some time to being present. As I've instructed other witnesses, if it's the case that anybody asks you what went on here, I would request that you simply reply that this is a serious matter, you've been instructed not to discuss it. Thank you very much.
(Discussion off the record.)
(Recess.)

McCOWEN, EXAM BY CALL

HEARING OFFICER McCABE: Let's go on the record. There was a discussion held while we were off the record on a procedural matter where an offer of proof was made by appellant's counsel, Mr. Call. This is a document for a Card No. 395, Salt Lake Air National Guard, Club Membership Application, involving one Matthew Jensen. As the hearings examiner, as I indicated off the record, the reason I am not going to admit this as extraneous and cumulative. The fact of the matter is, it is being offered as to call into question Mr. Jensen's testimony relating to the fact that Mr. Jensen was underage and was in an establishment, the club, where he should have been 21 years of age to consume alcohol, and the hearings examiner will consider that in terms of weighing the credibility of the witness without the necessity of this document.

MR. CALL: Your honor, could the record also reflect that the certification does indicate that he is, in fact, certifying that he is over the age of 21 and there appears to be a signature on it?

HEARING OFFICER McCABE: It's noted for the record.

MR. CALL: Thank you. Our next witness would be Roberta Menke.





ROBERTA MENKE, EXAM BY CALL

ROBERTA MENKE

called as a witness and sworn, was examined and testified and follows:

HEARING OFFICER McCABE: You may be seated. Would you please state your full name for the record, please.

THE WITNESS: Roberta Eleanor Haverly Menke.

HEARING OFFICER McCABE: Do you want to spell Haverly so we make sure we have it right?

THE WITNESS: H-A-V-E-R-L-Y.

HEARING OFFICER McCABE: Thank you very much. Mr. Call, proceed.

DIRECT EXAMINATION

BY MR. CALL:

Q Mrs. Menke, my name is Frank Call. As you know, I'm your husband's attorney. This is Paul Warner. He's the attorney for the Guard. And this is Colonel McCabe. He's our hearing officer today. You're frequently known by the name Birdie, correct?

A Yes.

Q First name is Roberta?

A Roberta.

Q But you go by Birdie, correct?





ROBERTA MENKE, EXAM BY CALL

A Yes.

Q What would you like me to call you?

A Birdie.

Q Where were are you currently employed?

A Galvantin Groomer.

Q What do you do there?

A Groom dogs. Self-employed.

Q You're married to Ronald Menke, correct?

A Yes, uh-huh.

Q How long have you been married to Mr. Menke?

A Almost 19 years.

Q And you live here in Salt Lake, correct?

A Yes.

Q Let me call your attention to September 17th, 1999, a Friday. Did you have occasion to visit the NCO Club at the air base where your husband works?

A Yes.

HEARING OFFICER McCABE: I'd ask that you speak up.

THE WITNESS: Oh. Yes. Sorry.

HEARING OFFICER McCABE: I'm a little difficult on the hearing sometimes.

THE WITNESS: I'm soft-spoken. I'll talk





ROBERTA MENKE, EXAM BY CALL

louder.

HEARING OFFICER McCABE: And probably a little nervous, I would assume.

THE WITNESS: Yes, I am.

HEARING OFFICER McCABE: Well, relax, take a deep breath and then talk loudly, please.

Q (BY MR. CALL) You had a chance to visit the NCO Club on September 17th, 1999, correct?

A Yes.

Q What time do you think -- who did you go with to the club?

A My husband, Ron.

Q What time do you think you got to the club?

A Somewhere around seven o'clock.

Q And when you entered the club, who else was there, to the best of your recollection?

A Bob and Blaine.

Q When you refer to Bob, were you referring to Bob Teinert?

A Yes, Bob Teinert. And Blaine Abbott.

Q Do you know Bob Teinert?

A Yes.

Q How long have you known Bob Teinert?

A Probably about four or five years. Maybe longer.

ROBERTA MENKE, EXAM BY CALL

Q And as you understand it, he's friends with your husband, correct?
A Yes.
Q And he's a co-employee, correct?
A Yes.
Q And has Mr. Teinert ever been out to your house that you know of before?
A Oh, yes.
Q And when you speak of Blaine, would that be Blaine Abbott?
A Yes.
Q At the time that you entered the club, did Mr. Teinert appear to be intoxicated?
A Yes.
Q Could you tell us, did he appear to be very intoxicated, slightly intoxicated? What would be your description of how intoxicated he was?
A Intoxicated, where he was obnoxious a little bit, to that point.
Q Was he being loud?
A Just -- I can't explain how he is, but you know when he's drunk.
Q Okay. You'd seen him drunk on other occasions, correct?
A Uh-huh.





ROBERTA MENKE, EXAM BY CALL

Q And when you came into the club, was he drinking?
A Yes.
Q And where did you and Mr. Menke sit when you came into the club?
A The end of the bar.
Q Let me show you what's been marked as Exhibit 12, which is a diagram of the bar, and you see an indication of a figure that's labeled "Ron"?
A Uh-huh.
Q Is that about where you and Ron were sitting?
A Yes. He was sitting there and I was sitting there. Right in there, yes.
Q And then you see the green figure labeled "Bob"?
A (Witness nods.)
Q Is that about where Mr. Teinert was sitting?
A That's his seat in the bar.
Q He's frequently there on the other occasions when you've been to the bar?
A Yeah. That's where he usually always sits.
Q At one point while you were there at the





ROBERTA MENKE, EXAM BY CALL

club with your husband, did Mr. Teinert approach you and Mr. Menke and begin making harassing and annoying comments?
A Yes.
Q And he appeared drunk to you at that point?
A Yes.
Q And his voice was elevated?
A (Witness nods.)
THE REPORTER: Yes?
THE WITNESS: Yes.
Q (BY MR. CALL) Do you recall the specific comments that he was making to you and Mr. Menke?
A Not really. I was just trying to ignore him because I didn't, you know, want him bugging me.
Q Okay. So you weren't actively engaged in a conversation with him yourself?
A No.
Q And how many times did that occur throughout the evening?
A Oh, I can't say the exact number, but it seemed like every time -- there was a few other people that came in and we were talking to them and he just -- you know, sitting on the other end of the bar, kept butting in the conversation and being obnoxious and like --





ROBERTA MENKE, EXAM BY CALL

Q Okay. In the various comments that he made when he would interject things into the discussion, did you hear him use vulgarities?
A A few times.
Q Including the word "Fuck"?
A Yes.
Q And at another point shortly before you left the club, Mr. Teinert again approached your husband Ron, correct?
A Yes.
Q And again be making obnoxious comments to him, correct?
A Yes.
Q And in response to those comments, what did your husband say, as best you recollect?
A Well, he said -- I heard, "Fuck you, Ron," "Fuck you, Bob," and it just kept going back and forth.
Q At that point you were getting ready to leave the club, correct?
A Yes.
Q In fact, before Mr. Teinert had come over the last time, you and Mr. Menke had discussed leaving the club, correct?
A Yes.

ROBERTA MENKE, EXAM BY CALL

Q And what did Ron say about why he wanted to leave the club?
A He was -- he had enough of Bob and it was time to head home. And we were talking about calling our son and we didn't want to call him too late in the evening.
Q Okay. And, in fact, at that point Ron had asked you if you felt you were okay to drive home?
A Yes.
Q Correct? And what did you respond to that?
A I said, "Well, I think maybe we should just call Mark."
Q Okay. And so did you get up to go use the phone to call Mark?
A Yeah. I went down to the end of the bar and got a glass of water and was getting ready to call Mark when -- that's when all the commotion came to a head, and he came over to me and -- "It's time to leave."
Q So you were down at the end of the --
A End of the bar. That's -- the phone is around the corner at the end of the bar.
Q So not at the end that Bob was sitting at, but the other end?
A No; the other end.





ROBERTA MENKE, EXAM BY CALL

Q That's when Ron and Bob exchanged the words where they were using the vulgarities back and forth?
A Yes.
Q And at that point Ron came up to you and said, "It's time to go," correct?
A Yes.
Q And had you actually called Mark at that point?
A No, I hadn't yet. I said I wanted to finish drinking my water, and he was -- I says, "Okay," you know, "what got him so upset?" And he kind of was explaining stuff, and before he finished, he had a tap on the shoulder, and it was security.
Q And what did Ron tell you that Bob had been telling him?
A Well, he says, "I'm going to get you kicked off the board. You're not in the unit no more. I got the key to the club. Nobody is going to get in unless they get a key from me." Just, you know, things that agitated.
Q Okay. And you indicated that he was tapped on the shoulder at that point, and that was by the security forces, correct?
A Yeah.
Q And the security forces took Ron out into





ROBERTA MENKE, EXAM BY CALL

the lobby and had a conversation with him, correct?
A Yeah.
Q And you remained there in the bar, correct?
A Yes.
Q So after the security forces came and took Ron out into the lobby, you remained in the bar, correct?
A Yes.
Q And you didn't hear what the security officers were saying to Ron, did you?
A No.
Q Okay. And then at one point Ron came back into the bar, correct?
A Yes.
Q What did he tell you at that point?
A He said that -- I guess Darren was going to take him home, because Darren had said, "You need a ride home." and I said, "Okay." You know, "If you want to take Ron home, okay. That's fine."
Q So Darren had volunteered to take Ron home, correct?
A Yes.
Q And then Ron came back into -- did Darren go out to talk with the SPs at one point?
A I don't know.





ROBERTA MENKE, EXAM BY CALL

Q But you recall him volunteering to take Ron home, correct?
A Yes.
HEARING OFFICER McCABE: Can I be so bold as to inquire, were you going home?
THE WITNESS: Yes.
HEARING OFFICER McCABE: Why didn't you give Ron a ride?
THE WITNESS: Because, I guess through the security, he was appeasing what they wanted. They said for him to drive him home, and by the time we left, it had been about another half hour.
HEARING OFFICER McCABE: Okay. Thank you.
Q (BY MR. CALL) And so Ron came back in and sat down in the bar with you at the end of the bar there, correct?
A Yeah.
Q And you had some more glasses of water, correct?
A Yeah. Well, we were kind of standing there at the end of the bar, uh-huh.
Q You were waiting for Darren to prepare to take Ron home, correct?
A Yes.
Q And the SPs left after Ron came back into

ROBERTA HENKE, EXAM BY CALL

the bar, correct?
A Yeah, I assume so. They -- I didn't see them after that, so --
Q They didn't escort you out to your cars?
A No.
Q Then what happened after that point? Did you go out to your cars with Darren?
A Darren took Ron home.
Q Okay. Did you actually walk to the car that Darren and Ron got into?
A No.
Q Where was your car parked relative to Darren's car? How far away?
A Just basically two cars away.
Q Okay. So you saw Ron get in the car with Darren and drive off?
A Yes.
Q And then you got in your car and drove --
A Yes.
Q -- your car home, correct?
A Yes.
Q After you got home, did there come a point when Ron asked you to get him Bob's cell phone number?
A Yes.





ROBERTA HENKE, EXAM BY CALL

out again and gave it to him again.
Q And then what happened during that telephone conversation?
A He said -- whoever answered the phone, he said to him, "Bob, you best watch your P's and Q's. Let's not be driving off base because you've been drinking too much."
Q Is that all he said to him?
A That's all he said to him.
Q At any time did he make a threat against Mr. Teinert's life?
A No.
Q Threaten him with any kind of harm?
A No.
Q Did he ever say, "You're dead, Bob. You're dead. I can do this," or words to that effect?
A No.
Q Then he hung up the phone, correct?
A Yes.
Q Do you know why Ron would say something like that to Bob?
A Well, he got a DUI a few years ago and he drove him around, and he's been his friend and he's just watching out for him, too, because he knows he's been having a problem lately.





ROBERTA HENKE, EXAM BY CALL

Q And how long had you been home before that event occurred with him asking you to get that number, as best you can recollect?
A Oh, about ten, 15 minutes.
Q Did you give him the number?
A Yes.
Q And why did you have the number?
A Because he don't remember phone numbers and I've always had it. It's in my wallet with a bunch of other numbers.
Q And you gave him the number, correct?
A Yes.
Q And then did you watch Bob appear to enter that number into his phone to call Bob? Excuse me. Ron enter those numbers into the phone to call Bob?
A Yes.
Q And what happened on that call? What physically happened? Was Ron able to say hello or --
A He said hello and then he asked for the number again.
Q Asked you the number again?
A Asked me for the number again.
Q And what did you say?
A I says, "Well, why?" And he says, "Goddam son of a bitch hung up on me." And so then I dug it





ROBERTA HENKE, EXAM BY CALL

Q So it was your impression that Ron was doing this out of concern for a friend?
A Yeah.
Q Okay. And you were familiar with the fact that Ron had -- Bob had gotten a DUI, correct?
A Yes.
Q And that Bob had driven -- had been driven around by Ron on occasion when he lost his license, correct?
A Yes.
Q Have you ever heard your husband use that phrase, mind your P's and Q's, before?
A Yes.
Q And it typically means mind your business, doesn't it?
A Uh-huh. That's what I understand it to mean.
Q So you heard Ron's end of that conversation. Did Ron appear agitated at that time that he said this stuff to Bob?
A Not too much.
Q Did he demonstrate any sort of outward sign that he was intending to cause any harm or fear to Bob?
A No.

ROBERTA MENKE, EXAM BY WARNER

Q Then what happened after that call? Anything else happen relevant to this issue?

A Other than he asked for the phone number to the guard shack and I gave him that. And I says, "Why?" And he says, "Because I want to let them know not to let Bob drive off base because he's been drinking too much."

Q Anything else that night relative to this?

A Not that I can think of.

Q Have you ever known Ron to threaten anyone's life? Have you ever heard him make a threat against anyone's life?

A No.

Q Have you ever seen him initiate physical violence against anyone?

A No.

MR. CALL: Nothing further.

HEARING OFFICER McCABE: Colonel Warner.

CROSS EXAMINATION

BY COLONEL WARNER:

Q Mrs. Menke, you arrived at the club at approximately 7:00 p.m.; is that correct?

A Yes.

Q And you say Teinert was there and Blaine Abbott?





ROBERTA MENKE, EXAM BY WARNER

A Yes.

Q How about Airman Jensen?

A Not at the time when we arrived.

Q He was there later on?

A Yes.

Q And you know Airman Jensen by sight?

A Yes.

Q A youthful looking baby face?

A Yes.

Q Just so we all know we're talking about the same one. And Airman Jensen was there during the evening when the events that you previously said yes to, as described by counsel, occurred; is that correct?

MR. CALL: Let me object. It's overly broad. I think you need to specify the answers.

THE WITNESS: What part of the night, though?

Q (BY COLONEL WARNER) Well, I'm talking about the later part when the -- when, as you described it -- and let me just look down here. A commotion -- when the commotion occurred.

A Yes.

Q Okay. How would you describe Ron's -- your husband Ron's demeanor throughout the course of the





ROBERTA MENKE, EXAM BY WARNER

evening?

A I don't understand the word. What do you mean?

Q Well, was he in a mellow mood, was he upset, was he --

A No. No, he wasn't upset. We were just out to have a drink because we weren't going to see each other for a couple weeks.

Q In fact, he did go TDY, did he not?

A Yes.

Q And so how would you describe his demeanor that evening, then? When I say demeanor, again, agitated, happy, pleasant, relaxed? How would you describe it?

A Pleasant.

Q Okay. Notwithstanding the fact that Teinert, Bob, continued to come down repeatedly to your end of the bar and agitate and harass -- I think you used the term -- Ron remained cool and kept his demeanor, and calm; would that be a fair statement?

A Yes.

Q It didn't seem to bother him?

A Not too much, no.

Q Certainly not outwardly in the sense that there was any raising of voice or profanity directed





ROBERTA MENKE, EXAM BY WARNER

towards Teinert; would that be true?

A Not at that time.

Q Okay. And in your opinion, I guess, or based from your observations, clearly Teinert was the one that was instigating whatever contact was going on; is that true?

A You mean coming over to us?

Q Yes.

A Yes.

Q And you said that Teinert, when you arrived at 7:00 p.m., was already intoxicated and obnoxious?

A Uh-huh, yes.

Q Did he continue to drink throughout the evening?

A Yes.

Q And I suspect that just based on that, that he got more intoxicated and more obnoxious as the evening went on. Would that be fair to say?

A Yes.

Q Because if he was intoxicated at 7:00, he must have been really drunk at 10:00. Fair enough?

A Yes.

Q Was that your observation?

A Yes.

Q As an example, was his speech slurred at

ROBERTA MENKE, EXAM BY WARNER

ten o'clock?

A Not really.

Q Were his motor skills impaired at all? I'm talking about Teinert now. You know, being able to walk and do those things.

A He seemed to walk okay.

Q But you could tell he -- I mean, as compared to seven o'clock, was he more or less intoxicated at 10:00?

A I think he was more.

Q And was he more or less obnoxious at 10:00 than he was at 7:00?

A Wasn't that just the same question you asked me?

Q No.

A I don't -- say that again.

Q I'm saying was he more intoxicated at 10:00 than he was at 7:00?

A I think so.

Q He continued to drink? Did you observe that?

A Yes.

Q Okay. So if he continued to drink, it makes sense he was more intoxicated?

A Yes.





ROBERTA MENKE, EXAM BY WARNER

Q And was he also more obnoxious at 10:00?

A Yes.

Q Loud obnoxious?

A I wasn't paying attention to him some of the time.

Q But did you -- I'm not saying --

A I mean, because I wasn't constantly -- I wasn't constantly around him. I try to block him out because he irritates me.

Q I understand. You don't like him?

A No. I -- he's still a friend, but he irritates me when he gets to that point.

Q That's what I mean. He irritates you and you don't like him, so you try and block it out when he's drunk and obnoxious?

A Yes.

Q And I'm not suggesting that you were observing him every minute, but I'm saying that, in general terms, at ten o'clock he was more obnoxious and more drunk than he was at 7:00? Fair enough?

A Well, now, see, Jensen came in, so he was occupied and he was talking to him for some of the time.

Q Well, then was -- I'm just trying to find out your observation. Was he more obnoxious, was he





ROBERTA MENKE, EXAM BY WARNER

more intoxicated or was he less intoxicated?

MR. CALL: Objection. It's been asked and answered.

COLONEL WARNER: Well, we're not getting an answer.

MR. CALL: I think it's been answered three times.

HEARING OFFICER McCABE: Mr. Call, the objection is noted for the record. Answer the question if it's possible for you to answer it. Do you have --

THE WITNESS: He seemed more intoxicated and obnoxious later in the evening.

HEARING OFFICER McCABE: Thank you.

Q (BY COLONEL WARNER) Thank you. Now, you say that he repeatedly approached with harassing comments and elevated voice; is that true?

A Yes.

Q And was that observed by Jensen?

MR. CALL: Objection as to what she knows that Jensen knew.

COLONEL WARNER: If she saw.

THE WITNESS: I don't know. He's sitting at the end of the bar.

Q (BY COLONEL WARNER) Was Jensen present





ROBERTA MENKE, EXAM BY WARNER

when Teinert kept coming down to make harassing comments to you?

A Not through the whole night he wasn't there.

Q Was he there for part of it?

A For part of it, yes.

Q So if he was there, he may have been able to observe that, correct?

A Jensen observe -- yes.

Q Because you're only at opposite ends of a relatively short bar, correct?

A Yes.

Q I mean, how many feet apart are you? Just a ball park guess.

A Probably twice as long as this table.

Q Okay.

A At least.

MR. CALL: Let the record reflect the table appears to me to be about ten feet long.

COLONEL WARNER: Well, eight or ten feet, whatever it is.

Q So he couldn't have been more than 15 or 20 feet away, right?

A Yes.

Q And if he was sitting with Jensen and he

ROBERTA MENKE, EXAM BY WARNER

left Jensen to go down and talk to you, it's possible Jensen would have seen that?
A Seen that? Yes.
Q Is it possible he could have heard his loud, obnoxious, harassing comments?
A It's hard to say with the TV blasting on the corner.
Q But is it -- wasn't the TV -- I mean, was the TV blasting the whole evening?
A I don't go down to that end because I can't hear. I can't hear with the TV on. And then there was the jukebox on in the other room.
Q So there was a lot of noise in there?
A A lot of noise on the other end of the club.
Q So there was just a lot of noise in there. It was very hard to hear anything; is that true?
A Depending on where you are, you could hear what you were -- where you were at.
Q But certainly it would have been very difficult to hear very much because of the loud noise in the club?
A Hear from where, though? I don't understand what you're asking.
Q What I'm saying is -- let's forget the





ROBERTA MENKE, EXAM BY WARNER

hearing part. Let's go back to the level of noise. Wasn't there a lot of noise in that club that night?
A Yeah.
Q So that could have certainly impaired anybody's ability to hear anything that happened very far away, correct?
A Yes.
Q When the security police arrived, was the TV blaring?
A I couldn't hear the TV because I was on the other end of the bar.
Q Well --
A And I was talking to somebody else at the time.
Q Okay. So if you're 20 feet away, even though the TV is blaring, you can't hear it? Is that what you're telling us? Because you're on the other end of a 20-foot bar?
A Uh-huh.
Q And it's a blaring -- that's your word, blaring TV -- but you can't hear it from 20 feet?
A No. If you're sitting underneath it, you can't hear. When I worked behind the bar, I couldn't hear the phone ring when I was doing the dishes because he'd always have the TV up so loud and I'd





ROBERTA MENKE, EXAM BY WARNER

always ask him to turn it down.
Q But is that that evening?
A That evening, I don't know, because I wasn't on that end.
Q So the TV wasn't so loud that it bothered you from 20 feet; is that correct?
A No. I mean -- I don't understand. No, it didn't bother me.
Q That's what I'm saying.
A Uh-huh.
Q Even though the TV was on, it wasn't so loud, apparently, that at 20 feet it bothered you and your ability to carry on a conversation?
A No.
Q And, indeed, when the security police arrive, didn't they arrive to talk to Teinert and Jensen initially when they came in?
A I don't know.
Q You didn't see them arrive?
A I was standing with my back -- I didn't see them arrive till they tapped on Ron's shoulder.
Q Okay. Now, you heard an exchange of vulgarities between Ron and Bob; is that correct?
A Yes.
Q And according to your testimony under oath





ROBERTA MENKE, EXAM BY WARNER

here today, subject to whatever sanctions there might be if, in fact, that's not accurate and true, you testified that Teinert was using the same vulgarities directed towards Mr. Menke, your husband, as he had used towards Mr. Teinert; that's correct? Is that true?
A Yes, if I under your question, meaning they both exchanged --
Q And this was at the time -- just so we make sure we know the time frame, this was at the time when your husband was about to leave the club, correct?
A Yes.
Q And, indeed, did you hear the exchange in terms of what Teinert said to Ron as he was leaving the club relative to a taxi or to getting a cab?
A No.
Q You didn't hear that?
A No.
Q So you don't know all of the conversation? You just heard the elevated voices exchanging these vulgarities?
A Yes.
Q So you don't know what provoked it?
A Other than when he came down to me and what

ROBERTA MENKE, EXAM BY WARNER

he was saying about, "I'm going to get you kicked off the board because you're not in the unit no more" and --
Q Now, when --
A But that was --
Q Was that earlier?
A No, no, no, no.
Q When was that?
A Well, that was when Ron came down to say, "It's time to leave."
Q Okay. I want to focus in on the time where the vulgarities were exchanged and the commotion -- That's the word you used -- the commotion occurred. Just about the time Ron was leaving the club. Now, apparently words were exchanged. Where were you in location to Ron and Teinert when that happened?
A I was at the end of the bar by the phone.
Q How far away --
A And I was -- I was like standing here, and Ron and Bob were right here.
Q Well, for purposes of the record, how many feet were you away from them?
A Probably from where Carol is sitting.
Q Well --
A I have a hard time judging feet. Ten feet.





ROBERTA MENKE, EXAM BY WARNER

Q Let the record reflect eight to ten feet.
A Eight to ten feet.
Q Okay. Eight to ten feet, approximately, away, right?
A (Witness nods.)
THE REPORTER: Yes?
THE WITNESS: Yes. I'm sorry.
Q (BY COLONEL WARNER) Now, you were eight to ten feet away, and you didn't hear all the conversation, but you did hear the vulgarities, correct?
A Yes.
Q Where was Airman Jensen in relation to this?
A At the end of the bar.
Q How far away from them?
A Twelve feet, 20 feet. Well, he was at the end of the bar, so from there, he was probably ten, 15 feet away.
Q And he couldn't possibly have heard at all if you couldn't hear from eight or ten, could he?
MR. CALL: Objection as to knowing what Mr. Jensen heard. She has no basis to form any knowledge as to what Mr. Jensen heard.
COLONEL WARNER: Well, let me rephrase the





ROBERTA MENKE, EXAM BY WARNER

question, because I think there's a good point to the objection.
Q There was a lot of noise in the bar, right?
A Yes.
Q Okay. And you had a hard time hearing at eight to ten feet, except when they raised their voices?
A Yes.
Q And so, based on the noise level, do you think, just on your perception of the noise level, do you think that Jensen could have heard anything at the other end when he was further away than you?
A He may have heard the vulgarity, but I don't think he could have heard the conversation, unless he's got acute hearing.
Q So he really wasn't just -- it wasn't like he was just sitting next to Bob Teinert when the conversation happened, was it?
A You mean when Bob approached Ron?
Q I'm talking about the commotion.
A Oh, the commotion? No, he wasn't near Bob.
Q Okay. And this commotion is what generated the security police coming over; is that right?
MR. CALL: Objection as to what --





ROBERTA MENKE, EXAM BY WARNER

THE WITNESS: I don't know.
Q (BY COLONEL WARNER) But they arrived shortly thereafter?
A Yeah. Yes.
Q All right. So it's your testimony that Jensen is at least 12 feet away and you're eight or ten feet away.
A Uh-huh, yes.
Q And so you don't really know the contents of the conversation, other than the vulgarities that you heard?
A Yes.
Q But it was clear that Teinert was loud, he was obnoxious, he was intoxicated, and confrontational?
A Yes.
Q But Ron wasn't, right?
A He was starting to get agitated with them.
Q Well, tell me about Ron's level of intoxication that evening. Was Ron intoxicated?
A Yes.
Q How intoxicated, from your observation?
A From my observations? Well, I know he didn't want to drive home.
Q Well, I understand that, but that doesn't

ROBERTA MENKE, EXAM BY WARNER

help us very much. For instance, did he have full control of his motor skills?
A He was slurring his words a little bit.
Q What about his ability to walk?
A He seemed okay when he walked.
Q Is Ron a mean drunk or a friendly drunk or something in between?
A A friendly drunk.
Q He doesn't get angry when he gets drunk?
A No.
Q Teinert, on the other hand, becomes an obnoxious drunk; is that fair?
A Yes.
Q And so it was your observation from the beginning of the evening until you left that your husband never was angry in the club, was he?
MR. CALL: Objection. I think it's been asked and answered. He's asked her before and she said at times he was mellow, and then when Ron would come over, he'd become agitated and then go back. I think it's been asked and answered.
HEARING OFFICER McCABE: If you can answer the question, answer it.
THE WITNESS: Okay. Ask the question again, because I don't --





ROBERTA MENKE, EXAM BY WARNER

Q (BY COLONEL WARNER) Did you ever see your husband angry during that night at the club?
A Right before we went home, he was agitated with Bob.
Q Why; do you know?
A I don't know, other than what he told me, the conversation -- with the conversation that he had that I didn't hear.
Q But what did he tell you?
A He told me, he says about getting kicked off the board, and that I got the key to the club and everybody is going to go through me if they want to get in.
Q So it had nothing to do with offering a cab; is that correct?
A I don't know. I didn't hear that.
Q I understand. But I'm saying that he -- Ron didn't report that to you?
A No, he didn't say that to me.
Q There was never any discussion about Ron needing to have a cab to go home because he was drunk?
A No.
Q So, as far as you know, any agitation or anger or dispute was over this being kicked off the





ROBERTA MENKE, EXAM BY WARNER

board?
A Just -- that could have been. I think it was at that point of the night that he had enough of him.
Q Because Teinert had been so obnoxious throughout the course of the evening?
A Yeah. I mean, you know, I guess you can only take so much, and that just -- that was it. He says, "Okay. It's time. I'm agitated enough. I want to go."
Q And how far do you live from the club?
A About five, ten minutes.
Q Now, when you got home, was your husband upset?
A He was a little upset, yes.
Q Well, help us. You say a little upset. I mean, was he quietly seething or was he stomping around or was he -- just in general terms help us understand when you say "a little upset." What does that mean for Ron Menke?
A I don't know how to answer the question. I mean, I -- he was agitated, you know. He wasn't -- wasn't slamming things. He wasn't throwing things.
Q In fact, it's true, isn't it, Mrs. Menke, that he was not very upset at all? I mean, if he was





ROBERTA MENKE, EXAM BY WARNER

really upset with Bob Teinert -- let me just ask another question here. If he was really upset with Bob Teinert, he wouldn't be concerned about Bob Teinert, would he?
MR. CALL: Objection as to knowledge of what Mr. Menke would know.
THE WITNESS: I don't understand what you're asking.
Q (BY COLONEL WARNER) I'm asking you, if somebody -- let's take Ron out of the equation. If somebody is really upset with somebody and they're angry, they're not usually at the same time really concerned about that individual's welfare, are they?
MR. CALL: Objection. I don't know that the relevance of someone else's anger is appropriate.
COLONEL WARNER: It's going to become really apparent here quickly.
HEARING OFFICER McCABE: In your experience, if somebody is agitated at someone else, do you usually see that person who is agitated also being very concerned or concerned about the welfare of the other person?
THE WITNESS: Not all the time, no.
Q (BY COLONEL WARNER) In fact, that would be a bit unusual, wouldn't it?

ROBERTA MENKE, EXAM BY WARNER

A I would guess so.
Q Now, you indicated -- and I wrote this down -- in your direct testimony that he called Bob because he was a friend of Bob's and he had concern for a friend, right?
A Yes.
Q He was concerned about Bob and Bob driving off and getting in trouble, wasn't he?
A Yes.
Q And so, out of his concern for his friend, that's what he did, didn't he? He called to express concern that Bob not do anything foolish like driving off the base?
A Yes.
Q And yet he did this moments after calling his good friend Bob a goddam son of a bitch; isn't that true?
A Yes.
Q And after he was mad enough to call his good friend Bob a goddam son of a bitch, he then called him up out of concern for his friend?
A Yes.
Q All right. And even though he had said, "Fuck, you Bob, fuck off" -- which you heard in the club, correct?





ROBERTA MENKE, EXAM BY WARNER

A Yes.
Q And then called him a goddam son of a bitch, correct?
A Yes.
Q He then said, in the mildest of terms, "Watch your P's and Q's, Bob. You better watch your P's and Q's"?
MR. CALL: Objection as to the characterization of "mild." I don't think that was her testimony, that it was mild.
HEARING OFFICER McCABE: Noted. Hearings examiner notes that that's the situation.
THE WITNESS: No. He said, "Don't" -- "Mind your P's and Q's. You best not be driving off base. You've been drinking too much."
Q (BY COLONEL WARNER) And he didn't use any profanity whatsoever?
A No, he didn't.
Q Well, so you would have us believe, then, that after this agitation that he had and after just moments earlier using the language that I described, then he calls back -- how long was it before he called back again?
A After he hung up?
Q Yes.





ROBERTA MENKE, EXAM BY WARNER

A Right away.
Q So it wasn't like there was a cooling off period, was there?
A No.
Q So would it be fair to say your husband was agitated when he called back?
A A little bit, yes.
Q Does your husband usually refer to Bob Teinert as a goddam son of a bitch?
A No. Usually, if I can say the term, Bob gets a charge out of when you say, "Fuck you, Bob," you know, and you pat him on the shoulder. I mean, he gets -- that's Bob.
Q Okay. So Bob enjoys having people tell him to fuck off or to get fucked or whatever; is that correct?
A In a jokingly matter. It's like saying hi to him. That's how he -- he -- that's what he likes. He says, "You don't call me a fucker, but say 'Fuck you, Bob.'"
Q He likes that?
A He likes it.
Q So when they were at the club, then maybe this wasn't a commotion after all. Maybe this was just some good-natured exchange. What do you think?





ROBERTA MENKE, EXAM BY WARNER

A The tone of voice, it was agitation, a little bit.
Q Well, so then maybe Bob didn't like it so much.
A Well, I don't know what the conversation was that upset him so much.
Q Well, I'm trying to find out whether this was the good-natured exchange between good friends or whether there was some agitation going on here.
A He was agitated when he left.
Q Who is "he"? Your husband Ron?
A Yeah.
Q Okay. And so he was agitated and it appeared that in that exchange at the bar, at the so-called commotion, that that wasn't exactly a good-natured, "Fuck off, Bob," was it?
A I don't think so, no.
Q And I don't think, based on what you've said, that Teinert took it as a good-natured comment, did he?
A No. Because, actually, Bob was the one who said it to Ron first. Or I -- I don't know that. That's who I -- what I heard first.
Q And so when Ron got home, this wasn't any good-natured, "He's a goddam son of a bitch," because

ROBERTA MENKE, EXAM BY WARNER

he didn't say that to Teinert. He said it to you, didn't he?

A Yeah. Or he's just making a statement.

Q Yeah.

A I guess.

Q Well, he did make the statement, though, didn't he?

A Yeah.

Q Okay. Now, your husband is quite fond of the phrase, "Mind your P's and Q's," isn't he?

A Yes.

Q In fact, you've heard him use it a lot?

A Yes.

Q It's one of his pet phrases, isn't it?

A Yes.

Q He uses it all the time?

A Yes.

Q Around your place?

A At times, yes, he does.

Q How often would you say he uses the phrase, "Mind your P's and Q's"?

A In what? A day or a month or --

Q In a day. How often in a day do you think he uses the term, "Mind your P's and Q's"?

A I wouldn't say he could use it every day if





ROBERTA MENKE, EXAM BY WARNER

he wasn't -- you know --

Q Well, I mean, when he was a bartender.

A Yes.

Q Well, you know the basis or how the term, "Mind your P's and Q's," came around, don't you?

A Yes. Mind your pints and quarts.

Q Right. And so, as a bartender, minding your P's and Q's is a very common term?

A Yes.

Q So didn't he use it commonly around your house?

A I would think so.

Q You heard it regularly?

A Yes.

Q How many times a week would you hear him say that?

A I don't know. Five or six, seven times.

Q I mean, that's not a phrase that everybody uses.

A No.

Q But for a bartender like Ron, that's a phrase that he used all the time? Five or six times a week? Is that a fair statement?

A I guess so. I mean, I don't keep marking it down every time he says it.





ROBERTA MENKE, EXAM BY WARNER

Q Well, but everyone has their pet phrases and some people will use them a lot.

A Yes.

Q Okay. But he used it around your place?

A Yes.

Q Do you know if he ever used it in the workplace?

MR. CALL: Objection as to the basis for her knowledge.

THE WITNESS: I don't know.

COLONEL WARNER: I just asked if she knew.

MR. CALL: I don't think there's been a foundation for how she would know.

HEARING OFFICER McCABE: Argumentative. Answer the question.

THE WITNESS: I don't know if he uses it at the workplace.

Q (BY COLONEL WARNER) Would you find it unusual that someone would use one phrase like that regularly in your home and never use it in the workplace? Would that be unusual?

A I think at the workplace he uses the word "fuck" a lot because he's a mechanic. I don't know. I'm not there when he's at work.

Q Now, your husband, as you know, is facing





ROBERTA MENKE, EXAM BY CALL

disciplinary action here, termination.

A Yes.

Q How does that impact your family?

A Meaning -- oh, it bothers me. It bothers me, uh-huh.

Q You obviously don't want to see that happen.

A No.

Q It's a loss of income?

A Yes.

Q Loss of security?

A Yes.

Q It's a major impact in your life?

A Yes.

COLONEL WARNER: I don't have any further questions.

HEARING OFFICER McCABE: Mr. Call.

RECROSS EXAMINATION

BY MR. CALL:

Q Just a couple of follow-ups. You've indicated that you weren't paying attention to the conversation that Ron and Bob had, the vulgarities that were exchanged by both Ron and Bob, correct?

A Correct.

Q Is that part of the reason you didn't hear

ROBERTA MENKE, EXAM BY CALL

what was said, is because you weren't paying attention to it?

A No, I wasn't paying attention. I was talking to somebody else at the time.

Q So you were talking to somebody else?

A Yes.

Q Perhaps if you would have turned and looked and watched, do you think you might have been able to hear what was said if you were turning and paying attention to the conversation?

A Yes.

Q And so it's completely likely that Mr. Jensen, wherever he was in the bar, could have heard the conversation if he was paying attention to it, correct?

A Yes.

Q Let's talk about -- counsel talked about it being odd, the expression of agitation and concern at the same time. Do you have children?

A Yes, but he's not at home no more.

Q Through your life he's done things that have agitated you, has he not?

A I have an example. I have a dog. I have dogs. They got out during a snowstorm. I scolded her and loved her at the same time.





ROBERTA MENKE, EXAM BY WARNER

Q And that's -- so it's consistent for Bob to express -- or for Ron to express both agitation of the fact that a friend of his has bothered him, but yet at the same time feel concern for him? He doesn't want to see his friend hurt, correct?

A Yes.

Q So that's completely consistent with what you've talked about, right?

A Yes.

MR. CALL: Nothing further.

RECROSS EXAMINATION

BY COLONEL WARNER:

Q Do you know if Bob Teinert has ever spent the night at the air base after a night at the club?

A On the assumption, yes.

Q But you don't have any firsthand knowledge of that?

A I assume so, yes, because he showed us the place where he sleeps sometimes.

Q He's got a cot there, doesn't he?

A Yes.

Q And he's shown that to you?

A Yes.

Q And, in fact, you know as well as anyone that he makes it a habit that if he drinks at the





ROBERTA MENKE, EXAM BY WARNER

club, he stays on that cot and spends the night at the club, doesn't he?

MR. CALL: Objection as to her knowledge of Mr. Teinert's habits.

COLONEL WARNER: We've laid a foundation.

HEARING OFFICER McCABE: Do you know or don't you?

THE WITNESS: There's times he doesn't stay.

Q (BY COLONEL WARNER) And you know that, too?

A Yes, because I've seen him leave before.

Q How long ago was the last time you saw him leave?

A I don't know because I -- I haven't seen him for months.

Q Well, I'm talking about before the incident on the 17th.

A I don't know. I mean, I'm not in there every night.

Q But you knew, did you not, Mrs. Menke, that it was his habit to stay on that cot and spend the night at the club after he'd been drinking because he'd had a prior DUI?

A Yes, but not generally on working days. It





ROBERTA MENKE, EXAM BY WARNER

didn't seem like it.

Q Of course, this was a Friday night, the 17th.

A Yes.

Q And so it wouldn't have been -- it would have been consistent with his habit to spend the night on that cot, wouldn't it?

A I guess so. I don't know.

Q And when he showed you the cot, did Ron -- was Ron there? Did he see the cot?

A Yes.

Q And he knew that Teinert spent the night at the club after a night of drinking, too, didn't he?

A I guess so. Not every night, that I know of. I mean, I don't know.

Q So, notwithstanding the fact both you and your husband knew that Teinert specifically had a cot there so he wouldn't have to leave the club, Ron, out of an abundance of caution and concern, called that goddamn son of a bitch Teinert to tell him, "Watch your P's and Q's and don't you drive. Be careful," right?

A Right.

COLONEL WARNER: Thank you.

//

RE-REDIRECT EXAMINATION

BY MR. CALL:

Q Just one follow-up question. Have you ever observed Mr. Teinert drive off that base when he was intoxicated?

A Yes.

MR. CALL: Nothing further.

HEARING OFFICER McCABE: Thank you very much for being here as a witness. You may be excused as a witness. Because of your relationship to the appellant in this case, if you wish to stay and your testimony is complete, I have no problem with you doing that, if that's your choice.

THE WITNESS: Oh, you mean stay --

HEARING OFFICER McCABE: In the room. That's up to you.

THE WITNESS: Is that okay with you?

HEARING OFFICER McCABE: Unless either party has any real problem with that. That's up to your discretion. It's noon. I assume that Mr. Menke is next.

MR. CALL: He's our last witness, your Honor.

HEARING OFFICER McCABE: And I don't know if we're going to have any rebuttal from the agency,







but it seems a reasonable time to probably talk about a break and, at the very least, make sure that Renee gets an opportunity to find her fingers again, so why don't we take a break until one o'clock and we'll reconvene at that time. We're off the record.

(Lunch recess.)

HEARING OFFICER McCABE: We're ready to proceed following the lunch break. Next witness, Mr. Call?

MR. CALL: Mr. Menke.

HEARING OFFICER McCABE: Mr. Menke, please be sworn by the court reporter, please.

RONALD J. MENKE

called as a witness and sworn, was examined and testified as follows:

HEARING OFFICER McCABE: Please be seated. State your full name for the record, please.

THE WITNESS: Ronald Joseph Menke.

HEARING OFFICER McCABE: Thank you very much. Mr. Call, you may proceed.

DIRECT EXAMINATION

BY MR. CALL:

Q Mr. Menke, how long have you been a member of the Utah Guard?

A Now, just over 11 years.







Q And what's your current MOS or position?

A Terminated.

Q Prior to your termination, what was your MOS and position?

A Jet engine mechanic.

Q And you were stationed out at the air base up by the Salt Lake International Airport, correct?

A That is correct.

Q And at the time prior to your termination, you were a technician, correct?

A That is correct.

Q How long did you serve in that technician position of jet engine mechanic?

A Eleven years.

Q I'm going to hand you what I will mark as Exhibit 16.

(Discussion off the record.)

Q I hand you what's been marked as Exhibit 16.

I've got copies of this if you want to look at it. It's his employment evaluations which were attached as an exhibit to the answers.

Do you recognize those documents?

A Yes, I do.

Q Okay. Thank you. And those documents are







your performance evaluations over the years that you've been at the Guard, correct, beginning in 1992?

A That is correct.

Q Okay. Do you know Robert Teinert?

A That I do.

Q How long have you known Mr. Teinert?

A I met Mr. Teinert -- I believe it was February of 1990.

Q So you've known him for approximately ten years?

A Yes.

Q Would you describe for Colonel McCabe the nature of your relationship with Mr. Teinert? Let's start when you first met him and kind of go forward from there.

A Well, when I first met Bob -- I'll refer to him as Bob because that's all I've ever called him all my life. He's a good friend. He's been my friend for a long time, and even when I first met him, our friendship started about there.

Q Over the years, have you had him in your home?

A I've had him at my house many occasions.

Q How many times do you think he's been in your home?

RONALD MENKE, EXAM BY CALL

A Over ten years, maybe 150 times, maybe 200.
Q When do you think the most recent was?
A A year ago New Year's.
Q Have you been in his home?
A Yes, I have. His parents' home, I should say.
Q And have you gone on camping trips with him and things like that?
A That I have.
Q Okay. And you socialize quite frequently, correct?
A A lot.
Q Over the years that you've known Mr. Teinert, you've been able to observe his drinking habits, haven't you?
A I have.
Q Is it your opinion that he has an alcohol abuse problem?
A Yes, he does.
Q And you're aware of the fact that he had a DUI some time ago?
A Yes.
Q Do you remember when that was?
A Yes. About '94 or so. He had gotten drunk





RONALD MENKE, EXAM BY CALL

and he called me on the phone because he had wrecked his truck and they had taken him to jail.
Q Did you go bail him out?
A No, I did not.
Q Do you know who did bail him out?
A I believe his father did.
Q Why was he calling to let you know that happened? Why was he calling you to tell you that?
A Because he told me that they had taken his driver's license and everything away and that he would need a ride to work.
Q So did you give him a ride to work during that period that he didn't have --
A Yes. I would go out there and pick him up when he wanted me to. He would call me at home and say that he wanted to come to work and I'd go pick him up.
Q So that happened for how long? A 90-day period when his license was gone?
A Well, out of 90 days, I probably took him 40, 50 places.
Q Okay. So he would call you when he needed you? It wasn't a daily occurrence, but you --
A Right.
Q -- were certainly shuttling him about,





RONALD MENKE, EXAM BY CALL

correct?
A Yes.
Q Did you notice that his drinking was becoming more progressive over the ten years that you've known him?
A At certain times of his life, his drinking has progressively gotten worse, and me being his friend -- and he doesn't -- I'm not saying he has no friends, but I've been trying to help him with his problem for a while.
Q Okay. So you've seen -- is it an ebb and flow or is it kind of a -- sometimes it's good and then it gets bad, or is it kind of a -- it's just progressively getting worse and worse?
A Well, for a short period of time he tried to quit drinking totally.
Q When was that?
A I would say this was probably about two years ago, three years ago. He went to drinking water. He would still go to the club, but he was drinking water. He was physically trying to break a habit.
Q And were you supporting him of that habit?
A Yes, I was. At the same time, I was actually sitting there and drinking water with him.





RONALD MENKE, EXAM BY CALL

because I know from experience breaking things is hard, and when you're under abuse like that -- and I do use the word tight. He is an alcoholic. And he needs help. He just, at points, does not know who his friends are.
Q You're aware of the fact that Mr. Teinert was reprimanded and actually suspended for drinking on the job, are you not?
A I was not physically there that day.
Q But you are aware that that --
A I am aware that that happened, yes.
Q And most recently, in the last year prior to your termination, did you notice that his drinking problem was getting worse?
A Yes, I did.
Q In fact, you'd be at the NCO Club on occasions correct?
A Yes.
Q You'd see him there?
A Yes, I would.
Q And you'd see him drinking in the NCO Club?
A Yes, I would.
Q And would you see him get intoxicated?
A Yes, I would.
Q How intoxicated would you see him get?

RONALD MENKE, EXAM BY CALL

A I'd see him get belligerent.
Q Would he lose motor control sometimes?
A Yes.
Q Would he begin slurring his words?
A Slurring, dropping things. I've even watched him tip his drinks over before while he was sitting there.
Q Did you have reason to believe that he was drinking on duty once again?
A Yes, I did.
Q What led you to believe that he might be drinking on duty?
A Well, I never physically seen him with a glass of alcohol. I could not say it was alcohol. He had this plastic cup. At approximately two o'clock, quite a few times I'd noticed he either drove one of the vehicles over to the club or was physically -- the door was open to the club, and when I -- when I'm stating the club, I am stating the bar. He's got a key to go in the back side of the bar to get in. Not the eating establishment part. That's on the other side of 1624.
Q Okay. So it was based off of your observations over about a one-year period, the most recent one year of you working there, that you





RONALD MENKE, EXAM BY CALL

noticed that his drinking was getting worse and that he was apparently drinking on the job, and you reported that to whom?
A I reported it to Sergeant McCowen first. I asked him if he would look into it for me.
Q Why did you tell Mr. McCowen that?
A Because I tried to tell Bob that he shouldn't be going over there like he was. And you use the word about the P's and Q's, yes. I'd tell him he needs to be minding what he's doing there because he's going to hurt someone. It's a safety issue when you're drinking on the job.
Q Were you also concerned for his well-being?
A I was very concerned for his well-being.
Q And how many times do you think you reported to Mr. McCowen that you thought he might be drinking on the job?
A On and off from February. And, granted, I was gone part of the time and so was he. He was gone -- I was gone for at least a month period in there between April and May, and he was gone from June through the first part of July, so at that point in time I cannot say that I reported him once there. But prior to that, from February to April when I left, I believe I reported him at least twice going





RONALD MENKE, EXAM BY CALL

over to the club.
Q And then after you got back, when was the most recent time that you reported to Mr. McCowen that you thought he might be drinking on the job? Was that in September?
A Yes, it was.
Q And what did you tell --
A I told -- I told Bob one more time that -- you know, that he needed to be careful. He shouldn't be going to the club.
Q Here's my question.
A Oh, I'm sorry.
Q In September, when you reported apparently to Mr. McCowen that you thought he might be drinking on the job again -- that was in September, correct?
A Yes, it was.
Q And did you ask him to talk with Ron about that?
A Talk to Bob. Yes, I did.
Q Talk to Bob about that. Okay. And shortly after -- do you recall when that was in September?
A It was about the first week of September.
Q Shortly after that, did Bob confront you about reporting to Mr. McCowen that he might be drinking on the job?





RONALD MENKE, EXAM BY CALL

A I believe at that point I was gone for a couple days in there, and when I came back, Bob did confront me on it.
Q What did he say to you?
A He told me to mind my own goddam business.
Q Was he mad at you?
A He was physically upset, and I told him there that I was only trying to be his friend.
Q And after that incident, didn't he also approach you on other occasions and say, "Are you going to go report me drinking to McCowen if I go over to the NCO Club?"
A Yes, he did.
Q How much occasions do you think he did that after you reported that to Mr. McCowen after he'd initially confronted you about it?
A Going towards the middle part of September, I happened to be in the service vehicle or shop vehicle, and I came from motor pool and Lee McDaniel was going to the two o'clock, and between motor pool and the inspection dock is where they had their two o'clock meeting, and I was taking Lee over there, and at the time I did not see Bob there. I didn't -- no vehicles, no nothing. I had no idea he was there. But later that evening, I went into the club and he

RONALD MENKE, EXAM BY CALL

confronted me in the club.
Q What did he say to you?
A He says that -- basically to the point -- and I don't have the exact words because I -- you know, sometimes what I say is what I mean, but not the exact words that go towards it. But he was telling me mind my own goddam business again and that I shouldn't be bringing people to see. So, in other words, he seen me, but I had not seen him.
Q Did -- in your opinion, did -- did you still consider yourself his friend at that point?
A I still consider him my friend today.
Q Did he express -- did the words that he said to you to express that he was still angry at you over the incident of you reporting his on duty or possible on duty drinking to Mr. McCowen?
A Yes.
Q Let's talk about the night in question. On September 17th, you went to the NCO Club; isn't that correct?
A That is correct.
Q And who did you go with?
A My wife Birdie.
Q And what time did you go there?
A Approximately 1900 hours.





RONALD MENKE, EXAM BY CALL

Q That's seven o'clock?
A Seven o'clock.
Q Why were you going to the club that night?
A Well, I had made up a duty because I was going to be gone the following week, and my wife Roberta was going to be gone in between there and we would not see each other for two weeks.
Q Okay. When you arrived at the NCO Club, who was there?
A Robert Teinert was there and Blaine Abbott was there.
Q Now, are we talking about the bar or the entire club area? Let's talk about the bar area.
A The entire club area was only Robert and Bob, is the only two -- I mean Bob and Blaine was the only two I seen there.
Q Okay. There were folks from the Com Flight that were having a birthday party. Did they arrive later?
A Yeah, they started coming in a little bit later. I noticed that there was lights on out there. That's how I knew there was a party going on.
Q And did Bob Teinert say anything to you when you came into the NCO Club?
A Actually -- I think he actually said hi to





RONALD MENKE, EXAM BY CALL

me.
Q And did Blaine Abbott say anything to you?
A Yeah. We talked for a couple minutes and he says, "Watch it. Bob's on one tonight."
Q Is that his exact words or what did he --
A That is his exact words. "Bob's on one tonight."
Q What did you take that to mean?
A That Bob had been drinking for a long time.
Q Okay. Let me show you what's been marked as Exhibit 12 and ask you -- you indicate -- you see the figure indicated in green?
A Yes.
Q That's labeled "Bob." Is that where Mr. Teinert was sitting?
A That's where he always sits.
Q That's where he was sitting when you entered the club about 7:00?
A That is where he was sitting, yes.
Q And was the TV on?
A The TV was on. Very loud.
Q And the indication there that your -- where did you and your wife sit down?
A That is approximately where we were





RONALD MENKE, EXAM BY CALL

sitting.
Q Where it's indicated on the diagram of you being "Ron" in that diagram, correct?
A Yes. And she was sitting to the right of me.
Q And you and Birdie ordered drinks, correct?
A Yes, we did.
Q And Birdie is your wife Roberta, correct?
A Yes.
Q At some point did Mr. Teinert approach you and begin talking to you?
A Yes, he did.
Q Tell me what happened.
A It was a little bit later in the night, because he was watching whatever he watches down there. But a little bit later in the night he kept trying to get in a conversation that me and Birdie were having, and I told him basically to knock it off.
Q Before we go into that, was he drinking when you entered the club?
A Yes, he was.
Q Could you tell by looking at him that he was intoxicated?
A To look at Bob you cannot tell that he's

intoxicated, unless he is -- unless he's down drunk.
Q So you don't know his state until he started talking to you, correct?
A Right.
Q When he came over and started talking to you, was he slurring his words?
A Well, actually, he never did, for a long time, come down and talk to me. He was yelling to me or interrupting the conversation I was having, so that's how I knew he'd been drinking, because when -- he would catch parts of the conversation and he would try to butt in.
Q And he'd just blurt something out?
A Right.
Q About the conversation that he was hearing you talking about?
A Exactly.
Q Was the TV so loud that he could not have had the opportunity to overhear your conversations with whoever you were having conversations with?
A When we first went in there, the TV was so loud that he could not hear anything. He just seen us come in the door, is all he did.
Q And then was the TV turned down at one point?







A I think someone did. I think the bartender, sooner or later, turned the TV set down because the party was getting ready to go on in the back.
Q At one point did a bartender come in and relieve Blaine Abbott?
A Yes.
Q Who was that, to the best of your recollection?
A Sherri Lindsay was the bartender.
Q Let's talk about the conversations where you were talking with your wife and Mr. Teinert would interrupt. He was continuing to drink at this time, correct?
A He was.
Q Tell me about the first conversation that he interrupted.
A We were talking about -- she was going on an AIDS walk in Chicago and she was really excited because she was getting to see some of her relatives that she hasn't seen for a long time and some new ones that she hadn't seen at all since she was a little kid, so that's basically what our conversation was about.
Q And how did Mr. Teinert interrupt that







conversation?
A He just was making rude comments to me, you know, calling me Airman Menke and blah, blah, blah, which he does a lot.
Q Let's talk about the blah, blah, blah, so we know what we're talking about. Do you recall specifically what it was?
A At this point in time, no.
Q And why is that? Were you trying to ignore him?
A I was very trying to ignore what he was saying to us.
Q As you were at the club, other people came into the club, correct?
A Yes.
Q Do you recall who else came into the club?
A Brian Smith. He's an SPO there.
Q Okay. Anybody else that you remember?
A Yeah. Throughout the night I think Jack Gerber came in for a few minutes, and then I remember seeing Rick Hodge there and -- but Rick Hodge and them were in the party in the background. That's why I knew it was the Con Flight having a party.
Q Did Darren Lindsay come in, also?
A Yes. He came in approximately ten o'clock







or so.
Q And did you talk with any of these people when they came in?
A Yeah. Me and Brian were having a discussion about me having to pay school tax if I don't have any children in school.
Q And did Mr. Teinert try and interrupt into that conversation?
A Yes, he did.
Q How did he do that?
A He starts yelling out, "Well, you should get into it because I'm a single taxpayer out there. I got to pay a higher tax bracket than all of you," and to the point.
Q At any of these times that he was interrupting you in your conversation, did he actually get up and come over to where you were? I'm assuming you didn't stay planted in the seat at the bar the whole time. You walked around, didn't you?
A For most of it, I was sitting in the seat.
Q So when Brian came up -- did Brian come up to you and start talking to you or sit next to you?
A Yeah. In fact, Brian was actually leaning against the pole that's in this photograph here or this picture here.

RONALD MENKE, EXAM BY CALL

Q You're talking about Exhibit 12?
A Yeah. The stanchion that sits in between the seats.
Q So when Mr. Teinert would interrupt in that conversation, would he actually just yell from where he was sitting or would he get up and walk over?
A He would yell from where he was sitting at the time.
Q And that was an indication that he was drunk. Is that he was elevating his voice and kind of jumping into conversations that weren't his, correct?
A That is correct.
Q And did he continue to drink at this time?
A Yes, he did.
Q What time did Darren come into the club?
A I believe it was around ten o'clock or so. I really wasn't watching the clock, either. I know I'd been there a while, so it was going on ten o'clock. I think the reason, really, Darren comes in is to make sure his wife is okay, you know, and that everything is going on okay at the club.
Q Okay. It's about seven o'clock when you got there and ten o'clock when that -- how many drinks did you have between the seven and ten o'clock hour; do you recall?





RONALD MENKE, EXAM BY CALL

A No, I usually can recall how much I have to drink. I was saving my straws.
Q How much do you think you had to drink between 7:00 and 10:00?
A I would say there was probably six to eight straws sitting there.
Q What were you drinking?
A Rum and Coke.
Q Is it fair to say that you were a little bit intoxicated?
A That is fair to say.
Q When Darren came in, was there a toast of some sort that was made?
A There was. Just prior to Darren coming in -- and I got to tell you this because it makes a little bit more sense to where I am in this -- is that, at that point, Birdie and I had discussed going home because I knew I had things I had to get done. She had to get packing done and stuff like that. I knew that, you know, you cannot totally get yourself wasted and try to get yourself up and get stuff done. So I had talked to her and she indicated that she felt she could drive, given a little bit more time.
Q Okay.





RONALD MENKE, EXAM BY CALL

A And so I says, "Well, we need to start thinking about going home here pretty soon." Well, at that point Darren had came in the door, and I'm pretty sure it was around ten o'clock or so, and we sat there and he come down and he got a beer, I believe, and we were sitting there talking a little bit. In fact, we were talking about golf. And he was saying -- you know, he was wishing that we could get back out there again. I says, "Well, you have to wait a couple weeks because I'll be gone."
As we were sitting there talking, Birdie was still being excited about her going to Chicago and being with her sisters and her aunts and that.
Q And what happened next?
A And she says to Darren, she says, "Is it okay if I buy us a toast," meaning a shot of alcohol. At that time I did have a shot of alcohol. I'm not much on doing shooters, as so-called to say, but I did that time. In fact, I had a tequila.
Q Okay. Did Birdie have anything to drink or did she just buy that for you and Darren?
A No. She bought one for herself, even. At that point, Birdie had went down to the end of the bar and she was sitting there talking to someone down at the end of the bar. I don't even know who she was





RONALD MENKE, EXAM BY CALL

talking to. I sat there and I continued to talk to Darren.
Q Then what happened? You were talking to Darren about golf and whatnot?
A Yes. We were talking about -- actually, he was talking about fishing.
Q Okay. After you were done talking about golf or fishing, what happened?
A Well, Darren got up to do something. I don't know what he was doing. Pulling chairs in, cleaning up tables or something. I don't know. He just wasn't there. And Bob came up to me and he was kind of staggering on me, and he started badmouthing me, or threatening me or -- I don't even -- you can't call it a threat. It was just a -- oh. I'm sorry.
Q Before you get to that, to that point in time -- what time do you think that was, about?
A Going on 10:30.
Q Okay. How much had you observed Mr. Teinert drink to that point in time, since you came in at 7:00, and about 10:30?
A Well, as much as I do know how much Bob drinks, I'd say, from 7:00 to 10:00, he had to have at least six.
Q Did you observe him have at least six

drinks? Did you actually observe him at different times having at least six drinks?

A I cannot say that that was the exact amount, but it's fair to say that that was real close.

Q You weren't watching his drinking habits --

A Right.

Q -- and everything he did, correct?

A Yeah. I was already tired of listening to him, so I was trying to stay away from him as much as possible.

Q And so he came up to you, and what did he say to you?

A When he got up to me -- and so the record states it here, I am not in maintenance militarily. I'm in a complete different department.

Q Military. What department are you in?

A I'm in the LSF.

Q Which is what?

A Flight support.

Q Okay.

A It's documentation under engine management, but it's a different command completely.

Q So what did Mr. Teinert say to you when he walked up to you?







A I am on the board here of the club, and that's to make decisions on anywhere from what kind of glasses we can afford to buy to how much money we got in the coffer to repair the chairs. And Bob was saying that he was going to get me off the board. He was going to tuck a talk to Reutlinger.

Q Did you sit on the board at that time?

A I am still on the board as of today.

Q What else did he say?

A He says that he was going to get me off the maintenance board so that -- so he could get himself on it and that he was going to have the locks and that changed to the club so no one else could get into the club except for him because he was building custodian with Jack Wall, and that's Captain Wall.

Q And then did he threaten you that he was going to tell Colonel Reutlinger to have you taken off the board?

A He did. When we were talking, or in his conversation, that's what he was saying about me getting off the board. He was going to physically tell Reutlinger to get me off the board.

Q How did you respond to that?

A I told him to fuck off and get out of my face.







Q At the time that he said this to you, was he speaking in an elevated voice?

A Yes.

Q And was he acting belligerent?

A The way I look at it, he was.

Q Was he acting aggressive toward you?

A Yes. He was basically over the top of me. He was physically pushing me into the bar as I was sitting there.

Q Did he actually push you into the bar with his hands or any part of his body?

A No. He was leaning against me.

Q When you say leaning against you, was he actually making physical contact?

A That he was.

Q So not only was he in what is traditional referred to as your personal space, he was making physical contact with you and pushing you against the bar?

A That he was.

Q And that's when you said what you'd indicated, correct?

A Exactly.

Q How did he respond to that?

A He got back up and went back down to the







end of the bar.

Q Did he say anything to you?

A Yeah. He turned around with the FU's, too. Or I should say, you know, different ways of saying fuck in the same mode, basically.

Q So in some form of words he told you to fuck off?

A Exactly.

Q And then went back and sat down?

A Yes.

Q In the prior conversations that you had had with him -- not the conversations, but where he'd interrupt through the evening, was his language peppered with vulgarities and including the word "fuck" or words to that effect?

A It was.

Q Was it frequent, was it occasional? What was it?

A Well, as much as we use what they use as obscene or vulgarities out here, you know, or we'd been mentioned to, it's almost commonplace, so that, when you say a word, it does not filter in as much as if you say a word, so, you know, throughout a period of time, if you used the word "goddam," it does not mean you want God to damn that. You just -- it's

RONALD MENKE, EXAM BY CALL

just a word that comes out of your mouth at the same time you're making a point of something.
Q I see. At the time that -- at one point Airman Jensen came into the club, did he not?
A Yes.
Q And do you know if he was in the NCO Club at the time of this incident where Mr. Teinert came in and told you that he was going to get you kicked off the board? Was he there when that happened?
A He was.
Q Was that conversation loud enough that Mr. Jensen would have had an opportunity to hear it, or was there too much noise in the bar from the TV and whatnot?
A Well, there was too much noise.
Q In your opinion, do you think Mr. Jensen heard that conversation?
A There is no opinion to this. I will say he could not hear what was said.
Q Do you think he heard the obscene language that both you and Mr. Teinert said? Do you think he heard that?
A Yes. That was a raised voice. He did hear that. He could hear that.
Q Do you know if he actually did?





RONALD MENKE, EXAM BY CALL

A I cannot say. I'm not him.
Q You didn't observe any -- you obviously weren't looking at his face when all this took place, correct?
A No. I was looking at Bob.
Q What did you do after Bob went down and sat down at the end of the bar?
A I got up out of my chair, went over to Birdie and told her. "It's time to go." I had enough of Bob.
Q Okay. Did -- what did Birdie say at that point?
A Birdie said that she was almost able to drive and it would be a few more drinks of water that she would have to take before we could drive, or we -- she would call Mark to come get us. At that point, she decided that it was better for us to call Mark.
Q Okay.
HEARING OFFICER McCABE: When you refer to Mark --
THE WITNESS: Mark is my son.
HEARING OFFICER McCABE: Okay. Just wanted to make sure.
Q (BY MR. CALL) What time do you think that





RONALD MENKE, EXAM BY CALL

was that you told Birdie that you wanted to go?
A Well, since the time line is between 10:00 and 11:00, it had to be, you know, around 10:30.
Q So this was shortly after Darren had come up and talked with you and then started going about his business, correct?
A Exactly.
Q Did your wife actually call Mark?
A No. When we were actually standing there talking -- we were at the end of the bar and we were talking about it and that, and she was getting ready to, because the phone is on the opposite side of the wall, and that is when the SPs came up and tapped me on the shoulder.
Q And to your recollection, who was it that came up and tapped you on the shoulder?
A Terry Morstad.
Q Anybody else you recognized?
A No. The other SP that I seen out in the hallway, I didn't even see him in the bar.
Q Do you know who that was?
A Not to my knowledge, until I seen him in here.
HEARING OFFICER McCABE: And so the record is clear, when you refer to SP, are you referring





RONALD MENKE, EXAM BY CALL

to --
THE WITNESS: Shore patrol or military police.
HEARING OFFICER McCABE: Thank you.
Q (BY MR. CALL) So after -- was it Sergeant Morstad that tapped you on the shoulder?
A That is correct.
Q What did he say to you?
A He said, "Ron, come with me."
Q What did you do?
A I followed him.
Q Where did he go?
A We went out into the foyer.
Q What did he say to you, if anything?
A Well, he said that he had been contacted that I'd been drinking too much.
Q Okay.
A And that I was going to attempt to drive home.
Q And how did you respond to that?
A Well, I'm not exactly sure of the words I used, but I think I turned around and said, "Goddam Teinert," because I'd looked in there and Bob was laughing.
Q So was it your understanding that Mr.

RONALD MENKE, EXAM BY CALL

Teinert had called the shore patrol?
A That is exactly correct.
Q And is that -- what did Sergeant Morstad say after you said that?
A Terry went and told me that it doesn't matter who called, that he was here for me.
Q Okay. And did you take that to mean that it was Sergeant Teinert that had called the shore patrol, but that wasn't the issue; the issue was whether you were intoxicated and going to drive home?
HEARING OFFICER McCABE: Would you rephrase that? I got lost on that one.
MR. CALL: Sure.
Q Did you take Sergeant Morstad's statement that "it doesn't matter who called" to mean -- because he seemed to respond to that when you said, "It was that goddan Teinert that called." He then responded, correct?
A That is correct.
Q So he -- in response to that, he said, "It doesn't matter who called," correct?
A That is the exact words.
Q And did you take that to mean that it was actually Mr. Teinert that called the shore patrol?
A In my mind, yes, it was.





RONALD MENKE, EXAM BY CALL

Q Okay. So after he said that that wasn't the issue -- you were intoxicated at this point, weren't you?
A I was.
Q Were you slurring your speech a little? Do you recall?
A I couldn't say if I was or wasn't.
Q Okay.
A I thought I was talking normal.
Q But you could tell that you were intoxicated to drive? Excuse me. That you were intoxicated?
A I passed my keys off about two hours prior to that.
Q Who did you pass them off to?
A I give them to Birdie because I knew -- I was sitting there drinking and I knew I wanted to stay a while longer, and when I do that -- I don't drive intoxicated.
Q So did you say to Sergeant Morstad that they were going to probably let him drive off the base?
A Yes. After he said basically that it didn't matter who called, and I says, "Well, you'll probably let goddam Teinert drive off that base and





RONALD MENKE, EXAM BY CALL

he's a lot more intoxicated than I am."
Q And how did Sergeant Morstad respond to that?
A He said that it wasn't Teinert's intoxication, it was mine that he was worried about.
Q Okay. Then what happened?
A Then he give me three choices. Or someone give me three choices. I don't even remember who give me the three choices. I still think it was Terry talking, but there was another SP standing there.
Q Could that have been Sergeant Bradshaw? Was that his name?
A It's possible, and I'm not sure that that's how the choices came, but I know there was a choice of a cab, a friend to take me home or they would take me over to security police.
Q Did they say they might call your commander?
A Yeah. Well, the commander and that would come as soon as I go to security police, so they'll make sure that they get a hold of him.
At that point Darren -- I don't know if he was in the restroom or in the back or that -- he stepped forward and I remember him talking, and he





RONALD MENKE, EXAM BY CALL

says, "Well, I'll just take you home." And says -- and I told the SPs, "Okay."
Q So the SPs said that they would leave, then, if Darren would give you a ride home?
A That's exactly what they did.
Q Did you promise then that you would go home with Darren?
A I did.
Q Then what happened? Did the SPs leave at that point?
A The SPs were gone. I don't know which door they left out of, but I know -- well, they probably went out the main entrance to the club.
Q Did you go back into the NCO Club?
A That I did.
Q And Birdie was inside the club at that point, correct?
A Yes. Fifteen, 20 minutes had elapsed since I was in there, so I don't really know at that point who was all still sitting there, but Birdie was still standing in the same corner that I left her in.
Q Okay. So how long -- when you came back into the NCO Club, how long were you there before you actually left?
A I'd say approximately 15 minutes. Maybe

RONALD MENKE, EXAM BY CALL

20.
Q What were you waiting for?
A Darren was doing something. I don't know if he was doing something in the back room or that, but I was just waiting on him.
Q But he was fulfilling some sort of duty that he had over there, whether it was policing tables or --
A Exactly.
Q -- cleaning up, things like that?
A I don't know what he was doing at the time. I asked for a glass of water and I was sitting there drinking a glass of water.
Q So you had glasses of water for about 20 minutes?
A Exactly.
Q Did you say anything to Mr. Teinert after you came back into the NCO Club at that point?
A No.
Q Did he say anything to you?
A No. He was just down there watching TV.
Q And then Darren came out. Did you and Darren then walk out to Darren's car?
A Yes, we did.
Q And did Birdie accompany you out?





RONALD MENKE, EXAM BY CALL

A Actually, Birdie went out first, and then I did and Darren did after. We went out the side door, the back door.
Q And you got in Darren's car?
A Yes, I did.
Q And Birdie got in your car to drive home?
A Yes. We had discussed it and Birdie said that she was fine to drive home and that there was no need to call Mark to take care of it, or she probably would have went with us.
Q Okay.
A But I promised the SPs I was going home with Darren and that's what I did.
Q When you got home, what happened?
A Let's see. When I got home, Darren came in the house for a little bit and we BS'd somewhat. I couldn't really tell you what. I think it was about his fishing again because he wanted me to go up and go fishing with him.
Q Do you recall Darren stopping at the gate and informing the guards that they were --
A Yes, I do.
Q Informing the guards that Darren was there and checking you off the base?
A Yes, I do.





RONALD MENKE, EXAM BY CALL

Q And then you drove from there home, correct?
A That's correct.
Q Or at least Darren drove you home?
A Yes.
Q How long did it take you to drive from the base to your home?
A Normally, when I drive, it takes 11 minutes.
Q Is that observing the speed limit?
A That's observing the speed limit and waiting for the light down there.
Q How long do you think it took you to get, that night in question, home?
A Fifteen minutes.
Q You got home. What time do you think it was when you walked into your home?
A I don't know. 11:30, a little bit after. I'm not quite sure because I never looked at any clocks.
Q Okay. So was Birdie following behind you or were you following Birdie?
A No. Birdie was in front of us.
Q So Darren was following Birdie home?
A Exactly.





RONALD MENKE, EXAM BY CALL

Q When you got home, you talked with Darren. How long was Darren there?
A Approximately 15 minutes or so.
Q And then he went home, correct?
A He went back to the base.
Q Or he left your home?
A Yeah. He went back to the base.
Q At least that's what -- I'm asking, how do you know he went back to the base?
A Because I called the base.
Q Later on in the evening?
A I did.
Q Okay. We'll get to that. When you got home, did you try and attempt to call Bob on his cell phone?
A I did.
Q Tell me what happened.
A Well, I can remember the last four digits of his telephone number but I never can remember the first three. I don't know why.
Q This is his cell phone number?
A This is his cell phone number. And I've been that way all my life. I can remember the four important digits. I just don't remember the first three ever. But, anyway, I went to go call him on

RONALD MENKE, EXAM BY CALL

his cell phone and I asked Birdie, I says, "What's Bob's number?"
Q What did Birdie say?
A Birdie says, "What do you want it for?" I says, "So I can call him." And at that point she dug it out of her purse and she read it to me, and I picked up the phone and I says, "What did you say the first three numbers were again?". She said it again and I dialed the number.
Q And did the phone ring?
A The phone did ring.
Q Did Bob answer the phone?
A I heard Bob answer the phone and then I heard the phone go dead.
Q Did you say anything for him to --
A No. I didn't even get a word in edgewise there.
Q Did you even get to say hello?
A No. That's why I thought he must have had a dead battery or something. So I asked Birdie for the telephone number again, and she says, "Why do you need the telephone number?" I says, "Goddam Teinert hung up on me."
Q So you didn't know whether he'd hung up on you or his battery had gone dead?





RONALD MENKE, EXAM BY CALL

A Yeah. Well, you can never tell with them. Mine is good for a minute and then it's totally gone.
Q Did you think he'd hung up on you?
A That's what I thought, or he accidentally hit the off button.
Q Was Birdie standing right over you when this happened?
A She was about a foot and a half away from me.
Q And you tried to dial him again, correct?
A That is correct.
Q And did he answer the phone?
A This time he did. He said hello.
Q And what did you say?
A And I told Bob straight out, I says, "Bob, you mind your P's and Q's and you best not be driving off that base. You've been drinking too much, too."
Q What did he say in response to that, if anything?
A Basically the phone hung up again.
Q Did you try and call him back after that?
A No, I did not.
Q What did you do then?
A I called bartender at the club.
Q And what did you tell him?





RONALD MENKE, EXAM BY CALL

A I told her that I was home safe and Darren was on his way.
Q And that was -- who was it that you called at the bar?
A That was Sherri.
Q Sherri. Okay. Did you call anybody else that night?
A Yes. I asked Birdie for the number to the main gate and -- I don't know the number. She does.
Q Did she give you the number?
A She read it right out to me and I dialed it.
Q And you dialed that. Did you call the main gate?
A Yes, I did.
Q What did you tell them?
A And I don't remember who was on duty at the time, but I told them -- and everyone knows what Teinert's truck looks like and is out there, and I told them not to let Bob drive off the base because he'd been drinking excessively as the night went on.
Q Why did you call the guard gate?
A I called the guard gate because I'm concerned for Bob.
Q Had you ever known Bob to drive off the





RONALD MENKE, EXAM BY CALL

base when he was intoxicated?
A Yes. He's even come over to my house intoxicated after being at the club.
Q When was the most recent time prior to that night that you had seen Bob --
COLONEL WARNER: I'm going to object. I realize that -- I mean, I've tried to give him as much leeway as possible to go into Teinert and his drinking. I think I understand what you're trying to do, but at some point it gets so extraneous it goes beyond relevance.
HEARING OFFICER McCABE: Well, I don't know what the question was yet. It was a start of a question. It looked like it was probably going in the direction you were thinking it was going, but what is the question you're intending to ask?
Q (BY MR. CALL) My question is: Most recently, when was the most recent incident prior to that time when you had observed Bob drive off the base drunk?
HEARING OFFICER McCABE: Objection is noted for the record.
THE WITNESS: I couldn't give you a date, but fair to say it was in August.
Q (BY MR. CALL) Okay. And you knew that

RONALD MENKE, EXAM BY CALL

sometimes Mr. Teinert stayed on the base, or at least believed he'd stay on the base. He'd go stay at the hotel service they have there, correct?
A Never.
Q Well, did you know that he claimed to have a room there that he stayed at?
A No. He used to stay in the shop at times, until Mike McCowen told him that he was no longer allowed to stay overnight in the shop.
Q But you know that he's claimed to stay over on the base at times?
A Yeah, he -- I had seen -- inside this little closet he had a cot with a sleeping bag on it.
Q So that it appeared that sometimes he would stay there, correct?
A That's correct.
Q But when you say no, you're saying no because you don't know from your own personal knowledge whether or not he stayed there?
A I have never seen him there.
Q It's just you don't know because you never observed it with your own eyes, correct?
A That's right.
Q When you called Bob to tell him to mind his P's and Q's, what were you referring to?





RONALD MENKE, EXAM BY CALL

A Basically I was telling him to mind his own business because I was going home and -- for his concern and my concern, but he was just being belligerent at the time.
Q So --
A So I was telling him to mind his own business. Even like the SPs and Darren and the rest of us get into a conversation with him. He needs to mind his own business at times.
Q But you were upset, weren't you, due to the fact that Birdie was going to be driving you home, or Mark, but he called the SPs and told them?
A That is correct.
Q At least that was your perception, correct?
A That is correct.
Q Were you a bit frustrated at the time you called him?
A Agitated is the word I would use.
Q What were you agitated about?
A Because knowing that he could possibly be driving off that base tonight and I did not want him to go.
Q Was that call out of concern for his well-being?
A Yes. It always has. Now, granted, Bob



RONALD MENKE, EXAM BY CALL

does not live a far distance, but the roads that he's got to drive on back there to get to his house, he could hurt someone. Or he could hurt himself, even, and I -- you know, being his friend -- it's hard to explain, unless you got -- people use me and Teinert as a love-hate relationship. Maybe that's true, too, but the thing is, I got genuine concern for Bob at all times. I could be pissed at him at one second and go out and work with him the next. I mean, there is -- there has never been a time that I did not have concern for Bob. And when he drinks the way he does at times, since no one in this room knows him like I do -- you guys cannot even believe -- or begin to believe and understand the relationship I have with Teinert.
Q Have there been times where you're both frustrated at him and trying to be his friend at the same time?
A I got genuine concern for him at all times. Yes, I do. I can be -- I can be so pissed at him that, you know, you just want to knock him in the head, but I know with a habit -- what his habit is. It's hard to ever get -- you cannot get mad at him because I know he's got a problem, and I just want to help his problem.





RONALD MENKE, EXAM BY CALL

Q And so is that -- do you have -- you indicated you have a son, correct?
A Yes.
Q And at that time -- you've been frustrated at your son before and agitated with your son for doing stupid things, haven't you?
A Yes.
Q And at the same time you've felt love and concern about his well-being, haven't you?
A Yeah. I've called him dam little bastard, piss me off. Now get over here and help me. Even though he pissed me off, I mean, I still love him. I never spanked him or anything else. I know how discipline is.
Q At the time you talked with -- Bob has alleged that you made the threat that consisted of, "You're dead. Bob, you're dead. I can do this." Did you say that or any words to that effect in your telephone conversation with him?
A No.
Q Did you convey any sort of death threat to him?
A No, I did not.
Q Did you intend any sort of threat?
A I've never threatened him at all.

RONALD MENKE, EXAM BY CALL

Q The question of P's and Q's, you use that phrase occasionally, don't you?
A I do.
Q And why do you use that phrase?
A Well, to tell you the truth, I think I was raised with it. I do not know. It's always been -- it's always been in my vocabulary, like people who live in glass houses don't throw rocks. I mean, I have no idea. I use that phrase, too.
Q Okay. So, to you, what does mind your P's and Q's mean?
A Mind your own business at the time.
Q And is that your understanding of what the general public would think that means?
A I would say so. The true meaning is pints and quarts. You mind your pints and quarts. It's no different than thinking what tips mean. Tips mean to ensure prompt service. I mean, it's -- you go in and you leave someone a tip. Well, why did you leave that person a tip? Did the person do you a good job? Yes. That's what tips means.
Q Do you use that phrase frequently at work?
A P's and Q's? No, because usually I'm working off by myself. Nine times out of ten I'm by myself.





RONALD MENKE, EXAM BY CALL

Q And on the night in question, on the 17th, did you have any other contact with Mr. Teinert after you hung up -- after he hung up from the telephone call in which you said to mind his P's and Q's and that he best not be driving off the base?
A No. I did not see Teinert until Monday morning.
Q And what happened on Monday morning? Anything?
A Nothing that I know.
Q There was no interaction between you and Bob?
A No. Bob was sitting in the usual spot he sits in at work and I went and did the business I had to do because I was getting ready to take an airplane.
Q Say hi or anything like that?
A Don't believe so.
Q Did Bob try and make any effort to evade you?
A No. He was just sitting there at the same table he sits at every day, reading his book at the time.
Q Did he look at you?
A I couldn't say if he did or didn't. I seen





RONALD MENKE, EXAM BY CALL

he was there.
Q Do you know if he saw you?
A I believe so, because I went into the computer room.
Q And then what did you do?
A Got ready to take an airplane.
Q And did you get on that airplane?
A Yes.
Q Where did you go?
A I went to New York City.
Q And how long were you in New York City?
A Four days.
Q And then where did you go?
A Came back to Salt Lake.
Q How long were you in Salt Lake?
A About two weeks. Maybe ten days. I can't remember the exact date. I know I came back about the 17th, 18th of October, so it was into the middle of October, already.
Q So you left on the 20th; is that correct?
A I'm trying to think what day I left.
Q If Friday was the 17th, 18th being Saturday --
A Oh, you mean for New York. I'm sorry.
Q Yes.





RONALD MENKE, EXAM BY CALL

A I lost the questions here.
Q You left for New York on the 20th?
A On the 20th. Yes, I did.
Q And then you returned about ten days later?
A No. I returned that Friday.
Q So just five days later?
A That's right.
Q Did you come back to the base at that point?
A Yes, I did.
Q Did you see Mr. Teinert at all while you were -- at any time between your visit -- you came back to the base, correct?
A That's correct.
Q And then how long before you flew to Pennsylvania?
A About ten days later, I believe.
Q And during that period of time, did you see Bob Teinert on the base at all?
A Every day. Or every day he was there or I was there. And I didn't take no time off, so I'd say -- and I'm not sure if it's every day because, at that point in time, I really had no idea what was going on in this thing.
Q Business as normal, as far as you were

concerned?
A Exactly.
Q Did you have any interactions with Bob during that period?
A Within the ten days?
Q Yeah.
A I take it back. I was actually pissed at him on the 27th.
Q Why?
A Well, I just realized that -- okay. I was gone. I came back. The following Monday I went to work, and at 1:30 in the afternoon Colonel Reutlinger called me on the phone and told me to come to Chief Baarz's office.
Q Okay. What day was this?
A That's the 27th of September.
Q Is that the day you got back?
A No. That's the day I returned to work.
Q Okay. So in between that period and when you actually got back from the trip before Colonel Reutlinger called you, was there a time that you saw Bob during that intervening time?
A No, I did not.
Q And Colonel Reutlinger came in, and what did Colonel Reutlinger he do?







A He called me on the phone called told me to come to Chief Baarz's office. At that point, I had no idea anything was going on or anything else. I thought maybe my sticker on my car was expired or something. I had no idea.
Q So you walked in and talked with Colonel Reutlinger. What did he tell you?
A I went to the Chief of Police Office and got in there and he told me to sit down. There was Captain Wall, Colonel Reutlinger and Chief Baarz was there.
Q What did they do?
A Chief Baarz handed me this piece of paper that said cease and desist, and I said, "What's this for?"
Q What did they tell you?
A And he told me that -- did I have an incident on the 17th of September in the NCO Club with Teifnert. I says, "Not to my real knowledge." At the time, I didn't know what an incident was. I remember we argued and that, and that was about it. But we've argued before, so I didn't really think anything of it. And I says, "Well, what is this for?"
And Ron Baarz was getting very upset with





me and basically he told me that if I go around Bob or, you know, do any threatening actions towards Bob, that there would be more action against me.
Q After that point, did you have any conversations with Bob?
A No.
Q Okay. Did you make an effort to stay away from him?
A Yes.
Q Did you happen to see him on occasion?
A Seen him almost every day.
Q And did he see you?
A He did.
Q Did he act afraid of you?
A No. He come in the same room I was in.
Q Did he appear to get away from you if you walked into the same room?
A No.
Q So essentially you just both kind of ignored each other, correct?
A Silent treatment, best word.
Q You made eye contact, did you not?
A Yes, we did.
Q Did he have a look in his eyes that he was afraid of you or fearful of you?







A Not that I could say.
Q Okay. After the 27th, how long were you there at your job?
A I was there for approximately ten days.
Q And then you went -- flew to Pennsylvania?
A Pittsburgh.
Q Or Pittsburgh. How long were you there?
A Three days. The fourth day I came back home, yes.
Q What day did you get back?
A Friday.
Q Do you recall what date that was?
A I'm trying to think. That was an odd day there. It was getting pretty close to Halloween, so I'd say it was the 30th. No. No. It was before the 30th. It was before my birthday, so it had to be coming up on the 20th.
Q And then you came back and returned to your normal work duties, correct?
A Yes.
Q And on the 11th -- excuse me -- the 6th of November you attended an award ceremony, correct?
A Yes.
Q And you were issued an award, correct?
A Yes.

Q And you've seen Exhibit 14, correct?
A I have.
Q That's a copy of the award that you received at that time, correct?
A It is.
Q Okay. Then on October 20th, did you have an opportunity to talk with Colonel Reutlinger late in the afternoon?
A Yes.
Q What happened?
A I had went over to the orderly room, and it was, oh, approximately 4:30, going on 4:30, and Colonel Reutlinger was there, and basically I was trying to find out what was going on with me, because I had not heard anything and, you know, once you don't hear things for a while, you start to wonder.
Q You're referring to this alleged incident?
A Exactly.
Q And the cease and desist, correct?
A Exactly.
Q What did he do.
A And Colonel Reutlinger says, "Well, hold on a second," and he went into Chapman's office, and then he came back into the orderly room and basically -- I can't say basically because this is







exactly what he said. He said, "Ron, the good news is that you're not going to be fired."
Q What else did he say?
A And he says that further action was coming down, that the paperwork was going to HRO.
Q Did he leave any indication from what he said -- was his statement that you will not be fired absolute, or did he leave it open that you may be fired?
A I took it as I was not going to be fired.
Q Do you recall what his exact words were?
A "Ron, you're not going to be fired."
Q Okay.
A I should say, "The good news is, Ron, you're not going to be fired," is what he said.
Q How did you respond to that?
A I just says, "Well, when am I going to find out?" He says, "As soon as the paperwork comes back from HRO." He said to talk to Chapman.
Q So you were expecting some sort of lesser sanction, perhaps?
A Well, I didn't know what it was going to be. I didn't -- at the time I didn't even know the IPR. I'd seen it when I first hired on ten years ago.







Q But all you knew is that you weren't going to be terminated?
A That's correct.
Q And then on 11-16, November 16, you were given a notice of proposed termination, correct?
A That is correct.
Q And your employment duties were suspended as of the 17th, correct?
A That is correct.
Q Since the date of the incident on the 17th of September, all the way to November 17th, there were numerous occasions when you were in close proximity to Bob, correct?
A That is correct.
Q And at no time did you threaten him or say anything to him, did you?
A That is correct.
Q You and Bob continued to work in the same shop together?
A On a daily basis, yes.
Q You weren't working on the same jobs, but you were in the same work site, correct?
A That is correct.
Q Had you essentially put the issue of the alleged threat behind you as far as holding any sort







of a grudge against Bob?
A I've never held a grudge against Bob.
Q Okay. But as far as you were concerned, you treated the incident on the 17th as being concluded on the 17th, did you not?
A I did.
Q There were no attempted fights between you and Bob between that September 17th and November 17th period?
A No. I just -- I just took it like with a grain of salt.
Q Okay. Did Bob make any attempts during that period of time when you did see each other to avoid you?
A No. He never avoided me.
Q Make any expressions on his face that he appeared to be afraid of you?
A No.
Q Now, there was an incident where Clay Zimmerman hit you with a flashlight and shoved you over some chairs, correct?
A That's correct. I went in and Clay was agitating me inside the inspection dock, and I turned around and used the word breast milk, because a long time ago Clay accidentally -- I don't know if it was

accidental or not. He drank someone's breast milk, and it's kind of a standing joke that's out there. And I told him to knock it off, and he says, "Or what?" And I says, "Or I'm going to talk about the breast milk."

And he turned around and -- I just seen a flare in his eyes, and he had a flashlight in his hand. He hit me in the chest with the flashlight and give me the push backwards and I went across a couple chairs.

Q So we're clear what we're talking about, at one point Clay had got into the refrigerator out there at the base and taken what he though was milk and drank it --

A Yeah.

Q -- and it turned out to the one of the airman's breast milk?

A Exactly.

Q On this occasion where Clay was -- he was saying something to you? He was teasing you, of sorts?

A Yeah. He was -- the fooling around, the kidding stuff that goes on on a daily basis out there.

Q Was he harassing you about the fact that







you had lost some stripes?

A He was.

Q And so you said, "Leave me alone," and he didn't, correct?

A That's correct.

Q And that's when you made this comment, correct?

A That's correct.

Q And he pushed and shoved you, correct?

A That is correct.

Q Did you ever try and defend yourself against his attack? Did you hit him back or push him back or shove him back?

A No. I wasn't even mad until I sat and I had a bruise on my chest, and then I was sitting there thinking about it and I brewed over it a little bit, and I went to Sergeant McCowen, and this was the day after, and I had told him what had happened, and he says, "Well, that's kind of a serious thing." because, since the incident in Italy, I've been teased and humiliated and everything else, you know, I'd have little airman stripes hanging up on top of my locker or, you know, have people carrying -- you know, pictures of people carrying statues out of places and stuff like that.





Q Okay.

A So I've been harassed quite a bit about it, but I just, like I say, take it with a grain of salt anymore.

Q And was Mr. Zimmerman terminated for that physical assault?

A No. What had happened is I had told Chief McCowen -- well, he wasn't chief at the time, but I had told him, and he says, "Well, let me get a hold of his supervisor." He got a hold of his supervisor and they decided that we had to come to some sort of an agreement. So they put Clay and I and then two in the conference room and we explained what we seen, what each of our side was, and Clay said he was wrong for hitting me in the chest. He says, "Yeah, I was teasing him and that. I didn't think it was going to go where it went, and I hit him." He says, "I didn't mean to really hit him or that. It just was a reaction."

Q And he took full responsibility for it?

A He did.

Q Were you sanctioned for that?

A No. I was counseled for it.

Q Who counseled you about that?

A Lee McDaniel put in my 904 that -- you







know, better ways to help myself stay out of that kind of situation because I, you know, have been around so much harassment because of Italy.

Q Was that counseling intended to be a sanction against you or just counseling?

A No. It was just -- it was put in that he had a talk with me about it.

Q And that was subsequently purged from your file because it was not an adverse action, correct?

A That is correct.

Q When did that event occur, this assault?

A Oh, it's been almost two years ago now.

Q Okay. And since that time, you've worked with Clay on a fairly regular basis, have you not?

A That day we shook hands and we continued working with each other.

Q And you were able to put it behind you and move on?

A That's correct.

Q The incident of September 17th, has that affected your ability to perform your duties in any -- except for your termination -- suspension and subsequent termination, did it affect your ability to perform any of your job duties?

A No. I didn't even know at the time

RONALD MENKE, EXAM BY CALL

anything was really going on until the day that they told me I had to leave. I was working on a computer project that the base was on.

Q And have you observed any effect of the events of that night on Mr. Teinert's ability to do his job and his performance?

A No. At the time I did not.

Q It's been represented that Colonel Reutlinger has asked you to admit that you threatened Bob in this case. Why haven't you admitted that you threatened Bob?

A Because I have not threatened Bob and I'm not going to admit something I did not do.

Q Why don't you just admit to it? If you didn't do it, just admit to it and get it over with?

A I'm not a liar.

Q Do you believe it would be morally wrong for you to admit that?

A That is correct.

Q Have you informed Colonel Reutlinger that you were intoxicated on the night in question?

A He's never really asked me.

Q But those that have asked, you've told them that you were intoxicated, have you not?

A I did.





RONALD MENKE, EXAM BY CALL

Q And you've taken responsibility for the things that you did in fact do, have you not?

A When I was handed the proposal to remove from Chapman's office, I was told at that time all I could do was refute what was in that statement, and that's exactly what I did. I said, "I did this, I didn't do this, I done this and I didn't do this."

Q So you took responsibility for those actions that you did take?

A Exactly. I have.

Q And denied responsibility for those things that you didn't take, correct?

A Didn't take or couldn't say what someone else done. It's in the TPR. I mean in the proposal to remove.

Q And even some of these things that could have got you reprimanded and sanctioned, correct?

A Yes.

Q For instance, you admitted to using vulgar language, did you not?

A I did.

Q That would subject you to adverse action, would it not?

A It would.

Q And the reason that you admitted to that is





RONALD MENKE, EXAM BY CALL

because that's something that you did do, correct?

A That is correct.

Q Do you think if you were reinstated you would have any further troubles with Bob?

A No. We're still friends. His problem is a problem, and I just want to -- even to this day, even if I don't get my job back, sooner or later I'll be around Bob again and sooner or later I'll still be his friend.

Q Are you going to continue to try and help him with his drinking problem?

A He's got a problem and it needs help. Yes, I will.

Q And how will you do that? By just being a friend to him?

A I'm still his friend, yes.

Q Do you want to be reinstated?

A I do want to be reinstated.

Q Why?

A That is my livelihood. I enjoy jet engines so much. Ever since I've been a little kid. I made a little Wankel engine and I put that thing together just to watch it work, and from that time on, I knew what I wanted. I love jet engines. If I got reinstated back into there, I would continue to do my





RONALD MENKE, EXAM BY WARNER

job.

Q You think you --

A My skills out there is, as everyone has heard throughout these people talking -- now, most of these people were not on my side to start with or your side or anyone's side here. They came in to say what they had to say, and they all believed that I am what I am. And I can't change what I am. But I'm a darn good mechanic and I enjoy my job out there. I love the Air National Guard. I never put it down. Even though I've been put through the ringer a couple times there, I still love the job.

MR. CALL: Nothing further.

HEARING OFFICER McCABE: We've been for about an hour. Let's just take a five-minute break, short five-minute break, and then proceed.

(Recess.)

HEARING OFFICER McCABE: We'll go back on the record after a short break and we're now at the point where, Colonel Warner, you may ask your questions of Mr. Menke.

COLONEL WARNER: Thank you.

CROSS EXAMINATION

BY COLONEL WARNER:

Q Sergeant Menke, much has been testified to

RONALD MENKE, EXAM BY WARNER

here concerning Bob Teinert's alcohol problem. Do you have a problem with alcohol?
A I do not believe so.
Q It's a fact, however, that that night at the club you drank to a level of intoxication; is that true?
A Yes.
Q And it's also true that, while you may not have a problem with alcohol in your own opinion, alcohol has gotten you in trouble in the past, hasn't it?
A Yes.
Q Indeed, would you not agree that alcohol was a seriously contributing factor to your problems in Italy?
A Well, yeah, I believe so. I believe --
Q Do you think --
A Hold on. You asked me the question. I might as well bring it out in the open so we can do this. I flew for 14 hours on an airplane to Italy. I climbed off that airplane. I had two days off. Out of the two days off I had, I went through a briefing and then I was released on my own self. Yes, I did drink excessively that night. Vino is pretty good over there and I admit I did. I guess I





RONALD MENKE, EXAM BY WARNER

got intoxicated. Yes, I did take a statue.
Q You stole it?
A I did not steal it. I removed --
Q Was it your property?
A Would you let me finish my question first?
Q No. I don't have to let you finish the question.
A Okay. okay.
Q I can ask the question.
A Okay.
Q You can answer yes or no.
A You ask what you want.
Q Did you steal the statue?
A I removed the statue.
Q Was it your property?
A No.
Q So you removed property that wasn't yours, but it's not stealing; is that correct?
A I admit to removing a piece of property on the same property at the time, and yes, I did pay my price for it. I took a punishment for this.
Q Did you steal the statue?
A I stole the statue. Is that what you want to hear?
Q Yes.



RONALD MENKE, EXAM BY WARNER

A Okay. You got it.
Q And you were punished, indeed, were you not?
A Militarily I was punished.
Q That's right. You lost three stripes; is that correct?
A That is correct.
Q All right. So we've established the fact that you were a thief on that occasion; isn't that true, Sergeant Menke?
A No, we have not.
Q Oh, I see. You stole it, but you're not a thief?
A The way you asked the question is not correctly what happened.
Q Well --
A I did not steal the statue.
Q Oh, I see.
A I was convicted of stealing the statue at the Air National Guard by -- not a preponderance of the evidence or anything else. At the time the statue was removed, yes, it was it was in the same place that we were, but I did not take the statue.
Q I see. So you were just railroaded on that deal; is that correct?





RONALD MENKE, EXAM BY WARNER

A I'm not saying that, either. I took my punishment for this. I did not take the statue, but I was there. It's just like if you go into the store and your buddy holds up the store, you're in trouble, too.
Q Uh-huh. I think I understand the principle. But the question is: What do you understand here?
A I understand that I lost three stripes off my arm and I paid my price for it and I'm on my way back up through the military chain.
Q And you did, in fact, steal that statue with the others because you were with them and you took the statue that wasn't yours, didn't you?
A I did not.
Q I see. They took it; you were with them? Is that the distinction you're making?
A It's your distinction. You keep saying I stole the statue. I said I did not.
HEARING OFFICER McCABE: Let me just make this suggestion.
THE WITNESS: Yes, sir. I'm sorry.
HEARING OFFICER McCABE: Perhaps this will help. Tell us what happened with the statue.
THE WITNESS: I tried to and he stopped me.

HEARING OFFICER McCABE: Well, I'm going to give you that opportunity before Colonel Warner proceeds any further.

THE WITNESS: Okay. Thank you, sir.

HEARING OFFICER McCABE: So perhaps we can get past this point and continue on with this hearing. Otherwise, at this rate, my plane may be in jeopardy.

COLONEL WARNER: I'll make sure you get to your plane.

(Discussion off the record.)

HEARING OFFICER McCABE: Go ahead and give me a --

THE WITNESS: Okay. In April of '96 I climbed on an airplane under Title 10 orders, went across the ocean. Fourteen hours into the flight, got off the airplane, was briefed, had two days off before I had to show up for work.

That evening they had a hospitality club, you know, set up for all of us airmen there and I drank too much vino. I admit to it. I was fairly intoxicated. And we had decided to go get something to eat, and in the parking lot there was this -- I can't even call it a statue. It's something that looked like it was thrown out, but it wasn't. It







belonged to somebody.

COLONEL WARNER: The hotel.

HEARING OFFICER McCABE: Okay. So there was this statue there.

THE WITNESS: It was a statue.

HEARING OFFICER McCABE: What happened? Where did it go?

THE WITNESS: The people I was with thought it would be funny to put it up in the hospitality room. It was a halfway statue of Venus. It had rods hanging out of it all over the place and basically it was a piece of concrete falling apart.

HEARING OFFICER McCABE: Okay.

THE WITNESS: And they thought it would be neat to have it sitting up in the hospitality room on the second floor of the hotel lobby.

HEARING OFFICER McCABE: Okay. So how did it get there?

THE WITNESS: Huh? It never did get there. See, that's -- everyone -- no one knows this story and no one has ever let me tell the story, and even when I went through --

HEARING OFFICER McCABE: I'm giving you that opportunity.

THE WITNESS: I know, but you're giving me







the option -- this is -- I believe what he's trying to say -- he's trying to discredit me for what I am.

MR. CALL: Ron, don't worry what he's going to say. Answer the question. Tell him the story what happened.

THE WITNESS: Okay. So we went to go get something to eat, and we were with an Italian and the Italian was driving us to this restaurant, and we crashed the car and we got out and the cabarinis were there, the Italian police, and they seen this laying in the back, and at first they thought it was, you know, an art treasure.

HEARING OFFICER McCABE: This statue was in the car that you were driving?

THE WITNESS: Exactly.

HEARING OFFICER McCABE: Or that you were in at the time.

THE WITNESS: I did not touch the statue at any time in my life. I seen it there. I thought it was pretty neat myself. I thought it would be neat being up there in that room. But I did not touch the statue. I did not place it in the car. So I did not physically -- I did not steal it. I just was there by association.

HEARING OFFICER McCABE: Okay.







THE WITNESS: And I took my licks for it.

HEARING OFFICER McCABE: Okay. Thank you.

Q (BY COLONEL WARNER) So the distinction that you're making -- just so I understand it, the distinction you're making is that, because you didn't touch it, even though you thought it was neat and you were with the others and they put it in the car and they took it and you thought it would be neat to have it in the day room, you didn't steal it because you didn't physically lift it up and put it in the car; is that correct?

A That is what I said.

Q And that's the fine distinction we're making here, correct?

MR. CALL: Objection. Asked and answered. I think we're going back over this just to rehash it.

HEARING OFFICER McCABE: I think so, too. I understand the distinction.

Q (BY COLONEL WARNER) But alcohol didn't get you in trouble that time, or did it?

A No. Association got me in trouble. The alcohol had nothing to do with it.

Q Okay. So your judgment wasn't impaired on that occasion at all by your alcohol?

A I didn't say that.

RONALD MENKE, EXAM BY WARNER

Q Well. I'm just asking you if it was a contributing factor. Was it?
A I was not driving the vehicle.
Q So if you're not driving drunk --
MR. CALL: Objection. I'm going to -- this has already been asked and answered. He asked him if alcohol got him in significant trouble on this instance.
HEARING OFFICER McCABE: Different question. I'll let him proceed.
Q (BY COLONEL WARNER) I'm just trying to get a feel for your view of alcohol. You're very concerned about Bob Teinert's alcohol, but --
A Sir, do you drink?
Q I'm trying to get a feel for your alcohol. I'm asking the questions.
A Okay. You asked it.
Q Now, it's your opinion you don't have any trouble with alcohol; is that correct?
A That's correct.
Q All right. And it's your stated position that alcohol wasn't a contributing factor to your problem in Italy; is that true?
A Did I say that?
Q I'm asking you now, is that true?





RONALD MENKE, EXAM BY WARNER

A I told you I drank.
Q Is it a contributing factor to your problem in Italy?
A What problem in Italy?
Q The statue problem.
A I did not steal the statue.
Q So you had no problem in Italy?
A I lost three stripes for being in association.
Q Okay. Now, let's talk about the evening at the club. You arrived about seven o'clock; is that correct?
A That is correct.
Q And you indicated that there was only Abbott and Teinert in the club at the time, correct?
A That's correct.
Q And you exchanged greetings with Teinert?
A It's very possible. I didn't say I did. I believe he said hi to us.
Q But you specifically remember Abbott saying, "Look out. Bob is on one tonight"?
A Yes, I did.
Q But, of course, Abbott didn't remember that this morning, did he?
A No.





RONALD MENKE, EXAM BY WARNER

Q But you remember it?
A Sure.
Q And you were convinced that, even at seven o'clock, Teinert was pretty well intoxicated, correct?
A That's correct.
Q And you indicate that by 10:00 or 10:30 he was really gone, so to speak?
A I didn't say that.
Q Well, was he?
A Define what you mean.
Q Well, he was heavily intoxicated. You said he'd been continuing to drink. Indeed, I think you said you observed him to have at least another six drinks between 7:00 and 10:00.
A I says possible. Intoxication, since obviously you do not know what it is, intoxication -- if a person drinks -- a person that drinks every day a lot will -- can consume masses, a mass amount of alcohol, and not show it.
Q Well, having been a prosecutor for only 25 years, I really don't know much about people who are intoxicated, so I appreciate your education.
A Well, I'm just telling you. You asked me the questions, but --





RONALD MENKE, EXAM BY WARNER

Q No, I appreciate your education.
A I give you an answer.
Q I appreciate your education on this.
A Okay.
Q And I'm asking you what you observed. Did you see him drink --
A I did see him drink.
Q But you don't have a clue how many he had?
A I didn't say I knew how many he had.
Q Well, you suggested that he had about six on your direct examination.
A Exactly.
Q Were you counting?
A No.
Q So what makes you think six versus eight versus five?
A I didn't say six. I said that in that amount of time he approximately had six drinks. I didn't say it was five. I didn't say it was eight. I didn't say it was three. I said approximately six drinks. Six drinks.
Q And what makes you say that?
A Because three hours had elapsed in that period of time.
Q Okay. But you weren't counting, you

weren't observing, you weren't watching -- you weren't counting his straws, so to speak, were you?

A No. Should I have been?

Q I'll ask the questions, Sergeant Menke. Now, let's talk about this elevated noise in the bar. A lot of noise in the bar that night?

A Fair amount.

Q And according to your earlier testimony, Bob was speaking in an elevated voice. He was shouting and he pushed you into the bar with his body; is that correct?

A Repeat that again.

Q According to your earlier testimony, he was speaking to you in an elevated voice and shouting at times and pushed you into the bar with his body?

A At different times, but -- yes. All that occurred in different places, different times.

Q And did that occur after 10:00 p.m.?

A What?

Q That incident where he was speaking loud and pushed you into the bar with his body.

A You'll have to -- you asked me three questions -- or three different incidents and I told you it was three different, and then you go back and say loud and pushed me into the bar.







Q Well, let's make it as simple as we can for you, Sergeant.

A Please.

Q After 10:00 p.m., did you have any encounter with Sergeant Teinert?

A I did.

Q All right. And he came down to where you were?

A That is correct.

Q Was Airman Jensen in the bar at the time?

A I believe so.

Q And at that time I believe you indicated that Menke -- or, excuse me, that Teinert was speaking in a loud or elevated voice -- indeed, shouting -- and that he pushed you into the bar with his body.

A I don't believe that was said anywhere in anything I said.

Q Okay.

MR. CALL: I'd just object to the nature -- the compound nature. If you could break it out, maybe he could answer which of those didn't occur.

Q (BY COLONEL WARNER) So none of that happened; is that right?

A After 10:00 p.m., yes, he did speak loud.







Yes, he did push me into the bar or lean against me into the bar. And yes, Jensen was down at the end. Now, it didn't all -- you, for some reason, are mixing different times and different situations from what was said.

Q Well, now, how far was Jensen away from the action, so to speak, when the commotion that your wife testified to happened?

A I'd say 20, 25 feet.

Q Twenty or 25 feet?

A Yeah.

Q And yet he testified he was sitting a foot and a half away at the bar from -- on the stool next to him, didn't he?

A That's -- Jensen is who you're speaking about?

Q Yeah. You heard him testify yesterday.

A I did hear him testify, but I didn't see where he pointed on this picture sitting in front of me, Exhibit 12.

Q No. He simply testified that he was sitting approximately a foot and a half away from Teinert.

A That's correct.

Q And you're saying he was 25 feet. I want







to just clarify the difference. That's all.

A Well, if you look at this picture here, you will see where it is marked where he was sitting. Bob was sitting and I was sitting, so that's about 25 feet.

Q Now, let me ask you a question. Did Teinert ever offer you a cab?

A No.

Q So when he said -- when he testified under oath yesterday that he had offered you a cab, that was a lie or he was totally mistaken, one or the other?

A That's possible.

Q Well, I mean, he either did or he didn't. Best of your knowledge --

A You asked me if he lied or that. I can't say he lied or that. I said he did not offer me a cab.

Q Okay. So I'm just saying he was either totally mistaken or he was lying, one or the other, because you're saying --

A It must be so.

Q Okay. You're saying unequivocally that he didn't offer you a cab?

A I says he did not offer me a cab, yes.

RONALD MENKE, EXAM BY WARNER

Q So then obviously Jensen was either mistaken or he was lying, because there was no offer made, right?
A That is true.
Q When Jensen says that his observation was that Teinert was gracious, was polite, was considerate in offering you the cab, again, that was a fabrication?
A That is correct.
Q And you were only, quote, a little bit intoxicated at that time?
A I quoted I was a little bit intoxicated?
Q That's what you said on direct. "I was a little bit intoxicated."
A I don't think I said "a little bit."
Q Okay. What were you? Let's give you a chance to clarify.
A Either you're under intoxication or you're not. If you drink, you're under intoxication at any time that you put a drink to your mouth.
Q I see. So after that it doesn't matter how much, correct?
A Well, it's according to what you're asking. Are you intoxicated or are you not intoxicated? There is different levels of





RONALD MENKE, EXAM BY WARNER

intoxication like there's different levels of work performance.
Q Okay. So how intoxicated were you at the time that you were not offered a cab?
MR. CALL: Objection. It's vague. If he's not offered a cab, that's the entire evening.
COLONEL WARNER: We're talking about the incident --
MR. CALL: Then let's refer to it as the incident, because he's testified -- not hiding it under "you weren't offered a cab." That's true broad.
Q (BY COLONEL WARNER) Do you know the time I'm referring to, Sergeant?
A You're saying -- in my mind, it's 20 after 10:00, maybe.
Q Okay. I think that's a pretty good guess. And how intoxicated were you at that time?
A Fairly intoxicated. I was not driving home.
Q All right. Were you agitated at all at that time?
A When I wasn't driving home or when I was intoxicated?
Q When you were intoxicated.



RONALD MENKE, EXAM BY WARNER

A Never really agitated.
Q Okay. When you told Bob to fuck off -- and I believe that was your testimony. You did tell him to fuck off, did you not?
A I did.
Q Your wife testified that Teinert liked that, that he enjoyed that.
A He does.
Q So is that why you were doing that?
A No.
Q When you told him to fuck off, were you doing that because he enjoyed and appreciated that?
A No. I said, "Fuck you. Fuck off."
Q And so --
A That means get out of my face.
Q Okay. And he had been using the same kind of language with you, correct?
A He was.
Q And yet Jensen, for some reason, continues to fabricate or to be mistaken because he suggested that he didn't hear any of that language.
MR. CALL: Objection. Argumentative.
COLONEL WARNER: I'm trying to give him an opportunity to explain here.
MR. CALL: Objection. It's argumentative.





RONALD MENKE, EXAM BY WARNER

You're asking him to comment --
HEARING OFFICER McCABE: The objection is noted. Proceed.
Q (BY COLONEL WARNER) So here's Jensen, who is kind of sitting here as a third party observing, and he doesn't hear any profanity from Teinert, according to his testimony yesterday.
A I take it he did. I read it in his statement.
Q I'm talking about his testimony yesterday.
A I read it in his statement. Is that not testimony? I'm trying to answer your question the best I can.
Q Well, let's look at his statement, since you're trying so hard. I appreciate that effort. Why don't you -- Exhibit 6. Why don't you show me in his statement where he quotes Teinert. I'm showing you what's been marked as Exhibit No. 6.
A Oh, where Teinert said, "Fuck off"?
Q Yeah, where Teinert said, "Fuck off."
A It doesn't.
Q So he's --
A So he's biased.
Q So Taylor is biased, right?
A Taylor?

RONALD MENKE. EXAM BY WARNER

Q I mean -- I'm sorry -- Jensen. Jensen is biased? Is that what you're telling us?
A Well, if he only hears partial, I'd say yes. Or he's half deaf.
Q But he indicated yesterday he knew both of you about equally well, did he not?
A No. I didn't even know what his name was.
Q He doesn't know either one of you very well, does he?
A I don't think so. He might know Teinert. I'm not in the club all the time.
Q I understand. And so if Jensen testified about all of these things we've just talked about, he's either biased or he's wrong or he's lying, one or the other?
A Do you want an opinion or what are you asking me for? You're not asking me a question. You're just --
MR. CALL: I'm going to object. It's argumentative. What Mr. Jensen testified about is on the record. The finder of fact can determine the distinctions between the two.
COLONEL WARNER: I can certainly question this individual to find out if he can somehow explain why there's a difference in the recollection and





RONALD MENKE, EXAM BY WARNER

accounting here.
HEARING OFFICER McCABE: There's been a lot of latitude displayed on both sides at various times and I'm going to continue to allow the latitude from the standpoint as long as it doesn't become overly redundant, repetitive. You can voice your objections. As I said, they go to weight, but other than that, proceed and ask the question.
THE WITNESS: Sir, I don't know what he's asking me.
COLONEL WARNER: Let me ask it again.
THE WITNESS: He's asking me what Jensen is --
MR. CALL: Let me do this. If you don't understand his question, ask him to repeat it.
THE WITNESS: Okay.
MR. CALL: Answer his question as he asks it. If you don't understand it, ask him to repeat it, okay?
THE WITNESS: Okay.
Q (BY COLONEL WARNER) Let's make it simple. Let's do it as easy as we can for everybody here. Jensen apparently didn't ever hear Teinert use profanity.
A I cannot say that. I'm not Jensen.





RONALD MENKE. EXAM BY WARNER

Sorry. I can't say if he heard or didn't hear.
Q Why don't you let me finish the question? You apparently did hear Teinert use profanity --
A Yes.
Q -- in that same conversation, correct?
A Yes, I did.
Q All right. And even though Jensen says he heard Teinert offer the cab, you didn't hear a cab offered, correct?
A That's correct.
Q And even though Jensen says he heard Teinert say it in a very cordial and concerned and decent manner, you heard Teinert in an abusive profane manner, correct?
A Say that again.
Q You heard Teinert using abusive profane language?
A When?
Q When the conversation happened down near the end of the bar when Teinert and Jensen claim they were talking about offering you a taxi and you claim he was talking to you about getting you off the board.
A Yes.
Q Because there's a real difference of





RONALD MENKE, EXAM BY WARNER

opinion about whether you were offered a taxi, correct?
A Yes, there is.
Q And you maintain you weren't offered a taxi?
A That is correct.
Q Okay. Just wanted to make sure. Now, when the security police took you out in the reception area, you looked back and you saw Teinert laughing at you, didn't you?
A I did.
Q Almost taunting you?
A You could say that.
Q Would that be a fair expression of how you felt about him laughing about it?
A No. I didn't take it as any animosity at the time, no.
Q So you weren't particularly offended by it, right?
A No. I know Teinert.
Q Okay. And you weren't going to let him get to you, right?
A No. Try not to.
Q Okay. So when the security police talked to you, you weren't angry or agitated at the time?