RONALD MENKE, EXAM BY WARNER

A No.
Q And those security police officers -- or Sergeant Bradshaw said that, on a scale of one to ten, you were bordering on furious at around 8:00 as you were using profanity in regard to Teinert; isn't that correct?
MR. CALL: Objection.
THE WITNESS: I don't know. Did he?
Q (BY COLONEL WARNER) Well, you heard his testimony. Didn't he say that?
A I do not know. I don't remember him saying that. I cannot say what he said.
Q I'm just asking you if you recall the testimony yesterday.
A Well --
HEARING OFFICER McCABE: Do you recall his testimony?
THE WITNESS: I do not, sir.
HEARING OFFICER McCABE: Thank you.
Q (BY COLONEL WARNER) But it's your testimony, irrespective of his, that you weren't furious, correct?
A That's what I said.
Q And you weren't even angry?
A That's what I said.





RONALD MENKE, EXAM BY WARNER

Q At best, maybe a little agitated?
A Correct.
Q So Bradshaw really, as far as you can tell, wouldn't have had any reason to be concerned about a potential for physical violence, would he, at least by anything you did?
A No. He left, didn't he?
Q Yeah. He left just as soon as he was assured that you were going to go with Lindsay to go home; isn't that right?
A That's correct.
Q Now, you knew about the cot at the club, didn't you?
A The what?
Q The cot. The sleeping cot.
A Yes, I've seen it.
Q But you indicated that you were very concerned about our friend, Mr. Teinert, driving off base, weren't you?
A That is correct.
Q And, indeed, you were very concerned because you'd seen him -- according to counsel's question, you had seen him do it just earlier -- the month before, I believe.
A I believe I said that, yes.



RONALD MENKE, EXAM BY WARNER

Q How many times do you think you'd seen him drive off base drunk?
A Oh, I don't know. Two hundred times.
Q Two hundred?
A That's my guess. Under intoxication, not drunk. Under intoxication, not drunk. Two hundred times.
Q You're talking about Teinert now?
A I'm talking about Teinert.
Q Why is it that after 200 times you picked this night to be so concerned?
A Just as I've done in the past.
Q So every night -- every night you called and --
A No, sir, I have not.
Q I see. So it was just this night that you were concerned enough to call and tell him, well, don't drive off the base drunk because, after all, 200 times before I didn't bother to make the call, right?
A It's according to the level of Bob being intoxicated.
Q I see.
A In ten years -- I've known Bob ten years, and out of these ten years, I've seen Bob so drunk





RONALD MENKE, EXAM BY WARNER

that he can't even stand up. I've seen Bob so drunk that it was hard for him to even talk.
Q How many times during that ten years did you call and say to him -- express that concern, "Don't be driving off the base drunk"?
A Over the past four years?
Q Yeah.
A Is that what you're saying?
Q Yes.
A At least 20 times.
Q And when we bring him back, he'll testify that you called him at least 20 times, right?
A You bring him back.
Q And he will testify that you've expressed --
A I don't know what Bob will testify to. I'm not Bob.
Q So who did you talk to? Bob each time?
A When?
Q When you called to warn him not to drive off base drunk?
A A lot of times I did, yes. Most of the time I did, because no one else was in the club.
Q Who else did you talk to to warn him? Names. Give me names.

RONALD MENKE. EXAM BY WARNER

A Don't know.
Q Oh, come on, Sergeant Menke.
A Don't know.
Q Give it your best shot. Tell us a name that we can bring in here to verify this very important information.
A Sir, I told you I don't know. I don't know a name.
Q So out of all those times that you called to express concern, you can't remember one name; is that right?
A That's right. When I talk to Bob, I talk to Bob.
Q You can remember talking to him, but you can't remember anybody else?
A Let's see. The best way to explain it is you bring in the cell phone record. Bring in ten years of his cell phone records. You'll see.
Q All I can see from the cell phone record is that he's received a call. It doesn't say from who.
A That's what I'm saying. So why would someone else be picking up the phone if I called Teinert?
Q Well, let's talk about that. That was an interesting point. Let's talk about that. Now, when





RONALD MENKE. EXAM BY WARNER

you called Teinert the first time from your home, you didn't even get in a word, did you?
A No.
Q Indeed, he picked up the phone, he turned it on, and bingo, he turned it off. He hung up on you. Isn't that your testimony?
A Yes. I didn't say he turned it off. Just didn't connect with him, that I realized.
Q That's when you told your wife, "The goddam son of a bitch hung up on me." right?
A That's exactly right.
Q Do you have any reason at all that you know of why somebody would turn on their cell phone and then turn it off before somebody can even say hello?
A I think I answered that prior.
Q Well, why don't you try it again.
A I said -- you can push the button, hand me my cell phone and I accidentally turn my buttons off. I accidentally hit the flipper; it goes off. There's a way to disconnect your phone when you're picking it up to talk on it.
Q But, hey, that didn't make you agitated, did it?
A I don't believe so.
Q I mean, even though you called him a goddam





RONALD MENKE. EXAM BY WARNER

son of a bitch for hanging up on you, you weren't agitated, were you?
A I don't believe so.
Q Okay. And then when you finally did get him on the line, you were kind enough to tell him to watch his P's and Q's and he better not be driving off the base, correct?
A In different words, but yes.
Q Give me the words you used.
A I told Bob straight out, I says, "Bob, mind your P's and Q's and you best not be driving off the base. You've been drinking too much alcohol."
Q Now, all night long you guys had been cussing and swearing and getting in each other's face?
A No.
Q Well, to one extent or another.
MR. CALL: I'm going to object to that characterization. He has not testified that Mr. Menke was getting in his face. It was the other way around. I don't think there's been that testimony from anybody that it was Mr. Menke.
HEARING OFFICER McCABE: Noted for the record.
Q (BY COLONEL WARNER) So off and on during





RONALD MENKE. EXAM BY WARNER

the course of the evening you two had been having some encounters with one another, correct?
A I believe so.
Q And he's been using language that you described, peppered with the F word, correct?
A Yes.
Q And you admit, yourself, to having told him to fuck off at least one time earlier in the night, didn't you?
A I think I answered that before. Yes.
Q Okay. And so, notwithstanding the -- oh. And then, of course, the security officers testified that you had used some pretty strong language in regard to Teinert out in the reception area?
A What language is that?
Q Well, they indicated that you had used quite a bit of profanity in regard to Teinert. You don't remember that?
A I don't remember them saying that. No, I don't.
Q Okay. Well, let's assume for the moment -- that -- whether they did or they didn't, that there had been some exchange of language between the two of you earlier, right?
MR. CALL: Asked and answered.

RONALD MENKE, EXAM BY WARNER

THE WITNESS: No.
MR. CALL: I think this has been -- I'm going to object. This has been asked and answered. We've been over this, to my count --
COLONEL WARNER: I'm just trying to lay a little foundation here, counsel.
MR. CALL: Well, it's been asked and answered.
COLONEL WARNER: Well, until we --
HEARING OFFICER MCCABE: I don't recall as to much about the security police asking him.
MR. CALL: I'm referring to the second question, that they were talking back and forth. We're back to the bar.
Q (BY COLONEL WARNER) So all of a sudden after all this profanity all evening long between the two of you, or you in terms of him, or vice versa, all of a sudden, moments after having said, "This goddam son of a bitch hung up on me," now you choose to say, "Bob, mind your P's and Q's," and you don't use one word of profanity?
A No.
Q Because you weren't agitated?
A No. I don't understand which you're trying to get at.





RONALD MENKE, EXAM BY WARNER

Q Well, what I'm trying to get at is I find it just a little hard to understand how it is in one moment you can be calling him a goddam son of a bitch for hanging up on you, and the very next moment calling him back and, in the most polite of terms, indeed, grandmotherly of terms, "Bob, you ought to watch your P's and Q's."
A Okay. Sir, less than maybe five minutes ago I was agitated with you for a second. It doesn't mean that I'm not going to be nice to you.
Q So what -- so you're telling me you can get over your agitation almost instantaneously?
A I believe anyone can.
Q And so -- well, let's leave that alone. Now, you're aware of the zero tolerance policy in the Guard, aren't you, on violence in the workplace?
A Well, I believe I am. I seen a piece of paper that they got as an exhibit here and I slid into a violence in the workplace meeting that occurred in January on the base.
Q You'd never seen it posted in your work space like McDaniel testified to?
A Oh, yeah, it's hanging on the wall. I'm not saying that. I'm saying that I've seen it before, yeah.



RONALD MENKE, EXAM BY WARNER

Q So you were generally aware of it?
A Sure.
Q You were aware that violence in any of its forms was not to be tolerated in the Air National Guard? Or the Utah National Guard, for that matter. You understand that?
A Would you rephrase that for me?
Q Yeah. You understand the policy suggests that there won't be any -- zero tolerance for --
A I've read the letter.
Q So you understood it?
A I read the letter.
Q Did you understand it?
A I never said I understood. I read the letter.
Q No. I'm asking you: Did you understand it?
A I believe I understand it to a certain degree, yes.
Q Well, let's just test how well you understand. I'll give you a copy of Exhibit No. 1 here.
A Okay.
Q Why don't you look at paragraph two, and on the second sentence it says, "Threats and violence in





RONALD MENKE, EXAM BY WARNER

the workplace will not be tolerated."
A It does say that.
Q What part of that don't you understand?
A I understand every word it says in there.
Q Good.
A On that line. Yes, I do.
Q Okay. Now, let's look at the last line in that paragraph in paragraph two. "The Utah National Guard's position on threats and violence in the workplace is zero tolerance."
A Okay. What is zero tolerance? Is there something that shows zero tolerance?
Q So that's what you don't understand, what the zero tolerance means?
A Yeah, I do not.
Q Do you understand what threats and violence in the workplace means?
A I know what a threat is and I know what violence is.
Q Okay. And then it says, first line of paragraph three, "Violence is defined as physical or verbal aggression towards others."
A Okay.
Q You understand that?
A I believe I do.

Q Next line down. "Any behavior that is threatening to another employee's physical or emotional safety will not be tolerated." Do you understand that?
A Well, I ought to. I feel like that's what's happening to me.
Q Okay. The following line, "Verified threats or violent acts will result in immediate disciplinary action, to include termination." Is there anything on that line you don't understand?
A Well, it looks to me like there's a broad point in there between the word disciplinary action. What disciplinary action are they talking about? Slapping your hands or firing you?
Q Okay. So you're not sure what disciplinary action means?
A Well, no, I know what the word disciplinary -- it means to punish.
Q Now, paragraph four is the last one I want to ask you about. The first line there. "Every employee is obligated to immediately report any threat by a co-worker or supervisor." Anything about that you don't understand?
A Sure, I understand every word of that.
Q Okay.







A Do you want to go any further on this?
Q No. That's all I need to know.
A Okay.
Q Now, there was some discussion yesterday about how word got around the National Guard concerning your problem out here with this threat. Did you ever talk to anybody out there about your problem? Did you ever mention this problem to anyone out there at the Guard or the club?
A What, yesterday? The day before? A week ago? Give me a time frame.
Q Since September 17th, when the incident happened.
A Yes, I have.
Q And how about your wife? Has she?
A No.
Q She's never spoken to one soul about it?
A No. She has not been on base since that day, that I can recall. Well, maybe the 17th, 18th, somewhere in there. Maybe she was there.
Q Now, how many people have you talked to about it at the Guard?
A You have to rephrase what you're talking about.
Q I'm talking about your threat incident.







How many people -- and the resulting discipline. How many people have you talked to about this that are involved with the Guard?
A What people are you referring to?
Q I'm referring to Guard personnel, members of the Guard.
A Well, members of the Guard, Captain Reutlinger, Chapman, Steve Bird.
Q Anyone that's not in the chain of command?
A No, I don't believe so.
Q So you haven't spoken to anyone other than those people who are in the official chain of command?
A That's all -- I had no idea what was going on until they, Carol and Chapman, handed me that adverse action and told me to leave the area, and I left the base.
Q I've got just a couple more questions and I'll be done here, Sergeant.
A Okay.
Q It was my understanding from counsel's question that you categorically deny, unequivocally deny that you made any threat to Sergeant Teinert over the phone when you called him on the night of the 17th from your house. Is that correct?







A That is correct.
Q You did not make that threat?
A I did not threaten Bob Teinert, no.
Q Indeed, such a threat would be out of character for you; is that true?
A I actually believe so.
Q Have you ever threatened anybody in the Air National Guard?
A Not that I believe so, no.
Q Well, let's -- what do you mean not that you believe so?
A Well, from my understanding of the word "threat" anymore, a threat can mean anything that when a person feels that they're being violated is a threat, so if -- I don't know what other people perceive as a threat.
Q Okay. Well, let's say it this way: Have you ever made any kind of a threat against any member of the Air Guard that could be perceived as a threat against them or their family or their lives?
A No.
Q Or their bodily health?
A No.
MR. CALL: Could you verify whose perception? His or theirs?

RONALD MENKE, EXAM BY WARNER

COLONEL WARNER: Either.
MR. CALL: I'll object. He doesn't know what other people perceive. I think he can speak to what he perceives, but what somebody else might perceive --
COLONEL WARNER: Well, I think he's a pretty bright fellow. I think that Sergeant Menke can tell whether or not when you make a statement that, on its objective face, whether anybody can perceive it as a threat.
Q Now, do you or don't you make threats to people?
A I do not make threats to people.
Q And it's your testimony here that you haven't ever done that; isn't that true?
A I have not threatened no one, no.
Q And as I recall, you indicated emphatically, "I am not a liar"; isn't that true?
A That is true.
COLONEL WARNER: Thank you. I don't have any further questions.
MR. CALL: I don't have anything further.
HEARING OFFICER McCABE: Thank you very much, Mr. Menke. You may resume your seat.
MR. CALL: We have no other witnesses at





this time, except for perhaps rebuttal. Surrebuttal I guess is what they call that.
HEARING OFFICER McCABE: Does the agency -- the appellant has completed their case. Does the agency contemplate calling any additional witnesses?
COLONEL WARNER: Yes. One.
HEARING OFFICER McCABE: Is that witness readily available?
COLONEL WARNER: He is.
HEARING OFFICER McCABE: Please call that witness.
MR. CALL: Can we inquire who is being called?
COLONEL WARNER: You'll see him when he comes in.
(Recess.)
TSG DALE C. SHUPE
called as a witness and sworn, was examined and testified as follows:
HEARING OFFICER McCABE: Please be seated and state your full name for the record, please.
THE WITNESS: Dale Curtis Shupe.
HEARING OFFICER McCABE: Would you spell your last name?
THE WITNESS: S-H-U-P-E.





SHUPE, EXAM BY WARNER

HEARING OFFICER McCABE: Thank you very much, Mr. Shupe. Colonel Warner, you may proceed.
COLONEL WARNER: Thank you.
DIRECT EXAMINATION
BY COLONEL WARNER:
Q Mr. Shupe, you're a member of the Utah National Guard?
A Yes.
Q And how long have you been a member?
A Seventeen years.
Q What's your rank?
A Tech sergeant.
Q And, Tech Sergeant Shupe, what's your rating or your MOS?
A I'm a WG-12 crew chief aircraft mechanic. The AFSE is 2B5.
Q I'm going to ask you to speak up just a little bit, Sergeant Shupe. You're a little nervous aren't you?
A I am.
Q I can tell that. Do you know Sergeant Menke here?
A Yes, I do.
Q And you like Sergeant Menke, don't you?
A I do.





SHUPE, EXAM BY WARNER

Q And you consider him to be a good worker?
A I do.
Q You were with Sergeant Menke in Germany in April of 1999?
A I was.
Q That was less than a year ago?
A Yes.
Q You'd been there about two weeks, is that correct, when an incident happened at the club?
A Right.
Q And you went over to the club and you were drinking Diet Coke were you not?
A I was.
Q And Menke came up and approached you, didn't he?
A He did.
Q And he was obviously very drunk, wasn't he?
A He was intoxicated.
Q And was he loud?
A Yes.
Q And did he get louder?
A Yes.
Q And did you tell him, whatever it was that he wanted to talk about, that you didn't want to talk about it at that point?

A Right, yes.
Q What did he want to talk about; do you know?
A Well, we had had some confrontation for the past week and a half or so that we'd been there, and there was some supervision and intervention on some allegations that I made, that he made, about our work performance, about what we did, how we did it, and at the time I didn't know exactly what he was going to approach me about or whatever, but I just told him at the time that I -- right now I didn't want to deal with it.
Q Okay. You weren't intoxicated were you?
A No.
Q Were you drinking any alcohol?
A No.
Q So you recall the incidents clear?
A Yes.
Q And you told him whatever it was he wanted to talk about, you didn't want to talk about it now?
A Yes.
Q Did he call you a name at that point?
A Maybe not at that point. There was a few words exchanged, and I don't know exactly what it was. I proceeded to get out of my chair. Ron was







playing pool at the time, and because I did not accept his approach at the time, it inflamed Ron and he called me an F-ing fagot.
Q Well, you'll have to use the exact words. What did he call you?
A Called me a fucking fagot.
Q Okay. Then what happened?
A Of course, I got heated, he got heated, words exchanged, and I don't know exactly what. I went to push him up against the wall, because it obviously infuriated me, and another gentleman that was playing pool grabbed me and kind of set me aside and said, "don't do this. It's not a good place. You just don't want to mess with this stuff."
Q Okay.
A And as he was saying that, Ron cursed at me, and I don't know exactly the bad language that he had used, but he held his finger like he had a gun and he says --
Q Put your hand up and show us.
A He says, "If you fuck with me," he says, "I'll hunt you and your family down," and I can't recall whether he said, "I'll kill you," or, "I'll get you." But I took it with the finger like, you know, that he was serious.







Q Okay. So you took it as a threat to you?
A I did.
Q And you took it as a threat to your family?
A I did.
Q And this happened just last April in Germany; is that correct?
A It did.
Q Did you report that threat to Ted -- is it Dutcher?
A Dutcher.
Q -- Dutcher and to Mike Fransen?
A Shortly after the incident I walked over, discussed it with Mike and Ted, and it had been -- like a half hour later, I re-approached Ron.
Q Okay. Now, you took that as a serious threat when he said it, didn't you?
A It scared me, yeah.
COLONEL WARNER: Thank you.
HEARING OFFICER McCABE: Your Honor, if we could take a couple minutes. Maybe a five-minute break.
HEARING OFFICER McCABE: We'll take a break until 20 after 3:00 and then let's proceed.
(Recess.)
HEARING OFFICER McCABE: Back on the







record. Proceed with cross examination.

CROSS EXAMINATION

BY MR. CALL:
Q Mr. Shupe, my name is Frank Call. I'm Mr. Menke's attorney.
A Yes, sir.
Q You testified about an incident that allegedly took place in Germany, correct?
A Correct.
Q And that was in 1999, correct?
A Yes, sir.
Q Now, how long had you been in Germany at that point, before that incident?
A Before the incident, probably a week, week and a half.
Q Isn't it true that there was a time when you were out working on the flight line with Mr. Menke and accused him of not doing his job?
A Yes.
Q Isn't it true that you told him that he wasn't doing his job and that he was getting by by sucking on Phil Dillinger's dick?
A I don't believe I said "sucking on Phil Dillinger's dick."
Q What did you say?

SHUPE, EXAM BY CALL

A Basically, sucking up to the boss.
Q So you made some sort of -- did you indicate that it was homosexual in nature?
A I don't think so, no.
Q Do you remember exactly what you said?
A I don't.
Q Could it have been that you said exactly that?
A No, because I would have known. Sucking Phil's cock, no.
Q But you did say some remark to that effect, of kissing up or doing something like that?
A Yeah. I mean, as we were working, there was a little animosity because we had engine troop folks from other units.
Q And Mr. Menke didn't like that, did he?
A No, I don't believe so.
Q In fact, he went and reported that to Al Chapman, didn't he?
A He did.
Q And then about a week later -- and Al Chapman talked to you about that, didn't he?
A He did.
Q And told you you were wrong for doing that, didn't he?





SHUPE, EXAM BY CALL

A No, he didn't -- he told me to stay away from Ron. This was not a good time to start any trouble or whatever. He just said, "We don't want no hassles over here." I said, "Okay."
Q So then about a week later you were in the club, correct?
A Yes.
Q And Ron was playing pool with some folks, correct, at that time?
A Yes.
Q And you approached him and pushed him at one point, didn't you?
A No, I didn't.
Q Wasn't your testimony that there was an exchange of words and that you pushed him up against a wall?
A He approached me first. There was some verbal confrontation.
Q Okay.
A Then yes. Yes.
Q At that point he reached out his hand to shake his hand with you to give you the indication that he wanted to bury the hatchet, correct?
A He may have, yes.
Q And you eventually ended up pushing him up



SHUPE, EXAM BY CALL

against a wall, correct?
A Yes, because of what he said to me.
Q And you're familiar with the zero tolerance policy in the Guard, correct?
A Yes.
Q Zero tolerance policy on violence, correct?
A Uh-huh.
Q Were you ever sanctioned for that action?
A No.
Q The Guard didn't take any action against you whatsoever for pushing Mr. Menke?
A No.
Q And, in fact, your statement, so I am clear, is that Mr. Menke told you after that point, "If you fuck with me, I'll kill you all," or hunt you down or something to that effect, correct?
A No. As the one gentleman was holding me and telling me not to worry, you know, to back off, this wasn't the place, Ron was saying, "Don't fuck with me or I'll" -- and he had his hand in the gun position. He says, "I'll hunt you and your family down and get you," or -- and I believe it was "get you." I'm not sure it was "kill you" or anything like that. And I took it as get me.
Q You had to be verbally restrained -- I mean





SHUPE, EXAM BY CALL

physically restrained by your fellows that were there, correct?
A I mean, it wouldn't have went any further than a pushing/shoving match.
Q They pulled you off of him, though, didn't they?
A No.
Q Wasn't your testimony, "They grabbed me and held me" --
A He just put his arm in front of me and just said, "Not here, Dale. Not here."
Q "Not here, Dale." So you were aggressive at that point, weren't you?
A I was.
Q That statement that you're indicating was allegedly said is quite defensive in nature, isn't it? That statement, "If you fuck with me, I'll hunt you down," or whatever he said, is defensive in nature, isn't it?
A Towards me, but not my family.
Q Okay. But it's defensive, saying, in other words, back off?
A Yeah.
Q You initiated this fight, correct?
A No, I didn't.

SHUPE, EXAM BY CALL

Q You pushed him, though, correct?.
A Yes. But he was verbally abusing me beforehand.
Q He didn't push you or try to hit you beforehand, did he?
A He was in my face, and when he was pointing and -- as he was alcoholic -- alcohol does to you, makes you get loud, and that was the incident, and he was right in my face. And that's basically why I pushed him off of me.
Q But his --
A Because he called me the name.
Q The question is: His alleged statement started, as you're testifying that it happened, was, "If you fuck with me," meaning it's contingent. It's contingent upon you taking further action against him, correct?
A No. He said, "Don't fuck with me."
Q Your first word, I believe, was "if;" but that's okay. But this threat was so scary that you indicated that you re-approached him half an hour later?
A Yes, I did.
Q So you weren't really in that much fear that he was going to hurt you because you





SHUPE, EXAM BY CALL

re-approached him, didn't you?
A I approached Ron, and him and I went and talked together. We discussed the allegation in which I am saying, and I remember asking Ron -- or basically telling him, "Ron, you don't say that kind of shit. That don't fly."
Q Did you guys bury the hatchets after that conversation?
A We did.
Q So you really didn't think it was a threat that you were going to -- I mean, it's not like he was holding a gun to you --
A No.
Q -- and you thought your life was in immediate danger that you were going to go back into that situation a half an hour later, were you?
A No.
Q So you didn't really think it was a serious threat?
A Because of our friendship, I felt I could approach him and discuss the problem, because he was inebriated.
Q You really didn't think he was going to hunt down your family and kill them, did you?
A I thought about it, yes.





SHUPE, EXAM BY WARNER

Q But at that time you didn't think it because you went and you retalked with him, didn't you?
A That's kind of like a double-edge answer. I mean, yes, I approached Ron, but of our friendship, I felt we could talk, discuss the problem and have the problem solved. But yes, it was a threat to me and my family and I felt my family does not need to be involved in this, and that's why I approached him, and if he wanted to take further action, he could.
MR. CALL: Nothing further.

REDIRECT EXAMINATION

BY COLONEL WARNER:
Q Just one question. Sergeant Shupe, could he have possibly said, "You better mind your P's and Q's," when he made that threat to you? Rather than saying, "Don't fuck with me or I'll get you and your family," could he have possibly said, "You better mind your P's and Q's"?
A No.
Q He didn't say that?
A No.
COLONEL WARNER: Thank you.
HEARING OFFICER McCABE: May this witness be excused?





MR. CALL: Yes
HEARING OFFICER McCABE: Thank you very much for being here to testify. As I have told the other witnesses in this case, this is a serious matter. If anybody approaches you outside of this room and asks you what's going on, just simply indicate to them that you've been instructed not to discuss the matter by the hearings examiner. Thank you very much.
COLONEL WARNER: I don't have any further rebuttal.
MR. CALL: Your Honor, can I take two seconds? I don't think we'll have rebuttal, but I want to make sure.
HEARING OFFICER McCABE: Yes.
(Recess.)
MR. CALL: I don't think we'll have any surrebuttal.
HEARING OFFICER McCABE: Very good. Then can I conclude from both sides that the factual matters, other than argument, are fully submitted? Colonel Warner?
COLONEL WARNER: Yes, it is.
HEARING OFFICER McCABE: Mr. Call?
MR. CALL: With the exception of adding all



0100

the exhibits we offered and then being accepted, yes.

HEARING OFFICER McCABE: Exhibits are already part of the record, so there's no problem there.

Prior to closing arguments, I ask you, Mr. Menke, are you satisfied that you've had an opportunity to present your side in this case?

MR. MENKE: To the best that they give me to work with, yes, I believe I did. But as for the way the system works, I don't believe so.

HEARING OFFICER McCABE: Okay. Thank you very much. My concern is not with the total system. It's with the opportunity that I give you as the hearings examiner. Closing arguments? Agency?

COLONEL WARNER: Yes. Recognizing that we'll have an opportunity to submit additional written remarks later, I have a few comments. Actually more than a few, but we'll try and be relatively brief right now.

We began yesterday morning by talking about the three things that we needed to talk about or prove. One, did it happen; two, will some discipline promote the efficiency of the service; and is the penalty appropriate. I believe that we can address each of those relatively briefly.





First of all, did it happen. We have a preponderance standard there, and it is the position of the agency that clearly it did happen. The only evidence to suggest that it didn't happen was the self-serving testimony of Mr. Menke and his wife. It is not the number of witnesses that determine credibility, but it is the credibility of the witnesses that determine who is to be believed. And one of the questions we have to ask, quite frankly, when we have diametrically opposed testimony, is who is believable and who has got a reason to lie or who has a reason to misrepresent.

Now, when we look at Teinert -- you know, the agency takes their witnesses as they find them. We're not here to vouch for Teinert, per se. Sergeant Teinert has his own problems, and undoubtedly he may have a drinking problem to one extent or another. I don't know how much he has, but certainly that came up.

But if we look at the facts and the circumstances surrounding Teinert, clearly the weight of the testimony from all of the witnesses clearly support his version of the facts.

Airman Jensen, who really has no ax to grind, has nothing to gain or lose, clearly supports





Teinert's version of what happened in that club. He was sitting exactly a foot and a half, according to his testimony, right next to Teinert. He heard the exchange between Menke and Teinert, and that exchange that he heard, as an independent third party, was very different than what Menke testified to, and it was absolutely consistent with what Teinert testified to.

Now, say what you will about Jensen, a young 20-year-old man who was in the club drinking underage, stepped up, had no reason to lie. I don't think the fact that he was 20 and drinking underage impeaches him one wit. He came in. He was obviously scared, but he was telling the story as he best recalled it, telling the facts as he best recalled it, and those facts were very consistent with what Teinert had testified to.

He clearly testified that he saw a Bob Teinert who was intoxicated but was not obnoxious, was not loud, was not boisterous. Indeed, was considerate and concerned when he stopped Menke and offered a taxi. Even offered to pay for it.

And, again, who has a reason to lie? Let's assume Teinert had an ax to grind with Menke because of the reports about drinking on duty. Even assuming





that's true, there was independent verification of Teinert's accounting of the facts that evening by Jensen. The security officers, again, independently verified Sergeant Menke's profane and angry behavior as directed towards Teinert.

Now, what's the significance of the contemporaneous reporting of the threat? It's the same significance as the contemporaneous making of any document. There's a certain amount of credibility that goes when something is done contemporaneously with the time that it happens in terms of recording the event. Sergeant Teinert gets a threatening call from Sergeant Menke. He literally puts the phone down -- turns it off and puts it down, and within an instant of putting it down, turns and reports the incident to Jensen. He doesn't have five minutes or five seconds to come up and generate a story about a threat.

Now let's take a look on the other side. Sergeant Menke. Has he got a reason to be less than candid here? Absolutely. His job is on the line, a job that he loves, by his own admission during his testimony. His livelihood. And this is a gentleman who was quick to point out his friend Teinert's alcohol problems, indeed labeling him an alcoholic,

but absolutely refused in cross examination to accept any suggestion that he himself has a problem with alcohol, even though, from the facts of the cross examination, he had himself a problem while intoxicated in Italy and then, notwithstanding his direct denial that he'd ever made any other threat, he was intoxicated again in Germany when he made the threat.

Now, this is a man who testified, testified under oath, I am not a liar, and then, in direct response to my question, "Have you ever threatened anyone in the Air National Guard?" "No." "It would be out of character?" "Yes." And within minutes of that denial under oath, that statement was given lied to.

I would suggest to you very respectfully that Sergeant Menke is not worthy of belief on this matter, that when you look at the facts, at his agitated state, at his furious demeanor directed towards Teinert at the time he was leaving the club, as reported by Bradshaw -- even his own wife admitted that he described Teinert, upon hanging up on him, as "that goddam son of a bitch just hung up on me," and then we are to somehow believe that he turns around within moments and, out of a sense of love and





concern, suggests he should watch his P's and Q's. It's inherently incredible.

And, quite frankly, it's an indication he was no more willing to accept responsibility for his threat against Sergeant Teinert than he was willing to accept the fact that he's a thief, that he stole a statue, so what we have here is someone who will lie and who will steal and then refuse to accept any responsibility for it.

Now, he's not charged here today with those things, but those things certainly give -- should be taken into account and bear on his credibility. I found it very interesting, for purposes of credibility, that he makes such fine distinctions about who took the statue and whether it was a theft and whether he participated and to what level. This is not a man who steps up and accepts responsibility easily, and he was unwilling to do it in the matter of the threat against Mr. Teinert.

Will some discipline promote the efficiency of the service? It was clear from the witnesses yesterday that there was some dispute about what the appropriate penalties should be, but there was no question that some discipline would promote efficiency of the service. No one stepped up and





said nothing should be done. They all testified that some discipline should be done.

And then Lieutenant Colonel Reutlinger testified -- and as I wrote down, I listed five items that he testified to as to why this discipline would promote the efficiency of the service. First, it guaranteed a safe workplace. Very important. Two, it promoted good order in discipline. Three, it sent a good message that you must abide by the rules. Four, people must accept responsibility for their actions. And, five, the concept of teamwork. You can't have a team when people are making threats against fellow team members.

Now, quite frankly, whether or not we as individuals accept each and every one of those are not isn't the standard. The standard is whether there's a reasonable basis for his determination on promoting the efficiency of the service, and if there's a reasonable basis for him making those conclusions, it seems to me that that determination must be upheld, even if we, as individuals, may not agree with it.

Finally, is the penalty appropriate? Once again, we heard much discussion about the level of the penalty. It's clear the TPR does not require any





particular penalty. The language of the TPR is clear. It is a guide. It is a guideline. It vests much discretion in the individual officer based on their good judgment and their experience. There are clearly levels of threat, and a threat on one's life is an extremely serious threat, which is much different than a threat to kick one's butt or to do whatever.

Clearly, the Guard has a vested interest in this issue. The TAG issued a zero tolerance policy for violence in the workplace. The rationale of that policy is to create a safe workplace. That promotes the efficiency of the service. And as threats go, a death threat is the most serious type of threat and, therefore, the table, A-5, that gives suggested penalties, is just that, but it emphasized we must consider "the factors relevant to the individual case," and when we consider those factors, it leaves us very little choice but to pick a penalty in this case of termination or removal.

And why? Because if Sergeant Menke is anything, he is consistent. Contrition is not part of his vocabulary. Remorse is not part of his lifestyle. Acceptance of responsibility, apology, stepping up and saying, "hey, I did something wrong,"

this is not part of Sergeant Menke. He couldn't even accept the fact that he had participated in the theft of the statue. He couldn't accept the fact that he had any problem with alcohol, while he was quick to point out Teinert's.

When you have someone who refuses to accept the fact that they made a mistake or that they have a problem -- and that kind of a problem, the kind of problem that results in threatening people's lives, Colonel Reutlinger made a very critical point. He said, "I can't take the chance. I can't take the chance." As a commander, as a manager, as a supervisor, he has the responsibility for the welfare and the personal safety of everyone who works under his direction. And he simply said -- and it's a reasonable position -- that, as a manager, he doesn't want to find out if he's wrong. He doesn't want to find out how serious Sergeant Menke is about his death threat. If he's going to be wrong, he's going to err on the side of termination, rather than err on the side of finding out someday that Sergeant Menke has injured or, worse, killed somebody as a result of a threat.

We submit to you that's a reasonable penalty based on the fact there was no indication





whatsoever that Sergeant Menke would accept any responsibility right from the beginning or even denying that the threat occurred.

Reading again, "Determining the appropriateness of the penalty" -- this is from A-1 of the IPR -- "relies not only on establishing factual circumstances, but also on an application of judgment and discretion." In other words, the issue should not be whether the penalty is within the permissible range, which counsel made such a big deal of with Colonel Reutlinger, but, rather, why the particular penalty was chosen, and in this case Reutlinger articulated why it was chosen. He gave us the reasons why it promoted the efficiency of the service and he also pointed out, he couldn't take a chance that Sergeant Menke would attempt to carry out that threat.

Now, much was made again about nothing happening within two weeks or two months of the time of the threat. That doesn't mean that he doesn't intend to carry it out at some time. Revenge is a dish best served cold, as some people have said in the past, and so we don't know if and when those threats might be carried out.

Well, to sum up, because I told you I'd be



brief and I'm pretty proud that I've been as brief as I have here, the simple point for the agency is that we have carried our burden. We have met our burden. We've demonstrated that the threat occurred. We believe Sergeant Menke was clearly impeached on his -- not only on his denial of the original threat but by the testimony of Sergeant Shupe.

I want to emphasize, in concluding, that we bring that in for purposes of impeachment and also under 404(b) for showing the pattern, the type of plan that he uses. This is something that's in Sergeant Menke's personality. If someone does something he doesn't like, he threatens to kill them.

Now, I suggest to you that is not somebody we can have in the Utah National Guard, and I believe that we have met the burden on all three prongs, and we submit it.

HEARING OFFICER McCABE: Thank you, Mr. Call.

MR. CALL: I'll be brief, your Honor, and the intent that I do plan to file written closing arguments. There's far too many issues out, but I just want to bring -- point to some to give you food for thought as we're waiting for this to come





through.

The first issue is whether or not the alleged incident of a death threat took place. Counsel for the agency would have you believe that it's clear that this threat took place. They said clearly Mr. Jensen has nothing to lie about and he's honest and clearly his story jibed 100 percent with Mr. Teinert's.

Let's look how clear they were, because they weren't. And counsel for the agency also made a very accurate point. When someone records something that's instantaneously or as close to the event as possible, that's the one that usually has the most accuracy in it because things are fresh on our mind, we know what's happened, and it's there, it's fresh. We're not reflecting on it six weeks later trying to write down what happened.

Mr. Teinert testified that at no time did he call the SPs and say that Mr. Menke was drunk and going to drive -- excuse me -- that he never called to report that Mr. Menke was drunk and going to drive home. He said that was Mr. Jensen. And I asked him that question a couple of times and he said, "I did not call and report that he was drunk and going to drive home. That was Jensen."

But yet the record from the SPs, who I think are probably very credible here, reported in their report Mr. Teinert called and reported that Mr. Menke was going to drive home and that he was drunk. So there's one lie. Mr. Jensen's apparently also called. Either he didn't know that Mr. Teinert had called or he knew about it but didn't want to talk about it. There's one inconsistency.

The next inconsistency between their own testimonies is where they were sitting. Mr. Teinert testified that he was down at the end of the bar at his normal place. Mr. Jensen places them far differently. If you look at Exhibit 12, he wrote J and S, and they are a far distance apart. Their testimony doesn't jibe there.

Their testimony doesn't jibe in the fact that Mr. Teinert claims -- and at the beginning of the day I withdrew my objection as to the exhibit concerning the telephone records because it shows the lies that Mr. Teinert is making. In that exhibit Mr. Teinert pointed out the call that he claims he received, according to his telephone records, at 11:38. He claims that at 11:36 I got a call from Ron that was a hangup call and he immediately turned around and called me with a death threat, at 11:38,





and then at 11:41 he immediately turned around and called the security forces about that.

Well, if you compare that to then the statements made in written statements to the SPs, they are completely inconsistent. Mr. Jensen says in his report, which is Exhibit 6, he says at approximately 12:30, 030, Mr. Teinert received a threatening phone call on his cell phone. Said he received many calls. So there's a huge hour of difference of time.

Mr. Jensen also testified -- "Where were you when you received this threat?" "We were sitting at the bar." You'll recall Mr. Teinert's testimony was they were at the pool table. That doesn't jibe.

In his report to the security police, the shore patrol, Bob said that the hangup call and the threat call were a half an hour apart. He states that clearly. But yet here he's testifying that all of a sudden it's only two minutes apart.

In Officer Horstad's report he indicates that the call that he received from Mr. Menke, turning in that call occurred at 030 hours, 12:30, not the 11:45 or the 11:38 that Mr. Teinert said. That's a whole hour difference.

Mr. Teinert testified that when he





immediately made that call, picked up his cell phone and he dialed, and he said, "My call is this call," the one at 11:41 to the shore patrol. Mr. Jensen's testimony is that he got up, he walked to the end of the bar and he used the base phone. The base phone's telephone call to shore patrol would not show up on his bill. It's clear that he's lying about that.

So he's got a good hour in which to make up this story. There's all kinds of inconsistencies. That's how clear their testimony is together.

Obviously he had -- by his own admission, he had a reason to lie about the threat. Mr. Teinert was angry at Ron for reporting his -- that he might be drinking, and he was getting his payback. And now he's made inconsistent statements also about what was said. In his report to the shore patrol, he says Ron said to him, "You're dead. Bob, you're dead. I can' do this." But yet in turning around and immediately saying what was allegedly said to Jensen, he changes it and says, "Well, he said, 'You're dead. You're going down.'" That's the threat that he received. So he's changed it once within a matter of two minutes of receiving it.

And then when Alan Chapman talks to him about the threat, Mr. Chapman testified, not by any





sort of leading question, but volunteered that Mr. Teinert said he threatened him and he said mind your P's and Q's. And I asked him that again, and the record will reflect it was not a leading question. Mr. Teinert was the one that said that. He said that's correct. And it was only after he was led through leading by counsel for the State that he tried to back away from that statement because he realized it hurt his case.

Mrs. Menke provided credible evidence. She's the only one, other than Mr. Menke and Mr. Teinert, who heard what was said, and her testimony is consistent with that that Mr. Menke has said.

So there's all kinds of inconsistencies about what was said. And even the security police -- I think, as you'll recall, one of the security officers acknowledged that they did receive a call from Mr. Menke saying, "Don't let Bob drive off the base. He's been drinking." So that supports his testimony that he was concerned about him and that he called the shore patrol, the front gate and had them make sure that he wouldn't be driving off the base."

There are all kinds of other inconsistencies between those things, and it's true that Mr. Jensen's testimony -- he has made false

statements in the past. It's clear that he made a false statement on a written document, a membership card to the bar, and was in that bar under the representation that he was 21, that he was not. That certainly reflects on his credibility. It's admitted that it's not a great impact on his credibility, but it does demonstrate that he's willing to lie at times.

As to the next issue, the final issue, to wrap up the point on it didn't happen. Mr. Teinert's actions after the alleged threat do not indicate any sort of fear that it was a real threat. He never tried to evade Mr. Menke when he saw him. They still worked in the same place. Didn't affect his employment, and went on.

The next issue is concerning the promotion of the efficiency of the Guard to take some sort of action and, in doing so, the case law is quite clear that the Guard has to demonstrate a reasonable nexus between the alleged conduct and the impact, and when it's off-duty conduct, as it is in this case, that is a heightened standard, and they must show an actual impact.

The testimony that was provided here was that it has had no impact either on Mr. Menke's





ability to perform his job or Mr. Teinert's. The immediate supervisors were here and testified that they both continued to perform their duties just like they had before.

And the courts have repeatedly held that an agency's determination that it will promote efficiency of the service cannot simply be done by declaratory fashion that it would promote the efficiency. They must demonstrate actual impact and how it actually has. That has not happened here. In fact, all the evidence is to the contrary of that. There is no actual impact on the Guard.

The only arguable impact is the notoriety, as the evidence demonstrates. That notoriety was achieved when the Guard itself published it instead of keeping this matter private like it should have, and even used it in a training session to broadcast it about.

The next -- the other various issues that are in there concern the issue of the efficiency of the Guard in the Douglas Factors. It's interested to note that the testimony indicated by Colonel Reutlinger was he ignored many of those factors. For instance, it was repeatedly made clear by the questioning by counsel of the various witnesses for





the agency that they didn't want to consider Mr. Menke's record because his performance record is very good, and they didn't want to look at that because that weighed against it, even though the Douglas Factors require them to look at it.

And, in fact, no one from the Guard's side ever sat down with Mr. Menke and said, "Tell us your version of the events." They assumed from the incident it was true and did nothing to investigate it. Colonel Reutlinger didn't even interview Mr. Teinert to determine whether or not he was credible, didn't even look at his record, and it would have shown he had been suspended for drinking on duty and had been suspended for that and would have motive to lie about Mr. Menke when Mr. Menke reported this again and get revenge, because that's going to cause him more problems. Colonel Reutlinger didn't even look at that.

Now, the consistency of the penalties, the issues that we brought up with the Schiele incident and the Wesemann incident, counsel for the Guard would have you believe they're apples and we're looking at oranges, but if you compare the facts in those cases, particularly in the Schiele and Martinez incident, they're almost identical, as far as a





threat and assault, to those they claim they look at when they terminated him. Or the three when they -- they claimed we looked at these three incidents. And I went through those with Colonel Reutlinger. And in all three cases, they involved one assaulting a supervisor. That's not this case. An actual physical assault.

But they fall within the realm of -- I'll give you even that one has some relevance here because it's a similar issue. They're not identical, but they're alike. Even in the most recent of these events, the event that Mr. Shupe testified to, Mr. Shupe wasn't even reprimanded for his, clearly, activities that were wrong and violative of the policy.

As to the issue of Mr. Shupe's testimony, it is clear from the testimony there that they're alleging that that was a threat. It's clear from what he testified that he was the aggressor in that. Mr. Shupe was the aggressor, that he had pushed him, and that Mr. Teinert responded defensively. I mean, excuse me, Mr. Menke responded defensively. That's not a threat when you're trying to defend yourself.

And his first statement of it was, "If you continue to fuck with me," or words to that effect,

PAGE 669

saying, "Stop it. I'm not here." As to the issue of Mr. Menke's ability to be rehabilitated in the event, as the Douglas Factors looks at, that very incident itself, Mr. Shupe testified he was coming to him to give him his hand, bury the hatchet about a prior dispute they had had and go on with their business. That sounds like contrition. That sounds like someone that is willing to get along. Bumps may come along and he's willing to put that behind him.

Mr. Zimmerman's incident where Mr. Menke was the victim. he's worked since that time in harmony with Mr. Zimmerman and there's been no problem. So it's clear that he is willing to accept responsibility for the things that he's done. He's not willing to accept responsibility for the things that he didn't do, and I don't think anyone would ask him to admit to things that they know that he didn't do.

As to the legitimacy of the penalty, the penalty is too harsh if, in the event you find that it is in the efficiency -- to promote the efficiency of the services to impose some sort of adverse action and if you find that the alleged threat took place. The threat here was not a serious threat as they would have you to believe that there's imminent



PAGE 670

threat of danger. It's ridiculous to allege that there's a realistic concern that Mr. Menke is going to go kill his friend Bob, and to ask you to believe that is not realistic. This was, as they allege, a drunken statement over a telephone, several miles apart, and it's never been acted upon and the parties have continued as though it really wasn't a big issue, and, in fact, it wasn't a big enough issue to Mr. Menke -- or, excuse me, to Mr. Teinert when he talked about it when Mr. McCowen. He didn't even tell him it was a death threat. He didn't say, "I'm afraid of Bob. Can you do anything about this?"

Mr. McCowen's judgment on the issue is probably the best here, that it doesn't have anything to do with employment and it's not an issue that we should be concerned about.

The termination adverse action is not fair, it's not consistent with the other kinds of actions they've done in similar cases, and it goes well beyond any of the ranges of penalties suggested. And we will admit that the recommended penalties are just that. They're recommended. They're to give the Guard discretion, and it's intended that they exercise that discretion, though, reasonably and not abuse it.



PAGE 671

The IPR says that they are to consider the subjective factors. When Colonel Reutlinger realized that viewing the subjective factors would not lead to the conclusion to terminate, what does he say? "Well, I took the face off it and I treat a threat as a threat." That is not what the IPR is designed to do. It would be an abuse of discretion for termination based off of what's taken place if you find that the threat actually occurred and that it would promote efficiency, and we submit that it does not.

We submit that the Guard has not met their burden of proof. I don't have anything further.

HEARING OFFICER McCABE: Okay. Anything additional, counsel?

COLONEL WARNER: No.

HEARING OFFICER McCABE: Then I will consider the matter fully submitted. Procedurally, where we go from here, so you understand that, is when the transcript is prepared, I ask that a copy be sent to me. And at the same time that it's sent to me, provided to the counsels for the agency and the appellant -- you, Mr. Menke, in that case -- from the date that it's -- how are you going to send those, Mr. Haws?



PAGE 672

MR. HAWS: Certified mail.

MR. CALL: Give me a call when you're sending it.

COLONEL WARNER: I like certified mail.

HEARING OFFICER McCABE: From the date that it is sent, each side will have 15 calendar days to place in the mail, dated as of that date, whatever additional information they wish me to consider in terms of rendering findings of facts, conclusions of law and a recommendation to the Adjutant General of of the State Utah.

I will endeavor, 30 days from the date that the transcript is put in the mail, to render a decision in writing, and what I will do with that is I will send that -- I'll send it to two entities at the same time -- and it will probably go certified mail, return receipt requested, so I can show that it was done -- I'll send one to Mr. Haws as the Labor Relations Specialist for the agency, and the other one I will send to you at your office address as it shows from the record, Mr. Call, so that we can go from there.

I'd like to thank both sides for the professional manner in which they conducted themselves in the presentation. As I've indicated

previously, this is far more pleasant hearing than some that I have experienced in other states and I think that's due to the professionalism shown on both sides.

Though it is not my responsibility, I will say that because I believe it's important. Between the time that we conclude this hearing and the time that the Adjutant General renders a final decision is perhaps the last opportunities the parties have to achieve some consensus on adjustment if adjustment is possible in this case. Now, why do I say that? You've both had the opportunity to hear -- to listen to the strengths and to the weaknesses of your cases, and, based upon that, to discuss that with your appropriate parties for the agency and the appellant and determine how you wish to proceed, wait for a decision, go that way, or look for some potential middle ground.

The only reason I raise that is because, as a recovering attorney who has had experience and as a hearings examiner, I've seen these cases drag on endlessly at great expense to both side, and that's the only reason I suggest it.

MR. CALL: One question. You want us to send our responses to you, correct?





HEARING OFFICER McCABE: Directly to me, yes. Do you have my address?

MR. CALL: If I could get an address from you. I think I've got it written down, but I want to make sure. Do you have a business card?

HEARING OFFICER McCABE: The easiest way, and I'll put it on the record so you've got it as well, you send it to Mike McCabe, Department of Military Affairs, Post Office Box 4789, Helena, Montana 59604-4789. And put on it "Attention NGB Hearings Examiner." I shouldn't have any problem on getting it. And the reason I ask you to put that last part on is that sometimes it gets better attention in the mail.

If there's nothing further, I thank both sides and this hearing is concluded.

(Whereupon the hearing was concluded at 4:10 p.m.)

* * * *



REPORTER'S CERTIFICATE

STATE OF UTAH )
) ss.
COUNTY OF SALT LAKE )

I, RENEE L. STACY, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public for the State of Utah, do hereby certify that the foregoing transcript, Volume II, consisting of pages 393 to 674, was stenographically reported by me at the time and place hereinbefore set forth; that the same was thereafter reduced to typewritten form, and that the foregoing is a true and correct transcript of those proceedings.

Dated this 10th day of February, 2000.

RENEE L. STACY, CSR, RPR

My Commission expires:
November 9, 2003

# EXHIBIT 10

## HEARING ON APPEAL OF ADVERSE ACTION

**Volume I**

**February 2, 2000**

IN RE: THE ADVERSE ACTION OF

RONALD J. MENKE

(VOLUME I)

FEBRUARY 2, 2000

HELD AT THE UTAH NATIONAL GUARD
STATE HEADQUARTERS
12953 SOUTH MINUTEMAN DRIVE
DRAPER, UTAH

REPORTED BY:
RENEE L. STACY, CSR, RPR



A P P E A R A N C E S

FOR MR. MENKE:
FRANK N. CALL
Attorney at Law
701 McIntyre Building
68 South Main Street
Salt Lake City, UT 84101
(801) 532-5909
Fax (801) 363-2420

FOR THE GUARD:
COLONEL PAUL M. WARNER
United States Attorney
District of Utah
UNITED STATES ATTORNEY'S OFFICE
185 South State, Suite 400
Salt Lake City, UT 84111
(801) 325-3209
Fax (801) 524-5515

HEARING OFFICER:
MICHAEL T. McCABE
COLONEL, MONTANA ARMY NATIONAL GUARD
Executive Officer
Box 4789
Helena, MT 59604-4789
(406) 841-3000
Fax (406) 841-3011

ALSO PRESENT:
RALPH HAWS
CAROL ELKINS
RONALD MENKE





I N D E X


WITNESS: TSGT ROBERT TEINERT

BY COLONEL WARNER. . . . . . . . . . . . . . . 35
BY MR. CALL. . . . . . . . . . . . . . . . . . 60
BY COLONEL WARNER. . . . . . . . . . . . . . . 85
BY MR. CALL. . . . . . . . . . . . . . . . . . 89
BY COLONEL WARNER. . . . . . . . . . . . . . . 92
BY MR. CALL. . . . . . . . . . . . . . . . . . 95

WITNESS: SRA MATT JENSEN

BY COLONEL WARNER. . . . . . . . . . . . . . . 96
BY MR. CALL. . . . . . . . . . . . . . . . . . 117
BY COLONEL WARNER. . . . . . . . . . . . . . . 131

WITNESS: TSG KEVIN FREEMONT

BY COLONEL WARNER. . . . . . . . . . . . . . . 134
BY MR. CALL. . . . . . . . . . . . . . . . . . 139

WITNESS: SSG TERRY MORSTAD

BY COLONEL WARNER. . . . . . . . . . . . . . . 145
BY MR. CALL. . . . . . . . . . . . . . . . . . 159
BY COLONEL WARNER. . . . . . . . . . . . . . . 168
BY MR. CALL. . . . . . . . . . . . . . . . . . 170

WITNESS: SSG SCOTT BRADSHAW

BY COLONEL WARNER. . . . . . . . . . . . . . . 171
BY MR. CALL. . . . . . . . . . . . . . . . . . 182

WITNESS: MSG LEE McDANIEL

BY COLONEL WARNER. . . . . . . . . . . . . . . 191
BY MR. CALL. . . . . . . . . . . . . . . . . . 208
BY COLONEL WARNER. . . . . . . . . . . . . . . 217
BY MR. CALL. . . . . . . . . . . . . . . . . . 223







WITNESS: MSG COREY QUINTANA

BY COLONEL WARNER. . . . . . . . . . . . . . . 225
BY MR. CALL. . . . . . . . . . . . . . . . . . 229
BY COLONEL WARNER. . . . . . . . . . . . . . . 234

WITNESS: CMS STEVEN BIRD

BY COLONEL WARNER. . . . . . . . . . . . . . . 236
BY MR. CALL. . . . . . . . . . . . . . . . . . 248
BY COLONEL WARNER. . . . . . . . . . . . . . . 252
BY MR. CALL. . . . . . . . . . . . . . . . . . 257
BY COLONEL WARNER. . . . . . . . . . . . . . . 259
BY MR. CALL. . . . . . . . . . . . . . . . . . 259
BY COLONEL WARNER. . . . . . . . . . . . . . . 261

WITNESS:. CMS RICHARD MIMMS

BY COLONEL WARNER. . . . . . . . . . . . . . . 264
BY MR. CALL. . . . . . . . . . . . . . . . . . 274

WITNESS: SMS AL CHAPMAN

BY COLONEL WARNER. . . . . . . . . . . . . . . 276
BY MR. CALL. . . . . . . . . . . . . . . . . . 284
BY COLONEL WARNER. . . . . . . . . . . . . . . 304
BY MR. CALL. . . . . . . . . . . . . . . . . . 313

WITNESS: LTC PAUL REUTLINGER

BY COLONEL WARNER. . . . . . . . . . . . . . . 315
BY MR. CALL. . . . . . . . . . . . . . . . . . 341
BY COLONEL WARNER. . . . . . . . . . . . . . . 378
BY MR. CALL. . . . . . . . . . . . . . . . . . 386




000011

EXHIBITS

Exhibit No.

1 Violence in the Workplace Policy
2 Proposed Notice of Removal
3 Original Decision to Proposed Notice of Removal
4 Supervisor's Record of Technician Employment
5 Statement of Telnert
6 Statement of Jensen
7 Statement of Morstad
8 Incident Report
9 Salt Lake Police Department report of offenses
10 AirTouch Cellular bill
11 List of citations
12 Bar layout
13 The Douglas Factors
14 Volunteer Service Medal award
15 Proposed Notice of Suspension
16 Employee Performance Plan





February 2, 2000
8:25 a.m.

PROCEEDINGS

HEARING OFFICER McCABE: Good morning. My name is Mike McCabe and I'm the hearings examiner for purposes of conducting this hearing regarding the adverse action involving Ronald J. Menke. I'm going to declare this prehearing in session. I've identified myself. We'll have the hearing on this case beginning immediately following this prehearing.

This is Wednesday, the 2nd day of February, 2000. The time is approximately 8:25 hours. The location is the conference room, the State Headquarters for the Utah National Guard at 12953 South Minuteman Drive, Draper, Utah.

My name was on a list of hearings examiners submitted to the Adjutant General of the State of Utah by the National Guard Bureau. I am qualified as a National Guard Bureau recognized hearings examiner, having taken the required training. From that list, I was selected and was asked to hear this case and render a recommendation resulting from this outcome.

I'd like to identify for the record those





persons who are present, beginning with the agency. Will the representative for the agencies please identify themselves for the record.

COLONEL WARNER: Yes. My name is Colonel Paul Warner. I'm the legal counsel for the agency for purposes of this hearing. With me is Chief Warrant Officer Ralph Haws, who is the labor relations officer for the Guard. I don't know your official title, Ralph. Is that close enough?

MR. HAWS: Labor relations specialist.

COLONEL WARNER: Labor relations specialist. And Carol Elkins, who is -- your title, Carol?

MS. ELKINS: It's the technician program manager.

COLONEL WARNER: There you go.

HEARING OFFICER McCABE: Carol is the one that's going to keep us all in line, right?

COLONEL WARNER: Exactly.

HEARING OFFICER McCABE: And for the appellant?

MR. CALL: My name is Frank Call. I represent Ron Menke. He's the technician in this case. Mr. Menke is here with me.

HEARING OFFICER McCABE: Thank you. Let me





give you an idea of what we're going to be doing. The case, as I understand it, in having reviewed the record, and this is an appeal of an adverse action being taken against Ronald J. Menke, the appellant, who was alleged committed conduct in violation of TPR-752, which is a technician personnel regulation 752, captioned Discipline and Adverse Action, and for that, there has been a recommendation through the process that Mr. Menke's employment as a federal technician be terminated.

I'm here for purposes of establishing a record and allowing both sides to develop in as great a detail as is reasonable the facts and circumstances surrounding this event. The reason that I emphasize to you the importance of that record is that I'm not here as a judge. The legal rules of evidence do not strictly apply.

I'm truly here is as a caretaker of that record so that we can develop the factual basis surrounding the circumstances so that, after I submit a recommendation to the Adjutant General, which will be based on findings and conclusions generated from and arising from the information that's provided today and tomorrow during the hearing.

That will all be put into a record that

will go to the Adjutant General of the State of Utah, and the Adjutant General will be the ultimate decision maker on whether or not to uphold the recommended termination of employment for Mr. Menke or to do otherwise.

So I consider myself a caretaker in that capacity. You need to understand that, by background and training, I am an attorney, and, consequently, you don't have to waste a lot of time, other than for purposes of the record and for the Adjutant General, making your arguments on legal points.

As I indicated earlier, it isn't my intent -- if anybody makes a motion that would have the potential to stop this hearing, that I will take that under advisement and will rule on its impact on the overall process after we have developed the facts and circumstances during this hearing. That's based on the practical experience I've had in the past on having a bifurcated hearing in the State of Arkansas that required three trips for me back there, and I don't intend to ever do that again. And Arkansas was real happy that I finally reached that conclusion.

With that in mind, as I said, the rules of evidence don't really apply. Please make your objections. It's kind of different from what you





usually hear when you talk about objections. You can make legal objections, but I'd also -- if you want to make an objection, please take some time to talk to me about how you view this as affecting the weight to be given to the testimony, so this is more of a factual hearing than a true evidentiary hearing. That may take some effort on your part as attorneys because I know you get used to being told that that's argumentative. In this case it's very appropriate.

Any questions at this point as to anything I've said? Colonel Warner?

COLONEL WARNER: No questions.

HEARING OFFICER McCABE: Mr. Call?

MR. CALL: Nothing so far, your Honor.

HEARING OFFICER McCABE: Mr. Menke, do you understand what I've been saying?

MR. MENKE: I understand.

HEARING OFFICER McCABE: That concludes my opening statement. What we're going to do during this hearing is, I think, develop the ground rules for the process, and the ground rules are pretty simple. Because it is the agency that's recommending the termination of technician employment of Mr. Menke, they will bear the burden of proof and will proceed first in the presentation of evidence.





As a witness is called -- and I've looked at the witness list and I realize that there's a grand total of -- I have 20 witnesses.

MR. HAWS: There's the first day that we worked out between the two attorneys.

HEARING OFFICER McCABE: Great. Twenty witnesses. And the way it's going to work, so that we can do this without having witnesses tied up as long as possible is, rather than having either side be one to, say, sponsor a witness, the witnesses will be called and both sides will have the opportunity to develop their case, so we'll do direct examination by whoever calls the witness, cross examination, and then if there's some direct examination by the other side to develop some facts beyond that, that can occur as well so that, again, we're not putting the witnesses out or having them have to come back.

In terms of speaking on the record, I don't think we'll have any problem with that, but I would anticipate for the agency that will be Colonel Warner, and insofar as for the appellant, that will be you, Mr. Call; is that correct?

MR. CALL: That's correct.

HEARING OFFICER McCABE: Mr. Menke, if there's anything you believe that you need to address





to me as the hearings examiner or you want to say, I would strongly encourage you to please make sure that you talk to Mr. Call about how that goes, otherwise we get a record that can be pretty confusing sometimes, and my concern about the record is to make it as clear as possible so that the facts are fully developed in this case, because that's the right you're entitled to in terms of review by the Adjutant General of the State of Utah.

MR. MENKE: Yes, sir.

HEARING OFFICER McCABE: I know, in terms of motions, that I was presented with a motion to dismiss and a motion for reinstatement, which is dated February 1, 2000, and, Mr. Call, as I understand it, you faxed this to me or E-mailed this to me in Montana yesterday; is that correct?

MR. CALL: That's correct.

HEARING OFFICER McCABE: Well, as I indicated this morning, whoops, it missed me. I was probably either taking care of some work outside the office or probably in preparation to come down here. Consequently, I've seen the objection and motion to dismiss for the first time today. I've had an opportunity to read it this morning. As I've indicated, I'm not going to rule on that directly

today. We'll develop the factual information.

However, if either side wishes to be heard on that motion today in terms of oral argument, I'll be happy to listen to that, or you can have the opportunity to address it following the hearing in writing.

Mr. Call, it's your motion. Do you want to add anything to it today?

MR. CALL: Your Honor, I think if I were to talk about it, I'd wait until closing and handle it then. You indicated that you won't rule on it until all the evidence is in. It would probably be most appropriate to address it at the close of the hearing.

HEARING OFFICER McCABE: That will be fine. Colonel Warner?

COLONEL WARNER: I'll probably do likewise, either address it at the close or address it in writing. The only comment that I would make now about it -- I just saw it late last night myself -- that is that counsel relies heavily on Section 2.15 of IPR-752, indicating that somehow the agency is in violation because the action was initiated by someone other than the technician's immediate supervisor.

I would simply point out for the record





that Section 215 doesn't require that. If you read the language carefully, it begins with the adverse action process, begins with the technician's supervisor. It doesn't say immediate supervisor. Doesn't require an immediate supervisor. It says technician's supervisor. That could be any supervisor in the chain. And the SPMO representative reviewing the information gathered about the misconduct, so on.

Then when the adverse action is decided upon, the technician's immediate supervisor initiates proposed action, initiates the proposed adverse action notice. And then goes down -- and this is the language that's critical -- circumstances may require others in the technician's supervisory chain to initiate such notices, indicating that, again, there's no mandate that it has to be the immediate supervisor.

As the evidence comes out, I think we'll be able to make that more clear about who did what and why, but I think it's important for the record to indicate that the IPR is not -- does not require that that be done by the immediate supervisor. At least that's our position. I don't have anything further at this time.





HEARING OFFICER McCABE: Thank you. Inasmuch as Colonel Warner made some comments on this at this point, Mr. Call, do you feel compelled to say anything at this point?

MR. CALL: I think I'll address that at the close, your Honor.

HEARING OFFICER McCABE: Thank you very much. Each side will be given the opportunity to make an opening statement. Obviously, the agency has that option first and, Mr. Call, as representing the appellant, you can make the opening statement immediately following that or wait till you begin to present your case in chief, and since we're really cross supporting witnesses in this case, I'll leave it to you whether you want to do that after the agency says it has presented all its testimony or if you want to do it immediately following. That's your choice.

MR. CALL: Okay.

HEARING OFFICER McCABE: Stipulations. Do we have any stipulations between the parties?

COLONEL WARNER: I don't believe we have any specific stipulations.

HEARING OFFICER McCABE: I do have a list here, a witness list, and a tentative time schedule





for the first day. Is that a list that was reached by agreement between the parties?

MR. CALL: It's hard to call it an agreement, your Honor. I think it was a schedule that -- we kind of anticipated where it was going. On that vein, from the schedule, it looks like there are quite a few witnesses, primarily Mr. Menke's witnesses, that don't appear that they will be reached today. I'm wondering if, instead of having them sit out in the hall today, they be excused and we bring them in tomorrow, how best to handle that. We do have Ms. Menke here who we can kind of use as a rubber band if we end up short and start that procedure.

HEARING OFFICER McCABE: Well, as long as we're talking about that, I'm here for two full days. It doesn't make any difference to me how long the hearing goes either day, so long as we get all of the information presented in the two days. So there's no misunderstanding, my wife has indicated to me that I will be on a plane tomorrow evening at 10:00 p.m. for purposes of being home. She's a lot higher power than I am and so I'm certainly going to honor that request.

With that in mind, again, let's see how we

go today in terms of witnesses. If witnesses -- seeing this list of witnesses here, I don't know how much time is involved, either. I've seen witnesses say, "Oh, it's only going to be a few questions," go on forever. There are ample here to take care of. What I would say is that we'll just simply adjust that tomorrow and how long we go tomorrow to satisfy the requirement, if necessary, just as long as I have enough time to find my way to the airport, get rid of my car and get on a plane by 10:00 p.m.

MR. CALL: That's fine with us, your Honor. The other issue was, I guess, a stipulation of sorts, and that was -- it was my understanding that this termination issue involves the threat only and not the accusation of abusive language. I think it's implicit in the termination, the original decision. If that's still the case, I did not intend to go into great detail about abusive language and what kind of language is used on military bases and whatnot.

I've talked with Mr. Haws and Mr. Warner about that. I don't know if there's a stipulation that the issue at hand is just the threat or the threat and the abusive language. I think our position was and my understanding was that the





language was not the issue here. If that's the case --

COLONEL WARNER: I think that's accurate, Mr. McCabe, that the -- we're not -- I don't think the decision to remove was based on the language. I think it was based on the alleged threat. I think we're proceeding on the basis of the threat. I think the language was initially included in some of the early notice to Mr. Menke, but I believe that a final decision letter doesn't rely on the language.

HEARING OFFICER McCABE: So basically, if I understand it -- and I want to make sure I'm clear on this, because we're not talking about two offenses, that may have some bearing at the end in terms of the determination of the severity. In the event that there's a determination the facts support a conclusion the offense was committed, from that standpoint, we are looking at this -- again, so I understand it -- only as a threat case, in terms of the basis for termination, is the threat of serious bodily injury that was alleged to have occurred?

COLONEL WARNER: That's true, but I want to clarify one point. We will bring out the fact that Mr. Menke did use offensive language, because we believe it's relevant relative to his attitude and



demeanor just prior to the threat, which would reflect what his attitude and demeanor may have been at the time of the threat. So that language will be coming out as part of the record that we develop, but we're not relying on that language as one of two offenses for purposes of the removal.

HEARING OFFICER McCABE: Very good. I understand that. Anything further, Mr. Call?

MR. CALL: No.

HEARING OFFICER McCABE: Are there any other matters you think need to be addressed at this point?

MR. CALL: Just -- your Honor, I know the Rules of Evidence don't apply, but I assume that the witness exclusion rule will apply and --

HEARING OFFICER McCABE: I leave that to the discretion of the parties. Customarily I exclude witnesses. This room is large enough to have witnesses here. My biggest concern about having witnesses available in the hearing is principally due to the ability to distract from what we're truly focusing on here.

The second reason that I customarily exclude witnesses is because, very honestly, Mr. Menke, it's only alleged that this offense has





occurred at this point and, very honestly, this is an employment issue, and in my mind, to the greatest degree possible, there is some sense of a personal nature and privacy that should be afforded until the ultimate outcome of this matter.

If you want to have witnesses available to sit and listen or have this as an open hearing, I have no problem with that. I leave that in your point. Otherwise, unless there's no serious objection, I'd like to exclude the witnesses.

MR. CALL: And we would move for that, your Honor.

COLONEL WARNER: We have no objection. In fact, we would subscribe to that as well, with the possible exception -- and, of course, one of the reasons that we exclude witnesses is so that their testimony will not be influenced by what others have said. I may be calling Ms. Elkins later to testify only about similar instances of discipline that, as a technician manager, she would be aware of and be able to talk about, but she has no factual knowledge that she would be testifying to about this incident that is the subject matter of this particular hearing, but I think she may be the best person in terms of talking about some of the issues that counsel raises

relative to how others have been treated and whether this discipline is, in fact, within the realm of what's been reasonable and fair in the past.

MR. CALL: And we would not object to that, your Honor. We believe that she's an agency representative that's entitled to be here.

HEARING OFFICER McCABE: Very good. I think I've talked to you a little bit about witnesses and testimony. I don't think we need to go over that any more. You need to understand, as the hearings examiner, if there's some question I don't think has been asked that I believe is important for the development of the record, I'm going to ask that question. If you want to call that meddling in how the case is presented, so be it, but my goal is, again, to make sure that the Adjutant General has as complete a record as possible, and a lot of that is to remove what I would call the uncertainties of lack of factual development, if necessary.

The fact that I ask a question, I would hope you would understand on both sides, doesn't mean I'm leaning one way or the other. It's just that I have an inquisitive mind that believes something needs to be clarified. And if it doesn't make sense to you, just chalk that up to the fact that I'm





left-handed and sometimes that side of my mind takes over.

Anything further at this point?

COLONEL WARNER: Nothing from the agency.

HEARING OFFICER McCABE: Mr. Call?

MR. CALL: Nothing for Mr. Menke.

HEARING OFFICER McCABE: Then what I'm going to do is go ahead and declare that the prehearing is complete and ask the parties, what time will you be ready to proceed with the hearing. Colonel Warner?

COLONEL WARNER: I believe we're ready to go immediately.

HEARING OFFICER McCABE: Let's take a 15-minute break and proceed -- approximately 15 minutes -- and we'll proceed at 9:00 a.m. This prehearing is concluded. Thank you.

(Recess.)

HEARING OFFICER McCABE: I'll call this hearing to order. We're now at the phase where both sides will be given the opportunity to make opening statements, and we'll proceed first with the agency. Colonel Warner.

COLONEL WARNER: Thank you. We'll be brief. We understand and acknowledge that the





hearing examiner is an experienced attorney and an experienced hearing examiner, so I don't think we need to spend a lot of time fleshing out what it is we're going to be doing.

This hearing really revolves around an incident that occurred at the NCO Club at the Utah National Guard air facility in Salt Lake City, and the allegation simply is that, on the evening of September 17th of 1999, Ronald Menke was there with several other individuals that will be called as witnesses. They were drinking.

Near the end of the evening, Sergeant Menke was about to leave. He was approached by Sergeant Teinert, a friend and an associate for some time, offered a cab. Apparently that did not sit well with Sergeant Menke, inasmuch as he rebuffed that offer in somewhat vulgar language, and eventually Mr. Menke was given a ride home by the bartender, Darren Lindsay.

All of these facts will be fleshed out in some detail during the course of the hearing by the various witnesses that will be called.

Shortly after Mr. Menke arrived home, several calls were placed to Mr. Teinert, Sergeant Teinert, on Sergeant Teinert's cell phone,





culminating with a call that we allege contained a death threat to Mr. Teinert from Mr. Menke. The exact words of that threat will come in in a couple of different ways, but the clear import of the threat is clear, irrespective of the actual words that were used.

We anticipate moving forward in the hearing in the following manner for purposes of explaining where we're going. We've divided our witnesses into two groups. The first group of witnesses will describe the incident, as we call it, the facts surrounding the incident, who said what, who did what and so on. That will include Sergeant Teinert, Airman Matt Jensen, who was a witness there at the NCO Club, several security officers who were involved in speaking with Sergeant Menke and others at the club, including Sergeants Freemont, Horstad and Bradshaw.

The second group of witnesses that we'll be calling I call the decision witnesses, which are those people who, in one way or another, may have had some input or influence on the final decision to terminate or to remove Sergeant Menke from his technician position, and that group of witnesses include Sergeants McDaniel, Quintana, Bird, Minns,

Chapman and, of course, Lieutenant Colonel Reutlinger.

The reason that we break these two up, these witnesses into those two groups, that being the incident and then the second, the decision, of course -- and, again, I am quick to point out I understand that the examiner is well aware of the issues to be determined in the hearing, but, of course, the TPR-752 requires three issues to be determined by the examiner. The first issue, of course, is did the technician do what he was charged with, i.e., did he threaten to kill Sergeant Teinert, a factual determination by the preponderance of the evidence, and we believe that the witnesses will establish that by preponderance.

Then, of course, the other two issues that the hearing examiner is responsible for making recommendations on is: Will some discipline based on the proven conduct promote the efficiency of the service. And, in particular, where we have off-duty conduct, the agency has to establish an adequate relationship between the grounds or the cause and the efficiency of the service, which is the technician's ability to perform his duties and the agency's ability to perform its mission.





We believe that the record will demonstrate, through the decision makers, that some discipline, in fact, does promote the efficiency of the service. And then the final issue, of course, is the penalty appropriate.

We believe that the -- we believe -- we submit -- let's put it that way -- we submit, again, that the evidence will demonstrate, based on the witnesses, that the penalty is appropriate based on the severity of the threat, and that, based on a careful review of the Douglas Factors and based on the treatment that has been accorded to others similarly situated and, in particular, upon the policy of the TAG or the Utah National Guard, which is the violence in the workplace policy.

We will submit a variety of exhibits, and I won't review those right at this point during this opening statement, but we will submit those exhibits for the examiner's consideration, and, of course, we will come back at the end and summarize at the conclusion of the evidence. Thank you.

HEARING OFFICER McCABE: Mr. Call, do you wish to make an opening statement at this point?

MR. CALL: I do, your Honor.

The events that are in question here



concern conduct that occurred while both Mr. Menke and Mr. Teinert were off duty. It occurred at the NCO Club. This is not either Mr. Menke's or Mr. Teinert's workplace, designated workplace. Although on the base, it does not qualify as the workplace.

We believe that the Court -- or you, in coming to a conclusion in this case, need to apply a subjective test to the facts that are here. And the issue of the threat is not just the mere words of what was said and what you determine was said, but the subjective circumstances surrounding that. The nature of the comment, the relation of the parties and the surrounding events need to be taken into consideration when determining whether a threat was made and whether the threat, if made, was credible, meaning that it was legitimate and intended to be a threat.

Mr. Warner indicated that the agency has the burden of proof here by establishing by a preponderance of the evidence three things, that the alleged threat actually occurred, that the adverse action imposed against Mr. Menke or proposed to take against Mr. Menke, i.e., the termination, would promote the efficiency of the National Guard, and in doing so, the law requires that the agency establish





by a clear nexus a relationship between the alleged misconduct and its impact on the efficiency of the service, we would submit, and we will -- it's our anticipation that the evidence will demonstrate that because this was off-duty conduct, it has no impact on the efficiency of the service and has no meaningful impact on the Guard as a whole, and, therefore, inappropriate.

We would submit that the evidence that will be presented, when balanced against the evidence presented by Mr. Menke, will weigh in his favor and that many of the agency's witnesses will not be credible. We'll demonstrate that they have some motive to not be truthful, and also that the other evidence as to the impact -- we believe the evidence will demonstrate that there is no or negligible impact on the efficiency of the Guard.

Also, we'll demonstrate that the appropriate penalty, in the event that you find that there has been misconduct, that the penalty imposed upon Mr. Menke, his termination, is unfair. It's overly harsh and it's inconsistent with similar punishments that have been imposed on other technicians and employees for similar conduct.

With that, we're ready to proceed.

HEARING OFFICER McCABE: Thank you very much. And we've come to the point where the agency may call its first witness. Witnesses will be sworn in by the court reporter.

COLONEL WARNER: Before I do that, I'm going to make a sort of a mass introduction of exhibits, if that's acceptable to the examiner, and what I mean by that is I'd like to just list the exhibits I anticipate using and just introduce them all. Since the formal rules of evidence don't recall apply, I'm not going to -- I want to just get them in and get them introduced, and then we can cite to them as they become appropriate in the hearing, if that's acceptable to you.

HEARING OFFICER McCABE: Any problem with that, Mr. Call?

MR. CALL: I would like to see what's coming in. I don't have any objection at the outset to it.

COLONEL WARNER: You have everything that's coming in, I'm sure.

MR. CALL: Okay.

COLONEL WARNER: But this is the list, and we will mark them in order as 1, 2 and 3, so on. The first one -- and I believe that the examiner has





almost of all of these. If not, we will provide additional copies. The first exhibit would be the policy letter of violence in the workplace, dated 23 March '99, which is exhibit -- would be our Exhibit No. 1, and in the index that was provided to the hearing examiner, it is also No. 1.

The second exhibit would be our proposed notice of removal, dated 16 November '99. Also, No. 2 in your index, the examiner's index.

Our third exhibit would be the original decision to the proposed notice of removal, dated 20 December 1999, and that's Index No. 5 on the examiner's index.

Our fourth exhibit would be the supervisor's record of technician employment, that being 6 on the examiner's index.

HEARING OFFICER McCABE: When you say supervisor's record of employment, are we talking about the 904-1, the form customarily called 904-1?

COLONEL WARNER: Yes, it is. I wanted to make sure I had the number correct.

HEARING OFFICER McCABE: Let me ask a question about that, if you're admitting it, inasmuch as I've seen it in the book, as I understand and my familiarity with the 904-1 is that it is a two-sided





document. The one that I have in the book that was submitted to me of information is only the front portion of the 904-1, and the only reason I raise that is if that's all we're going to consider, then I'm not looking at the back of the 904-1, but I want to make sure that both sides understand I don't intend to look at the back of the 904-1, unless there's a reason.

COLONEL WARNER: The reason that there wasn't a back side is because there's nothing on the back side.

HEARING OFFICER McCABE: Just wanted to make sure. I had this in the past with one side being admitted, the other side being objected to, so --

MR. CALL: We have an exhibit, if you want to use it. It's actually a full photocopy including the back side.

HEARING OFFICER McCABE: It doesn't make any difference. We'll take it as a 904-1, the front page, and the reason being that there's nothing on the back page to be noted at all.

COLONEL WARNER: That's correct.

HEARING OFFICER McCABE: Thank you.

COLONEL WARNER: Let's see. The fifth





exhibit for the agency would be the statement, the written statement of Robert Teinert, which is, in the examiner's index, No. 7.

The sixth agency exhibit would be the statement of Matt Jensen, which is Examiner Index No. 8.

The seventh agency exhibit would be the statement of Terry Morstad, Examiner Index No. 9.

The eighth exhibit for the agency would be the statement of Ray Pitt, the Examiner Index No. 10.

And the ninth exhibit for the agency would be the police report, Salt Lake City Police report, which is Examiner Exhibit No. 11.

We reserve the right, obviously, to submit additional exhibits as may become appropriate or relevant during the course of the hearing, but, for now, we'd like to just submit those as a block and have them admitted, as they may be referred to throughout the course of the hearing.

HEARING OFFICER McCABE: They will be submitted as a part of the record. Again, both parties will have the opportunity to argue and make statements as to the validity of those. At this point, understanding that Mr. Call may have something

he wishes to say on that, you'll certainly have the opportunity to provide that at this point, Mr. Call.

MR. CALL: We would not object to proposed No. 1, 2, 3, 4, 5, 6 or 7. I don't believe I've seen No. 8. If you could point it out if it's --

MR. MENKE: You have it.

MR. CALL: Okay. If you'll just show it to me. I don't anticipate --

COLONEL WARNER: If you can't find it quickly, I've got a copy that we can show you. (Handing.)

MR. CALL: Okay. We would not have an objection to No. 8. No. 9 we would object to on the grounds of authentication. It's a police report. It's not this agency's record. I don't believe there will be anything that's in question. Other than that, we wouldn't have any other objections.

HEARING OFFICER McCABE: Thank you.

COLONEL WARNER: I will assume, based on your prior comments, that there's no reason for me to respond to objections, unless you, for some reason, would ask me to respond to them.

HEARING OFFICER McCABE: Colonel, I would only say that, whether you wish to respond or not, I leave it to the discretion of a practicing attorney





as to whether it adds anything to the record or it's important for that purpose or whether it's simply being said because of our argumentative natures.

COLONEL WARNER: Well, then let me say this, both because I'm argumentative and also because I'm cautious. For whatever purposes of judicial review of this record, obviously the rules of evidence do not apply. Authentication is not an issue that goes to admissibility. It goes to the weight, and therefore, whether this be hearsay -- which it is classic hearsay since it's a written document prepared out of court, so to speak. I acknowledge that the police report is a hearsay document, but it has nothing to do with admissibility. It has everything to do with the weight which the examiner can properly assess.

HEARING OFFICER McCABE: Thank you. Now are we ready for the first witness?

COLONEL WARNER: We are.

HEARING OFFICER McCABE: Call your first witness.

COLONEL WARNER: We would call Sergeant Robert Teinert.

TSGT ROBERT TEINERT

called as a witness and sworn, was examined and





testified as follows:

HEARING OFFICER McCABE: State your full name for the record.

THE WITNESS: Robert Walter Teinert.

HEARING OFFICER McCABE: Thank you very much. You may proceed, Colonel.

COLONEL WARNER: Thank you.

DIRECT EXAMINATION

BY COLONEL WARNER:

Q Mr. Teinert, by whom are you employed?
A Utah Air National Guard.
Q And for how long have you been so employed?
A Be 18 years 1 May.
Q Do you have a military rank?
A Tech sergeant.
Q Would it be appropriate for me to call you Sergeant Teinert here today?
A Yes, sir.
Q Are you employed full time as a technician as well as tech sergeant in the military side of the house?
A Yes, sir.
Q I'm going to ask you to let me finish my questions, because she has to record this, so everyone has to speak one at a time. If that makes







sense.
A Yes, sir.
Q You are a full-time technician, then?
A Yes, sir.
Q And for how long have you worked as a full-time technician?
A Sixteen years.
Q So 18 years on the military side and 16 years on the technician side; is that correct?
A Correct, sir.
Q Now, what is your assignment as a technician?
A Jet engine technician.
Q Is that, for want of a better word, basically a mechanic who works on jet engines?
A Yes, sir.
Q In the course of your employment as a technician, as well as on the military side of the house, have you become known -- or have you become familiar with an individual by the name of Ronald Menke?
A Yes, sir.
Q And how long have you known Ron Menke?
A I think about ten years, 11 years.
Q Can you describe for this hearing briefly

TEINERT, EXAM BY WARNER

how you would describe your relationship with Sergeant Menke over those years?
A We've become friends.
Q Did you work with Sergeant Menke on a daily basis prior to the incident in September at the NCO Club?
A Yes, sir.
Q Did he work in your shop?
A Yes, sir.
Q So you saw him each and every day that you went to work?
A Yes, sir.
Q And how close of a working relationship was there? Did you see him occasionally during the day or would he be working in the same proximity as you? Can you help us better understand how close the working relationship was?
A There were days when we had different assignments and we would be in different areas working, but it was centered around the shop. We seen each other every day.
Q Okay. Had you -- strike that.
I'd like to direct your attention to September 17th of 1999. Do you recall that day?
A Yes, sir.





TEINERT, EXAM BY WARNER

Q Did anything unusual happen during the workday? I'm talking about the workday at your assignment.
A No, sir.
Q All right. And following the completion of your duties -- when did you finish your duties, your technician duties?
A I did not work that day, sir.
Q All right. That evening, you went to the club; is that correct?
A Yes, sir.
Q All right. And I'm talking about the NCO Club on the Air Guard Base.
A Yes, sir.
Q About what time did you arrive at the NCO Club?
A Around 3:30. 3:30, four o'clock.
Q In the afternoon?
A Yes, sir.
Q Did you observe anyone there that you knew?
A No, sir. It was closed. I went and -- I maintain an aquarium there. It was closed. There was no one there. I have a key, as an employee, and I went in to work on the aquarium. Change the filter, feed the fish.





TEINERT, EXAM BY WARNER

Q What time did the club open up?
A Bartender arrived at six o'clock for a party that night.
Q And were you still there?
A Yes, sir.
Q All right. During the course of the evening, did you remain there?
A Yes, sir.
Q And what were you doing at the club?
A After the aquarium was done, socializing.
Q All right. During the course of the evening, did you have the opportunity to observe Sergeant Menke at the NCO Club?
A Yes, sir. We talked a few times.
Q And approximately, to the best of your knowledge, how long was Sergeant Menke there, to the best of your knowledge and observation?
A I'm not sure what time he arrived. Around -- I think around 7:00, 7:30.
Q Do you recall approximately when he left?
A It was about 11:00, 11:30.
Q Sometime in that time frame?
A Yes.
Q During the course of the evening, did you spend much time with Sergeant Menke?





TEINERT, EXAM BY WARNER

A We had talked a few times, but that was -- I was sitting in a different area.
Q Okay. You weren't hanging out with Sergeant Menke?
A No.
Q Were you drinking that evening?
A Yes, sir, I was.
Q And can you tell us, to the best of your recollection, approximately what it was that you had to drink?
A Roughly ten drinks in six hours.
Q And what were those -- what did those drinks consist of?
A One shot of alcohol mixed.
Q And would you please tell us what your opinion of your state of intoxication was by the end of the evening when Mr. Menke left.
A Slightly intoxicated. I was not going to drive.
Q Can you describe for us what, if any, observations you had of Sergeant Menke that evening, relative to his intoxication?
A He had drank more than I had, in my opinion. He was boisterous, belligerent a few times. I heard him arguing with people at other

TEINERT, EXAM BY WARNER

tables. But I do not know the exact level, no.
Q Did you ever hear him raise his voice?
A Yes. Several times.
Q Did you observe his ability to walk and to -- and otherwise -- motor control?
A He slurred his words a little bit. That was about the only evidence I had.
Q Okay. Now, who was with you at the bar? You said you were sitting in another group or another area of the bar from Sergeant Menke.
A Airman Jensen.
Q And do you recall approximately when it was that Sergeant Menke left the bar -- or left the club?
A I do not know the exact time. I'd returned from the restroom and he was leaning on the end of the bar to leave, and it was evident that he was intoxicated, and I walked up and, friendly advice, put my hand on his shoulder and says, "Ron, you shouldn't be driving. You should get a cab. If need be, I'll even buy it."
Q Now, when you did that, did you do -- you say in a friendly manner?
A Yes. With concern.
Q Okay. Did you use any profanity towards Ron at that time?





TEINERT, EXAM BY WARNER

A No, sir.
Q Did you have any anger in your voice at that time?
A No, sir.
Q Were you threatening in any way?
A No, sir.
Q Harassing in any way?
A No, sir.
Q You did so out of a sense of friendship and concern?
A Yes, sir.
Q And what did Sergeant Menke -- or how did Sergeant Menke respond to your offer to pay for a cab and advice not to drive?
A Very belligerently. He said F you.
HEARING OFFICER McCABE: Now, you need to understand, this is a hearing where we're developing the facts. I need to know exactly what he said, and if you're saying he said F you, that's what goes in the record. If there were words connected with it, you need to repeat those. It's no reflection on you. It's simply an articulation of the facts as you know them.
Q (BY COLONEL WARNER) Yeah. I think, Sergeant Teinert. I understand and appreciate your



TEINERT, EXAM BY WARNER

sensitivity here, but we have to have the exact words.
A Yes.
Q So please tell us to the best of your recollection exactly what it was that Sergeant Menke said to you upon your offer of getting him a cab and suggesting that he not drive.
A He said, "Fuck you, Bob. It's none of your goddam business."
Q And are you relatively certain that that's what he said?
A Yes, sir.
Q When he said that, what was his attitude or demeanor?
A Very belligerent. He stood up and turned, facing me and pointing his finger at me, and he said, "Fuck you, Bob. It's none of your goddam business."
Q So it wasn't said in any kind of a joking way?
A No, sir.
Q Did anyone else observe or hear that exchange?
A Yes, sir. The whole bar. Airman Jensen reacted to it and said, "Is that going to be all right?"





TEINERT, EXAM BY WARNER

Q Now, what happened next after that exchange between you and Sergeant Menke?
A I -- that was the end of it. I went and sat down. I figured it was just, you know, the alcohol talking and blew it off. And I found out that Airman Jensen had called security police. They were outside waiting for him and the bartender ended up driving him home.
Q And who is the bartender?
A Darren Lindsay.
Q Okay. Now, did you remain at the NCO Club following Sergeant Menke's departure?
A Yes, sir.
Q And to the best of your knowledge, approximately what time did Menke leave, then?
A I -- like I said, I think it was around 11:00, 11:30. I'm not sure.
Q Now, how long did you remain at the bar -- or at the club?
A I ended up staying all night.
Q Okay. And why did you stay all night?
A Well, I had no intention of driving, and then, after the incident, when he phoned me, I was told by security police not to leave.
Q Well, let's talk about that. So Sergeant

TEINERT, EXAM BY WARNER

Menke is driven home and you remain at the bar. Did Sergeant Jensen -- or, excuse me, Airman Jensen remain there as well?

A We went out and was shooting pool when I received the phone calls.

Q Okay. You received phone calls. Did you have a cell phone at the time?

A Yes, sir.

Q And did you carry that routinely with you?

A Yes, sir.

Q And you say phone calls. What happened?

A My cell phone rang. I picked it up, answered it, and I could hear Sergeant Menke yelling, so I just turned it off and put it back in the pouch.

Q Now, you say yelling. Could you understand the words, or was it just sort of the noise?

A The -- I heard him yelling, swearing, everything like that. I did not -- it was not distinguishable. It was loud, screaming noise, and I recognized his voice, so I did not even put it up to my ear. I could just hear it out here.

Q And you turned it off?

A Turned it off -- well, ended the call and put it back. I did not turn it off.





TEINERT, EXAM BY WARNER

Q But you pushed end on your cell phone to terminate the call?

A Yes.

Q But you left the phone on for purposes of receiving incoming calls?

A Yes, sir.

Q All right. Now, Sergeant Teinert, did you receive any additional calls that evening?

A Yes, sir. Unknown time frame. Within minutes, it rang again. I picked it up, to my ear. It was Sergeant Menke yelling, "Fuck you, Bob. I'm going to kill you. I can do this."

Q Okay. Wait just one minute. I don't want to get to that just yet. How many calls did you receive before the one that you just alluded to which contained the threat? How many phone calls came in during that period?

A One.

Q One prior to the phone call -- to the threat?

A I received one that I ended, and the next one I answered.

Q Well, let's see if we can refresh your recollection on that.

MR. CALL: I object here. I think he





TEINERT, EXAM BY WARNER

hasn't -- he testified that he doesn't have any recollection. I think at this point he'd be leading him.

COLONEL WARNER: Of course I'm leading him. This is a hearing.

HEARING OFFICER McCABE: This is a hearing and I have no problem with that. Again, make your objection and I'll note it as to the fact that he's leading and take that under consideration as to the weight.

COLONEL WARNER: I believe I've already asked him and he's indicated that he received one.

Q I'm showing you what's been marked -- it hasn't been marked but it will be his toll records for the telephone in question. Do you have an extra copy of that, Carol, that we can --

MS. ELKINS: I'll make a copy.

MR. CALL: I'll object. That has not been provided to us previously. It's the first time we've even known that it existed. I think it's improper for it to be allowed at this point. The regulations are quite clear that all of the information needs to be provided before the hearing.

COLONEL WARNER: Well, whether or not we've submitted it as an exhibit, we can certainly use it





TEINERT, EXAM BY WARNER

to refresh his recollection and he can testify to it, so if he wants to keep it out -- I believe it should be admitted. As I indicated previously, we reserve the right to submit anything that comes up, whether or not it's been previously submitted, if it becomes relevant during the course of the hearing.

HEARING OFFICER McCABE: It will be submitted, received as an exhibit. Your objection is noted for the record and we'll determine whether or not there's undue surprise or harmful there in its consideration as a part of how I pull together the facts and circumstances in this. If it's determined to be harmful there from the standpoint that it should not be considered, I will not consider it in the findings and we'll duly note that it shall not be considered, so that, in review, the Adjutant General will understand that, based upon the hearing that was presented, it's not available for the Adjutant General's consideration, either.

COLONEL WARNER: We think it's important for the examiner, just for the record, to have the truth as it existed, and we're intending to do all on our part to ensure that the facts come out, since this is a factual determination, and if the facts as recalled by a witness aren't accurate, we're going to

do our very best to ensure that the accurate facts come out, rather than do our best to make sure that they don't.

MR. CALL: I need a copy of that.

Q (BY COLONEL WARNER) Sergeant Teinert, I'm going to show you a record of telephone calls that is reflective of AirTouch Cellular, and it has an account name at the top, Utah Air National Guard, and then under the monthly activity for detail, it says Bob Teinert. Would that be your record of phone calls on the cell phone?

A Yes, sir.

HEARING OFFICER McCABE: And for purposes of the record, we'll mark that as Exhibit No. 10, I believe, if we're going sequentially.

COLONEL WARNER: I believe that's correct.

HEARING OFFICER McCABE: Just to make sure that we've got that clearly identified.

Q (BY COLONEL WARNER) Now, I'd like you to scroll down, if you would, using your computer knowledge, scroll down to the date of 9-17. There's a record there of calls that came in on 9-17. Can you see that, Sergeant Teinert?

A Yes, sir.

Q Now, how many calls came in, Sergeant







Teinert, on 9-17? First of all, give me the total number of calls you received that day.

A Four. Four incoming, one out. Or two incoming, one out, two incoming. The outgoing call I placed to security police.

Q Okay. Now, tell us about --

HEARING OFFICER McCABE: Go back again and clarify that for me.

COLONEL WARNER: We're going to do it call by call.

HEARING OFFICER McCABE: Okay. No, I don't need to see it. I just -- listening to the record, I'm a little behind in terms of understanding how many calls were made, so please clarify that.

Q (BY COLONEL WARNER) Okay. The first call that came in is incoming at 11:36; is that correct? 11:36 p.m.?

A Yes, sir.

Q And then there's a second call incoming at 11:38, two minutes later; is that correct?

A Yes, sir.

Q And then there's an outgoing at 11:41?

A Yes, sir.

Q And then there are two incomings, at 11:46 and 11:48?







A Yes, sir.

Q All right. I'd like to work through those five calls just briefly. The first call, being an incoming at 11:36 p.m., is that the first call that you referred to as the hang-up call?

A Yes, sir.

Q To the best of your recollection, that would be the hang-up call?

A Yes, sir.

Q The second call -- and by the way, what was the duration of that call? I know they don't record it exactly, but in terms of minutes, what does it show?

A One minute.

Q And that's the minimum that they will bill; is that correct?

A Yes, sir.

Q They bill in one-minute increments?

A That is just for answering.

Q So if it's two seconds or 59 seconds, it will show as a one-minute call, correct?

A Yes, sir.

Q All right. Now, the second call comes in two minutes later, at 11:38?

A Yes, sir.







Q Now, is that the call that you were referring to that we will refer to as the threat call?

A Yes, sir.

Q All right. We'll come back and talk about that in just a few minutes. The third call is an outgoing, three minutes later, at -- by the way, what was the duration of the second call?

A One minute.

Q One minute. All right. So none of these were lengthy calls. The third call is an outgoing three minutes later at 11:41, and who was that to?

A That was to security police.

Q All right. The fourth call is incoming again, five minutes later, 11:46, and who was that?

A That was Sergeant Menke again, and I just ended the call -- I did not even answer it -- as soon as it started ringing.

Q And two minutes later, 11 48, another --

HEARING OFFICER McCABE: Hold on. Stop right there. So that I'm clear on the record, you say, "That was Sergeant Menke again. I didn't even answer it. I just ended the call."

THE WITNESS: I never brought it to my ear, sir. It's the same thing. I heard screaming over

TEINERT, EXAM BY WARNER

the phone as I was bringing it up, so I just hit end.

HEARING OFFICER McCABE: Okay. So it was your conclusion that that was the same person that had called earlier who you believe was Sergeant Menke?

THE WITNESS: I recognized the voice, sir.

HEARING OFFICER McCABE: You recognized the voice?

THE WITNESS: Yes, sir.

HEARING OFFICER McCABE: Thank you.

Q (BY COLONEL WARNER) And, again, how long was that call?

A One minute.

Q And the final call at 11:48, incoming, do you recall that call?

A No, sir. That -- I had my phone turned off at that time and the -- I have voice mail.

Q Okay.

A And they waited till the voice mail clicked on and never left a message.

Q Okay.

A So I was charged one minute for that.

Q All right.

A There was no message.





TEINERT, EXAM BY WARNER

Q So the fifth and final call, you never spoke to anyone?

A No.

Q All right. Now, Sergeant Teinert, let's go to the so-called threat call, direct your attention to that. That would be the second call of the five calls that evening, correct?

A Yes, sir.

Q You had hung up after the first one. That first one came in, according to the phone record, at 11:36 p.m.

A Yes, sir.

Q Would that be consistent with your prior recollection of approximately when Sergeant Menke left the bar? Would that give him sufficient time to get home?

A Yes, sir.

Q Do you know where he lives?

A Yes, sir.

Q In relation to the NCO Club?

A Yes, sir.

Q Now, when he called and you hung up, he then calls back, according to your testimony, two minutes later, and according to the records, 11:38 p.m.





TEINERT, EXAM BY WARNER

A Yes, sir.

Q Now, I'd like you to tell us very specifically, to the best of your recollection, exactly what it was that Sergeant Menke said to you at that time.

A He said, "Fuck you, Bob. I'm going to kill you. I can do this."

Q And did he say anything else?

A No, sir.

Q Okay. Did he -- could it have been possible that he said, "You're dead, Bob. You're dead. I can do this"?

A General terminology, it was more, "Fuck you, Bob. I'm going to kill you. I can do this."

Q All right.

A "You're dead. I can do this."

Q All right. Now, your statement that you gave on the night of -- actually, the early morning of 18 September, your written statement, you said in that, "I answered my cell phone to hear a voice. I recognized Ron Menke's voice and his words were, 'You're dead, Bob. You're dead. I can do this.'"

Is that consistent with your recollection today?

A Sir, the security policeman at the time did





TEINERT, EXAM BY WARNER

not want me to put "fuck you" on the report.

Q I understand. Now, are you certain that it was Sergeant Ron Menke who was on the other end of the line?

A Yes, sir.

Q And how is it that you can be certain that it was Sergeant Menke that was --

A I recognized his voice.

Q And that's based on over ten years of association with Sergeant Menke?

A Yes, sir.

Q Had you ever spoken with Sergeant Menke by phone in the past?

A Many times.

Q And so it was clear to you without any equivocation that it was Sergeant Menke?

A Yes, sir.

Q All right. After having received this threat from Sergeant Menke, what did you do?

A I was incredulous. I turned to the person I was shooting pool with and I says, "I can't believe it. He just called and threatened to kill me."

Q Who was that person?

A Airman Jensen.

Q And how quickly did you report that to

TEINERT, EXAM BY WARNER

Airman Jensen?
A Immediately. I was amazed. Immediately. As soon as I hung up. I says, "I can't believe it."
Q So immediately and contemporaneously, you reported it to Jensen --
A Yes.
Q -- who was standing next to you?
A Yes.
Q What, if anything, did Jensen do at that point?
A He said, "Maybe he was kidding." And I said, "No. He was serious." I told the bartender immediately after, too.
Q What impact or what effect did that threat have on you?
A It scared me.
Q Now, you said earlier -- because I want to put this threat in context, Sergeant Teinert. You said earlier, when Sergeant Menke was leaving the bar, you offered him a cab, you offered to pay for it, and he said words to the effect, "Fuck you, Bob," that you kind of blew that off. Those are my terms, not yours. But you sort of blew that off, said that was the alcohol talking.
A Yes, sir.





TEINERT, EXAM BY WARNER

Q Now we get a phone call from Sergeant Menke who says -- in essence, makes a death threat to you. Why was it that this scared you as opposed to simply saying, well, that's just alcohol?
A Tone of voice. He was yelling it and he was emphatic about it.
Q Have you ever seen anything in Sergeant Menke's personality to suggest that he is capable of violent behavior that would justify your concern?
A Yes, sir.
Q And what have you seen in the past?
A I have seen him, when things don't go right at work, throw tools, complain, get very belligerent, as far as towards other people.
Q So what did you do following receiving the threat and reporting it to -- I say reporting it, but telling Airman Jensen about it. What did you next do?
A I told the bartenders about it and immediately called -- well, three minutes, according to the phone bill, called security police and got then over there.
Q So you called security within just minutes of receiving it?
A Yes, sir.





TEINERT, EXAM BY WARNER

Q You considered it serious enough that you thought you needed to report it?
A Yes, sir. It scared me. In his state of mind, I figured that he would do it.
Q Were you concerned that he might come back to the club?
A Yes, sir.
Q And then you prepared the written statement which security took from you that evening; is that correct?
A Yes, sir.
Q And just for the record, Sergeant Teinert, I'd like you to take a quick look at this statement and tell us if you can identify that. And I'm showing him his statement which was previously marked as our Exhibit No. 5.
A Yes, sir.
Q Do you recognize that statement?
A Yes, sir.
Q And what is it?
A That is the statement I wrote for security police.
Q And submitted it on the early morning hours of the 18th?
A Yes, sir.





TEINERT, EXAM BY CALL

Q Just shortly after the threat that came in?
A Yes, sir.
COLONEL WARNER: All right. Thank you. Your witness.
MR. CALL: Has that been marked as an exhibit? Can I use it if it has?
COLONEL WARNER: You certainly may use it. This one hasn't been marked, but it has been submitted as No. 5.

CROSS EXAMINATION

BY MR. CALL:
Q Mr. Teinert, you recognize you're under oath, correct?
A Yes, sir.
Q You understand the importance of telling the truth here today?
A Yes, sir.
Q You understand that if you don't tell the truth here, there can be both civil and criminal penalties imposed against you?
A Yes, sir.
Q During your 16 years as a technician, how many of those years have been spent working with Mr. Menke?
A I believe it is just over ten. I'm not

TEINERT, EXAM BY CALL

exactly sure on the date when he hired on.
Q And is Mr. Menke also a jet engine mechanic?
A Yes, sir.
Q I didn't have a chance to depose you before this hearing to talk about the various issues. Before you testified today, did you talk with anybody about what you'd testify about?
A No, sir.
Q Has any adverse action ever been taken against you by the Guard?
A Yes, sir.
Q What adverse action was taken against you?
A Five days off without pay.
Q What for?
A Alcohol.
Q When?
A Eight years ago.
Q And was that -- you were drinking on the job?
A Yes.
Q Was Mr. Menke aware of that suspension?
A I believe so, yes.
Q Any other sort of adverse action ever been taken against you?





TEINERT, EXAM BY CALL

A No, sir.
Q Has adverse action ever been threatened against you, although maybe not imposed, but were threats of adverse action made against you by any of your superiors in the past?
A I had a letter in my file for leave, for using my leave.
Q Could you explain what you mean by that? Were you reprimanded for taking leave?
A Yes. Unscheduled leave.
Q When was that?
A Two years ago.
Q And what had you taken leave for?
A Sick.
Q Have you ever been convicted or pled guilty to a crime?
A Yes, sir.
Q What crimes?
A DUI.
Q When?
A Five years ago.
Q What were the circumstances of that DUI?
A I wrecked my truck.
Q And you were convicted of a DUI?
A Yes, sir.





TEINERT, EXAM BY CALL

Q Do you know what year that was five years ago? Would that be '94?
A November '94.
Q And what penalty was imposed against you for that?
A Fine, driving suspension.
Q You lost your driving privileges?
A Yes.
Q For how long?
A Ninety days.
Q Were you also sentenced to community service?
A Yes.
Q Let me show you what we'll mark as Exhibit 11 and ask you if that is a certified copy of the court records for that DUI. Does that appear to be the crime in question?
A Appears to be. I've never seen this before.
Q You'll notice on the line starting at the bottom -- it goes in reverse chronological order -- that it looks like that you were arrested for alcohol reckless driving, driving under the influence and failure to maintain control, correct?
A Yes.





TEINERT, EXAM BY CALL

Q And that was in November of '94?
A Yes.
Q And eventually that was -- you were found guilty of alcohol-related reckless driving, correct?
A Yes.
Q Were you also found guilty of a DUI?
A I assumed it was the same thing. I did not know the difference.
Q To the best of your knowledge, was Mr. Menke aware of the fact that you had been convicted of this DUI?
A Yes, sir.
Q How was he aware of that?
A He helped give me rides and made sure I did not drive.
Q Now, when you got that DUI, did you inform the Guard that you'd been convicted of a DUI?
A Security knew about it, yes.
Q Did you inform them?
A Yes.
Q Who did you inform?
A Chief Newsome. Chief Master Sergeant Jim Newsome.
COLONEL WARNER: Just for the record, I'm giving counsel a lot of leeway on this for purposes

TEINERT, EXAM BY CALL

of relevance. I believe I understand what he's doing, but I think at some point it becomes pretty protracted for purposes of relevance.
HEARING OFFICER McCABE: Noted.
Q (BY MR. CALL) Let's talk about your relationship with Mr. Menke. You've indicated you've known him ten years. Have you ever been in his home?
A Yes.
Q How many times have you been in his home?
A Exact number, unknown. Quite a few. We've socialized for a lot of years.
Q Play cards?
A Play cards.
Q And would you consider yourself -- prior to the events of September 17th, would you consider yourself to have been friends with Mr. Menke?
A Yes.
Q Describe the friendship. How close of a friendship was it?
A I assumed it was good friends.
Q Do you feel that you have a drinking problem?
A Possibly. Since the incident, I have made a point of monitoring and made sure that I'm not having a problem.





TEINERT, EXAM BY CALL

Q Do you consider yourself to be an alcoholic?
A No, sir.
Q Prior to the events on September 17th, did Mr. Menke ever have occasion to see you intoxicated?
A Yes. There have been times when I'd gone to his house, played cards and spent the night.
Q How often do you drink?
COLONEL WARNER: Objection.
HEARING OFFICER McCABE: Where are we going?
MR. CALL: Your Honor, this will go to the whole basis of the comments that were made on the telephone, that it's Mr. Menke's position that he did not threaten him, that he was concerned about driving and made comments to him about his driving, and so it establishes a foundation for his knowledge of the drinking and the witness's habits concerning drinking.
COLONEL WARNER: I think he's had wide latitude to make the point. I think we ought to move on.
HEARING OFFICER McCABE: So I understand what you're saying, you're basically calling into question the credibility of this witness as to what



TEINERT, EXAM BY CALL

he recalls as to the phone call?
MR. CALL: Not only credibility, your Honor, but also it goes to the background between their relationship and it gives context to the comments that we allege were by Mr. Menke at the time of the telephone conversation.
HEARING OFFICER McCABE: I'm having great difficulty in terms of seeing that in context. I'd be far more interested in clarifying the situation the evening of the call than I am in terms of context. I believe that you have developed a record here that establishes that Sergeant Teinert does consume alcohol, has had legal difficulties with alcohol, but as to its relevance to where we're going, I'm still a little bit in the dark, so proceed and move on to another area.
If you need to develop it further when we get to the point where Mr. Menke is talking about that, let's develop it at that point, but right now it's almost like -- I'm not sure where we are.
MR. CALL: I have a few more questions that will wrap that up.
Q Have you ever blacked out from drinking?
COLONEL WARNER: Objection.
HEARING OFFICER McCABE: Noted for the





TEINERT, EXAM BY CALL

record. You can answer the question.
THE WITNESS: No, sir.
Q (BY MR. CALL) And has Ron ever told you that he thought you had a drinking problem?
A No, sir.
Q Prior to the events on September 17th, did Ron ever approach you and express concerns that he thought you drank too much?
A No, sir.
Q Are you aware of the fact that Ron had reported to your supervisor, Mr. McCowen, that he thought you might be drinking on the job?
A I was not approached by Mr. McCowen. People in the shop -- I guess either Ron or maybe Mike -- had told them that Ron had said something, but I was not approached by Mr. McCowen, no.
Q Okay. But you were aware that Ron had made those reports to Mr. McCowen, correct?
A Yes.
HEARING OFFICER McCABE: Let's make sure as to the discussion of this. Are we talking before or after the proceedings here? If there's some significance to weight, I'd certainly like to have that clarified for the record, please.
Q (BY MR. CALL) So prior to September 17th,

TEINERT, EXAM BY CALL

you knew that Ron had made a report to Mr. McCowen --
A Yes.
Q -- that you may be drinking on the job?
A It was several weeks before.
HEARING OFFICER McCABE: Thank you.
Q (BY MR. CALL) And you got mad at Ron for doing that, didn't you?
A I was upset, but -- it was not a problem, so --
Q Okay. Let's go to the events on the night in question. You've indicated that you didn't work on Friday, correct?
A Right.
Q You work four tens, Monday through Thursday?
A Yes.
Q How did you get -- you've indicated that you got to the NCO Club at 3:00 or 4:00 in the afternoon. How did you get to the club?
A I drove.
Q And where did you park?
A Right out front.
Q And what kind of vehicle do you drive?
A '93 Ford truck.
Q Let me back up. When you lost your driving





TEINERT, EXAM BY CALL

privileges, Mr. Menke drove you around on occasions, correct?
A Yes.
Q And as a friend, he was helping you get from place to place, correct?
A Yes.
Q And that was a little bit of an imposition on him, was it not?
A Yes. And I appreciated it.
Q Prior to entering the NCO Club on the day in question, did you have anything to drink?
A No, sir.
Q Prior to entering the NCO Club, where had you been?
A Home.
Q What time -- can you give us just a rough thumbnail of where you were on Friday prior to entering the club at three o'clock?
A Home.
Q Till four o'clock when you drove -- three or four o'clock when you drove to the NCO Club?
A Yes. I might have stopped for gas or something. I don't recollect.
Q When you entered the NCO Club, what time did you start drinking?





TEINERT, EXAM BY CALL

A Probably an hour later.
Q That would have been four to five o'clock?
A Yes.
Q You indicated that Mr. Menke entered the club about 7:00, 7:30; is that correct?
A I'm unsure of the time. I'm guessing that that was around the time.
Q How many drinks had you had before he entered the club?
A Three, four. I'm unsure. I was not keeping track. I didn't know anything like this was happening.
Q And after Mr. -- were you intoxicated when he --
A No.
Q Did you feel that you were safe to drive after that point?
A No. I had no intention of driving.
Q At the time Mr. Menke entered the club, did you feel that -- I'm trying to get a gauge of how much alcohol you had and your feel for what your intoxication level was. Would you have been able to drive home safely at that time?
A No. Since I've had a reckless, I do not like to drive after drinking.





TEINERT, EXAM BY CALL

Q Who was with Mr. Menke when he came into the club?
A His wife, Birdie.
Q And at one point, you began making remarks to Mr. Menke, did you not?
A Define remarks.
Q Tell me, what was your first conversation when Ron came into the club, would you say?
A "Hi, Ron. Hi Birdie."
Q How did he respond?
A "Hi." It's -- like I said, we've been friends. It was cordial. It was, "What's going on," type thing. It's not --
Q What time did Mr. Jensen get to the club?
A I do not remember.
Q Do you know time frame, how many hours --
A No.
Q -- later?
A I do not know.
Q Before Mr. Jensen got to the club, did you and Ron have any sort of dispute?
A No.
Q Any sort of harsh words back and forth to each other?
A None to my recollection.

TEINERT, EXAM BY CALL

Q At one point during the evening, isn't it true that you approached Mr. Menke and told him that you were going to have him barred from the NCO Club?
A No. That's not my position. I'm unable to do that.
Q You never told him that you were going to be put in charge of the bar and you were going to have him 86'd at the club?
A No.
Q At any time in your conversations with Mr. Menke, did you use any profanities or obscenities?
A That's -- yes.
Q What did you say?
A We've always argued with each other. Not argued, but bantered with each other that way. We are mechanics and that is common.
Q So, to the best of your recollection, what did you say?
A I do not remember specifics.
Q Do you recall telling him to fuck off?
A No.
Q Did you ever use the word "fuck"?
A Possibly, but not in that context.
HEARING OFFICER McCABE: What context would you have used it in?





TEINERT, EXAM BY CALL

THE WITNESS: "You've got to be fucking kidding me," something to that effect. I don't know what -- you know, it comes up in conversation, but it's not -- it was not ever used as a threat or anything like that, no.
Q (BY MR. CALL) Isn't it true that while you were at the club you expressed anger again at Mr. Menke for having reported to Mr. McCowen that you might be drinking on the job?
A I asked him why he did it and why, you know, he thought it was his job, but there was not anger, no.
Q But it upset you that he made the reports, correct?
A Yes. But like I said, it was several weeks before, and I thought it was a done deal.
Q Wasn't it in response to statements that you had made to Mr. Menke that Mr. Menke said to you, "Fuck you, Bob. Fuck you"? That was not an unsolicited comment? In other words, he was responding to things you had said to him, correct, when he made those comments?
A At what time?
Q Well, when you were in the club, was there an instance when Mr. Menke said to you, "Fuck you,





TEINERT, EXAM BY CALL

Bob. Fuck you"?
A Other than offering him a cab ride?
Q Yes.
A Yes.
Q Okay. Now, before Mr. Menke left the NCO Club, you called the security forces and reported that Ron was drunk and was going to drive home, didn't you?
A That was -- Airman Jensen called.
Q It's your contention that you didn't do that?
A No. I called after the threat.
Q After Mr. Menke left the club, you began playing pool, correct?
A Yes.
Q And there were -- could you describe for Colonel McCabe the club's layout?
A Along the east wall is the bar. To the west of that is tables, the cafeteria area. To the south of that is the -- there's a Foosball table, cigarette machine. There's a little divider wall with the pool tables.
Q Is the divider wall between the pool table and the bar?
A Yes.





TEINERT, EXAM BY CALL

Q And so can you -- is it a full wall?
A Yes.
Q Structural wall?
A Yes.
Q Is it easy to hear what's going on between -- say you're sitting at the bar. Can you hear conversations out by the pool table, typically?
A Sometimes, depending on ambient noise.
Q Now, at this time that you were playing pool, some folks from the Con Flight were having a birthday party for one of their members in the NCO Club, correct?
A I do not think they were still there. I knew they were there earlier, but I do not know if they were still there or not.
Q And the pool table is right by the jukebox, right?
A About 25 feet farther south is the jukebox, yes.
Q But on the night in question it was quite loud in there, was it not, with the folks from the Con Flight party?
A Earlier, yes.
Q The jukebox was playing, also, was it not?
A I do not think it was playing later, no. I

TEINERT, EXAM BY CALL

think it had died off, pretty much.
Q Now, on the exhibit that has been marked as Exhibit 10 -- I don't know if you still have that in front of you.
A I'm familiar with it.
Q Those records don't indicate who the incoming calls are from, do they?
A No.
Q At the time that you claim to have received the threatening call from Mr. Menke, you were still drinking, weren't you?
A Yes.
Q And you were drunk when you received that call, weren't you?
A Intoxicated, yes.
Q Isn't it true that Mr. Menke said to you some words -- something to the effect of, "Bob, you need to mind your own P's and Q's and you best not be driving off that base because you've been drinking, too"?
A I have never heard Mr. Menke talk that way. He has not said that, no.
Q Have you ever heard Ron use the phrase "P's and Q's," "mind your P's and Q's"?
A No.





TEINERT, EXAM BY CALL

Q Have you ever heard him use the phrase, "Mind your pints and quarts"?
A No. I don't know where that came from.
Q Pardon me?
A I did not know where that came from.
Q Isn't it true that when he called you in that telephone conversation, what he was really doing was warning you that you shouldn't drive home because he was aware of your prior DUI conviction and he wasn't going to drive you around if you got another one?
A No, sir. He was aware that I was not driving that night.
Q You told Airman Jensen --
HEARING OFFICER McCABE: How would he be aware that you weren't driving that night?
THE WITNESS: Because I made clear that I was not driving home.
HEARING OFFICER McCABE: Was that in discussion with him?
THE WITNESS: Yes.
Q (BY MR. CALL) Did he tell you -- did he express concern to you that you shouldn't drive home that night, during your conversations with him?
A No.





TEINERT, EXAM BY CALL

Q Well, you just indicated that you talked with him about you not driving home. How did that come up?
A It was a comment I made.
Q You told him, "I'm not driving home tonight"?
A Yes.
Q Just volunteered that?
A Uh-huh.
Q What exactly did you tell -- as best you can recollect, what were your exact words to Airman Jensen about what you claimed Ron had said to you?
A Exact words, "That was Ron. My God. He just threatened to kill me."
Q Did he ask you what he said?
A Yeah, I think he did.
Q And how did you respond?
A "He said, 'Fuck you. You're going to die. I'm going to kill you. I can take you out. I can do this.'" To that effect. I might not have repeated it verbatim. I was in shock. You know, I was amazed. I do not know exactly what I told Airman Jensen.
Q At some point you then called security forces and reported it to them, correct?





TEINERT, EXAM BY CALL

A Yes.
Q And what did you tell them exactly in your telephone call to them that Ron had said to you?
A That he had threatened to kill me.
Q Did you say the specifics that he'd said or just that he had threatened to kill you?
A I did not say the specifics over the phone. When they got there, took my statement and I started writing the statement and I used the words he used, and they had me rewrite it so that was not in the official statement.
Q Isn't it true that you just made the threat up because you were angry at Ron?
COLONEL WARNER: Objection. That's argumentative.
HEARING OFFICER McCABE: Go ahead.
Q (BY MR. CALL) Isn't it true that you made up the threat for the purpose of evening the score with Ron because he had reported to Mr. McCowen that you had been drinking on the job?
A No, sir.
Q Let me show you what's been marked as Exhibit 5 and ask if you recognize that.
COLONEL WARNER: If I can take a quick look so we'll know what we're referring to.

TEINERT, EXAM BY CALL

MR. CALL: I've got one for you.
(Handing.)
Q You recognize that as the report that you gave to the security police, correct?
A Yes, sir.
Q And that's your signature on there, correct?
A Yes.
Q Have you ever seen Ron ever physically assault anyone?
A I have seen him push people, you know. Very belligerently push people. You know, "get out of my way" type -- you know.
Q Have you ever seen him fight with people? I mean, is that more -- tell me the context that you've seen this.
A It was in a work environment. He was having an argument with someone. I'm not even sure what the argument was about. And Ron pushed the guy and, in return, the guy threw a flashlight and hit Ron. It was physical, yes.
Q Could you overhear what they were talking about?
A No.
Q Was that an incident with Clay Zimmerman?





TEINERT, EXAM BY CALL

A Yes.
Q Wasn't it Clay Zimmerman that initiated that fight?
A I do not know.
HEARING OFFICER McCABE: Can we put that in a time context?
Q (BY MR. CALL) When was that?
A I do not remember. That was a year -- I'm not sure of the time. That was a year ago, maybe.
MR. CALL: If I can have just one minute.
HEARING OFFICER McCABE: That's fine.
(Pause.)
Q (BY MR. CALL) After this threat took place on the -- that would have been the morning of the 18th -- when was your next contact with Mr. Henke?
A It was over a week. He had gone to a conference.
Q Anytime during that week -- was the following Monday the 27th?
A 20th -- 18th, 19th -- that was Friday. 18th, 19th, 20th. 21st. You mean after he got back?
Q The next day, as best you can recall, when you next had contact with him.
A It would have been the following Monday,



TEINERT, EXAM BY CALL

the 28th.
Q Okay. So approximately ten --
A When he returned to work.
Q Approximately ten days later?
A Yes.
Q During that intervening time period, did Mr. Menke ever contact you?
A No.
Q Never did anything to assault you, did he?
A No.
Q Never did anything --
A He was not in town.
Q Never did anything to threaten you, did he?
A He was not in town.
Q But he never did anything to threaten you, correct?
A No.
Q What did you do after making the report to the security officers? Did you go back to the club?
A Yes. I stayed there all night. They told me to.
Q And you slept there?
A I never went to sleep.
Q Do you recall filling out a cease and desist order in this case?





TEINERT, EXAM BY CALL

A Yes.
Q And did you go to volunteer to do that or did someone ask you to fill that out?
A The security police on base contacted the Salt Lake City Police. I was later contacted by Detective Alcock, and he did.
Q And did you request the cease and desist to be issued?
A He said he would fax it out to the base.
Q Did you request it?
A No.
Q Or was it something they volunteered?
A They volunteered.
Q Did you believe that was necessary at that point?
A I thought it was the wise thing to do.
Q Did you believe it was necessary?
A Yes.
Q After the 27th, you started -- you saw Mr. Menke again at work, correct?
A Yes.
Q From that time to this day, has Mr. Menke ever done anything to threaten you?
A No, sir. I've avoided contact if at all possible.

Q Has he done anything to harm you in any way?
A Not to my knowledge, no.
Q What effect, if any, has it had since then, from the 27th forward? Have there been any problems between you and Ron?
A No. He has not been around.
MR. CALL: I have nothing further.
HEARING OFFICER McCABE: Redirect?
COLONEL WARNER: Yes.

REDIRECT EXAMINATION

BY COLONEL WARNER:
Q Sergeant Teinert, you say he hasn't been around. He was suspended and hasn't been at work; is that correct?
A Yes.
Q So since the incident on the 17th of September, how many times have you even seen Sergeant Menke?
A I do not remember the number of days. He actually came back to work and then he was escorted off base, and I have not seen him since, other than these proceedings.
Q When you signed the -- or obtained the cease and desist order, was that a reflection of the







seriousness with which you took the threat issued by Sergeant Menke?
A Yes.
Q So this was not something that you took lightly?
A No.
Q Are you aware of the violence in the workplace policy by the Utah National Guard?
A Yes.
Q And is that posted in your shop?
A I do believe there is a copy on the bulletin board, yes.
Q In your shop?
A I think so, yes. We have a memo that has been passed around.
Q Have there been briefings in your shop about that memo?
A Yes. We had a base-wide briefing here not too long ago.
Q How long ago?
A Last week or the week before, I think.
Q Was that the first time that there had been a briefing on it that you're aware of, or has there been previous briefings?
A There's been E-mail type memos that have







some around that we've been told to read.
Q So that policy has been posted and there's been briefings and there's been E-mails on it; is that correct?
A Yes.
Q Okay. Now, how many times have you stayed over at the club when you go there to drink?
A The exact number I do not know.
Q Is that a common thing that you do? When you drink there, is it common for you to stay over?
A Yes. Rather than drive, yes.
Q Have you done that on a number of occasions?
A Yes.
Q Just ball park, you know, a dozen, 50? How many? Just ball park.
A Thirty, 40.
Q Okay.
A Just unknown -- I don't know the exact number.
Q How long have you been doing that?
A Three years.
Q To the best of your knowledge, does Sergeant Menke know that you do that on occasion?
A Yes.







Q And how does he know?
A I've told him.
Q Has he ever been there when you've stayed over?
A Stayed the night?
Q No, not that he's stayed the night, but has he ever been there when you stayed the night?
A Yes.
Q On prior occasions. And he knew that you were staying the night there?
A Yes.
Q So it would not be unusual for him or you to comment or to discuss or to know any of the above, that if you were drinking at the club that you would be staying over?
A Yes. That's -- it would be common knowledge.
Q Now, Sergeant Menke, through counsel, alleges that he used the terminology, "You need to watch your P's and Q's." Was that consistent with the other language that you heard from Sergeant Menke that evening?
A Never. Not only that evening, but never.
Q Was the language that you heard on the threat, that you actually heard, was that consistent

TEINERT, EXAM BY CALL

with the other language that Sergeant Menke had been using that evening?
A Yes.
Q To include the word "fuck"?
A Yes.
Q Right?
A Yes.
COLONEL WARNER: All right. Thank you.

RECROSS EXAMINATION

BY MR. CALL:
Q Just a couple of questions in follow-up. Isn't it true that Mr. Menke was suspended on November 18th, is the last date of employment that he had working at the shop?
A I'm unsure of the date. I did not know.
Q Mid November, though, wasn't it?
A I do not remember.
Q Isn't it true that he worked with you for about a month and a half after this alleged incident before he was suspended?
A It's possible, but it doesn't seem that long to me.
Q You mentioned a briefing that took place just recently. That was about two weeks ago, was it not?





TEINERT, EXAM BY CALL

A I think that was the time frame, yes.
Q And during that briefing, the Guard referred to this incident, did they not?
A No, not -- specifically, no.
Q But they -- didn't they discuss it as a kind of a case example of what not to do and how problems can arise from drinking?
A No. That was not part of the briefing. There might have been similarities in the briefing, but this was not discussed in the briefing, no.
Q To the best of your recollection, was there any reference in that briefing -- was there any reference to this alleged incident?
A No. Like I said, there might have been similarities, but this was not a topic.
MR. CALL: Nothing further.
COLONEL WARNER: Nothing further.
HEARING OFFICER McCABE: May this witness be permanently excused? You may be subject to re-call. When I say permanently excused, it means you're not going to have to wait out in the hallway or be readily available.
THE WITNESS: Understood, sir.
COLONEL WARNER: Well, let me just clarify. I -- obviously we think it's important for



Sergeant Teinert to get back to his normally assigned duties. We would want to reserve the right, based on whatever comes up in the hearing, that we may want to call him back in rebuttal later on, but in terms of being excused to return to his normal duties, yes, we have no objection to that.
HEARING OFFICER McCABE: Then we'll use the word "excused" rather than "permanently."
MR. CALL: And that would be okay with us. We would expect if we did need him, it would be tomorrow
HEARING OFFICER McCABE: Before you leave. I just want to ask you a question, Sergeant Teinert. Or maybe more than one question. The testimony that's come out here today is that Mr. Menke had reported to your supervisor that you may be drinking on the job. Is that correct?
THE WITNESS: Yes, sir.
HEARING OFFICER McCABE: You were upset about that; is that correct?
THE WITNESS: That he did it, yes.
HEARING OFFICER McCABE: Did that in any way impact or affect the circumstances in this case, in your opinion?
THE WITNESS: No.





TEINERT, EXAM BY WARNER

HEARING OFFICER McCABE: So --
THE WITNESS: I thought that was history. I thought that was behind us. We had talked about it. It was no problem.
HEARING OFFICER McCABE: So your testimony is, for purposes of the record, that you do not believe that you were influenced in any manner in reporting this incident based upon the previous circumstances you testified to?
THE WITNESS: That is correct.
HEARING OFFICER McCABE: Thank you. Any questions from either side? I knew there probably -- I'm sorry.
COLONEL WARNER: I'd like to just follow up very briefly on your questions.
HEARING OFFICER McCABE: See how permanently you were excused?

RE-REDIRECT EXAMINATION

BY COLONEL WARNER:
Q Sergeant Teinert, we'll be brief on this. Obviously it was upsetting to you to have Sergeant Menke report that you may be drinking on the job, correct?
A Yes.
Q All right. Were you drinking on the job?

TEINERT, EXAM BY WARNER

A No.
Q Did you go to your supervisors to discuss the alleged -- or the report as alleged by Sergeant Menke?
A Yes. Once I heard about it -- like I said, I heard through other channels. It was not -- my supervisor did not come to me and say, "Is this happening?"
Q Indeed, was any action ever -- official action ever taken or unofficial action ever taken by any of your supervisors on that report by Sergeant Menke?
A No.
Q So you didn't suffer any discipline? You didn't suffer any kind of ill effect from the report?
A No.
Q All right. No job action whatsoever?
A No.
Q All right. So, while it was upsetting to you that he had made the report -- because, in your opinion, it wasn't true; is that correct?
A Yes.
Q -- no real negative impact occurred to you in terms of your actual job?
A No.





TEINERT, EXAM BY WARNER

Q And then you subsequently talked with Sergeant Menke about his making the report?
A Yes.
Q Was that at the club? Was that before the club incident on the 17th?
A It was before, yes.
Q Okay.
A It was weeks before.
Q And you believed that whatever feelings you had about that, you had cleared the air, so to speak, with Sergeant Menke at that time?
A Yes.
Q Now, when you received these calls from Sergeant Menke on the night of the 17th -- I want to emphasize again -- how much time was there between the actual threat made by Sergeant Menke to you and your, in turn, reporting to Airman Jensen?
A Immediately.
Q Did you have sufficient time to contemplate whether or not this would be a good opportunity to concoct a story to get back at Sergeant Menke?
A No.
Q So your reporting was immediate and contemporaneous?
A Yes. It was as I was hanging up the phone.





TEINERT, EXAM BY CALL

It's, "My God. He just threatened to kill me."
COLONEL WARNER: Thank you. I don't have any further questions.

RE-RECROSS EXAMINATION

BY MR. CALL:
Q Just so that we're clear, we'll do follow-up. You did talk with -- you previously testified that you did talk with Mr. Menke at the club that night about his reporting your drinking to Mr. McCowen?
A I do not remember if we talked about that that night or not.
Q I think your prior testimony was --
A We had talked about it before.
Q Okay. But I think your prior testimony was that you did bring that up that evening. I was wondering if you recall exactly what was said.
A No. I'm not even sure that we did talk about it that evening.
MR. CALL: I have nothing further.
HEARING OFFICER McCABE: Thank you very much. You're excused, subject to re-call. Why don't we take a five-minute break. Then we'll proceed again.
(Recess.)





JENSEN, EXAM BY WARNER

HEARING OFFICER McCABE: Next witness.
SRA MATTHEW JENSEN
called as a witness and sworn, was examined and testified as follows.
HEARING OFFICER McCABE: Please be seated. State your full name for the record, please.
THE WITNESS: Matthew D. Jensen.

DIRECT EXAMINATION

BY COLONEL WARNER:
Q Airman Jensen -- let's call you Airman Jensen. Is that fair?
A Yes, sir.
Q All right. Airman Jensen, would it be fair to say you're nervous?
A Yes, sir.
Q I can kind of tell. This is a hearing, obviously, and it's somewhat formal, but we want you to try and relax as best you can. Okay?
A Yes, sir.
Q So just listen carefully to all the questions that people will ask you and do your best to answer them truthfully and we'll try and keep the pain to a minimum. All right?
A Yes, sir.
Q Good. How old are you, Airman Jensen?

JENSEN, EXAM BY WARNER

A I'm 20 years old, sir.
Q And are you a member of the Utah Air National Guard?
A Yes, sir.
Q What is your capacity with the Air National Guard?
A Can you rephrase that?
Q Well, are you a traditional soldier? Are you a full-time technician? What's your status?
A I'm a traditional guardsman, sir.
Q And as such, being a traditional guardsman, that makes you, not a full-time employee, but you do your weekends and yearly drill and whatever active duty you get called to, correct?
A Yes, sir.
Q What's your MOS with the Guard?
A It's a personnel specialist, sir.
Q All right. And where are you currently assigned?
A The Security Forces Unit, sir.
Q And as such, do you know some of the security staff out there?
A Yes, sir.
Q Full time as well as the traditional airmen?





JENSEN, EXAM BY WARNER

A Yes, sir.
Q How long did you say you've been with the Guard?
A I enlisted on the 23rd of February of '98, so almost two years, sir.
Q Now, Airman Jensen, I'd like to direct your attention to the evening of September 17th of 1999. Do you recall that evening?
A Yes, sir.
Q Did you have occasion to go to the NCO Club at the Air Guard facility here in Salt Lake City?
A Yes, sir.
Q And, Airman Jensen, why did you go to the club?
A Just to see people, hang out.
Q Okay. Basically just to hang out and socialize, correct?
A Yes, sir.
Q Now, do you know a Sergeant Robert Teinert?
A Yes, sir.
Q And how well do you know him?
A I don't know. We work together. You know, I see him around base. Not like -- you know, we don't like go and hang out places and stuff, but we see each other and say hi and talk once in a while.



JENSEN, EXAM BY WARNER

Q So he's a typical acquaintance and friend that you know through the Guard, correct?
A Yes, sir.
Q You don't spend a lot of time socializing with him, but you do see him occasionally around the base and at work and otherwise?
A Yes, sir.
Q Would you describe your relationship with Sergeant Teinert as friendly?
A Yes, sir.
Q Did you see Sergeant Teinert at the NCO Club on the night of the 17th?
A Yes, sir, I did.
Q Now, do you know Sergeant Ron Menke?
A Yes, sir, I do.
Q How do you know Sergeant Menke?
A Pretty much the same way I know Sergeant Teinert. Just seeing him around, meeting him, talking to him.
Q How would you describe your relationship with Sergeant Menke?
A About the same, sir.
Q Don't socialize a lot with him, but would you describe it as friendly?
A Yes, sir.





JENSEN, EXAM BY WARNER

Q You don't -- you haven't had any so-called negative experiences with either Sergeant Menke or Sergeant Teinert? When I say negative experiences, experiences that would cause you to have any bias or ill will towards them prior to the night of the 17th.
A No, sir.
Q Now, directing your attention, Airman Jensen, to the evening of the 17th, about what time did you arrive at the NCO Club?
A At approximately 2230 hours, sir.
Q 2230?
A Yes, sir.
Q And for those of us who are not military, is that about 10:30 at night?
A Yes, sir.
Q So you got there about 10:30 in the evening. Did you happen to see Sergeant Bob Teinert that evening?
A Yes, sir.
Q Did you spend any time with Teinert that evening?
A Yes, sir. Sergeant Teinert was sitting at the bar, and I believe I sat next to him or the seat down.
Q What interaction did you have with Teinert

JENSEN, EXAM BY WARNER

during the course of that evening from 10:30 on?

A We talked on occasion. We'd other -- you know, seen other people and go and talk to them and return.

Q You weren't hanging out exclusively with Teinert, but you certainly were sitting near him or next to him and, on occasion, would talk and interact; is that true?

A Yes, sir.

Q All right. Now, had you been drinking at all that evening, Sergeant Jensen?

A Yes, sir. I did have a few beers, sir.

Q Beginning around 10:30 when you arrived?

A Yes, sir.

Q When you say a few beers, about how many beers did you have before the incident that we're going to get to with Sergeant Menke when he was leaving the bar?

A Possibly two or three.

Q So would it be fair to say that you had had a couple of beers but were not intoxicated at that point?

A Yes, sir.

Q Do you believe that your ability to recall and recollect and recount what happened that evening





JENSEN, EXAM BY WARNER

is relatively clear in your mind?

A Yes, sir.

Q Did you have an opportunity to observe the state of intoxication of Bob Teinert that evening?

A Yes, sir. He didn't appear to show extensive signs of intoxication. He still had his motor skills and speech was okay and so he didn't look that intoxicated to me.

Q And that came on the basis of observing him for a period of time there in the club from 10:30 on?

A Yes, sir.

Q Did you have an opportunity to observe Sergeant Ron Menke as well relative to his state of intoxication in the club that evening?

A Yes, sir.

Q And would you please tell us what your observations were concerning Sergeant Menke.

A It appeared to me that his motor skills were delayed. His speech was a little bit slurred.

Q When he spoke, did he speak in a rambling manner at all or did it appear to be normal speech or was it slow or rapid? Was there anything unusual about the manner in which Sergeant Menke spoke?

A He didn't appear to be rambling extensively, but I can't remember exactly.





JENSEN, EXAM BY WARNER

Q Okay. Now I'm going to ask you if you recall what I would refer to as an incident, or at least the context of the situation when Sergeant Menke prepared to leave the club at approximately 11:00 p.m. Do you recall that, when Sergeant Menke was leaving the club?

A Yes, sir.

Q Was there a conversation that ensued between Sergeant Teinert and Sergeant Menke that you were privy to? Do you know what "privy" means? That you heard.

A Okay.

Q Did you hear a conversation between Sergeant Teinert and Sergeant Menke when Sergeant Menke was about to leave the NCO Club?

A Yes, sir.

Q And you were sitting right there at the time?

A I was -- Sergeant Menke was sitting down about three or four chairs from the bar and I was sitting away from him a little ways, but yes, I did hear the conversation, sir.

Q And you could hear it clearly?

A Yes, sir.

Q The music wasn't so loud -- was there music





JENSEN, EXAM BY WARNER

playing?

A Not that I'm aware of, sir.

Q Now, as best as you can recollect, would you please tell us -- now, we need to know the exact words as best as you can recollect. And I realize there may be some profanity in here and that's not going to make you comfortable, but if there is profanity, I want you, nevertheless, to tell us exactly what you heard in that exchange between Sergeant Teinert and Sergeant Menke just about the time Sergeant Menke was about to leave the NCO Club.

A Okay. Sergeant Teinert walked up to Sergeant Menke and asked him if he would like a cab. He offered to pay for it and just, you know, had a friendly relationship situation. And Sergeant Menke replied with, "Fuck you, Bob. Fuck off."

Q You specifically recall hearing that?

A Yes, sir.

Q Now I want to back up just a little bit and ask you about Sergeant Teinert's demeanor and attitude as he approached Sergeant Menke. Okay? How would you describe Sergeant Teinert's demeanor and attitude?

A He was calm and fairly friendly with the situation. He was treating it more as a friendly

JENSEN, EXAM BY WARNER

gesture than something out of vengeance or anything like that.
Q Okay. He didn't appear to be angry in any way?
A No, sir.
Q Did he appear to be insulting to Sergeant Menke?
A No, sir.
Q Did he appear to be making fun of Sergeant Menke?
A No, sir.
Q Teasing him in any way?
A No, sir.
Q Taunting or harassing?
A No, sir.
Q As far as you can tell or recall, did Sergeant Teinert use any profanity or other vulgar words or taunting words directed at Sergeant Menke?
A No, sir, not that I'm aware of.
Q And you were just an observer to this?
A Yes, sir.
Q And you knew both of these gentlemen?
A Yes, sir.
Q All right. So to the best of your recall, Sergeant Teinert's approach and demeanor was





JENSEN, EXAM BY WARNER

respectful and friendly; is that a fair statement?
A Yes, sir.
Q What was your reaction to Sergeant Menke's response?
A It kind of surprised me a little bit.
Q Why?
A Well, typically people will deny it peacefully. They'll just say, "No. I'll be okay." But his reaction kind of surprised me.
Q Now, let's talk about Sergeant Menke for just a moment. What was his attitude and demeanor when he used the language that he did directed towards Sergeant Teinert in response to the offer of getting a cab?
A He seemed rather aggravated, possibly insulted by that.
Q Is "angry" too strong a word?
A No, sir.
Q So he appeared aggravated and even angry at the suggestion he needed a cab, correct?
A Yes, sir.
Q To the best of your knowledge, had you seen or observed that -- anytime during the course of the time you were there -- anything that Teinert had done or said to Sergeant Menke that would be insulting or





JENSEN, EXAM BY WARNER

aggravating to cause his response?
A No, sir, I don't believe so.
Q Would it be fair to say that, as far as you could tell, Teinert's offer was out of simply a sense of concern and kindness for a friend?
A Yes, sir.
Q That's what it appeared to you?
A Yes, sir.
Q All right. After Menke's response of, fuck you, Bob, fuck off," what was your opinion about Menke's ability to safely drive home? Did you form an opinion about that?
A At the time I didn't think he was entirely fit to drive home.
Q So what did you do about it?
A I called security forces and asked them to send somebody over.
Q Okay. Did anybody ask you to call security forces?
A No, sir.
Q You did that on your own?
A Yes, sir.
Q Teinert didn't ask or direct you to do so, correct?
A Yes, sir.





JENSEN, EXAM BY WARNER

Q You are, in fact, associated with security forces in your work, correct?
A Yes, sir.
Q And you took it upon yourself -- not Teinert. You took it upon yourself to make that call to security?
A Yes, sir.
Q Based on your observations of his demeanor -- meaning Sergeant Menke's demeanor and level of intoxication?
A Yes, sir.
Q And you did so out of concern for his safety and the safety of others?
A Yes, sir.
Q All right. When you called security, what did you tell them?
A I informed them of the situation and the comments made and asked them if they could have somebody come over and keep them from driving.
Q And did they?
A Yes, sir, they did.
Q Do you recall who it was that arrived at the NCO Club in response to your call to the security?
A I believe it was Staff Sergeant Norstad,

JENSEN, EXAM BY WARNER

sir.
Q Did he have anybody with him --
A I don't recall.
Q -- to the best of your recollection?
A I don't recall.
Q Okay. Were you a party or privy to the conversation between Staff Sergeant Morstad and Sergeant Menke?
A No, sir.
Q Okay. That was conducted out of your hearing?
A Yes, sir. He took Sergeant Menke outside and talked to him.
Q Do you know what happened as to how Sergeant Menke got home?
A Yes, sir. I believe the bartender's husband took him home.
Q Would that be Darren Lindsay?
A Yes, sir.
Q Did Mrs. Menke accompany Sergeant Menke with that ride home?
A I believe so.
Q Do you know Mrs. Menke?
A Not on a personal basis, sir.
Q But would you know her by way of





JENSEN, EXAM BY WARNER

observation? To use a term from my professional work, if we put a lineup of five women, could you pick her out of a lineup?
A Yes, sir, I believe so.
Q And did you observe Mrs. Menke at the club that evening with Sergeant Menke?
A Yes, sir.
Q Did you observe whether she was intoxicated or not? Just based on your observation, not any scientific test.
A Yes, sir.
Q What was your observation about Mrs. Menke?
A I believe, by my own judgment, she was also intoxicated.
Q Too intoxicated to drive either herself or Sergeant Menke home?
A Yes, sir.
Q What was her attitude and demeanor at the time?
A She didn't seem to be too upset. I can't really recall too much about her attitude, sir.
Q Is that by way of comparison to Sergeant Menke?
A Yes, sir.
Q He appeared to be more angry and more





JENSEN, EXAM BY WARNER

upset?
A Yes, sir.
Q Now, after they drove -- excuse me. After the bartender's husband, Mr. Lindsay, drove the Menkes home -- do you recall about what time that was?
A No, sir.
Q Within a few minutes of the time Staff Sergeant Morstad arrived, I take it.
A Yes, sir.
Q Did you continue to remain at the club?
A Yes, sir, I did.
Q And did you continue to hang around Sergeant Teinert? When I say hang around, I mean, were you sharing bar stools closely in proximity to each other?
A Yes, sir.
Q Do you recall phone calls coming in on Sergeant Teinert's cell phone?
A Yes, sir. I believe there were a couple of phone calls when I was sitting there next to him, sir.
Q Do you recall the length and/or duration of these calls?
A Most of them were like a prank call. He'd





JENSEN, EXAM BY WARNER

answer his phone and they'd hang up. And then one was fairly lengthy, and he hung up his phone and looked over at me and said, "That was Sergeant Menke. He said" -- "He just said, 'You're dead. You're going down.'"
Q Okay. Well, let's back up for just a second and talk about that. Apparently there was at least one call or more where you recall that Teinert never actually spoke on the phone. He answered the phone and, whatever happened, whether there was a hangup or whether he hung up, there was no conversation, correct?
A Yes, sir.
Q And then there was an actual conversation on a subsequent call that Teinert actually spoke, correct?
A Yes, sir.
Q Now, you don't personally know or have personal knowledge who was on the other end of the call, do you?
A No, sir, I don't.
Q It was reported to you moments later by Sergeant Teinert that it was Sergeant Menke on the other end of the call, correct?
A Yes, sir.

JENSEN, EXAM BY WARNER

Q But you didn't hear the call. I mean in terms of being able to hear the voice, and so you don't have personal knowledge?
A Yes, sir.
Q That's correct?
A Yes, sir.
Q Now, you say it was lengthier. Are we talking about a ten-minute conversation here?
A A couple-minute conversation.
Q At the most?
A At most.
Q Whatever it was, it wasn't lengthy, but it was certainly not the hangup, correct?
A Yes, sir.
Q Now, when that call was finished, when Teinert finished the call, how far away from Teinert were you?
A I believe I was sitting next to him at the bar, sir.
Q All right. Take a look at how close Chief Warrant Officer Haws and I are sitting. We're approximately three feet apart. Would you say that was about as close as you were to Teinert?
A Maybe a foot and a half to two feet.
Q You were even closer than Mr. Haws and I





JENSEN, EXAM BY WARNER

are sitting here; is that true?
A Yes, sir.
Q So you were relatively close in proximity, then?
A Yes, sir.
Q Did you see him terminate the call on the phone?
A Yes, sir.
Q Pushed the end button or closed the phone up, or whatever it is that he did to stop the call, you saw that?
A Yes, sir.
Q How much time elapsed from the time that he terminated the phone call until he turned to you to report the contents of the call?
A He took the phone away from his ear, closed the flap and proceeded to tell me as he sat it down on the bar.
Q Literally, as he put the phone down, he turned to you?
A Yes, sir.
Q So we're talking fractions of a second or a second, at the most, but it was just contemporaneous, instantaneous, immediate?
A Yes, sir.



JENSEN, EXAM BY WARNER

Q Now, tell us exactly what it is that he turned to say to you again as he put the phone down on the bar, as best as you recall.
A He says, "That was Ron. He just said, 'You're dead. You're going down.'"
Q And that was to the best of your recollection?
A Yes, sir.
Q Of the words that he used, "You're dead, you're going down"?
A Yes, sir.
Q Did Teinert seem concerned?
A I believe so, sir.
Q What did he do then? What did you observe him do, if anything, after he'd reported that to you? When I say "reported," after he had turned and relayed or recounted for you what the call was.
A He got up and walked over to the phone on the wall and called security forces, sir, to report it.
Q Now, when he told you the contents of the call, did he make it clear that it was Menke that had called him?
A Yes, sir.
Q Did you tell him or suggest to him that he





JENSEN, EXAM BY WARNER

should call security, or did he do that on his own?
A I can't remember exactly, sir.
Q Okay.
A But there may have been a brief conversation about that, sir.
Q But he then went over and reported it to security, correct?
A Yes, sir.
Q Did security come over?
A Yes, sir. They proceeded over and asked myself and Sergeant Teinert to fill out a statement, sir.
Q Did you fill out a statement which has now been marked as an exhibit in our hearing as Exhibit No. 6? And let me show you that statement, Sergeant Jensen. Or, excuse me, Airman Jensen.
A Yes, sir.
Q To the best of your recollection and knowledge, that is, in fact, the statement you completed at the time?
A Yes, sir.
Q And you filled that out just shortly after the incident, as you have testified to; is that correct?
A Yes, sir.

Q Does it, to the best of your knowledge, accurately represent what occurred?

A Yes, sir, it does.

COLONEL WARNER: Just one moment, please.

(Discussion off the record.)

COLONEL WARNER: We have no further questions.

HEARING OFFICER McCABE: Cross?

CROSS EXAMINATION

BY MR. CALL:

Q Hi. My name is Frank Call. I'm Ron Menke's attorney. Let me ask you some questions. You indicated that you entered the club at 2230, correct?

A Yes, sir.

Q At the time you entered the club, you indicated that Bob was not extensively intoxicated. Is that a fair statement of what you --

A I didn't notice any signs of intoxication at the time, sir.

Q At 2230 when you entered the club, based off of your observations, did he appear fit to drive home if he needed to?

A Yes, sir.

Q You indicated that Mr. Menke left at about







eleven o'clock, correct?

A I believe so, sir, yes.

Q So you were there for about a half an hour between the time that you arrived and Mr. Menke left, correct?

A Yes, sir.

Q Let me show you what we'll mark as Exhibit 12, which we hope is an accurate rendition of the club, and ask if you recognize that as being kind of a diagram of the club, or at least the bar area of the club.

A No, sir. I was about here and Bob was about here.

Q Let's, first, before we -- the general layout is correct, except for where you're sitting, correct?

A Yes, sir.

Q Why don't you put a "B" on the stool that you think Bob was sitting on and a "J" where you think you were sitting.

A (Witness complies.)

Q And is Mr. Teinert -- excuse me, is Ron indicated -- is that about where he was sitting or was he further down the bar?

A Yes, sir. About there, sir.





Q So you were sitting between Bob and Ron, as far as the bar stools go, correct?

A Yes, sir.

Q And when you entered the club -- you indicated that you're 20, correct?

A Yes, sir.

Q Are you legally capable of drinking in Utah?

A No, sir.

Q And they were serving you alcohol?

A Yes, sir.

Q Did the bartender check your ID?

A Yes, sir. I've got an NCO Club card, sir.

Q Does it state your age on the card?

A I don't believe so, sir.

Q Did the bartender know that you were underage?

COLONEL WARNER: Just objection as to relevance. The real relevance here isn't whether he was legal to drink. The relevance is whether he was intoxicated and what he saw and observed.

HEARING OFFICER McCABE: Noted.

Q (BY MR. CALL) Let me ask you the question this way: Did you make any sort of misrepresentation to the bartender to get him to serve you drinks? In







other words, did you present a card that would represent that you were of legal age to drink?

A No, sir.

Q When you came into the club, did Bob tell you that he had been arguing with Mr. Menke all day?

A He said something to that effect. He said they hadn't had a very good day, they weren't getting along very well, but that was about the extent of it.

Q Let me have you turn to the second page of Exhibit 6, and in it you've written -- this is about the fourth line down -- "Bob Tingey and Ron Menke had been verbally disputing all day, from what Bob had told me." Tell me what Bob had told you that they had been arguing or disputing about.

A He didn't tell me exactly, but he said they had been -- that Sergeant Menke was upset at him in his actions, or something to that effect, and they just weren't getting along that day. They were arguing.

Q So there had been some argument back and forth between them --

A Yes, sir.

Q -- prior to the time you entered the bar, from what Bob told you, correct?

JENSEN, EXAM BY CALL

A Yes, sir.
Q Now, at about eleven o'clock, when Mr. Menke left, right before that -- when was -- when in time in relation till eleven o'clock, when he actually left, did this incident of Bob going up and asking him if he could call him a cab, where was that in the time frame?
A It was probably about five minutes prior to when Sergeant Menke left.
Q And did Bob get up from his chair and walk around to where Ron was sitting and make that offer or where were the --
A Yes, sir. Bob went up to him and asked him if he would like a cab, sir.
Q And wasn't Mr. Menke down near the other end of the bar, at the far end of the bar by the telephone?
A Yes, sir.
Q And how many feet in distance from where you were sitting is that telephone?
A Maybe 15, sir.
Q And you were still sitting on the stool, correct?
A Yes, sir.
Q Did you actually hear Bob ask him if he





JENSEN, EXAM BY CALL

could buy him a cab?
A Yes, sir.
Q Was Bob yelling at all or -- it seems 15 feet in a bar -- are you capable of hearing that or was it loud enough so that you could hear it?
A I could hear it, sir.
Q Isn't it true that there were about 25 people in the club when you came into the NCO Club that night?
A Yes, sir.
Q And there were some folks from the Com Flight having a birthday party for one of their members, correct?
A I believe so, sir, yes.
Q And it was quite loud in the bar that night, wasn't it?
A They were more back in the party area, so they were away from the bar, so it was still kind of quiet around the bar.
Q Back by the pool table is where they were?
A Yes, sir.
Q Now, you don't know how -- from your own personal knowledge, how Mr. Menke and Ms. Menke got home, correct?
A I believe the bartender's husband drove



JENSEN, EXAM BY CALL

them home.
Q But you don't know that from your own knowledge, correct? You didn't see the bartender put them in a car and drive them home, correct?
A No, sir.
Q So you don't know whether or not Birdie drove home by herself, correct? Or Ms. Menke. Her name is Birdie.
A I'm not aware of that, sir.
Q Now, this telephone call that took place, how many telephone calls did Bob receive before the threat call? You said they were kind of prank calls. How many of those would you say occurred?
A I only witnessed two of them before the initial phone call.
Q Before the threat phone call?
A Yes, sir.
Q How many calls did you observe Ron take during the entire night you were in the club there? How many calls did you see him receive?
A Who was that? Ron or Bob?
Q Excuse me. Bob.
A Like I says, about two, and then --
Q In the report that you gave to the security forces, you indicated that Bob Tingey received





JENSEN, EXAM BY CALL

threatening phone calls on his cell phone from Ron Menke, and then you go on, and then you say, "Bob Tingey had received many calls between 2400 hours and" -- what would it be? 020. When you say "many," I'm asking, how many is that, the "many" you're referring to?
A In that time frame, one can be many. I mean, you're talking past midnight, so two or three would be what I would consider a lot of phone calls.
Q Okay. So that's all I'm asking. By "many" you meant two or three?
A Yes, sir.
Q Did Mr. Teinert -- let's talk about the -- what we're referring to as the threatening phone call. You indicated that lasted about two or three minutes; is that correct?
A A maximum of two minutes.
Q Okay. A maximum of two minutes. What did -- you heard Bob's end of the conversation?
A Yes, sir.
Q What did Bob say?
A I believe he answered the phone and -- I can't remember exactly. I was sitting next to him but I wasn't trying to listen to his phone calls.
Q Do you remember him having some sort of

JENSEN, EXAM BY CALL

exchange with whoever was on the other end of the phone?
A Not exactly, sir.
Q When you say not exactly, did he say anything?
A I can't remember.
Q After that -- and you did not actually hear what was said on the other end of the phone? In other words, what was coming out of the earpiece, correct?
A No, sir.
Q Bob puts up the phone and he's setting it down and he turns to you and he says, "You're dead. You're going down"? That's what Bob told you, correct?
A Yes, sir.
Q Did Bob tell you that was Ron Menke and he just said --
A Yes, sir.
Q Okay. Did he tell you that he said, "Fuck you. I'm going to kill you. I can do this"? Is that what he said to you?
A No, sir.
Q And then after that happened, you indicated that Bob got up from the bar where he was sitting and





JENSEN, EXAM BY CALL

walked over to the security force phone -- or the pay phone on the wall, correct?
A No, sir. It's an on base phone.
Q It's an on base phone?
A Yes, sir.
Q So he went down to the on base phone and called security forces?
A Yes, sir.
Q Could you hear his end of the conversation of that call?
A No, sir.
Q And why is that?
A The phone is back and around and I remained at the bar, sir.
Q But wasn't that base phone the same phone that Mr. Menke was at when Ron offered to buy him a cab?
A I was not aware that Ron was on the phone at the time.
Q He wasn't on the phone, but he was down standing by the phone, correct?
A Yes, sir. But there's two phones.
Q Okay.
A There's one at the end of the bar and there's one around the corner.





JENSEN, EXAM BY CALL

Q The one at the end of the bar, is that a pay phone?
A No, sir.
Q Is that an on base phone, also?
A Yes, sir.
Q They're both on base phones?
A Yes, sir.
Q So the reason you could hear the first conversation down at the -- what I'll call the first phone -- is because it's closer than the second phone that Mr. Teinert used?
A Yes, sir.
Q Okay. Now, at the time that Ron received this phone call, what time was that? The threatening phone call. What time was that?
A I'm not exactly sure, sir.
Q If you had to estimate it, what time would you --
A Probably about 030 hours.
Q Now, up to that point you'd had three or four beers, correct?
A Yes, sir.
Q Were you having your fourth or fifth beer at that point in time?
A Probably, sir.





JENSEN, EXAM BY CALL

Q All total -- what time did you leave the bar, by the way?
A About 040 hours. Depending on when the phone call was. They came over and asked us to fill out statements and then we proceeded to leave the bar for the evening, sir.
Q And did you leave the bar?
A Yes, sir.
Q And did Mr. Teinert leave the bar?
A Yes, sir.
Q Did he drive home?
A No.
Q Where did he go?
A I believe he stayed -- I can't remember. I think it was in Salty Guard. I'm not aware, sir.
Q So you went over to the security officers, filled out your reports?
A Yes.
Q And you went home and he apparently went --
A I went to the Salty Guard, the base building.
Q And describe to me what that is. I'm unfamiliar with that term.
A It's rooms they let us use when we stay overnight up there, sir.

JENSEN, EXAM BY CALL

Q Okay. So, all total, how many drinks do you think you had that night?

A I probably had four, maybe five beers, sir.

Q And in a time frame of about two and a half hours, correct?

A Yes, sir.

Q And you didn't drive home that night, correct?

A No, sir. I didn't drive anywhere.

Q And is that because you were intoxicated?

A Because I had been drinking, sir, yes.

Q Did you feel it would have been unsafe for you to drive home?

A Yes, sir.

Q Let me ask you this: How much do you weigh?

A I weigh approximately 135 pounds, sir.

Q And your height?

A Five nine, sir.

Q Is it fair to say that five or six beers, given your weight and height, over a two and a half hour period would render you legally intoxicated?

A Legally, yes, sir.

Q Now, at the time of this call, this call that came to Ron, did he appear to be intoxicated to





JENSEN, EXAM BY CALL

you?

A Bob or Ron?

Q Excuse me. Bob.

A Please clarify.

Q Bob. Did he appear to be intoxicated to you at the time that he received the telephone call?

A No, sir.

Q During the two and a half hours that you were at the bar, how many drinks did Mr. Teinert have?

A I'm not aware, sir.

Q Did you see him drinking?

A Yes, sir, I did see him drinking.

Q And for most of the evening you were sitting next to him at the bar, correct?

A Yes, sir.

Q Can you estimate how many drinks he had?

A Maybe two or three. I'm not sure.

Q How long was it between the time that Ron sets down the phone and he tells you what -- or Bob sets down the phone and tells you what Ron had allegedly told him, how long had elapsed between that period and the point that he walked around and used the number two on base phone to call security forces? How much time elapsed?



JENSEN, EXAM BY WARNER

A Maybe a minute.

MR. CALL: Nothing further.

REDIRECT EXAMINATION

BY COLONEL WARNER:

Q Just a couple follow-ups. Airman Jensen, do you have any ax to grind with Sergeant Menke?

A No, sir.

Q Do you have any ill will towards Sergeant Menke?

A No, sir.

Q Do you have any particular fondness for Sergeant Teinert vis-a-vis Sergeant Menke?

A No, sir.

Q Do you have any reason at all to come in here and favor one over the other in terms of recounting the incidents as you've described them in this testimony today?

A No, sir.

COLONEL WARNER: Thank you.

MR. CALL: I don't have anything further.

HEARING OFFICER McCABE: You've indicated you're part of the security force; is that correct?

THE WITNESS: Yes, sir.

HEARING OFFICER McCABE: What is your military training?





THE WITNESS: Personnel specialist, sir.

HEARING OFFICER McCABE: Okay. When you say you're part of the security force, would you explain that to me?

THE WITNESS: I'm the security forces -- or the personnel specialist for security forces. It's pretty much a secretary job, sir.

HEARING OFFICER McCABE: So from that standpoint, do you have any special training in law enforcement?

THE WITNESS: No, sir.

HEARING OFFICER McCABE: Haven't had any special training in terms of identification, such as working with intoxicated persons or determining degree of consumption of alcohol?

THE WITNESS: I've been around a lot of drinkers, some heavy, some light drinkers, and so I've seen a lot of intoxication.

HEARING OFFICER McCABE: Thank you. Anything further?

COLONEL WARNER: No.

MR. CALL: Nothing.

HEARING OFFICER McCABE: You may be excused. That means that you may be subject to re-call. One thing that I do want to state to you,

and I didn't tell Sergeant Teinert, but this is a hearing that is important and serious in nature and, very honestly, when you leave this room, if anybody asks you what's going on, just simply tell them that the hearings examiner said it's none of their business and you've been instructed really not to discuss the matter.

THE WITNESS: Yes, sir.

HEARING OFFICER McCABE: Thank you very much.

THE WITNESS: Thank you, sir.

COLONEL WARNER: Thank you, Airman Jensen.

MR. CALL: Thank you.

HEARING OFFICER McCABE: Next witness.

COLONEL WARNER: We should have Kevin Freemont, I believe.

(Discussion off the record.)

TSG KEVIN FREEMONT

called as a witness and sworn, was examined and testified as follows:

HEARING OFFICER McCABE: Please take a seat, please, and state your full name for the record.

THE WITNESS: Kevin Lee Freemont.

HEARING OFFICER McCABE: Thank you very







much. You may proceed.

COLONEL WARNER: Thank you.

DIRECT EXAMINATION

BY COLONEL WARNER:

Q Mr. Freemont, are you a member of the Utah National Guard?

A Air National Guard.

Q Well, we're going to get to that.

A National Guard. Air National Guard.

Q I know you air guys think that you're not part of the rest of us, but you are part of the National Guard.

A Okay.

Q You are still part of the National Guard, right?

A Yes. Yes, sir.

Q You are a tech sergeant with the Air National Guard; is that correct?

A Yes, sir.

Q So if we call you Sergeant Freemont, would that be appropriate?

A Yes, sir.

Q And, Sergeant Freemont, how long have you served with the Utah Air National Guard?

A Twenty-three years.







Q And as such, do you have an MOS and a specific assignment?

A Yes. I'm a security policeman.

Q Is that both -- are you a full-time technician or just a traditional guardsman?

A I'm full time.

Q Are you in security as both a full-time technician as well as your traditional slot?

A Yes.

Q In the course of your 23 years of experience with the Air Guard, do you know Sergeant Teinert?

A Yes, sir.

Q Bob Teinert?

A Yes, sir.

Q And do you know Sergeant Ron Menke, who is here at the table, as well?

A Know of him, but I don't know him.

Q You've heard the name and you know of him?

A Yes.

Q It is a relatively small community out there at the Air Guard, however; is that correct?

A That's correct.

Q So it's not uncommon for most of the full timers to at least know one another or to have some







acquaintance?

A Yes, sir.

Q I'd like to direct your attention, Sergeant Freemont, to the evening of September 17th of 1999 and ask you if you were on duty that evening.

A Yes. I was a security controller.

Q And, just briefly, is that dispatcher for security?

A Yes.

Q If phone calls come in to security control, you dispatch people out to take care of whatever the matter is?

A Yes.

Q And to deal with whatever situations arise; is that correct?

A That's correct, sir.

Q And you were serving on the evening of the 17th. Do you recall receiving a call that evening, late in the evening, from Sergeant Bob Teinert?

A Yes, sir, I do recall it.

Q Can you tell us briefly what the contents of the call were? What was Sergeant Teinert calling about?

A He was calling me about -- to say that somebody was making death threats on him, so I

FREEMONT, EXAM BY WARNER

proceeded to ask him who this individual was, and he told me it was Sergeant Menke and that he was doing it on his cell phone, at which time Sergeant Jensen -- he told me to talk to Sergeant Jensen. I says, "Was anybody else there that heard it?" And he said, "Yes. Airman Jensen did."

Q Did you -- well, let's back up just a little bit. Having received the call, can you tell us what the state of mind was -- when I say "state of mind," in terms of attitude and demeanor on the phone -- what Sergeant Teinert's state of mind was as he recorded with you -- or recounted for you, excuse me -- this alleged threatening call from Sergeant Menke.

MR. CALL: I'm going to object to his state of mind since he can't comment on that. I wouldn't mind -- demeanor is fine with me.

Q (BY COLONEL WARNER) Okay. Well, let's go with his attitude and demeanor as displayed over the phone.

A He seemed to be worried and seemed to be shook up about it. It wasn't -- knowing Sergeant Teinert, sometimes he does joke, but at this time he sounded very serious, like it was a threat.

Q Okay. He was taking it as a serious





FREEMONT, EXAM BY WARNER

threat?

A Yes. At which time, you know, I leave it up to my boss to decide if it is an actual threat. I can't determine myself if it was a threat. I dispatched the right person out.

Q I understand. You were simply taking the report, if you will, of the alleged threat.

A Yes, sir.

Q And in response to that, you dispatched somebody to go over to the club; is that correct?

A That's correct.

Q You at least considered it sufficiently serious, based on the report from Sergeant Teinert, that it warranted someone going to the club to determine exactly what had happened?

A Yes, sir.

Q All right. You weren't making any judgment yourself?

A No.

Q Other than the fact that it needed a response?

A It just was a procedure.

Q Okay. It's true, however, that Sergeant Teinert had indicated that the threat had come in over his cell phone?



FREEMONT, EXAM BY CALL

A Yes, sir.

Q And it was Sergeant Menke who had made the threat?

A Yes, sir.

Q You asked Sergeant Menke -- excuse me -- Sergeant Teinert if anyone else had heard it and he reported Sergeant Jensen?

A Airman Jensen.

Q Excuse me. Airman Jensen.

A And I did talk to Airman Jensen.

Q Okay.

A On the phone.

Q And you were the one who personally took the call from Teinert; is that correct?

A That's correct.

Q Who did you send over? Do you recall who you dispatched over?

A Sergeant Morstad and Sergeant Davis.

COLONEL WARNER: Thank you. No further questions.

HEARING OFFICER McCABE: Cross.

CROSS EXAMINATION

BY MR. CALL:

Q I'm Frank Call. I'm the attorney for Mr. Menke.





FREEMONT, EXAM BY CALL

A Yes, sir.

Q You've testified that you were the security dispatcher on the night in question, correct?

A Correct, sir.

Q At about 11:40 you got a call from Mr. Teinert, correct?

A Correct, sir.

Q And is it your testimony that Mr. Teinert informed you that he had received a death threat from --

A Yes, sir.

Q -- Mr. Menke? Did he tell you what words -- exact words Mr. Menke had allegedly used?

A No, sir. I learned that from Airman Jensen.

Q Okay. So all Mr. Teinert told you was that he had received a death threat and that Airman Jensen had overheard the death threat?

A Yes. That he was in the club at the time.

Q How familiar are you with Mr. Teinert?

A I've worked there -- as long as I've worked there I've seen him off and on and talked to him at various locations on base.

Q Do you know anything about his drinking habits?

FREEMONT, EXAM BY CALL

A Yes, sir. I do.
Q What do you know about his drinking habits?
A Well, I don't know, per se, to say that he does have the drinking habits, but I know that he spends a lot of time at the NCO Club.
Q Have you ever seen him drunk before?
A On several occasions, sir.
Q And does he slur his speech when he's drunk?
A As I recall, no.
Q When he called you that evening, was he slurring his speech or did he give you any indication that he may be drunk?
A Well, yeah, I could tell that he was intoxicated.
Q Okay. And how could you tell that?
A Well, I don't know, per se, to say for fact that he was. I had heard from various, per se, individuals in my unit that there was an altercation and that they were both intoxicated.
Q Let's focus on the night in question. When he called you -- and let's just go off of your knowledge from talking with him and the fact that he's calling from a bar. Did you suspect that he may be intoxicated?





FREEMONT, EXAM BY CALL

A It didn't sound like he was, no.
Q Okay. That's all I was trying to get to. You then indicated you spoke with Airman Jensen.
A Yes, sir.
Q And what did Airman Jensen tell you he had overheard?
A He had overheard the fact that -- there was an altercation to the fact that Bob Teinert said that Menke was pretty well intoxicated and asked if somebody should take him home or maybe somebody give him a ride because he was intoxicated, and then at the time there was some altercation of obscene words back and forth, and then he said that he stormed out of the NCO Club at this time.
Q So Airman Jensen told you that Sergeant Teinert was using offensive swear words?
A Well, both of them. Altercation was going on. They were both shouting back and forth.
Q Okay. Did Airman Jensen tell you that he actually overheard the threat in question?
A Yes, he did, sir.
Q And what did he tell you that Mr. Menke's words were?
A Well, I asked him precisely on the phone. I says, "Did you actually hear the death threat?"





FREEMONT, EXAM BY CALL

And at the time, myself, I couldn't understand how he had heard the death threat, but he stated, "Yes, I have."
Q And do you recall what he said the death threat was? And I understand that it may involve some vulgarities.
A He said, "I'm coming over to get you, man."
Q Is that the exact words he used?
A Yes. And then later he stated that, yes, he did threaten him.
Q Okay. I want to have you take a look at what's been marked as Exhibit 8 and ask if you recognize that document. I'll indicate on line nine it indicates that you are Kevin L. Freemont, E-6 security controller. Did you prepare this form?
A Yes, sir.
Q And then you submitted it to Mr. Pitt to sign?
A Yes, sir.
MR. CALL: Okay. Nothing further.
COLONEL WARNER: Just one moment, please.
(Pause.)
COLONEL WARNER: I don't have any further questions.
HEARING OFFICER McCABE: Thank you very





much. You may be excused as a witness. You may be subject to re-call. That is, there may be something further that is required of this hearing, so please let the folks in human resources office know where you're going to be, or reachable.
In terms of the proceedings today, this is a serious matter. It doesn't have any real basis to be discussed from here, so if anybody approaches you and asks you where you've been or what you've been doing, you can tell them I've been in a hearing. Other than that, just simply tell them that you've been instructed by the hearings examiner not to discuss the matter.
THE WITNESS: Yes, sir.
HEARING OFFICER McCABE: Thank you very much.
(Recess.)
SSG TERRY HORSTAD
called as a witness and sworn, was examined and testified as follows:
HEARING OFFICER McCABE: Please be seated. State your full name for the record, please.
THE WITNESS: Terry D. Horstad.
HEARING OFFICER McCABE: Do you have a full middle name?

MORSTAD, EXAM BY WARNER

THE WITNESS: Dean. Terry Dean Morstad.
HEARING OFFICER McCABE: Thank you. You may proceed.
COLONEL WARNER: Thank you.

DIRECT EXAMINATION

BY COLONEL WARNER:
Q Mr. Morstad, are you a member of the Utah Air National Guard?
A Yes, sir.
Q For how long have you been a member of the Air Guard?
A I've been part time with the Air National Guard since 1992. I've been an AGR since November of 1993.
Q And are you a staff sergeant?
A Yes, sir.
Q So would it be appropriate if I just referred to you as Sergeant Morstad for purposes of our discussion here today?
A Yes, sir.
Q Thank you. Sergeant Morstad, what is your MOS training and assignment with the Guard?
A I'm a 3P071, which is security police.
Q And, as such, is that both your traditional assignment as well as your technician assignment?





MORSTAD, EXAM BY WARNER

A Yes, sir.
Q Or AGR. Excuse me.
A AGR, yes, sir.
Q I understand you're AGR. Now, sergeant, when you were working the evening -- excuse me. Were you working the evening of September 17th of 1999?
A Yes, sir.
Q You were performing your normal duties as part of the security force as the Air Guard Base here in Salt Lake City?
A Yes, sir.
Q Do you recall being called to or sent to the NCO Club that evening?
A Yes, sir.
Q How many visits did you make to the NCO Club that evening?
A Two, sir.
Q I'd like to talk about both of them, but let's start with the first one.
A All right, sir.
Q How was it that you had occasion to go to the club the first time?
A We were called about an individual who was intoxicated who wanted to drive his vehicle home from the club and we went over there to make sure that he





MORSTAD, EXAM BY WARNER

did not drive.
Q Do you know who reported that somebody was about to drive that was intoxicated?
A We had two calls. One was from Matt Jensen and one was from Sergeant Bob Teinert.
Q Okay. And you were dispatched or did you just go or how did that happen?
A We were dispatched over there, sir.
Q Was that by Sergeant Freemont?
A No. It would have been by Sergeant Bradshaw. He was the on duty flight sergeant at the time.
Q When did you arrive at the club the first time? Do you recall?
A It was about 2240 to 2245. Somewhere in that time frame.
Q Could it have been any earlier?
A I don't believe it was, sir, no.
Q Just asking, you know, to try and get a handle on it. Now, when you arrived at the club, who were you instructed to talk to?
A We were instructed to talk to Ron Menke, the one that was talking about driving his vehicle home.
Q That's Sergeant Ron Menke?





MORSTAD, EXAM BY WARNER

A Yes.
Q The same one who is sitting at the table here today?
A Yes, sir.
Q Now, previous to showing up at the NCO Club, did you know Sergeant Menke?
A Yes, I did, sir. Just an acquaintance. Not really any more than knowing him by sight.
Q You knew who he was?
A Yes, sir.
Q Okay. And that's basically because you're both full-time employees out there at the facility?
A That's right.
Q And you see him occasionally?
A I'd see him when I was a part timer, also, sir.
Q So you knew who you were looking for? Let's put it that way.
A Yes, sir.
Q In terms of you knew who Sergeant Menke was.
A Yes, sir.
Q When you arrived and encountered Sergeant Menke, what did you do? Did you talk to him in the club? Did you take him outside? What was the

MORSTAD, EXAM BY WARNER

circumstances of your discussion?
A There was a reception area right out in front of the club and I asked him if he would go out into that area with me.
Q And why did you ask him to go to the reception area?
A Just basically as a privacy. Talk to him in private instead of in front of anybody else.
Q Is that out of a sense of professionalism?
A Professionalism, right.
Q Or the way you wanted to deal with the situation?
A One on one.
Q His privacy?
A Uh-huh.
Q No interruptions and all of those things?
A Right, sir.
Q Would you describe for us what -- by the way, did you speak to either Teinert or Jensen? Do you know both Teinert and Jensen?
A Yes, sir.
Q Did you speak to either one of them when you arrived?
A No, sir.
Q Did you see them?





MORSTAD, EXAM BY WARNER

A Yes, sir. I seen them in the establishment.
Q But you went directly to Menke?
A Right, sir.
Q Would you describe for the hearing what you observed about Sergeant Menke upon arriving and meeting with him, your physical observations of his demeanor, motor control, appearance and so on.
A What I noticed is that Sergeant Menke had been drinking quite excessively. His speech was slurred. He was talking in a loud tone. I didn't see him walk. At that point, when I asked him to go out into the reception area of the club, then I noticed his walking was slightly staggered. Staggering.
Q Did you have any doubt in your professional experience that he was intoxicated?
A No, sir.
Q Now, as a security officer, I take it you have a relatively common experience of dealing with intoxicated individuals.
A Not real common, sir. We do have occasions to go over to the club and --
Q Have you had any specific training in your security MOS on identifying indices of intoxication?



MORSTAD, EXAM BY WARNER

A Not official training. Just, over the years, working in different security police units and that, you notice intoxicated persons, whether it's the breath, the staggering, the slurring of the speech.
Q There was no question in your mind that Sergeant Menke was intoxicated?
A No, sir.
Q Seriously intoxicated?
A Right, sir.
Q Much too intoxicated to safely drive an automobile?
A Right, sir.
Q That was his appearance and demeanor, as far as intoxication?
A Yes, sir.
Q What attitude or emotional state did he display in his discussion with you?
A Toward me, he had no aggression or anything. His main aggression was towards Sergeant Teinert, that he felt that he called and it wasn't his business to call us up. He was a little bit argumentative during that period of time. He had -- at first he had stated he could drive, and I told him, "No, sir, you're not going to drive off this





MORSTAD, EXAM BY WARNER

base."
Q You indicated that he was -- I forget the exact words you used, but angry or upset with Teinert, but not towards you?
A Right, sir.
Q Did he appear to be angry or upset with Teinert because Teinert had made the call concerning his ability to drive?
A I believe so, sir.
Q That's what it appeared to be from the conversation?
A Right, sir.
Q How angry was he? How upset was he?
A Fairly angry, sir. A couple times I had to ask him to hold his voice down.
Q He got loud?
A His voice was elevated considerably.
Q What about the language? Did he use any --
A There was in foul language in there.
Q The full gamut, so to speak, of foul language?
A Yes, sir.
Q Was it frequent?
A Not at the -- immediately, but it became more at the end of our conversation -- toward the

000239

MORSTAD, EXAM BY WARNER

center of our conversation, that he was using more language. He was very upset with Sergeant Teinert.

Q Did he seem to get increasingly agitated as you discussed his state of intoxication and the need to have someone drive him and as he talked about Teinert making the call?

A He elevated his voice several times, became agitated that somebody had called us over there. I informed him, anytime that he started getting more aggressive or loud or -- that he needed to calm down and relax, that we weren't there to immediately arrest him.

Q But you did indicate that if he tried to drive off, you would apprehend him; is that correct?

A Yes, sir.

Q Did you ultimately make an arrangement for him to receive a ride home?

A It was made -- the individual -- the bartender's husband was there and I felt -- and he was sober, and he offered to give Sergeant Menke a ride home, and I said okay, that would be fine.

Q Okay. And so, as far as you know, that's how Mr. Menke -- or Sergeant Menke was able to get home that evening?

A Yes, sir.





MORSTAD, EXAM BY WARNER

Q Do you know if his wife accompanied him?

A I don't know that, sir.

Q Did you see Mrs. Menke? Do you know Mrs. Menke personally?

A Yes, sir.

Q Did you see her there that evening?

A Yes, I did, sir.

Q But you don't know whether she actually accompanied Mr. Menke's in the car with the bartender's husband?

A Sergeant Bradshaw actually talked to Mrs. Menke and he made the determination whether she was sober enough to drive or not.

Q Now, did that pretty much terminate that first encounter at the club that evening?

A Right, sir.

Q Did you have an occasion to go back a second time on the night of the 17th or the early morning of the 18th?

A Yes, sir.

Q And would you describe briefly what caused you to go back that time?

A Sergeant Teinert had called us and stated he wanted to make a report on a phone call he had received on his cell phone from -- he stated at that



MORSTAD, EXAM BY WARNER

time that it was Sergeant Menke.

Q Did he talk to Sergeant Freemont at that time?

A Yes, sir.

Q He didn't speak directly to you?

A No, sir. He talked to Sergeant Freemont.

Q We've had Sergeant Freemont testify so we don't need to hear your accounting of what was said there, but --

A Right, sir.

Q I take it you were dispatched back to the club as a result of Teinert's call to Freemont.

A Yes, sir.

Q And when you went over, did you find Teinert?

A Yes, sir.

Q And how would you describe his attitude and demeanor at that point?

A His demeanor was real good. He was not angry. He had been drinking and he was, in my eyes, intoxicated. Not to the level of Sergeant Menke, but intoxicated, nonetheless. When we arrived there, he had stated that he'd received a couple phone calls from Sergeant Menke and that he wanted to fill out a report on that.





MORSTAD, EXAM BY WARNER

Q Let me just back up for a minute, because I forgot to ask. You indicated you didn't talk to Teinert the first trip to the club?

A Right.

Q But just observed him?

A Right, sir. From across the bar. He was sitting at the bar.

Q Did he appear to be, at that point, angry or upset visibly from the standpoint of, you know, what he was doing at the bar?

A No, sir.

Q Did he appear unusual at all in his demeanor?

A No, sir. Not to me.

Q You couldn't see anything that would reflect that he was upset?

A No, sir.

Q Or angry?

A No, sir.

Q All right. Let's come back now to your second visit. You arrived and you said that he was intoxicated but did not appear to be angry?

A Right, sir.

Q All right. What did he report to you, specifically?

MORSTAD, EXAM BY WARNER

A He said he had received a phone call on his cell phone from Sergeant Menke with threats to his well-being.
Q Did he describe the nature of the threat to you? Was he specific?
A He said bodily harm, but he didn't say anything other than that.
Q So he didn't give you the exact words?
A No, sir. I don't recall hearing them.
Q I'm sorry. I interrupted you.
A I'm sorry. I don't recall hearing him say exactly what the words were on the phone passed to him.
Q Did you ask him to fill out a written statement --
A Yes, sir.
Q -- concerning the incident?
A Yes, sir.
Q And did he do that?
A Yes, sir.
Q Did you also talk with Airman Jensen?
A Not anything about the actual incident over there. The only thing I asked him to do, he needed to fill out a statement, also.
Q So you did ask Jensen to fill out a





MORSTAD, EXAM BY WARNER

statement?
A Right, sir.
Q So, basically, after making a generalized report that a threat had been made to him involving bodily harm and that it came from Menke, you just asked him to fill out a statement?
A Right, sir.
Q Did you do anything else?
A Sergeant Pitt actually was -- he was the flight sergeant at that time, after eleven o'clock, and he called Salt Lake PD to make a report there.
Q But you didn't do anything else?
A Right. Sergeant Menke called, supposedly from off base, onto the base to Sergeant Teinert.
Q Did the PD arrive?
A Yes, sir.
Q And they talked to Teinert?
A Actually, they just took our report number and they gave us a case number.
Q You didn't have anything further to do with the officers from the Salt Lake City PD?
A No, sir. All we did was exchange case numbers and then our report number.
Q You filled out a written report about the events of the evening, did you not?





MORSTAD, EXAM BY CALL

A Yes, sir.
Q Let me show you what's been marked as Exhibit No. 7 and just ask you to briefly take a look at that. Does that appear to be the report that you filled out?
A Yes, this is the report I filled out, sir.
Q All right. That's been previously submitted as an exhibit. I just wanted to make sure that you could identify and verify that, to the best of your knowledge, accurately reflected what occurred that evening, correct?
A Yes, sir.
COLONEL WARNER: I don't have any further questions.

CROSS EXAMINATION

BY MR. CALL:
Q My name is Frank Call. I'm Mr. Menke's attorney in this case. Let's talk about the first time you were dispatched to the NCO Club on the night in question. If you'll take a look at Exhibit 7, at the top -- I'm assuming that you prepared this typewritten --
A Yes, sir.
Q -- form, correct? And this is a dialogue of your indication of what happened, correct?





MORSTAD, EXAM BY CALL

A Yes, sir.
Q The first sentence indicates that at 2240 Mr. Teinert called the security forces and reported that Mr. Menke was intoxicated -- very intoxicated and going to attempt to drive home, correct?
A Yes, sir.
Q And then it indicates that at approximately 2345 you and Mr. Bradshaw went to the NCO Club, correct?
A Yes, sir.
Q I have a question concerning the time. Is one of those times a typo or was there actually about almost an hour delay between the time you got over there and the time -- it says that the call came in and 2240 and you were there at 2345.
A Yes, sir, that is a typo.
Q If you could correct it for us.
A Okay. 2240 is when they originally had the call. 2245 is when we arrived at the club.
Q Okay. Thank you. Do you know who took Mr. Teinert's call when he called at 2240?
A Actually, sir, I answered the phone and I gave it to the flight sergeant, which would be Staff Sergeant Bradshaw.
Q So you pick it up and Sergeant Teinert

MORSTAD, EXAM BY CALL

identified himself?
A Yes, sir.
Q Told you the nature of the complaint?
A Yes, sir.
Q And then you gave that off to --
A Sergeant Bradshaw.
Q Sergeant Bradshaw. And at that time he told you that Mr. Menke was in the bar intoxicated, correct?
A What was passed on the phone after Sergeant Bradshaw took over, I don't know.
Q Let's just focus on the things that Sergeant Teinert told you.
A All right, sir.
Q To the best of your recollection, what did he tell you when he called at 2245?
A He stated that Sergeant Menke was over there; he was very intoxicated. At that time I gave the phone to Staff Sergeant Bradshaw, who was the on-duty flight sergeant at the time.
Q At that time did Sergeant Teinert tell you that he thought Mr. Menke was going to be driving home?
A I don't recall that, sir.
Q At that time, did -- you indicated Airman





MORSTAD, EXAM BY CALL

Jensen also called. Did you speak with him briefly, too?
A No, sir.
Q Do you know who did?
A I don't remember who the CSE controller was that night.
Q That's fine. And then you were dispatched and you went over to the club at 2245, according to the corrected information that you've provided. Let me show you what's been marked as Exhibit 12. Is that an accurate layout of -- not where the people are located, but is that an accurate layout of the bar area of the NCO Club?
A Fairly close, sir, yes.
Q And you see there's an indication of a gentleman -- a figure named Ron sitting at the bar. Is that about where Mr. Menke was when you entered the NCO Club?
A No, sir, it's not.
Q Where was he located?
A There's actually a waitress station down this way a little further that he was standing out.
Q Towards the telephone; is that correct?
A Right, sir.
Q Where were Mr. -- where was Mr. Teinert and



MORSTAD, EXAM BY CALL

Mr. Jensen sitting?
A This is about correct on Sergeant Teinert and Airman Jensen. Right at the end of the bar.
Q So the green figure that's labeled Bob is where Mr. Teinert was sitting, and Mr. Jensen, the kind of purple-colored figure, were down at the other end near the TV, correct?
A Right, sir.
Q When you entered the club, how many people were in the club?
A Six, sir, that I can recall.
Q Sitting on the bar side?
A There was actually the bartender, her husband, Sergeant Teinert, Airman Jensen, Sergeant Menke and his wife.
Q Okay. And was there music playing?
A I don't recall, sir.
Q Was the TV on?
A The TV was on.
Q We've been referring to the NCO Club to include -- I guess there's another divided area where they have some tables and a pool table and a jukebox.
A Right, sir.
Q Were there people back there having a birthday party?





MORSTAD, EXAM BY CALL

A I don't recall anybody back there, sir.
Q Do you recall anybody being in the back there at all?
A No, sir.
Q You indicated that Mr. Menke had elevated his voice. Would you consider it elevated talking or was he yelling? What would be your characterization?
A Just elevated, tone-wise. Higher than a normal speaking conversation.
Q Do you think the level of the tone that he was talking got to the point where he was drawing attention to himself by the other patrons, or were they kind of oblivious as to what was going on with you and Mr. Menke?
A Other than the bartender's husband, who had offered to take him home, Sergeant Bradshaw and myself and Sergeant Menke were the only ones in that room at the time, in the entryway to the club.
Q So is it fair to say he wasn't creating a disturbance by the volume? He may have had an elevated voice but wasn't creating a disturbance?
A I wouldn't -- no, sir. Elevated voice was it.
Q Okay. And at that point, he ended up going home with Mr. Lindsay, correct?

MORSTAD, EXAM BY CALL

A Right, sir.
Q Did you escort him with Mr. Lindsay to the car?
A No, sir, we did not.
Q Did you actually see him at any point leaving the base?
A Our gate guard called up and said that he had stopped and that Mr. Lindsay was taking Mr. Menke home, or Sergeant Menke home.
Q Let's talk about the time when you went back out when the other -- on the second visit for this I alleged threat. Your report indicates that at approximately 030 hours on September 18th, Sergeant Teinert called and indicated that he had received a threat to bodily harm. Did you actually take that call again, picking up the phone and passing that along? Do you see where I'm referring? About the fifth or sixth line from the bottom. Right about in here, at 030.
A What was the question again?
Q At 030 did you actually receive a phone call from Mr. Teinert?
A Tech Sergeant Freemont received that call.
Q And the nature of that call was that Mr. Menke had just left a death threat with Mr. Teinert,





MORSTAD, EXAM BY CALL

correct?
A Right, sir.
Q Did he indicate the time -- if the call came in at 030, did he indicate how long had elapsed between the time that he got that phone call?
A No, sir, he did not state that.
Q What time did you go out to the -- what time did you enter the club on that second visit? If he called at 030, what time do you think you responded to that?
A Quarter till or ten till, somewhere around that time.
Q So if we converted that to military time, about --
A 0050 or 0045.
Q So about 15 minutes later you appeared at the bar?
A Right, sir.
Q At that time did he tell you what time he had received the threatening telephone call?
A I don't recall him stating a time exactly. He said there was actually a couple calls, and I don't know if that was in his report.
Q Did he give you any indication from the time that he allegedly received this phone call to





MORSTAD, EXAM BY CALL

the elapse of time that he contacted security forces?
A He didn't state that to me, sir.
Q And at that time he only indicated that Mr. Menke had threatened him with bodily harm but didn't tell you the exact words that he had used?
A I don't recall them, sir.
Q And you asked Sergeant Teinert to fill out a complaint form, correct?
A Right, sir.
Q Did you at any time tell him not to include any information on the form that had swear words?
A No, sir. I never told him -- he was told to fill out the report, whatever was said.
Q And so we're to take, from what he wrote down, what actually was said, correct?
A I believe so, sir.
Q Did Mr. Teinert then accompany you and Officer Bradshaw back to the security forces?
A No, sir. There was -- Airman Davis, sir.
Q Did he accompany you and Airman Davis back to security forces?
A Yes, sir.
Q And where did he fill out the forms? In the bar or --
A At security forces, sir.





MORSTAD, EXAM BY WARNER

Q And then after they filled out the forms, where did Sergeant Teinert go?
A He went over to the Salty Guard Inn, which is a basically like a hotel on the base.
Q At that time, at the time you appeared the second time, what was Officer Teinert's physical demeanor? Did he appear to be intoxicated?
A I believe him to be -- have had too much to drink to drive. I don't believe that he was quite as bad as Sergeant Menke at that time. His walk was not staggered, his speech was not slurred.
Q Okay. Were his motor reflexes delayed at all?
A Just slightly, if any at all, sir.
Q So you could tell that he was obviously impaired?
A Yes, sir.
MR. CALL: Thank you. I don't have anything further.

REDIRECT EXAMINATION

BY COLONEL WARNER:
Q Impaired for purposes of driving?
A Yes, sir.
Q Do you have any doubt about his ability to recall or recollect and observe and recount for you



00042

MORSTAD, EXAM BY WARNER

the events that had occurred?
A I couldn't answer that question, sir.
Q Well, what I'm saying is, did he appear to be lucid to you? For instance, was he oriented as to time and space?
A Right, sir.
Q Could he carry on a conversation?
A Yes, sir.
Q Could he tell you, you know, that was up and that was down, kind of thing?
A Yes, sir.
Q I mean, he wasn't so intoxicated that he didn't have control or knowledge of his circumstances and surroundings?
A Right, sir.
Q He was carrying on a lucid, coherent conversation?
A Yes, sir.
Q His speech wasn't slurred?
A I don't recall it being slurred, no, sir.
Q Did you have any reason to doubt his ability at that time to respond to your questions and to give the answers that you wanted?
A No, sir.
COLONEL WARNER: All right. Thank you.





MORSTAD, EXAM BY CALL

RECROSS EXAMINATION

BY MR. CALL:
Q You indicated you were talking in the lobby area with Mr. Menke and he asked you if it was Sergeant Teinert that had called. I believe you indicated that he said, "It was Sergeant Teinert who called you, isn't it?" Do you recall him asking you that?
A Yes, sir.
Q How did you respond to that?
A I believe I responded, "It doesn't matter who called us. That is not the problem. The problem is with you. I feel that you're too intoxicated," or words that effect, sir.
Q Is it fair to say that, from your response to Mr. Menke's question, that you were essentially indicating that Mr. Teinert had called, that that was not the issue; the issue was his sobriety?
A Right, sir.
MR. CALL: Nothing further.
COLONEL WARNER: No further questions.
HEARING OFFICER McCABE: You may be excused in this case. You may be subject to re-call. As I've instructed other witnesses, this is a serious matter. If anybody asks you outside what you've been



BRADSHAW, EXAM BY WARNER

doing, you can tell them you've been in a hearing. Anything beyond that, please just simply advise them that the hearings examiner has told you not to discuss the matter.
THE WITNESS: Okay, sir.
HEARING OFFICER McCABE: Thank you very much. And I would assume we're at our lunch break.
COLONEL WARNER: I think that's a very good assumption, as far as I'm concerned.
HEARING OFFICER McCABE: Well, we're five minutes ahead.
(Discussion off the record.)
(Lunch recess.)
SSG SCOTT BRADSHAW
called as a witness and sworn, was examined and testified as follows:
HEARING OFFICER McCABE: Would you state your full name for the record, please.
THE WITNESS: Joseph Scott Bradshaw.
HEARING OFFICER McCABE: Thank you very much. You may proceed.
COLONEL WARNER: Thank you.
DIRECT EXAMINATION
BY COLONEL WARNER:
Q Staff Sergeant Bradshaw; is that correct?





BRADSHAW, EXAM BY WARNER

A Correct.
Q Staff Sergeant. Can you tell us, first of all, how long have you been in the Air National Guard?
A Since '85, August of '85.
Q And has that been traditional or --
A I started out traditional. I went AGR 30 September '86.
Q So you've been an AGR for about 13 or 14 years?
A Correct.
Q What is your MOS or background with both sides of the house?
A Army National Guard, I was 67 November, which is helicopter mechanic. Air Force, 3P071, which is security police.
Q And since going AGR with the Air Guard here in Utah, have you spent most of your time with the security police?
A Yes. All of my time with the Air Guard has been with security.
Q And you've been working full time in that capacity since '86?
A Correct.
Q Staff Sergeant Bradshaw, just for purposes

BRADSHAW, EXAM BY WARNER

of an explanation on the record, you've been up a long time, haven't you?
A Yes, sir.
Q Approximately 31 hours now?
A Correct.
Q We appreciate you coming in and we know that you're tired so we'll try and get to the point here.
A Okay.
Q And get you out so you can get some rest. I'd like to direct your attention to the evening of September 17th of 1999, last fall. Do you recall that evening?
A I do.
Q That evening involved a call that the security forces received regarding Sergeant Menke. Do you recall that?
A Yes.
Q Can you tell us to the best of your recollection what you recall, first of all, about responding to a call concerning Sergeant Menke?
A The first call was from Sergeant Teinert. Sergeant Morstad actually picked up the phone and then handed it to me. Sergeant Teinert advised that he had an individual over at the NCO Club, Building





BRADSHAW, EXAM BY WARNER

1624, that was intoxicated and he wanted to see about what we could do to get him a ride home.
I suggested to him that he call a taxi and Sergeant Teinert stated that that would probably be turned down, but he would make the offer. I said, "Okay. If he turns it down, then give us call back."
They called right back and spoke to the Con Plotter. Basically they told us that the offer to get a taxi had been turned down. We were getting close to shift change, so my other responding member was already in the arms room, Sergeant Morstad, who was coming on duty. I asked him to arm up and accompany me over to Building 1624, NCO Club.
Q Okay. Did Teinert seem agitated or angry when he called you?
A No.
Q Did he seem concerned?
A He seemed concerned, very calm, just stating that he felt like this individual might try to drive home and didn't think that was in the best interests of --
Q Okay.
A Of that individual.
Q Now, the individual, of course, he was talking about was Sergeant Ron Menke; is that



BRADSHAW, EXAM BY WARNER

correct?
A Yes, sir.
Q And in your experience, did you know both Sergeant Teinert and Sergeant Menke?
A I knew Sergeant Teinert. I -- perhaps by sight, but I wouldn't have known Sergeant Menke by name.
Q Okay. So when you went to the club in response to the call, you and Sergeant Morstad went; is that correct?
A Correct.
Q When you arrived, did anyone have to point out Sergeant Menke or how did you find out who he was?
A We walked through the doors. There were a male and female on our left. Sergeant Teinert and Airman Jensen were on the right. I didn't see anybody else in the room. I assume that the people on the left was who -- because I recognized Sergeant Teinert -- was who they were referring to. I walked up to Sergeant Teinert and asked if that's who he was referring to and he said yes.
Q So there wasn't a big crowd in the club?
A No.
Q Just basically Teinert and Jensen and Mr.





BRADSHAW, EXAM BY WARNER

and Mrs. Menke?
A That's all I saw, was the four, besides the bartender.
Q Okay. How about the noise level in the club? Were you able to -- was it noisy or loud in there?
A No. I believe the jukebox was on, but it wasn't -- wasn't terribly noisy like at other times.
Q Did you and Sergeant Morstad have occasion to invite Sergeant Menke to a reception area to have a conversation with him?
A Yes, sir.
Q And is that, in fact, where you talked to him, was out in the reception area?
A Right.
Q Was anyone present beside you and Sergeant Morstad and Sergeant Menke?
A No. The double doors had closed. I assumed at the time it was Sergeant Menke's wife, was standing just inside those double doors.
Q You were not otherwise familiar with Mrs. Menke?
A No.
Q Had never met her previously?
A No.

BRADSHAW, EXAM BY WARNER

Q All right. Now, can you tell us, Staff Sergeant, to the best of your recollection, what your observations were about Sergeant Menke's state of intoxication when you arrived and when you took him to the reception area to talk to him.
A He obviously had been drinking. He wasn't falling down drunk.
Q Was he unsteady?
A Somewhat. Speech was just a bit slurred.
Q What was his attitude and demeanor like as demonstrated at the time?
A He was angry at Sergeant Teinert.
Q And when you say angry, did he give some reason why he was angry at Sergeant Teinert?
A He felt like Sergeant Teinert was sticking his nose in business that wasn't his.
Q Are you referring to the fact that he shouldn't drive?
A And the fact that Sergeant Teinert was trying to get him a taxi home.
Q That's what I mean.
A Correct, yes.
Q Now, you say sticking his nose in his business. Was that your term or is that a term that Sergeant Menke used?





BRADSHAW, EXAM BY WARNER

A That's probably not word for word, but words to those effect, that Sergeant Menke used.
Q Did he display any anger towards you or to Sergeant Morstad, as you recall?
A He started to at one point, and that's when I stopped him and advised that if he continued on that vein, then his options would become a lot less than what they were at that point.
Q Options in terms of going home or how he was going to get home?
A In other words, I would just call his first sergeant and commander and let them deal with it from that point on.
Q Did you have any intention of letting him drive after you saw him and talked to him?
A No.
Q That was not going to be an option?
A No.
Q Is that true?
A Correct.
Q And that was based on your determination that he was intoxicated sufficient that it would not be safe for him to drive?
A Sure.
Q Now, let's talk about this agitation or



BRADSHAW, EXAM BY WARNER

anger that was directed towards Teinert. Did he use any profanity --
A Yes.
Q -- at that time?
A A fair amount.
Q And was it, again, directed towards Teinert?
A Yes.
Q Did that include using the word "fuck"?
A Yes.
Q In any of its derivatives?
A Yes.
Q And was it repeated --
A Yes.
Q -- in terms of the profanity?
A Yes.
Q How angry was he? I mean, can you put it on a scale from slightly agitated to furious? I mean, where was this anger on this scale?
A I wouldn't say furious. If furious would be a ten, I'd say a seven or eight.
Q So he was fairly angry, then?
A He was quite angry.
Q All right. Based on your experience as a security officer and based on the facts as you





BRADSHAW, EXAM BY WARNER

observed them at the time, did you have any reason at that time to be concerned about a physical -- or the potential for a physical confrontation between Teinert and Menke?
A I didn't feel that it would be in the best interests if Sergeant Menke went back into the club at that point. I was going to stay there basically until we found a ride for him, called a taxi, whatever it was. I didn't want him to go back in because I felt like he was probably getting more angry as time went on, the longer we were there.
Q You didn't want him to go back -- I'm not trying to put words in your mouth, but I'm just trying to move it along here -- because you were concerned there might be a physical confrontation?
A Yes.
Q And you were sufficiently concerned, you didn't want him to go back in and have further contact with Teinert?
A Yes.
Q Did you, in fact, either you or Sergeant Morstad -- were you able to arrange transportation for Menke?
A Yes. Boy, I can't remember his name.
Q Darren Lindsay?

BRADSHAW, EXAM BY WARNER

A That was the husband of the woman who was tending bar?
Q Uh-huh.
A He stepped out, oh, after ten minutes or so, and offered to take them home, Sergeant Menke and his wife.
Q Did you personally observe that occur?
A Yes. I was standing right there when he came out.
Q Let me put it this way: Did you observe Sergeant Menke get in the car with Mr. Lindsay?
A No.
Q All right. But apparently you were satisfied that that would happen?
A I was going to say Sergeant Morstad stayed there, but I don't believe he did. We needed to get back over to the building for shift change. I called the main gate and they advised me over the phone that they were just leaving the main gate.
Q So, to the best of your knowledge, then, based on what you were told, they did, in, fact get a right with Mr. Lindsay?
A True.
COLONEL WARNER: Thank you. Your witness.
//





BRADSHAW, EXAM BY CALL

CROSS EXAMINATION

BY MR. CALL:
Q My name is Frank Call. I'm Mr. Menke's attorney in this matter. You indicated that there was a first call, that Robert Teinert called, spoke briefly with Officer Morstad, and then you were given the phone, correct?
A Uh-huh.
Q And that occurred at approximately 2240, correct?
A Approximately.
Q And what do you recall Mr. Teinert telling you specifically? Can you remember what he said to you?
A He basically told me that there was an individual at the club that he felt was intoxicated enough to not be driving home and that he and his wife were going to drive. I asked at that time if the wife had been drinking, and he said yes, they both had. I suggested a taxi and he stated, "Okay, but it will probably be turned down," and that's when I said, "Okay. Offer it, and if they turn it down, then call us back."
Q So you suggested the taxi with the instructions if it were turned down, to call back.



BRADSHAW, EXAM BY CALL

Did he call back?
A I didn't take that call. The on-duty Com Plotter did. I don't know if it was actually Sergeant Teinert or Airman Jensen that called back.
Q But somebody called back --
A Somebody called back and said they had declined a taxi, yes. And the Com Plotter relayed that to me.
Q And it's at that point that you and Officer Morstad went over to the NCO Club, correct?
A Correct.
Q Do you know how long a time frame it was between -- so you know where I'm looking, I'm looking at what's been marked as Exhibit 7, which is Officer Morstad's report, and in it --
A Do you want me to look at it, then?
Q Yeah. The second page. First he indicates 2240. How much time elapsed between the first call and the second call back?
A Not very long. Two minutes.
Q Okay.
A Approximately.
Q And who would have taken that call, do you believe?
A I believe it was Sergeant Darby, who was my





BRADSHAW, EXAM BY CALL

Com Plotter.
Q And then after you received that call, how long was it before you went over to the NCO Club?
A We went over immediately. A couple minutes, at the most.
Q One of the things that I'll point out to you, on the third line it says, "At approximately 2345." I'll represent to you that Officer Morstad has testified that he believes that's a typo and that time should read 2245. Does that time read correct to you, too?
A Yes. Sorry. We make shift change at 2300 and 1100, so it was just before shift change.
Q When you spoke with Mr. Teinert the first time that he called, did he sound intoxicated to you?
A He didn't, however, he stated he had been drinking.
Q Okay. Did he tell you that he -- when he said that the offer would be turned down, did he tell you that he'd been having a verbal argument with Mr. Menke at all that evening?
A Huh-uh.
HEARING OFFICER McCABE: Pardon me? Can you make that an audible response?
THE WITNESS: Oh. Sorry. No, he did not.

BRADSHAW, EXAM BY CALL

HEARING OFFICER McCABE: Thank you.
Q (BY MR. CALL) So if the first call took place at 2220, you arrived at the club about 2245, correct?
A Correct.
Q Let me show you what's been marked as Exhibit 12, which is kind of a crude rendition of the bar area of the NCO, and ask you -- I understand on to the left of this page there would be a telephone down near the end of the bar. There's a figure in green with the arrow pointing to him saying Bob, for Bob Teinert. Is that about where Mr. Teinert was sitting?
A Yes.
Q And was Mr. Jensen, who is represented by the kind of purplish color with an arrow pointing to him, is that where he was sitting?
A Yes.
Q Right next to the TV?
A Yes.
Q Where was Mr. Menke when you entered the club? Was he where he is indicated in that picture, or was he standing by the phone?
A No. He was in -- I believe both him and his wife were here.





BRADSHAW, EXAM BY CALL

Q Where it's indicated "Ron" on the drawing?
A Yes.
Q Okay. Thank you. At the time you entered the NCO Club and went over and spoke with Mr. Teinert, you had a little bit more interaction with him, correct?
A Uh-huh, yes.
Q To the best of your recollection, what did you -- you indicated you asked him if that was Mr. Menke?
A Words to that effect, yes.
Q Did he say anything else?
A No.
Q He didn't say, "He's going to try and drive home," or something like that? Anything like that?
A I don't believe so.
Q Based off of those interactions with Mr. Teinert there with you, you were quite close to him, correct?
A Yes.
Q Physically. Did he appear intoxicated to you at that point?
A No. I wouldn't say so.
Q Was he drinking?
A He was. I can't say that there was a drink



BRADSHAW, EXAM BY CALL

in front of him and he didn't take a drink while I was there, but, like I say, he stated that he had been drinking.
Q Did you observe him slurring his speech at all or were his motor reflexes slowed at all?
A No.
Q At one point you then took Mr. Menke out into the lobby and had a conversation with him. How long did that conversation last?
A I would say eight to ten minutes.
Q And then when Mr. Lindsay indicated that he'd give him a ride home. Was it at that point that you and Officer Horstad departed the NCO Club?
A Yes. I want to say that I departed before Sergeant Horstad did, and I'm unsure as to how long Sergeant Horstad stayed. It seems like he -- because we were conducting -- or getting ready to do shift change. I was the on-duty flight sergeant. I needed to pass things on to the oncoming flight sergeant. And I want to say he stayed for just a little bit longer, but it wouldn't have been much.
Q Okay. So then at some point did Officer Horstad return to the security forces office?
A Yes.
Q And how many minutes do you think that you





BRADSHAW, EXAM BY CALL

saw him back there?
A A couple. Two, three minutes.
Q So you're talking with him there. Approximately 2300 hours, maybe, is the point when left, and shortly thereafter Mr. Horstad came back to the security offices?
A Correct.
Q And at that time Mr. Teinert was -- excuse me -- Mr. Menke was left at the NCO Club with his wife, waiting for Mr. Lindsay to take them home, correct?
A They were actually going out the door with us. We as a group were talk walking out, as I recall.
Q Let me call your attention to Officer Horstad's report. He says that at approximately -- this is about two-thirds of the way down right in the middle. It starts, At approximately 2320, SSO Bloomfield called and stated that Mr. Darren Lindsay stopped at the gate and informed him that they were taking Mr. Menke home. So it looks like there was about a 20-minute delay from the time that you left the NCO and that they hit the gate.
A Okay.
Q How much distance is there between the NCO

BRADSHAW, EXAM BY CALL

Club and the front gate?

A Four hundred yards.

Q So is it -- I'm trying to account for that 20 minutes. Where was Mr. Menke during that 20 minutes? Was he in a car? Was he at the club waiting for Mr. Lindsay to get off to take him home?

A I couldn't tell you that. All I can say is obviously these are approximate times. If we didn't leave the club till 2305, then perhaps his -- I was still there when SSO Bloomfield called and stated that they had left the base, but I didn't notice the time.

Q Do you specifically recall leaving the NCO Club with Mr. Menke and his wife?

A I remember the group of us walking towards the door, and that's as far as I can tell you.

Q Do you know if they went outside? And the reason I'm asking this --

A No.

Q I'm not trying to hide the ball with you, is you'd indicated that you were -- had some idea that Mr. Menke was angry and there might be a fight. It sounds like you weren't so concerned about it that you didn't stay and actually escort him off the base. Isn't that correct?





BRADSHAW, EXAM BY CALL

A No, we didn't escort him off the base.

Q What did you do when you got back to the security force? Did you then go off shift?

A Yes.

Q And so any of the events that occurred after that, you wouldn't have any specific actual knowledge of that, correct?

A No.

MR. CALL: Nothing further.

COLONEL WARNER: No redirect.

HEARING OFFICER McCABE: You may be excused. It is conceivable that you could be called back additionally as a witness to this proceeding. Based upon the amount of time you've been up, I hope that that's not necessary. As I've instructed other witnesses, I would encourage you, if you're asked, in this matter to just simply indicate that it's a private matter and you've been instructed by the hearings examiner not to discuss the matter.

THE WITNESS: Okay.

HEARING OFFICER McCABE: Thank you very much.

COLONEL WARNER: We call Sergeant Lee McDaniel.

(Recess.)





McDANIEL, EXAM BY WARNER

MSG LEE McDANIEL

called as a witness and sworn, was examined and testified as follows:

HEARING OFFICER McCABE: Please be seated and state your full name for the record.

THE WITNESS: Lee Dennis McDaniel.

HEARING OFFICER McCABE: Thank you very much. You may proceed.

COLONEL WARNER: Thank you

DIRECT EXAMINATION

BY COLONEL WARNER:

Q Mr. McDaniel, you're a master sergeant with the Air National Guard, Utah Air National Guard; is that correct?

A Yes, sir.

Q Master Sergeant McDaniel, how long have you worked for the Air National Guard?

A I've been a technician since '77 and in the Guard since '73.

Q Are you thinking about making this a career?

A Oh, definitely.

Q Well, Sergeant -- Master Sergeant McDaniel, you've been a technician since seventy --

A '77.





McDANIEL, EXAM BY WARNER

Q '77. And what is your rating or your MOS?

A Jet engine mechanic.

Q Jet engine mechanic. Do you do that on both sides of the house as a traditional guardsman as well as -- in a guard assignment as well as your AGR status?

A Actually, my MOS is jet engine mechanic/foreman.

Q Okay.

A Mechanic/foreman, so --

Q You run the jet engine shop there where they work on jet engines out there at the Air Guard?

A Yes, sir. I'm the assistant supervisor.

Q How many folks did you -- prior to September 17th, how many folks did you have working in the shop?

A We had six technicians.

Q In addition to yourself?

A No. That's not including myself.

Q Including yourself there were six?

A No, that's not including.

Q Oh, okay. All right. Let's start again. Not including you, there are six others, right?

A Plus my other supervisor. So there's eight total in the shop, then.



000418

McDANIEL, EXAM BY WARNER

Q Six worker bees and two supervisors?
A Yeah. Basically, yes.
Q Now, Master Sergeant McDaniel, were Sergeants Bob Teinert and Ron Menke among the six in the shop that you supervised?
A Yes, sir.
Q How long had you known both of those individuals? Let's take Bob Teinert first.
A I don't remember when they were hired on or anything.
Q Are we talking months or years?
A Years.
Q A substantial number of years? Five to ten years?
A I guess somewhere around there, yes.
Q Just to the best of your recollection. That's all we're asking.
A I don't know exactly the date they hired on.
Q Okay. But it was a substantial period of time?
A Yeah.
Q Now, you are aware, are you not, of the allegation involving Sergeant Menke that occurred at the NC -- well, occurred both at the NCO Club





McDANIEL, EXAM BY WARNER

resulting in an alleged threat that Sergeant Menke made to Sergeant Teinert by phone?
A Somewhat.
Q You've heard just in general terms --
A Yeah.
Q I realize you don't know all the details, but you've heard in general terms --
A Uh-huh. Yes, sir.
Q -- the nature of the threat?
A (Witness nods.)
Q All right. And you were aware, obviously, that that has generated personnel action and culminating in this hearing today?
A Yes, sir.
Q Okay. Were you involved in any discussions with other supervisors in the decision making process about what should be done relative to discipline for Sergeant Menke?
A Well, we had -- after me and my -- well, Michael McCoven, who was the supervisor -- he was my boss. When we heard about it -- or was informed about it, anyway, as branch chief, Al Chapman came over and says, "This is what we got." He basically just kind of briefed us on. "Okay. This is what happened. Details are sketchy." He says, "They're



McDANIEL, EXAM BY WARNER

going to have a meeting," and he said, "I need to meet with Reutlinger" -- excuse me for using the names like that. I apologize.
Q I understand. Just go ahead and recount it as best you recall.
A He said, "I need to let you guys know what's going on and I need some suggestions."
Q So he basically -- this was Mr. Chapman, right?
A Yes, sir.
Q He was trying to get input from you and -- is it Mike McCoven?
A Michael McCoven, yes.
Q From Mr. McCoven about what possible discipline, if any, ought to be imposed; is that correct?
A Yes, sir.
Q Now, did you make any recommendation at that time to Mr. Chapman?
A Yes, sir, I did.
Q Okay. And what recommendation did you make based on your limited knowledge of the incident?
A Okay. Based on my limited knowledge of the incident -- Chapman asked us our opinion and basically what to do. Well, I said, basically, "Was





McDANIEL, EXAM BY WARNER

it a threat or not?"
Q Right.
A And based on is it a threat, then termination, but if it is not, then we're going to go to some other disciplinary action.
Q That was your recommendation?
A That was my recommendation.
Q Now, did you -- quite aside from whether you believe a threat happened or not -- let's leave that alone for just a moment. I'm trying to make sure I understand your recommendation. You're saying that, in your framework, a threat -- a death threat or threat of serious bodily harm is serious enough to warrant termination; is that correct?
A Yes, sir, I do.
Q If, in fact, someone did that. Whether or not Sergeant Menke did that, forget that for a moment.
A Right.
Q Just from an objective standpoint?
A Uh-huh.
Q And so your position was that if such a threat was made, then termination should result?
A Uh-huh.
Q And, of course, the corrolary being, if

00049

MCDANIEL, EXAM BY WARNER

such a threat was not made, then there shouldn't be a termination or there should be some other discipline if it's a lesser threat?
A Yeah.
Q Is that fair?
A That would be fair, depending on --
Q Well, I mean, is that fair to say?
A Yes, that's fair to say.
Q Now, are you aware of the Adjutant General's violence in the workplace policy?
A Yes, sir, I am.
Q And how is it that you are aware of that policy?
A It's posted in the shop.
Q Where you work?
A Yes, sir.
Q And is that posted publicly or is that just for supervisors?
A It's on the bulletin board right in the -- right on the shop bulletin board.
Q And is that commonplace for people to go and see --
A Uh-huh.
Q -- policy or any other news items that the Guard wants the workforce to know and be aware of?





MCDANIEL, EXAM BY WARNER

A What we have to -- basically what they deem is you have to post it for your employees, yes, sir.
Q And you had read that policy?
A (Witness nods.)
Q Are you aware whether or not that policy had been discussed at all or briefed or otherwise informed, other than posted; do you know?
A I don't think so.
Q So you're not sure whether that was otherwise discussed?
A No, sir.
Q In your opinion, would threats involving violence, threats of violence, ever be tolerated in the workplace?
A Shouldn't be, no.
Q Now, this --
A Can I make a --
Q Sure.
A Because if I got two people working together and if I got violence or threats or whatever, I mean, that makes my job harder.
Q I understand.
A And I don't think I should have to tolerate it whatsoever.
Q What impact, if any, do threats, would you





MCDANIEL, EXAM BY WARNER

imagine, have on morale within your shop if a threat such as alleged actually occurred? What impact does that threat have on morale in your shop?
A It would be quite a bit.
Q Well, let me ask you -- go ahead. I'm sorry.
A That's okay. If two people are working in the same shop, then other people aren't going to want to work with whoever, whichever person, you know, supposedly made the threat or whatever.
Q Let me ask you --
A And then, you know, it's just going to go downhill.
Q Let me ask you specifically about this incident. I'm sure -- I say I'm sure, but I would guess that word got out of the alleged threat made by Sergeant Menke to Sergeant Teinert in your shop. Did that word spread around in your shop?
A It spread around quite -- all over, really.
Q All over the base, you mean?
A (Witness nods.)
Q Is that what you're referring to?
A Yes, sir.
Q Let's talk just about that part which you have responsibility for or cognizance over, that





MCDANIEL, EXAM BY CALL

being your jet engine shop. Did that alleged threat have a morale impact on your shop?
A I would say so because we didn't know what was going on. We didn't know where to go, what to do.
COLONEL WARNER: Okay. Your witness.

CROSS EXAMINATION

BY MR. CALL:
Q Prior to -- if you can clear something up for me. On September 17th, were you Ron Menke's immediate supervisor?
A September 17th? This last year?
Q Yes.
A Yes, sir.
Q And then it was Mike McCowen who was your supervisor?
A Yes.
Q So you were the first line supervisor and Mr. McCowen was the second line supervisor?
A He's the propulsion section supervisor and I'm the shop supervisor.
Q So as the chain of command would go, Ron would answer to you, then you would answer to Mr. McCowen, and then Mr. McCowen would answer to who?
A He would answer to the branch chief.

McDANIEL, EXAM BY CALL

Q Which was?
A It would be Chapman.
Q Okay. Now, at some point Mr. McCowen retired, in mid October, did he not?
A Yes, somewhere around there.
Q Did you take Mr. McCowen's place or did Mr. Quintana take that position?
A I took the position basically for the time span that it was vacant.
Q Okay.
A Well, I took the responsibility. Let's put it that way.
Q And then did Mr. Quintana become the second line supervisor?
A Uh-huh. Yes, sir.
Q When was that, approximately? My understanding is Mr. McCowen retired in about mid October. Was there a period of time --
A It's been a couple months? The dates -- the time frame I don't remember exactly.
Q You're aware that Mr. Menke was suspended on November 27th, correct?
A Uh-huh.
THE REPORTER: Yes?
THE WITNESS: Yes. Sorry.





McDANIEL, EXAM BY CALL

Q (BY MR. CALL) And during that entire period of time between September 17th and November 27th, you were his first line supervisor, correct?
A (Witness nods.)
THE REPORTER: Yes?
THE WITNESS: Yes. I'm sorry.
Q (BY MR. CALL) You talked about a conversation that you and Mr. McCowen and Mr. Chapman had where he came and asked for your suggestions. When was that conversation?
A It was just like a couple days after. Just -- I guess this happened on a Friday or something like that, over the weekend or something. Bob -- Mr. Teinert came and told us on -- I think it was either Monday or Tuesday, that we probably would hear something about an incident that he had with Ron.
Q Okay.
A And he left it at that.
Q Okay. And then when did you -- so that was Monday or Tuesday. When did you have your meeting with Mr. Chapman?
A It was a couple days later. One or two days later.
Q So you think it might have been --



McDANIEL, EXAM BY CALL

A Wednesday or Thursday.
Q The following week.
A He more or less came over with the -- and kind of briefed us a little bit on the reports that they had gotten.
Q Let me have you take a look at what's been marked as Exhibit 1.
A I hope my memory is correct on time frames.
Q Let me show you what's been marked as Exhibit 1, and is that the zero tolerance policy that you're referring to?
A Yes, sir.
Q Let me direct your attention to paragraph three, the second -- third sentence, actually, in that reads as follows: "Verified threats or violent acts will result in immediate disciplinary action, to include termination." You see where that says that?
A Uh-huh.
Q So under the zero tolerance policy, is it your understanding that you have a whole -- as a supervisor, if you have an incident where there is a threat or violence, you can impose disciplinary action that ranges from a warning all the way up to termination?





McDANIEL, EXAM BY CALL

A Well, I don't think I can impose.
Q But your reading of the policy, as the supervisor, is it your understanding that if they make a threat, they have to be fired, or is it a discretionary issue?
A It's a discretion.
Q Okay. Now, when you first heard of this alleged incident that took place on the 17th from Mr. Teinert, what was your initial reaction to that?
A Oh, boy.
HEARING OFFICER McCABE: That's the exact reaction? Okay. Thank you. You think a lot more clearly than I do.
Q (BY MR. CALL) Isn't it true that when you first heard about it, though, you didn't believe any action needed to be taken because it occurred off base? Not off -- it was away from the work site and it was off duty?
A Well, we didn't know what to -- we -- you know, it was off duty and we was trying to figure out -- well, I still am, to be honest with you -- on that. It was off duty, after hours, whatever you want to call it, and it has nothing to do with -- to me, with Ron's performance that he worked for me.
Q So the incident didn't have any bearing on

00051

McDANIEL, EXAM BY CALL

the employment, as you saw it, correct?

A Yes, sir. You're correct. Assuming that I did not have -- it happened off base and that, and I had no -- what do you want to --

Q If I can rephrase it, maybe. Is it fair to say that you didn't think it was any concern to you as his supervisor because it happened off the work site and off duty?

A Okay. It's a concern to me because it happened to my two people.

Q Right.

A But the circumstances and what would happen and that, yes, I would get involved, but I would have no initial say into it because I wasn't there, or to claim that, yeah, okay, he did it. I hope you understand what I'm trying to --

Q I understand what you're saying.

A What I'm trying to say.

HEARING OFFICER McCABE: I don't. I'm sorry. I just want to make sure. It's important, you understand, that for purposes of the record -- this will go to the Adjutant General, who is the ultimate decision maker in this, and it's important that we have a clear record. Take the time to clearly state what it is you're trying to say so we





McDANIEL, EXAM BY CALL

do understand, please.

THE WITNESS: Okay. If it happened on -- during work hours, in the shop, okay, on base during his normal work duty, then it would be my -- I would be directly involved with it, you know, by processing paperwork, whatever needed to be processed. But where it happened off duty and that, I have no -- I feel that I have no -- to process anything.

HEARING OFFICER McCABE: So you weren't sure at that point, because it happened off duty, you'd be involved with the initial processing of the paperwork? Is that what I'm hearing you say?

THE WITNESS: Yes.

Q (BY MR. CALL) So it's fair to say that you didn't think it was your responsibility to react to this because it was off duty, correct?

A Yes, sir.

Q When you first heard about this incident, did you contact Mr. Chapman and ask if anything needed to happen?

A No, sir.

Q So you didn't initiate any sort of adverse action; is that correct?

A No.

Q No, you did not, or --





McDANIEL, EXAM BY CALL

A No, I did not.

Q Let's talk briefly about Bob and Ron's interaction on a day to day basis in the time frame that you were their supervisor. How much contact did they have on a day to day basis and what's the nature of that contact? Are they a work team together?

A Yeah. Yes, sir, they work together. I mean, they've gone out on jobs together, worked together.

Q This is before September 17th, correct?

A Yes, sir.

Q And they've always got along on those assignments?

A Yes, sir. I have had no problems on that with either one working together and doing their job.

Q On a day to day basis prior to September 17th, how often would they have contact with each other? I understand it's a shop. You've got eight people total. Can you describe their normal contact together?

A You'd be bypassing everybody all day long.

Q Sometimes they worked together; sometimes they don't. They see each other in the shop, that kind of thing, correct?





McDANIEL, EXAM BY CALL

A Yes.

Q After the incident on September 17th to the time Ron was suspended in November, on November 27th, Mr. Menke and Mr. Teinert continued to work together, correct?

A No. They were in the shop together, okay? But we did not put them on any jobs together.

Q Okay. Was there any problem with the two working in the shop during that period of time?

A Being in the shop?

Q Yeah.

A No.

Q No fights?

A No.

Q No threats?

A No.

Q No arguments?

A No.

Q Let me call your attention -- or let me ask you this first: Are you familiar with the TPR-752 regulations?

A I've looked at it and --

Q Let me call your attention to -- this is Table A-5, penalties, in that TPR, and you see on paragraph nine where it indicates that, in 9-8,

McDANIEL, EXAM BY CALL

threatening or attempting to inflict bodily harm. You see the penalties that are listed there for first, second and third offenses, correct?
A Uh-huh.
Q And then you see in 9-C where it talks about hitting or other acts of actual physical violence that don't cause injury, and then different penalties for first, second, third offense, correct?
A Uh-huh. Yes, sir.
Q Then there's a 9-D that indicates hitting, pushing or other acts of violence that cause injury and different penalties for those, correct?
A Yes, sir.
Q Is it fair to say that making a threat without any physical violence is less egregious misconduct than actually hitting someone, as you understand it?
A Well, it depends. I'm not -- well, I'm not qualified or I'm not saying that it was a threat.
Q I'm asking you a hypothetical.
A Well, and I can't go by that, either.
Q Hypothetically, which is worse? Not Mr. Menke. Just a technician in general. If a technician were to threaten someone -- that's scenario A -- or a technician were to actually





McDANIEL, EXAM BY CALL

physically hit someone? Which of those two scenarios is more egregious misconduct?
A I would say hitting, and that would be the most serious, okay, of the two.
Q And that's all I'm trying to get at, because there are different degrees of misconduct, correct?
A There's verbal, and then we're getting into a push/shove, actual physical.
Q And your understanding would comport then with the table to indicate that threats are less egregious -- they're not supposed to happen, but they're less egregious than actual physical violence, correct?
A According to that, yes, sir.
Q Now, I've spoken with you on two different occasions prior to this hearing, correct?
A (Witness nods.)
HEARING OFFICER McCABE: Is that a yes or no?
THE WITNESS: Yes, sir. I'm sorry.
Q (BY MR. CALL) Once was on December 5th when I spoke with you on the phone, correct?
A Whatever the date was. I don't remember the exact date.



McDANIEL, EXAM BY CALL

Q Does that sound about right, though?
A Yes.
Q And then I called you again on January 13th and spoke with you again, correct?
A Was that after --
Q Let me tell you -- during that conversation -- do you recall me calling you back a second time after our first conversation on the phone?
A Yes, sir.
Q Do you recall me telling you that I spoke with Chief Haws and he had said that I could contact you and talk to you about the case?
A Yes, sir.
Q And in both of those conversations, you had indicated to me that the alleged event had had no visible effect on Ron's performance, correct?
A That's correct, sir.
Q And you also indicate to me that the alleged event had had no visible effect on Bob's performance, didn't you?
A Yes, sir.
Q Your shop is currently understaffed, isn't it?
A Well, we just hired two new technicians.





McDANIEL, EXAM BY CALL

Q Okay. How many do you have working for you right now? How many individuals total in the shop?
A We got five, plus the two supervisors. Seven.
Q So seven. So from when Mr. Menke was there, you're still understaffed by one, correct?
A One, yes.
Q And isn't it true that you rate Mr. Menke as a good employee, and when I asked you on a scale, you said on a scale of one to ten you rated him an eight out of ten, correct?
A Yes, sir.
Q And didn't you also indicate to me that Ron was an indispensable employee, given his computer knowledge?
A Yes, sir. We've miss him quite extensively because of his knowledge on that.
Q Okay. And so the efficiency of your shop has been diminished by his absence, has it not?
A Okay. Beginning, yes, it was. Okay. We've had to go and find other people to help us. We've gotten by, but it hurt us, yes. In the long run, it did hurt us bad.
Q And do you feel that the shop is running as efficiently now with his absence as it was before he

McDANIEL, EXAM BY CALL

was suspended?

COLONEL WARNER: Objection just as to relevance.

HEARING OFFICER McCABE: Understood. You can answer the question.

THE WITNESS: It's running. We're getting by.

Q (BY MR. CALL) But my question is this: When Mr. Menke was there, because you had on site computer help, your shop was running more efficiently when he was there, correct?

A Yes, sir.

HEARING OFFICER McCABE: Let me ask a question as long as you've talked about computer skills. I'm just trying to understand that in an engine shop and how that relates. Would you explain to me how the computer skills and how they relate to the performance of the duties there?

THE WITNESS: Well, I wouldn't say performance of duties, okay? He helped us and that with our cams programs. When we'd have trouble with the computer systems, documenting, ordering parts and so on and so forth, he was readily available to us that we could call on him.

HEARING OFFICER McCABE: Okay. I





McDANIEL, EXAM BY CALL

understand.

THE WITNESS: And being now not there, we've had to go to other resources and that to fix our problems.

HEARING OFFICER McCABE: Had to learn, too?

THE WITNESS: Yes, sir. Had to learn quite a bit.

HEARING OFFICER McCABE: I understand. Thank you.

THE WITNESS: But that's why I say that, you know, in that respect we've missed him a lot.

HEARING OFFICER McCABE: Thank you very much.

Q (BY MR. CALL) And during our conversations before, you indicated to me that it would harm the service to remove Ron from his employment, did you not?

A Yeah.

Q And you also indicated that it would do more damage than good to terminate him; isn't that correct?

A Under -- yes, sir, I did. Based on -- still based on my opinion whether a threat or not a threat. And I have no idea.

Q Okay.





McDANIEL, EXAM BY CALL

A What I'm getting at, that is not my determination.

Q And we're not asking you to make that determination. Colonel McCabe will make that determination, at least at this point.

A I don't --

Q My next question is to you: During our conversations you also indicated to me that there was no noticeable reduction in the morale because of the alleged offense. People were obviously curious about it, but their overall morale had not dropped; isn't that correction?

A No, sir. That's true.

Q Initially you thought that Ron should not be removed, but then you've changed your mind to the point that if the threat did take place that perhaps he should be terminated, correct?

A Yes, sir.

Q What was your initial belief?

A Well, my initial belief was, was it or was it not a threat. Okay? And 15 days' suspension, okay, maybe we can get something done, get something --

Q Okay.

A -- accomplished in that -- you know, in





McDANIEL, EXAM BY CALL

that area.

Q So initially you thought that a 15-day suspension would be more appropriate rather than termination?

A Yes, sir.

Q Are you familiar of an instance where Clay Zimmerman assaulted Mr. Menke?

A I was involved -- well, I wouldn't -- I heard about it, yes. I was a supervisor at that time, also.

Q And Mr. Zimmerman was -- was he one of your employees?

A No.

Q Was Mr. Zimmerman terminated because of that physical assault?

A No, sir.

Q What punishment was issued against him?

A I believe that it was just a reprimand in his 904.

Q And so -- isn't that an incident where Mr. Zimmerman actually hit Mr. Menke with a flashlight and pushed him over some chairs?

A Well, I don't know all the details, sir. Just from what we were told.

Q But he wasn't terminated for that physical

McDANIEL, EXAM BY WARNER

violence, was he?

A No, sir.

Q Are you familiar with an incident where Ed Wesemann and Jim Lock got into a fight?

A No, sir.

Q Have you heard anything about that?

A I heard about it. I heard rumors that somebody -- two people in flight line got -- well, dismissed or reprimanded for a couple, three days.

Q But nobody was terminated because of it?

A Not to my knowledge. I had no details on that.

MR. CALL: I don't have anything further.

REDIRECT EXAMINATION

BY COLONEL WARNER:

Q Master Sergeant McDaniel, would it be fair to say that your observations and opinions come from the perspective of a first line supervisor who has to get the work done?

A Yes, sir.

Q You're not looking at it particularly from the big picture of the National Guard; you're looking at it from the perspective of a first line supervisor who's got six employees to get the jet engines repaired? Is that fair? I mean, that's your first





McDANIEL, EXAM BY WARNER

concern?

A That is my first concern, and that is my people working together getting the things accomplished.

Q And so when you look at, as an example, the possible termination of Sergeant Menke, your first thought would be its impact on your shop and your ability to get the work done; isn't that true?

A Yes, sir.

Q And so, because Sergeant Menke's performance is -- as you have testified, he's a good performer. At least in your opinion, he's a good performer.

A Yes, sir.

Q Losing any one of your six who are good performers hurts your ability to get the job done, right?

A Yes, sir.

Q And that colors your opinion, does it not?

A Yes, I guess I'm prejudiced in a sense. I am prejudiced because my people -- anytime I lose a person --

Q It hurts you?

A It hurts.

Q I understand. So when you say that it does





McDANIEL, EXAM BY WARNER

more damage than good, more damage in the sense that it hurts your ability to get the job done?

A Yes, sir. I would say that, yes.

Q Okay. Now, let's talk about -- and I recognize that your expertise is not in legal matters, and you can take pride in that, I might say, Master Sergeant McDaniel. You have an actual skill that contributes to our national security and welfare, but, having said that, you were shown the TPR and the table of punishments and so on and asked your opinion about relative seriousness and those things, and recognizing that we're asking you just what your opinion is, let's talk about the relative -- let's go back and talk about the relative seriousness for just a minute of the threat -- a threat versus a push or a shove or a punch. Okay? Now, I recognize, and I suspect it's true today, that you still don't know whether or not Mr. Menke made a death threat. Is that true?

A That's true, sir.

Q I mean, that's coming through in your testimony, to me, at least, that one of the problems you have with that whole thing is that, in offering opinions, you don't know whether he made the threat or not?





McDANIEL, EXAM BY WARNER

A Yes, sir.

Q Right?

A That's correct.

Q That kind of clouds everything you're saying?

A Yes, sir.

Q Is that fair?

A Yes, sir.

Q Okay. Because that's how I'm reading what you're saying here today. Let's talk about threats for just a minute. Forget whether or not Sergeant Menke made a threat. There are a wide range of potential threats. Would you agree?

A Yes, sir.

Q For instance, I could threaten to kick your dog, I could threaten to call your wife and tell her that you're not a nice man. She might stipulate. I don't know. I could threaten all kinds of things, clear out to I could threaten to kill you. That's about the most serious threat I could make against you. Would you agree?

A Yes.

Q So there's this wide range of threats.

A Uh-huh.

Q And you would agree that the most serious



00055

McDANIEL, EXAM BY WARNER

threat that can be made is a death threat?
A At the end, yes, sir, I would.
Q All right. Now, on the other hand, you've been in the military for a lot of years and you know that people can get upset and angry with one another; isn't that true?
A Yes, sir.
Q And so whether or not a threat is made is one thing and whether or not it's serious is another, isn't it?
A Yes, sir, it is.
Q All right. But if a threat is made and it's taken seriously, even if it wasn't intended seriously, if it's taken seriously, that's a pretty serious matter, isn't it?
A Yes, sir.
Q On the other hand, if two people get angry and they get in a pushing match -- no one says they're going to kill each other. They just get angry and they push and shove or even punch. That could be serious or it may not be so serious, based on the circumstances?
A Yes, sir.
Q And so you have to judge every incident on its own circumstance; isn't that true?





McDANIEL, EXAM BY WARNER

A Yes.
Q And, indeed, are you aware that the TPU suggests that very thing?
A Yeah. I've kind of looked it over. I have not, you know, had to really get into that and, you know, really sit down and look at things, which I'm glad I haven't.
Q I understand.
A But I understand what you're saying, yes.
Q What I'm saying is that, on a given circumstance, you understand that a threat can be just as serious or more serious than an actual punch in a given circumstance?
A Yes, sir.
Q Or vice versa?
A Or vice versa, yes, sir.
Q And I understand from what you've testified that you really don't feel comfortable enough with the facts surrounding this circumstance to make those judgments.
A Yes, sir. I don't.
COLONEL WARNER: I don't have any further questions.
THE WITNESS: You know, my question -- I mean, I've always had this question, and if you folks





McDANIEL, EXAM BY CALL

don't mind me asking, I would like to ask it. I still cannot figure out and that under the technician -- it's nothing to do with his technician work and his performance, now -- why I'm involved with it. Just because I'm his supervisor?
HEARING OFFICER McCABE: Do you want an answer from me as the hearing examiner? The answer to that is absolutely yes. The reason you're here is because you do have a supervisory role.
THE WITNESS: All right, sir.
MR. CALL: I just have one quick follow-up

RECROSS EXAMINATION

BY MR. CALL:
Q You would agree, then, with the concept that not all threats are equal, correct?
A Yes.
Q You could have two death threats; one, because of circumstances, would be meaningless, correct?
A Now, I don't know.
Q I mean, it seems, for instance, if --
A I don't know whether you'd call two death threats and that one less serious than another one.
Q For instance, as far as the impact that it can have on people in your command. Wouldn't you





McDANIEL, EXAM BY CALL

agree that a death threat over the telephone, I'm going to kill you, is less egregious than two people butting heads right up next to each other ready to go to fisticuffs saying, I'm going to kill you? That's different, isn't it?
A To be honest with you, I really don't know whether it would be called different or not.
Q But you would agree that the threat needs to be judged from the entire circumstances, correct?
A And I don't know the circumstances, so I can't judge.
MR. CALL: That's all.
HEARING OFFICER McCABE: May this witness be excused?
COLONEL WARNER: Yes, Mr. McCabe.
HEARING OFFICER McCABE: Thank you very much for being here and testifying. As I have indicated to the other witnesses, this is a serious matter. What goes on in this room really isn't anybody else's business. If anybody wants to discuss this with you, simply tell them that the hearings examiner has advised you not to discuss it.
THE WITNESS: Yes, sir.
HEARING OFFICER McCABE: Thank you very much.

QUINTANA, EXAM BY WARNER

(Recess.)

MSG COREY QUINTANA

called as a witness and sworn, was examined and testified as follows:

HEARING OFFICER McCABE: Please be seated and state your full name for the record, please.

THE WITNESS: Corey Russell Quintana.

HEARING OFFICER McCABE: Thank you very much. You may proceed.

DIRECT EXAMINATION

BY COLONEL WARNER:

Q Sergeant Quintana, you're a master sergeant; is that correct?
A Yes, sir.
Q How long have you been with the Air National Guard?
A Fifteen, 15 and a half years.
Q And how much of that have you been in a full-time position?
A The whole time.
Q Are you AGR or technician?
A Technician.
Q As a traditional or on the military side of the house, how long -- have you served the same amount of time?





QUINTANA, EXAM BY WARNER

A Yes, sir.
Q And what is your rating or what is your MOS?
A Jet engine mechanic 2A671A.
Q And are you a supervisor there?
A Yes, sir.
Q How long have you been a supervisor?
A Two and a half months. Maybe three months.
Q Do you know Sergeant Ron Menke?
A Yes, I do.
Q Is he -- was he in the shop that you are now a supervisor in?
A Yes.
Q Was he ever there when you were there as a supervisor?
A When I got the supervisor position, he was TDY on a trip, and when he came back is when he went on administrative leave so he was -- I was officially his boss, his supervisor for two weeks, but he never was actually in the shop in my presence.
Q Did you replace Mike McCowen?
A Yes, I did.
Q Master Sergeant Quintana, did you ever work in the shop as a technician?



QUINTANA, EXAM BY WARNER

A Yes.
Q You know, as a line mechanic, for want of a better term.
A Yes.
Q Have you worked with Menke or Mr. Menke in that capacity?
A Yes, I have.
Q For how long?
A I've known Ron 11 -- ten, 11 years. Roughly right around in there.
Q How about Sergeant Bob Teinert? Do you know Mr. Teinert?
A Yes.
Q Have you known him about the same amount of time?
A No. I've known Sergeant Teinert for roughly 15 years.
Q Is it fair to say that you would be the second line supervisor in the shop?
A Yes.
Q Lee McDaniel being the first line supervisor?
A Correct.
Q Did you have occasion to discuss what action, if any, would be appropriate to take





QUINTANA, EXAM BY WARNER

regarding the alleged threat made by Mr. Menke to Mr. Teinert at the NCO Club on September 17th?
A No, sir.
Q You've never had any interaction with anyone concerning that decision making process?
A No, sir.
Q You were never drawn into the discussions?
A No.
Q Okay. You are aware of the alleged threat, however?
A Yes.
Q All right. Now, is that threat inconsistent -- is that alleged threat inconsistent with the Sergeant Ron Menke that you know?
A As far as actually making the threat versus what would be normal or --
Q No. In terms of, is he a person that is capable of making that kind of a threat, based on what you know?
A Under the influence of alcohol, probably, yes.
Q Do you believe that he is capable of a violent act under the influence of alcohol?
A I believe that -- including Ron this statement, I believe anybody is capable of that.

QUINTANA, EXAM BY CALL

including Ron, yes.

Q Do you believe that he has a short temper, based on your observations over 11 years?

A Yes.

Q How would you describe -- strike that.

Do you support the decision to terminate?

A Under the fact of a death threat, yes.

Q Yeah. Let's assume for the moment that the determination has been made that the threat was actually made and it was a death threat.

A Then yes.

Q Making those two assumptions, you support the decision to terminate?

A Yes.

COLONEL WARNER: Thank you.

CROSS EXAMINATION

BY MR. CALL:

Q Corey, my name is Frank Call. I'm the attorney for Mr. Menke.

What is your understanding of the threat that was made? You were asked about the threat. As you understood, what was the actual threat that was made?

A The actual threat was made by phone. I was under the understanding that Mr. Menke called several





QUINTANA, EXAM BY CALL

times to Sergeant Teinert, while he was still at the club, on his cell phone and threatened to kill him at that time.

Q Do you know what specifically was said?

A Just --

Q What's your understanding of the death threat? What did the death threat consist of? A telephone call in which he said what?

A "I'm going to kill you. Watch yourself. I'm going to kill you." is basically the way I understand it.

Q Okay. You've known Bob Teinert for 15 years, haven't you?

A Correct.

Q And you know the fact that he drinks?

A Correct.

Q Are you aware of the fact that he has been reprimanded for drinking on the job?

A Yes, I am.

Q Tell me about Mr. Teinert's demeanor, general demeanor. Is he a pretty high strung guy or is he a low key guy, or whatever you think it is.

A I don't know if I'd use the word high strung. Bob -- I've known people with better moral character than Bob Teinert.





QUINTANA, EXAM BY CALL

Q What moral deficiencies are you referring to?

A Bob's more of -- he's a mean person. You know, calls in to work a lot, you know, like as far as being sick. Not really a team player, that kind of stuff.

Q Does he have a reputation for honesty?

A Probably not a reputation for that, no.

Q And if he has a reputation concerning honesty, what would that reputation be? Is he perceived to be dishonest?

A Not in all of his dealings, no.

Q But some occasions?

A Yes; that's correct.

Q Anything stick out in your mind of dishonesty on his part?

A No. I don't know if I'd use the word dishonesty. As far as -- as a fellow worker with him, he would leave you -- like if you're doing an engine together, he would leave you hanging on that motor to go do something else. He wouldn't do his share on that.

Q Okay. Have you ever known him to make false statements, for example?

A Can you give me an example?





QUINTANA, EXAM BY CALL

Q Have you ever known him to punch out -- do you punch a clock?

A No, sir.

Q Have you ever known him to report that he was on duty when he was not?

A Not report it, no.

Q So he -- meaning -- I guess what I'm asking is: Have you ever known him to make false statements as to his whereabouts, meaning he's supposed to be doing one job but he's not doing that job?

A Well, never made a false statement. He just wouldn't do it, but there was never a false statement saying I was somewhere else. He just wouldn't show up or --

Q Okay. Are you aware of any instances where Mr. Teinert was in the NCO Club during working hours?

A Yes. I believe he would go over there towards the afternoon time.

COLONEL WARNER: Objection. Relevance.

HEARING OFFICER McCABE: Relevance objection noted. You can answer it. The answer, I believe, was yes.

THE WITNESS: Yes.

Q (BY MR. CALL) And what were you familiar with?

QUINTANA, EXAM BY CALL

A I know Bob would leave for a half hour, 45 minutes. We could assume what he was doing. I never actually saw what he did in there, but he would actually be -- we'd drive by and his vehicle would be there, and he has a key to that establishment.
Q Are you aware of the fact that Mr. Menke reported to Mr. McCowen that Mr. Teinert had been -- or may be drinking on the job?
A Yes.
Q And Mr. Teinert learned about that, didn't he, that Ron had made that report?
A Yes. I'm sure he did, yes.
Q And Mr. Teinert was quite upset about that, that Ron had reported that he might be drinking on the job, wasn't he?
A I never saw him yell at Ron for it, but I don't think he was happy with it.
Q But you did see him confront Ron on a couple occasions about it, did you not?
A Just as far as -- such as when Bob would disappear, he'd ask, "Are you are you going to go tell Mike?" Or, "Are you going to follow me?" or that kind of stuff, yeah.
MR. CALL: Nothing further.
//





QUINTANA, EXAM BY WARNER

REDIRECT EXAMINATION
BY COLONEL WARNER:
Q They also serve food in the NCO Club, don't they?
A Yes, sir.
Q So you don't know whether he was drinking or eating or --
A No, sir.
Q -- fixing the aquarium?
A That's correct.
Q He has a responsibility for the aquarium over there, doesn't he?
A Yes, sir.
Q So he could have been feeding the fish?
A Yes.
Q You talked about -- we talked about acts of dishonesty of Mr. Teinert. Did he ever steal a statue in Italy?
A No, sir, not to my knowledge, no.
Q Do you know anybody who did?
A I've heard rumors of somebody who did.
Q Who's that?
A Sergeant Menke and Sergeant Costagno.
Q So, speaking of dishonesty, you don't know of any theft that Teinert actually committed, do you?



QUINTANA, EXAM BY WARNER

A None that I can think of.
Q I just want to make sure that we're certain about who really is dishonest here.
A Yes, sir.
COLONEL WARNER: Thank you. I don't have any further questions.
HEARING OFFICER McCABE: Anything further, Mr. Call?
MR. CALL: Nothing further.
HEARING OFFICER McCABE: May this witness be excused?
COLONEL WARNER: You bet.
HEARING OFFICER McCABE: In that case, Sergeant Quintana, you're excused. You may be called, if necessary, to testify further. If anybody approaches you, asks you what's going on in this hearing, just simply tell them that you're not at liberty to talk about it and the hearings examiner has instructed you to say that.
THE WITNESS: Yes, sir.
HEARING OFFICER McCABE: Thank you very much.
HEARING OFFICER McCABE: Let's take a short five-minute break.
(Recess.)





BIRD, EXAM BY WARNER

CMS STEVEN BIRD
called as a witness and sworn, was examined and testified as follows:
HEARING OFFICER McCABE: Please be seated and state your full name for the record.
THE WITNESS: Steven LaMar Bird, Command Chief Master Sergeant, Utah Air National Guard. Militarily, okay?
HEARING OFFICER McCABE: Command Chief Master Sergeant?
THE WITNESS: Yes, sir.
HEARING OFFICER McCABE: That's the big dog of --
THE WITNESS: That's what they tell me.
HEARING OFFICER McCABE: Okay. I just wanted to make sure. I understand what command sergeant --
THE WITNESS: It's the same thing. My counterpart is Command Sergeant Major Blatton here.
DIRECT EXAMINATION
BY COLONEL WARNER:
Q My ability to say "command chief master sergeant" is not very good, as you know from our prior interview. I'm going to call you Master Sergeant and I hope you don't take that as an insult.

000559

BIRD, EXAM BY WARNER

but just as an indication that it's a mouthful for me to say "command chief master sergeant."
A "Steve" is accessible, too.
Q We'll at least give you master sergeant. How does that sound?
Master Sergeant Bird, how long have you been in the Utah Air National Guard?
A Since 1974, so 25 years.
Q And how much of that has been full time and how much of that has been traditional soldier?
A Full time since July of 1977.
Q What has been your professional MOS or background and training?
A Aircraft maintenance mainly is where I grew up. KC-135 aircraft crew chief.
Q Master Sergeant, we'll ask you to kind of speak up a little bit and as clearly as possible because Ms. Stacy has to take this all down and get it recorded, so --
HEARING OFFICER McCABE: She's been listening a long, time, too.
THE WITNESS: Okay.
COLONEL WARNER: Yeah. She's been taking it all day here.
Q Do you know Sergeant Ron Menke?





BIRD, EXAM BY WARNER

A Yes, I do.
Q For how long have you known Sergeant Menke?
A I don't know when you came in the Guard, but it's been at least ten years.
Q All right. You've known him since he's been here?
A Right, sir.
Q Did you ever work directly with Sergeant Menke?
A On the flight line. When I was on the flight line, yes, we did.
Q How would you describe your relationship with Sergeant Menke?
A We had a good relationship work-wise and friendship-wise.
Q Did you consider him to be a friend?
A Yes.
Q All right. In fact, you were in a bowling league with him; is that correct?
A Right. Still are. We're still on the same league.
Q Not on the same team?
A No, sir.
Q Are you a better bowler than he is?
A I don't believe so.





BIRD, EXAM BY WARNER

HEARING OFFICER McCABE: Under oath, got you on that one.
Q (BY COLONEL WARNER) I'm not sure if that's going to go to bias on what you tell us the rest of the way or not.
All right. Well, Master Sergeant Bird, first of all, tell me if you've had an opportunity to consult with other supervisors -- well, let me back up. Are you aware of the generalized allegations surrounding the events that bring us to this hearing today?
A Yes, sir.
Q That being an alleged death threat by Sergeant Menke to Sergeant Teinert on the evening or early morning of September 17th and 18th?
A I wasn't aware that it was a death threat.
Q But you were aware that it was a threat?
A Right.
Q Of bodily injury or some harm?
A A threat.
Q Okay. And so you're aware of that?
A Yes, sir.
Q And you have had an opportunity to discuss that, I take it, with a variety of individuals?
A Right, sir.





BIRD, EXAM BY WARNER

Q In the chain of command?
A Right, sir.
Q And that would be -- can you tell us some of the people that you've spoken to?
A We met with Colonel Reutlinger, myself, CMS Sergeant Mimms, Sergeant Chapman, and I'm not sure if Ray -- Sergeant Lund was there or not.
Q And these are all people that are in varying stages or places in the chain of command that have some supervisory responsibility?
A Right, sir. Yes, sir.
Q With, I take it, Lieutenant Colonel Reutlinger at the top of that heap?
A Right, sir.
Q And the purpose of the meeting -- how many times did you meet with those individuals?
A Twice.
Q The purpose of those meetings was to discuss what action, if any, should be taken in regard to the alleged threat; is that true?
A Yes, sir.
Q Can you tell us, generally speaking, what the suggestions were, recommendations were preliminarily in those meetings? Let's start with the first meeting. You said you met two times?

BIRD, EXAM BY WARNER

A Yes. Basically it was about the same both meetings. What the meetings consisted of was the process and what to do. There was two supervisors that were for removal and there was two for last chance, but with some caveats attached to the last chance. Myself and Sergeant Minns was for the last chance and for Sergeant Menke to do a TAPs program possibly --

Q What's a TAPs program?

A Technician assistance program through the HRO and complete that. And that was pretty much the gist of it. And Colonel Reutlinger was basically, at the last meeting, was for the last chance.

Q Was that before -- when you say the last meeting, what time frame was the last meeting; do you recall?

A It was about a month after you got that, but what was the date? I don't remember.

MR. MENKE: October 20.

THE WITNESS: It was October time frame.

Q (BY COLONEL WARNER) Okay. It was before Colonel Reutlinger met with counsel and Sergeant Menke; is that correct?

A Right.

Q All right. Now, let's talk about this





BIRD, EXAM BY WARNER

so-called last chance recommendation that some supported, and others apparently supported termination; is that true?

A Right, sir.

Q What, in essence, was that last -- what was going to be necessary for that last chance opportunity to be afforded Sergeant Menke?

A That was for Sergeant Menke to take responsibility for the phone call, and not knowing what was discussed on the phone, and -- basically take responsibility for the phone call, get together with Reutlinger and, you know, do that process, and then he'd come back to the world, basically.

Q Was there going to be any requirement that he deal with a perceived alcohol problem?

A Yes.

Q Did anyone ever discuss any of that with Sergeant Menke prior to the implementation of any formal action?

A I don't believe so. You and I didn't talk about it, did we, at that time?

Q Master Sergeant Bird, I'm going to have to ask you not to --

A Sorry.

Q -- direct questions back and forth to



BIRD, EXAM BY WARNER

Sergeant Menke. You'll have to --

A Okay.

Q If you need to refresh yourself. Just do as best you can here.

A Okay.

Q And then counsel for Sergeant Menke can ask you whatever.

A All right, sir.

Q And hopefully we'll work it out. To the best of your knowledge, has Sergeant Menke ever accepted any responsibility for the phone call?

A He's admitted he made the phone call, but it wasn't a threat, but -- to me. That's what he said to me.

Q He indicated to you that he did call Sergeant Teinert?

A Right.

Q But that he did not threaten him?

A Right, sir. He said he made three phone calls, one to the person -- it was Sherri that was at the bar that night, and he called the main gate and he called Sergeant Teinert.

Q Did Menke ever indicate to you that he has an alcohol problem?

A No.





BIRD, EXAM BY WARNER

Q Do you believe he has an alcohol problem?

A To some degree. I believe he does, yes, sir.

Q And what do you base that on?

A On the -- Sergeant Menke and I have talked about it, the commonality between this incident and another previous incident that was alcohol related.

Q That's the incident in Italy?

A Yes, sir.

Q Are you aware of the final decision, if you will, made by Colonel Reutlinger after having met with counsel and Sergeant Menke?

A Yes, sir.

Q That decision being to terminate Sergeant Menke?

A Yes, sir.

Q Do you support that position? Do you support that termination?

A Still at this time I don't support it, but I -- but Colonel Reutlinger made that decision and so -- and I -- I have to support it, but some guidance that Reutlinger and I discussed was that Ron, if he would take the responsibility for the phone call, come talk to Colonel Reutlinger, that he would come back to work, but it was still the last

BIRD, EXAM BY WARNER

chance at that time. And Sergeant Menke and I discussed that, also.

Q Well, let's see if we can clarify this just a little bit --

A Okay.

Q -- Master Sergeant. Did Sergeant Menke do that?

A As far as I know, he did not.

Q Okay. He, in essence, did not do the things that the command, including Sergeant -- excuse me -- including you and Lieutenant Colonel Reutlinger believed necessary to resolve the matter; is that true?

A Right.

Q And part of that is accepting responsibility candidly, honestly accepting responsibility and dealing with that and dealing with the alcohol; is that true?

A Yes, sir.

Q Okay. And none of that happened, to the best of your knowledge?

A Right.

Q And, therefore, because none of that happened, Colonel Reutlinger apparently made the decision to terminate?





BIRD, EXAM BY WARNER

A Yes.

Q So do you or do you not support that decision?

A That's a real tough one. Yes, sir.

Q You do support it?

A (Witness nods.)

Q Notwithstanding that the fact that Sergeant Menke is your friend?

A Yes.

Q And that's what makes it very difficult?

A It is difficult.

Q Nevertheless, being a supervisor in the Air National Guard, you recognize you can't have an environment where people can't accept responsibility for their conduct; is that true?

A Yes, sir.

Q And you also understand that if they don't accept responsibility for their conduct and they don't deal with their problems that that makes an untenable workplace environment?

A Yes, sir.

Q Indeed, the efficiency of the service is not served by that?

A (Witness nods.)

Q Yes or no?



BIRD, EXAM BY WARNER

A Yes.

Q Master Sergeant Bird, in your discussions with Sergeant Menke, did he ever seem or appear to be willing to accept any responsibility for his conduct?

A He's admitted he made the phone call, but whether or not he's accepted it fully, I'm not sure.

Q Well, admitting to making a phone call is quite different than admitting to making a threat, isn't it?

A Yes, that's true.

Q Did he ever admit to making a threat?

A No, not to me.

Q Has he ever admitted to you that he has a problem with alcohol or that he gets into trouble when he drinks?

A No, sir.

Q Are you aware of the TAG's, the Adjutant General's zero tolerance policy on violence in the workplace?

A Yes, sir.

Q Have you read it?

A No. I just know it is zero tolerance.

Q Do you subscribe to that policy, meaning do you support that policy?

A Yes, sir.





BIRD, EXAM BY CALL

Q Do you believe that the Air National Guard can conduct its work when fellow co-workers make threats against one another who work together on a daily basis in the workplace?

A Okay. Repeat the first part of that.

Q Do you believe that the Air National Guard can conduct its business and be successful when co-workers make threats against one another that work in the workplace?

A No, they cannot.

Q So assuming that the threat is substantiated, then you believe, again, that that's a serious matter, correct?

A Yes, sir.

COLONEL WARNER: I have no further questions.

HEARING OFFICER McCABE: Mr. Call.

CROSS EXAMINATION

BY MR. CALL:

Q Mr. Bird, my name is Frank Call. I'm Mr. Henke.'s attorney in this case. Now, you are not Mr. Henke's supervisor on the employment side, correct?

A No, sir, I'm not.

Q You have no supervisory capacity there whatsoever, correct?

BIRD, EXAM BY CALL

A No. Until about two years ago, I was a military supervisor, but that was two years ago.
Q At the current time -- as of -- he was placed on leave in November of 1997. Did you have any supervisory capacity over him at that time?
A No, sir.
Q Now, you indicated that you had two meetings with Colonel Reutlinger, Chief Minns, Chief Chapman, yourself, and possibly one other person. Do you recall who that was?
A I believe it was Sergeant Lund.
Q Luntz?
A Lund, L-U-N-D.
Q And at those meetings, Colonel Reutlinger, yourself and Chief Minns were of the -- leaning to perhaps grant a suspension with a last chance, correct?
A Right, sir.
Q But that last chance having some conditions that he take responsibility for the events and that he get some sort of alcohol treatment, correct?
A Right, sir.
Q You indicated that nobody ever told that to Mr. Menke, correct?
A I'm not sure if that was told to Ron or





BIRD, EXAM BY CALL

not.
Q But you didn't?
A No.
Q And you don't know of anybody that did?
A (Witness shakes head from side to side.)
Q Now, in taking responsibility -- there was some discussion about taking responsibility for the telephone call. Did Mr. Menke tell you what he said in the telephone call?
A What Sergeant Menke has told me that he mentioned in the phone call to Sergeant Teinert was that he needed to mind his P's and Q's and he needed somebody to drive him home, type of --
Q Okay. Were Colonel Reutlinger and you and Sergeant Minns wanting Mr. Menke to essentially lie if, in fact, the threat did not happen? Were you asking him to -- let me rephrase that. If, in fact, Mr. Menke did not threaten Mr. Teinert and, instead, said what you indicated, mind your P's and Q's, were you asking him to lie and say that he had threatened him?
A No. The truth is, I don't know what the truth is, but my understanding is a threat is the way the receiver takes it, so all I'm going on is what's out there. You know, I want to believe Ron on what



BIRD, EXAM BY CALL

he said, but I don't -- you know, so no. As far as lying, no.
Q So it would be improper for him, if he didn't make the threat, to admit to making a threat, correct?
A Right.
Q In fact, that could get him fired from the Guard, correct?
A Yes, sir.
Q Now, you indicated that you don't support the decision to terminate him but that you do support it in that it's a decision of your commander, correct?
A Yes.
Q Is that a fair characterization, is that you don't think it's the proper response, but that, because your commander is making it, you're going to follow that as his order?
A The thing of it is, Ron and I are friends. I support a last chance with some caveats that I -- you've heard those. So if the decision was to terminate, then, not being in his supervisory chain, you know, it's Colonel Reutlinger's call, as far as --
MR. CALL: I understand. Nothing further.





BIRD, EXAM BY WARNER

REDIRECT EXAMINATION

BY COLONEL WARNER:
Q Master Sergeant Bird, you've known Ron Menke for a long time?
A Yes, sir.
Q Have you ever heard him use any profanity?
A Yes, sir.
Q That doesn't shock you to hear me even ask that question, does it?
A No. There's not too many people that doesn't use it, okay?
Q In that environment?
A Yeah.
Q Including the word "fuck"?
A Yes, sir.
Q In its various derivitives?
A (Witness nods.)
Q As a noun, as an adjective, as an adverb. You hear it used quite a bit?
A Yes, sir.
Q Sergeant Menke uses it?
A Yes, sir.
Q Okay. And that's not unusual in your environment?
A No, sir.

BIRD, EXAM BY WARNER

Q Okay. Now, how often have you heard Sergeant Menke use that kind of language over ten years?
A How do you want me to gauge that, because, you know --
Q Well, is it regularly? I'm not asking you for a number, but I'm asking you occasionally, regularly?
A Oh, it's occasionally, yes, sir.
Q Okay. All right. Now, some people have pet phrases, correct, that they like to use?
A Yes, sir.
Q How often have you heard Ron say, "You've got to mind your P's and Q's"?
A What?
Q How often have you heard Ron Menke say to you, "Geez, you ought to mind your P's and Q's"? Is that something you hear him say?
A Just when he referred to the phone call. That's the only time I remember that one.
Q That's the only time in over ten years you've ever heard him say that, right?
A Yes, sir.
Q Indeed, that's something that your grandmother used to say, isn't it?





BIRD, EXAM BY WARNER

A Yeah. I remember my folks saying that, yes, sir.
Q Right. But you don't hear that in the military environment very often, do you, Master Sergeant Bird?
A Not much.
Q No. And the only time you've ever heard it from his lips is when he recounted that to you as what he allegedly said to Telnert, correct?
A Uh-huh.
HEARING OFFICER McCABE: Is that a yes?
THE WITNESS: Yes, sir.
HEARING OFFICER McCABE: Thank you.
Q (BY COLONEL WARNER) Now, Command Chief Master Sergeant -- and I hope you will not take this as an offense because I don't intend it that way -- but you have certain duties and responsibilities as a command chief master sergeant for the Air National Guard, do you not?
A Yes, sir, I do.
Q And, indeed, your opinion counts a lot out there, I suspect.
A I've found out it counts a lot since this job, yes, sir.
Q I would think it would. And you are sort



BIRD, EXAM BY WARNER

of the command example to the enlisted folks; isn't that true?
A Yes, sir.
Q All right. Now, can you separate your friendship for Sergeant Menke, which we have already established -- and we know you're a friend and probably a good friend and a bowling buddy and all those things -- can you separate that friendship from your responsibilities as the command chief master sergeant in terms of what you're saying here today, because, quite candidly, I see a real mix in your answers. I'm just being candid here.
A Okay.
Q Now, counsel suggested that you did not support the decision to terminate, so I want you to clarify one last time on the record, do you or do you not support the decision to terminate based on the fact that right now Sergeant Menke is denying that a threat was made and has done nothing to accept responsibility for it and has done nothing to seek any assistance with whatever alcohol problem he may or may not have? Now, those are the facts on the record as of right now. So do you support the decision to terminate, as the command chief master sergeant? Is that the right thing to do or are we





BIRD, EXAM BY WARNER

going to let someone in the Air National Guard make an alleged death threat and just sit back and say, "No, it doesn't matter"?
A Well, it does matter and so, from that perspective, I have to support that decision.
Q Because I want to know for the record if that's the decision that the command chief master sergeant -- or the position, excuse me -- not the decision, but the position the command chief master sergeant of the Air National Guard takes, the position that the TAG needs to know about, the position that your generals need to know about, your commanders and your enlisted folks that look to you as an example.
A Yes, sir.
Q So it's one thing to say you have to support it; it's another thing to say do you support it.
A I do support it.
Q Now, have I bullied you into that?
A No. If you go back in the value system and the integrity, those are the issues.
COLONEL WARNER: Thank you.
//
//

BIRD, EXAM BY CALL

RECROSS-EXAMINATION

BY MR. CALL:

Q You indicated that occasionally you hear vulgar language at the Guard, correct?

A Yes, sir.

Q That's not a shock to anyone?

A No. It still shocks me when the females say it, but there's a lot of females that say it, too.

Q In fact, you've heard Colonel Reutlinger use obscene language occasionally, haven't you?

A Yes, sir.

Q And Chief Chapman, also, correct?

A Yes, sir.

Q And Sergeant Teinert, also, correct?

A Yes, sir.

Q Now, this phrase, P's and Q's -- you've known Ron for ten years, correct?

A Yes.

Q You've known he's been a bartender before, too?

A Yes, sir.

Q Isn't the phrase P's and Q's short for mind your pints and quarts?

A I'm not aware of that.





BIRD, EXAM BY CALL

Q Are you aware of the fact that bartenders frequently use that phrase when referring to straighten up and fly right, mind your business? It's short for mind your business for bartenders, isn't it?

A I've heard mind your business, but I haven't --

Q Okay. And your support of the decision to terminate Mr. Menke is only based on the assumption that the alleged death threat actually occurred, correct? Did you understand my question?

A Okay. The alleged --

Q Let me rephrase it. If, in fact Mr. Menke made a death threat, you're saying that he should be terminated, correct?

A Yes, sir.

Q If he did not make a death threat and if he did as he said and said words to the effect of, "Mind your P's and Q's," you don't believe he should be terminated for that, do you?

A Again, it's allegations, so --

Q So I'm asking you to assume. Assume that the facts turn out that the question is: He said, "Mind your P's and Q's." You don't believe that he should be terminated for that, do you?



BIRD, EXAM BY WARNER AND CALL

A I wouldn't believe so.

MR. CALL: Nothing further.

RE-REDIRECT EXAMINATION

BY COLONEL WARNER:

Q Would you find that a little bit out of character for him to say "minding your P's and Q's"?

A You know, I --

Q Does that sound like Sergeant Menke to you? I'm not talking about a threat. I'm talking about the term.

A Somewhat, probably, but, you know, you have to put some trust in the people and that they're telling you the truth when they tell you that.

Q Unless they have a reason to lie, right?

A Yes, sir.

Q If you've got a motive to lie, like you're trying to save your job, you might tell some other story, wouldn't you?

A That's a possibility, yes, sir.

COLONEL WARNER: Thank you.

RE-RECROSS EXAMINATION

BY MR. CALL:

Q One final question. You listened to Mr. Menke tell you what he said.

A Yes, sir.





BIRD, EXAM BY CALL

Q In your opinion, do you believe him?

A I want to believe him.

Q The question is: Do you believe him?

A I would hope he's telling me the truth and I would say if that was the truth, then I would believe him. But he has -- I don't think he has any reason to lie to me, but I wasn't there so I don't -- I don't know.

Q And understand that Colonel McCabe will be making the final judgment, but if the judgment were yours --

HEARING OFFICER McCABE: Whoa, whoa, whoa. Let's clarify that so you don't lay that responsibility on me.

Q (BY MR. CALL) Let me clarify that. Colonel McCabe will make a determination and make a recommendation to the Adjutant General in this case. He's the fact finder at this level. But if you were, do you believe that he's telling you the truth? I know that you want to believe him, but my question to you is: Do you believe that he's telling you the truth?

A Ron I don't believe has lied to me in the past, so I have to say yes, but I have to leave doubt there, because I don't know for sure.

000665

BIRD, EXAM BY WARNER

RE-REDIRECT EXAMINATION (Continued)

BY COLONEL WARNER:

Q Well, since we've opened that door --

HEARING OFFICER McCABE: Are you done, Mr. Call?

MR. CALL: I'm done.

HEARING OFFICER McCABE: At least for now. Colonel Warner.

COLONEL WARNER: Thank you.

Q Since we've opened that door, have you ever heard the term "It's a flat pancake that ain't got two sides"?

A Yes, sir.

Q Or, "It's a thin dime that doesn't have two sides"?

A Sides.

Q So you really haven't investigated all of the facts surrounding the incident, have you?

A No, sir. I have not read the reports.

Q So you don't know who may have witnessed the call or what other corroborating statements there may be?

A No.

Q Or any of those things, do you?

A No, sir.





BIRD, EXAM BY WARNER

Q So it's really not fair to even ask you whether the statement is true within the context that you don't have enough facts to make a valid conclusion?

A I really don't. I mean, it's just --

Q So even though counsel kind of pressed you to sort of bootstrap, the reality is, you don't have enough facts to make a decision?

A No. Like I say, I haven't read the report so I don't know exactly what the report says.

Q And you don't particularly know the circumstances surrounding the alleged threat, do you?

A No, sir.

MR. CALL: I'm going to object to the form of the question. I believe it mischaracterizes my question. My question was whether or not he believed it, not whether or not it was true, but whether or not he believed Mr. Menke, and I believe he's twisting what was said.

HEARING OFFICER McCABE: Noted. Can you answer the question as it's presently phrased, or would you like it restated?

THE WITNESS: Restate the question.

Q (BY COLONEL WARNER) Well, let me just simply say this: Do you have enough facts, firsthand





BIRD, EXAM BY WARNER

knowledge to honestly answer whether you believe Sergeant Menke, based on the fact that this is a contested matter?

A No, I don't.

COLONEL WARNER: Thank you.

MR. CALL: I don't have anything further.

HEARING OFFICER McCABE: Thank you very much. You may be excused and you may be subject to re-call. Chief, I know I don't need to emphasize to you, but this is a situation that's serious, and if anybody wants to talk to you about what went on in here outside of the environment, just simply tell them that you've been instructed by the hearings examiner not to discuss it.

THE WITNESS: I have no problem with that.

HEARING OFFICER McCABE: Thank you very much.

COLONEL WARNER: Richard Mimms.

(Recess.)

SMS RICHARD MIMMS

called as a witness and sworn, was examined and testified as follows:

HEARING OFFICER McCABE: State your full name for the record, please.

THE WITNESS: Senior Master Sergeant





MIMMS, EXAM BY WARNER

Richard Lawrence Mimms.

HEARING OFFICER McCABE: Thank you very much. Colonel Warner.

COLONEL WARNER: Thank you.

DIRECT EXAMINATION

BY COLONEL WARNER:

Q Master Sergeant Mimms, how long have you been in the Utah National Guard?

A Since 1986. Fourteen years.

Q Has that been full time or traditional status?

A It's been full time.

Q Are you an AGR or are you a technician?

A Technician.

Q What area have you worked in with the Guard?

A I've been the programs and mobility NCO.

Q And during the course of your 14 or 15 years with the Guard, Master Sergeant, have you had the opportunity to come to know Ron Menke, Sergeant Ron Menke?

A Yes, sir. I have.

Q And in what capacity have you known Sergeant Menke?

A Sergeant Menke worked in maintenance in the

MIMMS, EXAM BY WARNER

engine shop. I worked for staff. We both worked for maintenance in general. I was in a staff position, he was in a maintenance position, and it was generally in passing.

Q Have you ever been a supervisor of Sergeant Menke's?

A Yes, sir. In 1998 I was the LSF NCOIC and at that point --

HEARING OFFICER McCABE: LSF?

THE WITNESS: Yes. Logistics support flight. Sergeant Menke was my engine management person.

Q (BY COLONEL WARNER) Okay. Do you have any supervisory responsibility over Sergeant Menke at this time? Are you in a chain of command?

A Other than militarily, no.

Q But militarily you are?

A Yes. As the LSF NCOIC.

Q You'll have to slow down just a little bit for us on the acronyms because you're dealing with some army folks here and some civilians as well, so --

A Okay.

HEARING OFFICER McCABE: And the Air would say that we're somewhat slow in picking up acronyms





MIMMS, EXAM BY WARNER

and other things as well, so --

THE WITNESS: I understand.

Q (BY COLONEL WARNER) And for purposes of our court reporter, if you would spell out, so to speak, what the acronyms mean, then that would help us as well for making the record.

A Okay.

Q Master Sergeant Mimms, were you involved in any of the decision making meetings -- I say decision making meetings, but meetings where they were trying to determine what, if anything, should be done about this alleged threat that Sergeant Menke made to Sergeant Telnert on the late evening of September 17th?

A Yes, sir, I was. I was involved with two of the meetings.

Q And can you tell us -- let's start with the first meeting. Can you tell us who was involved in that meeting?

A It was Sergeant McCowen, Sergeant Lee McDaniel, Sergeant Al Chapman and myself.

Q Can you tell us, generally speaking, where people came down in that meeting relative to what ought to be done? I'm assuming that there was an assumption -- just before you answer, I'm assuming



MIMMS, EXAM BY WARNER

there was an assumption that some threat, either death threat or bodily injury threat, occurred.

A That's correct. We were briefed as to what had transpired and we talked about the punishment that should be handed out in this particular situation. Sergeants Chapman and I believe McCowen wanted a suspension, and I myself and I believe Sergeant McDaniel wanted a 30-day suspension -- or suggested a 30-day suspension and a last chance letter. That was our recommendation.

Q That was in the first meeting?

A Yes, sir.

Q Do you recall approximately when that was?

A I don't think I can give you a date. It was probably a week or ten days after the occurrence happened, sir.

Q Then apparently there was a second meeting; is that correct?

A That's correct.

Q And who do you recall was in that meeting?

A Lieutenant Colonel Reutlinger, Sergeants Rick Strife, Steve Bird, myself and Sergeant Al Chapman.

Q And what was the general discussion there relative to potential punishment?





MIMMS, EXAM BY WARNER

A It was a --

Q Or discipline. Let me put it that way.

A It was a rehash of the first meeting that we had, and basically it was the same recommendations. I opted for a 30-day suspension and a last chance letter in that meeting.

Q Why don't you define for us what you mean by a last chance letter.

(Discussion off the record.)

A Your question was what is my interpretation of last chance letter?

Q Right.

A To me, a last chance letter is a -- it's a letter that is black and white and says this is what has happened, and if you don't change -- however you define that -- if you don't change, if you don't improve your work ethics or if you don't improve your attitude, then this is the last chance and you no longer will be associated with the organization. In other words, it's the last chance. You mess up one more time and you're gone.

Q As part of that last chance letter and the process or the offer that you were supporting, would that have required an admission on the part of Sergeant Menke to -- that he was wrong in doing what

00067

MIMMS, EXAM BY WARNER

he did or to accept some responsibility for his actions?

A I think it would force him to accept responsibility for his actions, yes. As far as minutes, I don't know. To me, it's saying this is the last chance, you know. Irregardless of what's happened, you know, if something -- if something goes wrong again that you are responsible for or accused of being responsible for, then you're out of the organization.

Q Now, that was your recommendation?

A That was my recommendation, yes.

Q Did you support the final decision?

A Yes, sir, I did. When I was told that the recommendation was that he would be terminated, I agreed with that and that was it.

Q Why did you agree and/or support -- not to put words in your mouth, but why did you agree or support that when your earlier recommendation was for a last chance letter?

A In the original meetings there were two people that were for termination and there were two of us that were for a 30-day suspension and last chance letter. When I was told that he would be terminated -- well, evidently what had happened is





MIMMS, EXAM BY WARNER

that the tie breaker, so to speak, came from Colonel Reutlinger and he says, "I know that two of you requested a 30-day suspension and a last chance letter and two of you -- of the other people want termination. I'm going to be the tie breaker and I'm going to request termination." And I concurred with that at that point. I said, "If that's what you guys want to do, then I'll go along with it."

Q Now, let me ask you this: You apparently didn't feel strongly about the last chance letter. When I say "feel strongly," apparently -- I mean not so strongly that it bothered you when you heard the decision was to terminate; is that correct?

A Yes, it did bother me.

Q It did bother you that the decision was to terminate?

A Yes, because my recommendation was a last chance letter.

Q I understand.

A Okay.

Q But when I say -- it didn't bother you sufficiently that you couldn't support the decision. Let's put it that way. You said earlier you supported the decision.

A Right. It didn't bother me enough that I



MIMMS, EXAM BY WARNER

would object to the decision, no.

Q Right.

A Okay.

Q Now, what did you determine in your own mind were Sergeant Menke's chances of succeeding on a last chance letter?

A In my personal opinion, I didn't think there was much chance at all, but I also felt that it was an opportunity to say, this is the last chance and if you don't concur with this, for whatever reason, you're going to be terminated. I did not think that he would -- going back into the situation that he would be going back into, I did not think he would last long at all.

Q Why?

A Well, I know Ron to some degree. The personality that Ron has, the situation that I had heard that was going on, he -- I felt that he would -- something would come up and he would overreact to it or he would misinterpret it, for whatever reason, and then that would be grounds for him to be terminated.

Q So you just felt like, based on your knowledge of his personality, that he wasn't going to be able to live up to the workplace standards?





MIMMS, EXAM BY WARNER

A Unfortunately, no.

Q Did you think the termination was fair and equitable?

A In my opinion, no, because I -- here again, I wanted the last chance letter. That was how -- that's what I felt would have been a justifiable punishment.

Q I understand that, but in our previous discussion, didn't you indicate to me that you had no problem with the firing, that you felt it was fair and equitable because you didn't think -- that you had no expectation that he could live up to the last chance letter?

A That's true.

Q So what is true?

A Okay. The truth is that I felt that he really didn't have a chance of making this last chance letter. I felt that the public punishment was equitable.

Q Now, let's keep in mind what the termination was about. The termination was about an alleged threat that could easily be construed as a death threat. Are you aware of the violence in the workplace policy the TAG has issued to the National Guard?

MIMMS, EXAM BY WARNER

A Yes, I have. Zero tolerance.
Q And, of course, zero tolerance doesn't mean automatic termination, but it means zero tolerance in terms of not allowing that to happen without some action being taken. Is that your understanding?
A Yes, sir.
Q And you don't disagree that if a death threat was made that that's a very serious matter?
A Yes, sir, I do. I agree.
Q And would it be fair to say, then, that out of an abundance, if you will, of fairness for Sergeant Menke, that you were willing to give him a last chance?
A Yes, sir, I was.
Q Was there any indication that he was willing to take a last chance, to accept responsibility and to deal with his problems?
A To the best of my knowledge, no, sir, there was not.
Q What was your assessment of him as a work performer?
A I had had limited dealings with Ron, except for the year and a half or two years that I'd been involved with the LSF. I -- there were times that I questioned his work performance. There were times





MIMMS, EXAM BY CALL

that I wasn't sure exactly where he was coming from on some of the things that were going on in the LSF.
COLONEL WARNER: I have no further questions.
HEARING OFFICER McCABE: Mr. Call.
CROSS EXAMINATION
BY MR. CALL:
Q My name is Frank Call and I'm the attorney for Ron Menke.
You've never been a supervisor for Ron on the employment side of his work, correct?
A On the technician side?
Q That's correct.
A No, I have not.
Q Are you aware of an instance where Ed Wesemann and Jim Lock got into a physical fight?
A I heard -- I heard about it but I have no factual basis for it. I just heard about it.
Q Are you aware of a fight between Roger Schiele and Mike Martinez?
A I heard that, too, yes.
Q Do you know if any of those people were terminated for their physical violence that they engaged in?
A To the best of my knowledge, no.



MR. CALL: Nothing further.
COLONEL WARNER: No redirect.
HEARING OFFICER McCABE: Then you may be excused as a witness. As I've instructed other witnesses that have appeared here and testified, this is a serious matter. If anybody asks you what's going on in here or as to your testimony in these proceedings, just simply respond to them that you've been instructed by the hearings examiner not to discuss the matter.
THE WITNESS: Yes, sir.
HEARING OFFICER McCABE: Thank you very much.
MR. CALL: Why don't we go off the record here.
HEARING OFFICER McCABE: Let's just go off the record for a moment.
(Discussion off the record.)
(Recess.)
SMS ALAN E. CHAPMAN
called as a witness and sworn, was examined and testified as follows:
HEARING OFFICER McCABE: Go ahead and be seated and state your full name for the record, please.





CHAPMAN, EXAM BY WARNER

THE WITNESS: Alan E. Chapman.
DIRECT EXAMINATION
BY COLONEL WARNER:
Q Mr. Chapman, you're a member of the Utah National Guard?
A I am, sir.
Q And what is your rank?
A Senior master sergeant.
Q And Senior Master Sergeant Chapman, how long have you been in the Utah Air National Guard?
A Since 1978.
Q And are you a full-time technician or AGR or a traditional soldier?
A I'm a full-time technician.
Q How long have you served as a full-time technician?
A Since March of 1978.
Q And what MOS specialty or rating have you served in?
A Several of them. I was a jet engine mechanic, a 2A5. I don't know what the designation is now. It just changed. I was a 43131 or a 2A571, and I'm in a 2A300 position right now.
HEARING OFFICER McCABE: And what is a 2A300 position?

000205

CHAPMAN, EXAM BY WARNER

THE WITNESS: It's a branch chief.

Q (BY COLONEL WARNER) And as a branch chief, how many people do you supervise, Senior Master Sergeant Chapman?

A Roughly 30 technicians in AGR and in the neighborhood of about 54 traditionals.

Q During the course of your work as a branch chief, have you come to know Sergeant Ron Menke?

A I have.

Q Is he one of those individuals that you supervised as a branch chief?

A He is.

Q And he works in the jet engine -- excuse me -- worked in the jet engine shop; is that true?

A He did.

Q My understanding of your chain of command is that you would be about the third line supervisor over Sergeant Menke. Is that true?

A I am, sir.

Q Meaning that there are at least two others, Sergeant McDaniel and Sergeant Quintana, that are below you in that chain of command?

A Correct.

Q Are you aware of the alleged incident that occurred on September 17th, 1999 at the NCO Club





CHAPMAN, EXAM BY WARNER

wherein it's been alleged that Sergeant Menke threatened Sergeant Bob Teinert with either a bodily threat or a death threat?

A I am.

Q And were you involved in any disciplinary action that was taken subsequent to that alleged threat against Sergeant Menke?

A I was.

Q In that decision making process, can you just describe briefly what role you played?

A I was the supervisor who recommended the disciplinary action.

Q And who did you recommend the disciplinary action to?

A First off to the HRO to get -- to see if I was in bounds and doing it right.

Q The HRO being the human relations office?

A Yes.

Q And did you, in the context of making your recommendations, consult with other individuals about what might be appropriate discipline for Sergeant Menke as a result of this alleged threat?

A I did.

Q Can you tell us some of the people you consulted with as you tried to determine the





CHAPMAN, EXAM BY WARNER

appropriate course of action?

A I consulted with Sergeant McDaniel, Lee McDaniel, with the then retiring Mike McCowen. He was the engine shop supervisor at the time. His military supervisor, Mr. Minns. And I believe that's it.

Q Did you also have conversations with Lieutenant Colonel Reutlinger?

A Oh. I did, sir.

Q First of all, did you try and ascertain, as best as you could from whatever information was available, the truthfulness of the allegation about the threat?

A I did.

Q Would it be fair to say that you must have concluded in your own mind that a threat did, in fact, occur for you to proceed with action?

A Yes.

Q All right. And having concluded that, then you proceeded to try to determine what should be done; is that correct?

A Correct.

Q You indicated you consulted with the individuals you just named. Was there unanimity or a consensus on what should be done, differences of





CHAPMAN, EXAM BY WARNER

opinion? How would you describe it?

A I would describe it as split, probably 50-50 either way, for the options I discussed with them, based on the threat incident.

Q Where did you come out on the discussions relative to proposed discipline?

A I come out recommending dismissal.

Q Termination or removal?

A I did.

Q Can you articulate for the hearing, what was your thinking on that? What factors drove that in your mind or why did you choose that position?

A Well, I recommended -- after talking to the other supervisors and they pretty much either wanted to dismiss or suspend, and having referred to the TPR-752, I just ascertained that a life threat was probably the high end of the disciplinary side of that particular action and I just felt that that was probably appropriate.

Q I'm not trying to put words in your mouth, but apparently you determined that you thought that threat was serious and that it merited serious discipline?

A Absolutely.

Q And you so made that recommendation to

CHAPMAN, EXAM BY WARNER

Colonel Reutlinger?
A I did, sir.
Q Did you consider performance as related to the discipline?
A I did not.
Q And why is that?
A I just didn't consider it a performance-related issue. Violence in the workplace is basically a personnel matter rather than a performance issue.
Q Now, let's talk about that for a minute. Are you familiar with the Adjutant General's policy on violence in the workplace?
A I am.
Q Have you actually seen the policy?
A I have read it. It is zero tolerance.
Q Do you concur with and support that policy?
A Absolutely.
Q You believe that it's well-founded?
A I do.
Q That it makes sense within the context of your years of experience?
A Yes, sir, it does.
Q The termination of Sergeant Menke is a serious matter, obviously. Do you believe that his





CHAPMAN, EXAM BY WARNER

termination promotes the efficiency of the service, meaning the Air National Guard?
A Oh, absolutely.
Q In what context do you -- or in what way do you believe that his termination promotes that efficiency?
A Those types of actions distract from performance and team and discipline within the workplace.
Q When you say discipline, are you talking about good order and discipline as within the military or discipline within any work organization?
A Both.
Q What about morale? Do you see that as a problem, it impacting morale if threats were made?
A Yes, I do. Threats of that nature explode and more than, oftentimes, just the people involved in the threat feel threatened.
Q From your perspective as a third line supervisor, rather than one who is in the trenches in the engine shop, but one who has a little more perspective from being up in the organization a ways, was it your perception that this threat had impact beyond the engine shop within the Guard?
A Absolutely. Absolutely.



CHAPMAN, EXAM BY WARNER

Q Can you talk about that for just a minute?
A Like I said, threats like that usually, in the situation where it took place, do not stay confined to that area. The security police know, the bartenders know and anybody else in the area in the club knows, and the threat thing spreads and I think feeds more inappropriate -- probably rumor and unfact than anything.
Q Would -- is it your belief that -- and I'm not trying to put words in your mouth, but I'm going off of our prior discussions here and I'm trying to move this along. Is it your belief that that kind of a threat taints the workplace and promotes violence?
A Absolutely.
Q On what basis does it do that?
A I think it causes other people to try to react to the threat in itself. People try to defend themselves, which, in itself, becomes another undue threat. To me, it's a building notion. It's a growth issue. It continues to spread.
Q Now, Senior Master Sergeant Chapman, was your determination -- excuse me -- was your decision and recommendation, your initial decision and your recommendation for termination or for removal, was that based on any personal animosity that you might





CHAPMAN, EXAM BY CALL

have for Sergeant Menke?
A Absolutely not.
Q Let's take Sergeant Menke out of the equation and let's just put any airman or soldier in that equation, unknown to you on a personal basis. Would your decision be the same based on the facts surrounding the incident?
A Absolutely.
COLONEL WARNER: I don't have any further questions.

CROSS EXAMINATION

BY MR. CALL:
Q Sergeant Chapman, my name is Frank Call. I am Mr. Menke's attorney. How long have you been Mr. Menke's third line supervisor?
A I believe I came to this position in November of '98.
Q And because of your position, you're also Mr. Teinert's --
A I am.
Q -- employment supervisor?
A Yeah.
Q Third line, also, correct?
A Yes, sir.
Q Are you aware that Mr. Teinert drinks

2-2-00, ADVERSE ACTION OF RONALD J. MENKE, VOLUME I

PAGE 285

CHAPMAN, EXAM BY CALL

frequently?

A I am.

Q And have you ever known him to drink on the job?

A No, sir.

Q Have you ever known him to be accused of drinking on the job?

A I discussed it because of a rumor I heard one time with the then supervisor, Mr. McCoven, and he assured me it has not happened.

Q So there wasn't an occasion whether you talked with Mr. Teinert about whether he was drinking on the job?

A I only heard words and I just stopped by and asked him if he thought he was drinking on the job and he said no.

Q You're aware of the fact that he had been reprimanded before and suspended for drinking on the job, correct?

A Actually, I'm not.

Q You indicated that you met with some people in determining whether or not to take action against Mr. Menke. You listed Mr. McDaniel, Mr. McCoven, Mr. Minns, Colonel Reutlinger, yourself, obviously. Was Mr. Bird involved in those discussions at all?

RENEE L. STACY, CSR, RPR
(801) 320-1188 285

PAGE 286

CHAPMAN, EXAM BY CALL

A He was in one meeting, but I couldn't tell you exactly when it was, and it was a little farther down the road. I'm guessing probably two weeks after the incident.

Q When did you first approach these folks about what they thought should happen? How far after the alleged incident?

A It was -- I believe the Monday afterwards is when I first got word, and that morning was when I -- the Monday morning afterwards was when I think I took my first meeting with the engine shop supervisor and Mr. McDaniel.

Q And so that would have been the 20th, correct?

A Either the 20th or 21st. Monday or Tuesday. Early that week.

Q What was Mr. McDaniel's position? What was his recommendation?

A I believe his -- I believe his decision was to terminate.

Q And then you met with Mr. McCoven at one point?

A I did.

Q What was his position?

A I believe he wanted to suspend with a last

PAGE 287

CHAPMAN, EXAM BY CALL

chance letter.

Q And what was -- when did you meet with him?

A At the same time.

Q On the 20th or 21st?

A Yes, sir.

Q Okay. And was your meeting with Mr. Minns also on the same date?

A Later that day I gathered him -- I decided he needed to be in on the issue because he was his military supervisor.

Q What's Mr. Minns' recommendation?

A I believe he wanted to suspend with a last chance letter.

Q And Mr. Bird?

A Mr. Bird's meeting wasn't until farther down the road, and I think his recommendation was suspend, also, with a letter of some kind.

Q Did you consult with Colonel Reutlinger about what --

A I told him that I had talked to all these people to try and get a feel for what I thought I should do, and then I made my recommendation to him.

Q Okay. Did he indicate what he thought should happen?

A He did.

RENEE L. STACY, CSR, RPR
(801) 320-1188 287

PAGE 288

CHAPMAN, EXAM BY CALL

Q And what was his indication that he thought would happen?

A He -- well, basically he informed me to do my thing with the HRO and see if that's the direction they wanted to go, and I believe that's when they contacted the human resources office.

Q But when you talked with him first, did he give you a recommendation as to that he thought maybe he should be suspended with last chance or did he recommend termination or what --

A I don't think he was a hundred percent convinced yet what he was going to do. I think he was waiting to decide what he was going to do based on what I was allowed to do. I mean, what I -- you know what I mean? What I decided to do when it got all said and done.

Q Did he express an indication of where he was leaning?

A No, sir. I don't believe so.

Q Now, you indicated that you engaged in activities to try and verify that the threat actually occurred, correct?

A I did.

Q What did you do to verify the threat had occurred?

CHAPMAN, EXAM BY CALL

A I was in a conference with the Security Police Chief Baarz and Lieutenant Colonel Reutlinger and I did review the police reports.

Q So you reviewed the police reports -- the police reports or the security reports?

A Security police reports. I'm sorry.

Q And you reviewed Mr. Teinert's report?

A Yes, sir.

Q And also a report filed by Mr. Jensen?

A Yeah. The security police that were at the scene.

Q And then did you also review a report by Officer Horstad?

A The Salt Lake City?

Q No. I believe it's -- let me have a look. Let me show you what's been marked as Exhibit 5. That's Mr. Teinert's report. You indicated that you reviewed that, correct?

A I did.

Q Okay. And then let me show you what's been marked as Exhibit 6. Did you -- and I believe that's Mr. Jensen's. You reviewed that, did you not?

A I did.

Q Did you review No. 8, which is a report that was prepared by Kevin Freemont at the security





CHAPMAN, EXAM BY CALL

force?

A Is there a second page to this one?

Q I don't believe so.

A I believe I did. I believe I looked at this one.

Q Okay.

A But it might have stapled to one of these.

Q And then also let me show you what's been marked as Exhibit 7, which is Mr. Horstad's report. Did you also review that?

A Yes, sir, I did.

Q Okay. Were you aware of the fact that -- you'd heard, obviously, that Mr. Menke had made a report to Mr. McCoven that Mr. Teinert was drinking on the job?

A Yes, sir.

Q And that's what motivated you to go talk with Mr. Teinert, correct?

A No. I did not talk to Mr. Teinert. I talked to his supervisor.

Q His supervisor. Okay. I'm sorry. I wanted to make sure that -- so you never talked with Mr. Teinert --

A I did not.

Q -- about drinking on the job?



CHAPMAN, EXAM BY CALL

A About an incident you're talking about, no. About the rumor I'd heard, yes, I did confer with him.

Q With whom?

A Sergeant McCoven, Mike McCoven.

Q Okay. But at no time did you go out and ask Mr. Teinert whether he was drinking on the job?

A I did not.

Q Okay.

A I did not.

Q Were you aware of the fact that Mr. Teinert was a bit upset at the fact that Mr. Menke had informed Mr. McCoven that he may be drinking on the job?

A No, I was not.

Q In investigating whether or not the threat occurred, did you talk with Mr. Teinert?

A Yes, I did.

Q What did he tell you?

A He basically said everything that's in the police report. He said that he'd been threatened on the cell phone and that he'd called the cops and tried to get a taxi for him, that kind of thing.

Q What exactly, to the best of your recollection, did Mr. Teinert tell you the threat





CHAPMAN, EXAM BY CALL

consisted of?

A Quote, unquote, he said he was going -- had threatened his life. He was going to do him in.

Q Did he tell you the specific words that he alleged that Mr. Menke had supposedly said, or did he tell you just in some form words that he had threatened to kill him?

A He said that, and he also said something to the effect of minding his P's and Q's and all sorts of threatening language.

Q Okay. So Mr. Teinert told you that Ron had threatened him, told him that he was going to kill him and that he should mind his P's and Q's?

A He did.

Q Did you talk with Airman Jensen?

A I did not.

Q Did you talk to Mr. Menke about what had transpired?

A A little bit. Probably more down the road when I was trying to decide where I was going to go, but I did not talk to him, I believe, specifically about the incident itself. We may have brushed on it a little bit, but I did not ask him if he had done it, if that's what you're asking.

Q And so, in coming to your conclusion to --

CHAPMAN, EXAM BY CALL

that dismissal was the appropriate adverse action, you never asked Mr. Menke, "Did you make that threat," did you?
A I did not.
Q So you didn't get his side of the story, did you?
A I did not.
Q Let me show you what's been marked as Exhibit 1. Is that the zero tolerance policy that you've made reference to?
A Yes, I believe so.
Q Is it your position that the zero tolerance -- let me find my copy of it. Do you see in paragraph three there where it starts off -- do you need it put your glasses on?
A Yeah, please.
Q Start right here.
A Okay.
Q You see where it says, "Verified threats of violent acts will result in immediate disciplinary action, to include termination," correct?
A Correct.
Q And so, under the policy, the policy gives you some leeway in what disciplinary action to impose against a technician that makes a threat, including





CHAPMAN, EXAM BY CALL

all -- a range all the way up to termination, correct?
A Correct.
Q So termination is not mandatory under this policy, correct?
A Termination is not mandatory under the policy.
Q Okay.
A Action is.
Q Okay. Are you familiar with the TPR-752?
A I am.
Q And did you review that in coming to your conclusion of what penalty to impose?
A I did.
Q Let me show you paragraph nine of that TPR in exhibit -- I believe it's A-5, if I'm not mistaken. Yes, A-5. You see in paragraph nine where it indicates offenses and various applications of suggested penalties, correct?
A Correct.
Q And you see in paragraph 9-B where it talks about threats of violence, correct?
A Threatening or attempting to inflict bodily harm.
Q Okay. And the suspension -- and the



CHAPMAN, EXAM BY CALL

penalties there range, for a first offense, from a written reprimand to a 15-day suspension, correct?
A Correct.
Q And then in 9-C, you see where it says "hitting, pushing or other acts against another without causing injury"?
A Correct.
Q And the penalty for a first offense on that is a written reprimand for 30 days, correct?
A Correct.
Q And then in 9-D, it indicates that hitting, pushing or other acts that cause injury can lead to a 30-day suspension to removal being the appropriate penalty for the first offense, correct?
A Correct.
Q So is it fair to say that -- based off of this chart, is it your understanding that, as far as egregiousness goes, it goes in the order of threats without violence, violence without injury, violence that cause injury, in the scope of egregiousness; is that correct?
A To some degree, yes.
Q So, for instance, the penalty for a threat is less than a penalty for actual violence, correct?
A No, I don't -- I don't read it that way,





CHAPMAN, EXAM BY CALL

particularly, no. Leaving out, of course, it's creating a disturbance resulting in an adverse effect on morale, production or maintenance of proper discipline.
Q What I'm getting at is not Mr. Menke's situation but in general. You would admit that a threat is less egregious conduct than an actual physical fight, correct? At least according to this chart?
A To me, it would be based on the level of the threat.
Q And not all threats are equal, correct?
A I believe so.
Q Okay. And, in fact, the TPR in this case, the appropriate regulation, threatening or attempting to inflict bodily harm, the recommended offense is a written reprimand and a 15-day suspension, correct?
A I believe so. That was the three behind it.
Q And not termination, correct?
A Correct. The one you had marked in yellow.
Q And this is, in fact, the first time Mr. Menke has been alleged to have made a threat, correct?

000274

CHAPMAN, EXAM BY CALL

A Officially, I believe so.
Q In fact, there's nothing in his record to indicate that, correct? His 904's are clean?
A I believe so.
Q Are you aware of a fight that took place between Ed Wesemann, or at least physical violence that took place between Ed Wesemann and Jim Lock?
A I am.
Q And were either one of those gentlemen terminated because of that fight?
A I don't believe so.
Q And that occurred on base, did it not?
A It did.
Q And it occurred during work hours, didn't it?
A It did, to the best of my recollection. I have not read any of the official reports on that.
Q Are you aware of an incident where Roger Schiele and Mike Martinez got into a fight during work hours?
A Vaguely. I've only heard a little information on that. Not very much at all.
Q Have either one of those gentlemen been terminated?
A I don't know what action has been taken on





CHAPMAN, EXAM BY CALL

those two.
Q But to the best of your knowledge, they have not been terminated; isn't that correct?
A I really couldn't say. I don't know whether they have or not, to be honest with you.
Q Let's talk about the impact of the alleged threat. Is it your position -- one of the things that Colonel McCabe is going to have to make a factual finding on and make a recommendation on is whether or not the threat actually occurred. Mr. Menke's position is that he never threatened him. He told him to mind his P's and Q's and not to drive off the base because he had been drinking himself. If that is the finding, do you think it's appropriate that Mr. Menke be terminated?
A Can you say that one more time?
Q Sure. Let me rephrase that. Let me ask it this way: If Mr. Menke's phone call to Mr. Teinert consisted nothing more than, "Bob, you need to mind your P's and Q's and you better not be driving off the base because you've been drinking," would you consider that a threat?
A No. No.
Q So if that's what was said, do you think it would be appropriate to terminate Mr. Menke based off



CHAPMAN, EXAM BY CALL

of that, if that's what, in fact, happened?
A No.
Q Now, the impact -- let's talk a about the impact about the telephone call. This was a threat that allegedly took place over a telephone call, correct?
A Correct.
Q So the only person that heard that threat, at least from Bob's end, was Bob, correct?
A To the best of my recollection, yes.
Q So it wasn't like this was a threat where you had two people standing nose to nose where other people could actually hear the threat, correct?
A Correct.
Q And so the notoriety that's arisen from that, this incident, is notoriety that's risen through the Guard's own actions of publishing the incident, correct?
A To some degree, yes.
Q And, in fact, there was recently a seminar on violence in the workplace, correct?
A Correct.
Q And this incident was referred to, not by name, but just circumstances, during that seminar on appropriate and inappropriate conduct on base,





CHAPMAN, EXAM BY CALL

correct?
A I believe so.
Q And so the Guard actually published that even more by broadcasting this about, correct?
A I guess to some degree, yes.
Q We've heard some testimony that there was a meeting with you and your discussions with the various chiefs on what should happen, and there was a meeting, and we're trying to pin down who was there. We had a second meeting at which it was indicated that Mr. Reutlinger, a Mr. Striffe -- I think I'm pronouncing his name right, but I might not -- Mr. Bird and Mr. Mimms and you were present. Do you recall that meeting?
A I do.
Q Is that an accurate list of who was there?
A I believe so.
Q When was that meeting?
A I couldn't tell you. That was a meeting I think we're referring to later down the road. It was probably -- I'd be guessing, but a couple weeks later, a week to a week and a half later, something like that. Maybe only a week.
Q Does ten days sound about right?
A Okay. That would be accurate.

CHAPMAN, EXAM BY CALL

Q And at that time, that's the meeting in which -- did Colonel Reutlinger at that point indicate that he was going to have him terminated?

A I don't believe that he had determined that he was going to be terminated at that point, no.

Q But it's at that meeting that you came to the conclusion that you were going to propose termination, correct?

A No. I had come to my conclusion before that. I had decided that's what I was going to recommend.

Q I don't want to mischaracterize evidence. I'm going off recollection, so, counsel, please feel free to correct me if I'm incorrect. I believe that Mr. Bird indicated that at that meeting -- you only had one meeting with Colonel Reutlinger on this matter, correct?

A Yes, sir.

Q And at that --

A Well, let me tell you. I told him of my findings from the earlier meeting earlier, the week before.

Q But at the meeting that Colonel Reutlinger was at with these other people that I just listed, I believe it was Chief Bird, indicated that at that





CHAPMAN, EXAM BY CALL

point Colonel Reutlinger indicated that there appeared to be some sort of a -- kind of a tie between the various recommendations. Some saying suspension, others with a last chance and some others recommending termination. At that point he said, "I'm going to be the tie breaker and we're going to terminate."

A I believe he said he was going to be the tie breaker, and I don't remember whether he said he was going to terminate. I thought that he was still waiting to make a final decision, but I -- I'd hate to put words in his mouth.

Q Sure. And I'm just asking you for your recollection, if you recall him saying at that meeting that he was going to break that tie by terminating Mr. Menke.

A If I recollect it correctly, I thought he was going to say, "Well, it looks like I'm going to be the tie breaker," but I could be wrong, but I believe that's what he said. Might I also add, I mean, at this point, I think there was still some question on whether the disciplinary action was going to take place via military channels or civilian. It was still in the -- that was still in the air, I believe.



CHAPMAN, EXAM BY CALL

Q And at the time you had these various meetings with the chiefs, up to that point in time, Mr. Menke was on duty outside the state of Utah, correct?

A Yeah, for what -- a period of time, for at least one week, he was gone to -- or maybe even two. I think he went back for another week to -- back East on some computer stuff.

Q Does it refresh your recollection that he was in Pittsburgh for a total of two weeks?

A I believe so. But I think there was a week in between. I don't know exactly. I'm not his timekeeper, but I believe that's accurate. They went for a week and they came back to try and get the system on line and then they went back for a week to load data or something to that effect.

Q To your best of your knowledge, Mr. Menke was never given the option of accepting suspension with a letter of last chance, correct?

A To my recollection -- I wasn't in the meeting where he met with Colonel Reutlinger, so I couldn't say for that point, but to my -- I never offered it. I made the recommendation that he was to dismiss.

Q To the best of your knowledge, was a last





CHAPMAN, EXAM BY WARNER

chance letter ever prepared?

A I believe they talked about it as a strategy, but whether they offered it to him or not, I could not tell you.

Q When you say "they," who are you referring to?

A Colonel Reutlinger and/or the HRO. I believe we discussed it, but I cannot tell you whether they offered it to him or not.

Q You're unaware of him ever being offered a last chance letter, correct?

A I am. It was discussed as just an option. That's all I can tell you.

MR. CALL: That's all I have.

REDIRECT EXAMINATION

BY COLONEL WARNER:

Q Master Sergeant Chapman, I want to show you what's been marked, I believe, as Exhibit No. 5, which is the statement of Teinert. I'd like you to look at the exhibit, the language that he wrote, very carefully, on the second page, the language on the last part of the paragraph that refers to the phone call and the alleged threat. "I answered my cell phone," so on.

A Okay.

CHAPMAN, EXAM BY WARNER

Q Is that language consistent with what Teinert told you about the phone call?
A Pretty much.
Q Okay. Now, I want you to think very carefully, Master Sergeant Chapman, because it's very important. You gathered a lot of information about that threat, did you not?
A I did. Talking to Chief Baarz and reviewing these reports.
Q All right. I understand. And you heard various information from various people; is that correct?
A If you're asking if I got testimony from very many people, I did not.
Q No, no. I'm just talking about, did you talk to people?
A Other than the supervisors to try and decide what to do, not really.
Q You indicated earlier that Teinert had said -- he said to watch his P's and Q's?
A He did use that quote.
Q And you're absolutely certain of that?
A It was one of the quotes he used. I believe that's what -- if he didn't tell me, Ron told me when he -- in passing when we had our discussion.





CHAPMAN, EXAM BY WARNER

Q Well, see, that's the whole issue here, Master Sergeant.
A Okay.
Q So that's why you need to be accurate about what I'm about to ask you.
A I understand.
Q If Teinert told you that, then what Teinert said there is a lie and what he's saying is true?
MR. CALL: Objection to the form of the question.
HEARING OFFICER McCABE: It is a little argumentative. Why don't we just so to: Do you have a clear recollection of what Teinert told you?
THE WITNESS: If you are asking me if I know for sure that he's the one that told me that, I could not verify that.
Q (BY COLONEL WARNER) Well, that's very important, and that's what we're asking you.
A And I apologize for that because -- I did listen to some of Ron's. He was inquisitive on what was going to happen, and I couldn't tell him because I for sure didn't know whether my recommendation was going to be approved or not, and that's when he talked to me, and I believe -- I'm almost certain in that discussion he said it.



CHAPMAN, EXAM BY WARNER

Q Who is "he"?
A Ron Menke.
Q But that's a lot different than Sergeant Teinert.
A I understand that, but I also -- I talked to Bob Teinert the morning that we had to do the cease and desist order, and I cannot remember whether he said that to me or not. And that's why -- if you're asking me to pin down who said that, I'm not sure. It may very well have been Ron. I believe he did say that, but I cannot tell you whether Bob said that for sure or not. If you're asking me to quote that, I can't do that. I don't remember.
Q Well, what I am trying to find out -- because your earlier testimony was that Teinert had told you that Bob had said to watch his P's and Q's. Now, that's what this whole issue is all about, whether Teinert -- whether Bob -- excuse me, whether Ron Menke made the threat as alleged in that statement or whether he merely said, "Watch your P's and Q's," so if Teinert said P's and Q's --
MR. CALL: I'm going to object. It's argumentative. He's answered the question, and I don't think going past this is going to give us anything more than just argumentative response.





CHAPMAN, EXAM BY WARNER

HEARING OFFICER McCABE: It's noted for the record.
COLONEL WARNER: Thank you.
Q What I'm trying to clear up here, Sergeant, is whether or not you can specifically testify with any assurance as to who told you about P's and Q's.
A In the question that I answered that I said that, I believe that my testimony said that -- I was answering the question believing I was answering that among other statements were made, and I added that in there because I know that was told to me. And forgive me, folks. I believe Ron said that to me, but I cannot tell you if Bob used that terminology, and I apologize for that.
Q Well, you don't have to apologize for anything. We're just trying to get the record clear.
A I don't want to make anything unclear.
Q Well, here's the point I'm trying to determine. In the process of gathering the information, you were told a number of things, apparently.
A I was. And I read a number of the reports.
Q I understand. And what you're testifying to today, at least currently, is that you can't be certain as to who told you specifically about the P's

CHAPMAN, EXAM BY WARNER

and Q's comment, whether that was Menke or whether that was Teinert or someone else; is that true?
A I really can't.
Q Okay. But what you can say is that you read Teinert's statement, correct?
A I did.
Q And you just read it again, did you not?
A I did.
Q And it doesn't contain anything about P's and Q's, does it?
A It does not.
Q Indeed, it has rather specific language, quite a bit stronger than minding your P's and Q's, doesn't it?
A Absolutely. And I heard that quote, also.
Q From Teinert?
A I believe so.
Q All right. But whether you heard it from Teinert, you certainly relied on that statement, his written statement, in making your decision, did you not?
A Believe it or not, I relied on these reports to make that decision.
Q All right. Now, let's talk about the suggested penalties in the TPR that counsel went over





CHAPMAN, EXAM BY WARNER

with you briefly. If you look at 9-A, fighting, creating a disturbance -- actually, just 9, fighting, creating a disturbance, and you look at 9-B, which is threatening or attempting to inflict bodily harm -- I believe that you were looking at that previously.
A I was.
Q All right. Would you agree with me, Master Sergeant, that there is certainly a continuum when it comes to the seriousness of threats made?
A Absolutely.
Q As an example, I could threaten to kick your butt, which is not an uncommon threat, so to speak, in terms of what we've heard in our lives. That's quite different than me threatening to kill you.
A Correct.
Q Do you see one as more serious than the other?
A Absolutely.
Q And you also understand, I'm sure, that those are merely suggested or recommended?
A Hence, the spectrum.
Q Right. Hence, the spectrum. And that you're not locked into that spectrum, because you have to take into account the individual facts of the





CHAPMAN, EXAM BY WARNER

case?
A Yes, sir.
Q And you did just that, did you not?
A I did.
Q And you determined what about the threat that you ascertained had been made?
A It was the life issue.
Q It was a serious threat?
A It was.
Q And, hence, your recommendation for termination?
A It was.
Q Now, you also recognize, I take it, that that whole policy was written -- excuse me -- the TPR was written in February of '87 and that the TAG's policy on workplace violence was a recent iteration from March of '99?
A Correct.
Q Indeed, the guidance on the workplace -- violence in the workplace is the most recent by some 12 years, correct?
A Yes.
Q Now, I want to just cover one other point. Talking about the publication by the Guard, I think to borrow the term of counsel, publication of either





CHAPMAN, EXAM BY WARNER

this incident or at least information concerning the incident. Apparently there was some kind of a briefing on violence in the workplace recently at the Air Guard; is that true?
A There was.
Q And that would be consistent with the policy as articulated by the TAG?
A I agree.
Q And in your experience, would it be uncommon for someone giving such a briefing to cite examples or to cite experiences that would help people understand what we're talking about in terms of violence in the workplace?
A No, it's not uncommon.
Q As an example, if you were giving a briefing in the area of your expertise, that being engine mechanics, would it be unusual for you to cite examples of problems that had gone wrong with a jet engine in trying to help mechanics learn to better troubleshoot, as an example?
A I rely on it.
Q Okay. So that's a tried and true teaching method, so to speak, in terms of citing examples and --
A It is.

CHAPMAN, EXAM BY CALL

Q And you saw nothing unusual about the citing of a specific instance of violence in the workplace in terms of the briefing or the lecture?
A No.
Q And, indeed, that was an educational tool used by the command in terms of trying to help others to avoid a problem?
A Absolutely.
Q It wasn't intended to embarrass anybody?
A No.
Q Were specific names used?
A No.
COLONEL WARNER: Thank you very much.
MR. CALL: Do you have anything else?
COLONEL WARNER: No. Thank you.

RECROSS EXAMINATION

BY MR. CALL:
Q Regarding the infamous P's and Q's, is it possible that both Ron and Bob told you about P's and Q's?
A I couldn't verify one way or the other. All I know is it's a quote that was given to me. Like I said, I apologized earlier. If I thought it was going to become an issue, I certainly would have noted it.





MR. CALL: Nothing further.
HEARING OFFICER McCABE: May this witness be excused?
COLONEL WARNER: Yes.
HEARING OFFICER McCABE: You may be excused. You may be subject to re-call. As I've instructed other witnesses, if anybody asks you what went on in here, just indicate that this is a matter that's still in process, it's serious in nature and you've been instructed not to discuss the matter. Thank you very much.
MR. CALL: Can we take a break before we go to our last witness?
HEARING OFFICER McCABE: Sure.
(Recess.)

LTC PAUL REUTLINGER

called as a witness and sworn, was examined and testified as follows:
HEARING OFFICER McCABE: Please be seated. State your full name for the record.
THE WITNESS: Paul Baylor, B-A-Y-L-O-R, Reutlinger, R-E-U-T-L-I-N-G-E-R.
HEARING OFFICER McCABE: Sir, I can tell already that I'm just simply going to indicate to you you'll want to speak up so that everybody can hear



REUTLINGER, EXAM BY WARNER

you, including the court reporter.
THE WITNESS: Okay.
HEARING OFFICER McCABE: Thank you.

DIRECT EXAMINATION

BY COLONEL WARNER:
Q Colonel, you are a member of the Utah Air National Guard; is that correct?
A That's correct.
Q How long have you served in the Air National Guard?
A Since 1977.
Q Are you an AGR, technician, traditional soldier?
A A technician.
Q And how many years have you served as a technician?
A Since 1977.
Q And you hold the rank of lieutenant colonel?
A That's correct.
Q What is your current position with Utah Air National Guard?
A Aircraft maintenance officer for the maintenance division.
Q How many people do you supervise, in round





REUTLINGER, EXAM BY WARNER

terms, round numbers?
A Technician-wise or military?
Q Technician-wise.
A Technician-wise, approximately -- about 90, I guess, technicians.
Q And among those technicians that you supervise is Sergeant Ron Menke?
A Yes, he was.
Q He was one of those?
A (Witness nods.)
Q And would it be fair to say that you are the top of that chain of command?
A Yes.
Q Within the maintenance arena?
A Yes, I am.
Q And, as such, you were the, what we call the final decision maker relative to the discipline that was imposed on Sergeant Menke due to the alleged incident on the 17th of September of '99; is that correct?
A That's correct.
Q All right. And obviously the things we want to talk to you about today are what went into that decision and why and so on. First of all, obviously, you had to make a determination in your

REUTLINGER, EXAM BY WARNER

own mind that something had happened.
A That's correct.
Q That, in fact, the allegation -- that there was some substance or truth to the allegations.
A (Witness nods.)
HEARING OFFICER McCABE: You have to make an audible response.
THE WITNESS: I'm sorry. Yes.
Q (BY COLONEL WARNER) Yeah, you'll have to answer out loud because we've got a court reporter here. So did you, in fact, determine in your own mind that there was truth to the allegations made concerning what Sergeant Menke had said?
A Yes.
Q So you determined that you were convinced that that was true?
A Yes.
Q All right. Would you briefly tell us what you did to determine that in your own mind. What did you review, what did you look at, who did you listen to? How did you come to the conclusion that there was some truth to the fact that a threat had been made by Sergeant Menke?
A Well, we had talked earlier, a week -- I'd been TDY. I'd just come back TDY, and Monday morning





REUTLINGER, EXAM BY WARNER

my first sergeant had given me that there'd been an incident and that we had an issue that allegedly took place at the NCO Club, so I started asking around to get some of the issues as to what happened. I didn't know what it was.
I had security police reports, I had Salt Lake City reports that we were working off of, and I started to compile some information. I got with folks out here at HRO. I asked them, Where do I go? I'm not -- I wasn't totally sure on which direction to go.
Q Okay.
A So I got some help from the HRO. I came here and they gave me somewhat of a -- well, they gave me the procedure that I needed to do and what I had to do from that time.
Q After reviewing the reports and talking to whomever you may have spoken to, you determined that something had happened and that it happened according to what the reports said?
A Yes. According to the reports -- the reports were from a couple of different people, so something -- something happened there, and that's -- I believe what was in the reports happened.
Q All right. Based on the fact that you





REUTLINGER, EXAM BY WARNER

determined in your own mind that the threat had occurred as alleged, you then decided that some discipline would be appropriate?
A That's correct.
Q Is that based on the TAG policy letter from last March entitled Violence In The Workplace?
A Yes, sir, it is.
Q You're familiar with the TAG policy on violence in the workplace?
A Yes, sir, I am.
Q And, indeed, that is in front of you now as Exhibit 1. You've read that previously, I take it.
A Yes, sir, I have.
Q And do you concur with that policy and support that policy, colonel?
A Yes, sir. 100 percent.
Q Do you see any value to the policy?
A Yes, sir.
Q Why does that policy make sense or why does it have value to you as a supervisor and as a military officer who has to conduct military business?
A This policy promotes, I feel, the basic doctrine of the military, what we can and cannot do in the military. The military is held to a higher





REUTLINGER, EXAM BY WARNER

esteem than anybody else, in my opinion, and this doctrine promotes safe work places, it promotes ordered discipline. It gives us a safe workplace.
Q So you basically have no problem with that doctrine?
A No, sir.
Q Or that policy.
A No, sir.
Q Did you arrive at the decision that some discipline needed to be taken?
A Yes.
Q All right. Did you have -- did you make an immediate decision what that discipline should be?
A No.
Q Other than the fact that some discipline ought to be imposed?
A Yes.
Q Okay. Did you take into account, as an example, that this occurred off duty at the NCO Club?
A Yes, I did.
Q Did it occur to you that an argument could be made that, well, it's off duty, it has nothing to do with the workplace, so this really isn't violence in the workplace?
A I considered that thought.

REUTLINGER, EXAM BY WARNER

Q And did you accept it, reject it? What did you -- how did you deal with that?

A Even though it was not in the workplace, I felt that it was pertinent to what we were doing, because you cannot have that action on the military installation. You can't have it happen that night and the next morning go to work with each other, and I felt that could be a problem.

Q So you took into account that the individuals involved shared the same workplace in your maintenance shop?

A Yes.

Q You took into account that it happened on the military installation where they work?

A Yes.

Q You took into account their military and civilian status as technicians and as members of the Air Guard?

A Yes, I did.

Q And you took into account the close relationship between their work and their socializing at the NCO Club?

A Yes, sir, I did.

Q Now, once you determined that some discipline had to be taken, but you hadn't made up





REUTLINGER, EXAM BY WARNER

your mind what it was, did you seek the advice of some of your junior supervisors? When I say junior, junior to you in the chain of command. Not necessarily junior in terms of years of service or their experience.

A Yes, I did.

Q And you sought out their advice and counsel?

A That's correct.

Q And was there unanimity among them?

A No.

Q They gave you various recommendations?

A Yes, they did.

Q Can you briefly tell us what some of the recommendations were that you got from those that you sought out their counsel and guidance?

A Everything went from a -- there was a gamut of removal all the way down to a letter of reprimand.

Q And I take it you gave due consideration to each of those recommendations.

A Yes, I did.

Q Did you respect the individuals who were making those recommendations?

A Yes, I did.



REUTLINGER, EXAM BY WARNER

Q Did you respect their opinions?

A Yes, I did.

Q Had you made up your mind, after hearing their recommendations?

A No.

Q Now, I would direct your attention back to a meeting that you subsequently had that I was present at with counsel and Sergeant Menke when they had an opportunity to present their position on the proposed removal notice. Do you recall that meeting?

A Yes, sir, I do.

Q At the time you went into that meeting, had you made up your mind?

A No, I had not.

Q Can you tell us what your thinking was as you went into that meeting?

A My thinking was, I wanted to keep a completely open mind. I wanted to see what counsel was going to propose to me, what they were. I was looking for acceptance of responsibility that something wasn't quite right, and I was going to keep an open mind from that point.

Q Now, as a result of that meeting and as a result of what you heard in that meeting and as a result of what you received in that meeting by way of





REUTLINGER, EXAM BY WARNER

counsel's written response -- did you review that written response?

A Yes, I did.

Q And you paid careful attention to what counsel said in that meeting?

A Yes, I did.

Q Representing Mr. Menke?

A Yes, I did.

Q Did you see anything in the written response or hear anything in counsel's oral presentation which suggested to you that you were hearing the things that you wanted to hear relative to attitude or willingness to accept responsibility?

A No, I didn't.

Q Did you subsequently review, either before or after that meeting, the so-called Douglas Factors?

A Yes, I did.

Q You're aware of the Douglas Factors?

A Yes, I am.

Q Just one second here. I'm going to -- let's mark this as an exhibit. It would be next in order.

HEARING OFFICER McCABE: 13.

COLONEL WARNER: Thirteen. Counsel, do you have a copy of the Douglas Factors?

REUTLINGER, EXAM BY WARNER

MR. CALL: No.
COLONEL WARNER: We'll get you a copy right now. In fact, Carol's got one for you.
HEARING OFFICER McCABE: You can use mine in the interim and we'll continue to proceed.
MR. CALL: I'd like to object to this. This is the first time I've seen it, for the record, so I make my objection. There is no indication in his original decision that he relied on the Douglas Factors in coming to it, other than -- by that name. He may have by other names, but I haven't seen this document before.
COLONEL WARNER: We're not suggesting that he did rely on the Douglas Factors. We're suggesting that he considered the Douglas Factors, which is a different issue all together.
Q Now, you relied on the information that had been provided to you; is that correct?
A That's correct.
Q But you considered the Douglas Factors in arriving at your decision?
A Yes, I did.
Q I want to work through these quickly, but I want you to have an opportunity to say whatever it is you'd like about each one, but we don't want a





REUTLINGER, EXAM BY WARNER

filibuster, okay?
A I understand.
Q As an example, did you consider the nature and seriousness of the offense?
A Yes, sir, I did.
Q I want to talk about that briefly. What did you determine about the nature and seriousness of the offense in your mind?
A The way I worked it, I put it on a one to ten scale, ten being the worst, one the least, and I couldn't think of anything worse on a one to ten scale than a threat on somebody's life.
Q Barring taking one's life?
A Yes. Except for -- yes.
Q Did you consider the fact that there are a range of threats?
A Yes, I did.
Q That this may have been a threat -- pardon me -- the expression to kick your butt versus a threat to take one's life?
A Yes, I did.
Q As you looked at this threat, you considered this to be an extremely serious threat?
A No more serious than that threat.
Q Now, let me put it in another context. The



REUTLINGER, EXAM BY WARNER

table of punishments talks, in this particular section, about other forms of fighting, such as pushing or punching, hitting. If two airmen were to punch one another in a fist fight, but no threat of death, which would you consider more serious?
A Well, the threat of death is much more. To me, that was an apples and oranges issue. Somebody getting into some fisticuffs here versus someone saying you're going to take their life, to me, that was -- in my opinion, that was apples and oranges. There was no comparison.
Q Did you consider Sergeant Menke's job level and type of employment? If you'll look at the next one down.
A Yes, I did.
Q What about Sergeant Menke's past disciplinary record? Did you take into account any of his past disciplinary problems?
MR. CALL: I'm going to object. There's been no basis that there were any disciplinary problems and there are none listed in his 904.
COLONEL WARNER: Well, let me make the point that clearly --
HEARING OFFICER McCABE: As I understand it, on the 904, when we talked about it this morning





REUTLINGER, EXAM BY WARNER

when we were talking at the prehearing, that this -- there wasn't anything on the back that indicated anything as to disciplinary action taken on the technician side.
COLONEL WARNER: Yeah. That's exactly right, but -- and we're going to go to the decision letter in just a few minutes, but we would be denying the reality if -- the reality is this individual, Sergeant Menke, had a problem on the military side and I want to make sure that we hear from Colonel Reutlinger whether or not he was able to isolate this, so when we talk about his past disciplinary record, I'm not talking about his technician record, but this is something that is so closely aligned to the environment out there that it would require a conscious choice on your part.
Q Did you consider the problem that Sergeant Menke had had in Italy?
A No. Not with this decision.
Q You were aware of it, though?
A Yes, I was aware of it, but it had no factoring in this part of the decision.
Q And that was a military -- he was in a military status, meaning a guard status, military guard status in Italy, and so that wouldn't have been

REUTLINGER, EXAM BY WARNER

reflected on his 904, would it?

A No, it wouldn't.

Q But, in fairness to Sergeant Menke, you were aware of it and tried to disregard it?

A Yes, I did.

Q All right. Did you consider his past work record as you understood it to be?

A Yes.

Q Now, let me just follow up on that a little bit. Did you consider this to be a performance issue?

A No. His work performance was never an issue.

Q That really wasn't the criteria that you were really working off of here?

A No, sir.

Q How about the effect of this offense upon the employee's ability to perform his job and his supervisor's confidence in that ability? Do you think that he was compromised at all in his ability to perform in the workplace because of the threat? I'm talking about Sergeant Menke.

A Sergeant Menke was not, no.

Q Consistency with penalties imposed on other employees for the same or similar offenses. Do you





REUTLINGER, EXAM BY WARNER

know of anyone else who had made a threat similar to the one Sergeant Menke allegedly made?

A I have -- when I checked with HRO and we asked for some -- I asked for information when I was gathering to go through this issue of where do I go, just to -- the book said I can go from a letter of reprimand to removal. What is the past history? What have we done in the past? They said we have -- as an agency, we have in the past for these type of offenses. So I was not -- with the decision that I came to, I was not out there all by -- I'm not the first one that this was ever done.

Q You weren't personally aware of the circumstances of that prior incident?

A No, I was not.

Q It may have been on the army side, for all you know?

A That's correct. All they gave me was it's been done before.

Q Now, you talked about apples and oranges in reference to fisticuffs versus this kind of a threat.

A Yes.

Q In your opinion, in your judgment, fisticuffs is not consistent with this particular



REUTLINGER, EXAM BY WARNER

offense?

A No. That's not close.

Q All right. How about the notoriety or its impact upon the agency's reputation?

A As I said, we in the military have a higher standard we have to live to. It's not. Written, it's not doing anything else. It's no different than a police officer or someone out there. The military is run on order and discipline. We have to be one step above everyone else in a crowd or, as I've heard it before, the general public. We have to be better than the general public, and this was detrimental to that.

Q So you believe that the threat that you determined to be genuine or accurate did, in fact, impugn the reputation of the agency; in this case, the Air National Guard?

A Yes.

Q The clarity with which the employee was on notice of any rules that were violated or if he's been warned, do you know whether or not the TAG policy on violence in the workplace had been posted in the work space?

A Yes, it had. Numerous places.

Q And to the best of your knowledge, would





REUTLINGER, EXAM BY WARNER

any employee either be on actual or constructive notice based on the posting of that policy?

A Oh, yes. It's readily available.

Q Did you consider Sergeant Menke's potential for rehabilitation?

A Yes, I did.

Q Did you see anything in his response, attitude or demeanor that suggested that he accepted the fact that he needed any rehabilitation?

A No, sir. I did not.

Q Did you consider any possible mitigating circumstances surrounding the offense and, if so, did you determine any did exist? Such as, an example, did you take into account that he was intoxicated at the time?

A Yes, I did.

Q What consideration did you give to that fact?

A You wonder sometimes, is it -- as the term is used before, is it the liquor talking, or is it he talking? I wasn't willing and I'm not willing to take a chance on which one is talking. I just -- I can't do that. If you take Menke's face off of it, anybody that comes down with that, I don't care if they're drunk or sober or whatever. You can't -- you

REUTLINGER, EXAM BY WARNER

can't take the chance. Who wants to be the one to take the chance?

Q So you're saying, as a senior supervisor, that you're not interested in finding out whether or not Sergeant Menke was serious or not from the standpoint that if you give him the chance and he comes back in and does, in fact, harm Sergeant Teinert or others, you would feel responsible for that?

A There's no doubt that I would be responsible for that.

Q And as a supervisor, you felt that that would be irresponsible for you to take that chance?

A Totally irresponsible on my part not to take that action.

Q That leads to the final Douglas Factor, the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others. Did you consider whether or not, for instance, a suspension, be it 15 or 30 days, would be adequate to, one, sanction or discipline Sergeant Menke and, at the same time, deter the conduct in the future by either himself or others?

A Repeat that. I'm sorry.

Q Well, it was a long protracted question.





REUTLINGER, EXAM BY WARNER

A I know it was. I'm sorry.

Q It's my fault. You don't have to apologize for my verbosity, but I appreciate you doing so, and if I could keep you around most of the time to do that for me, it would be a big plus.

What I'm saying is -- if you'll look at the last one, so I don't have to read to you -- did you carefully consider whether there was any alternative to -- a reasonable alternative that would have the same impact or effect that you wanted to have that would be a lesser discipline, such as --

A Yes, I did.

Q Such as the suspension?

A Yes, I did. I thought -- I went through the full gamut of a one-day, three-day, five-day, 15-day suspension, what it would do, how it would work, but I also based that on the fact of whether there was anybody accepting responsibility for wrongdoing, or not possibly wrongdoing, but for the incident. Somebody's got to take responsibility. It happened. In my mind, somebody has to take responsibility for it.

Q And so, in summation, then, as we look to the appropriateness of the penalty, you carefully considered these factors?





REUTLINGER, EXAM BY WARNER

A Yes, I did.

Q You considered the seriousness of the offense?

A Yes.

Q And you've already articulated that.

A (Witness nods.)

Q And you determined in your own mind that this was the only penalty which made sense under the circumstances?

A Yes, sir. I think the -- yes.

Q Now, let's look at your letter of decision, which is --

HEARING OFFICER McCABE: Exhibit 3.

COLONEL WARNER: Exhibit 3. Do you have a copy, Ralph, that I can give him to look at? I've got my own copy, but I want him to be able to refer to it.

THE WITNESS: You're going to have to help me here. I didn't bring my glasses.

COLONEL WARNER: Well, does that help?

THE WITNESS: There we go.

COLONEL WARNER: I know that at my age it's just a matter of how far, if your arm is not long enough --

THE WITNESS: I'll be okay. I think I'll





REUTLINGER, EXAM BY WARNER

be able to get what you need to.

COLONEL WARNER: All right.

Q Now, Colonel Reutlinger, on 20 December of '99, you once again met with counsel and with Sergeant Menke to give them the decision letter, what we call the original decision to the proposed notice of removal; is that correct?

A That's correct.

Q And you have what's in front of you marked as Exhibit 3, which is a copy of that letter, correct?

A Yes, sir.

Q And that is signed by yourself on page three, and below that there is a signature purported to be Sergeant Menke's dated that 20th day of December; is that correct?

A That's correct.

Q All right. Now, in this letter, you go through a variety of statements. I want to hit not all of them but some of them. You, as an example, in paragraph 2-C, indicate that you recognize that the details of the conversation are disputed, but you have given consideration to it and, among other things, you took into account that there were different calls made that night by him, and you also

took into account the contemporaneous statements of Teinert to Sergeant Jensen in paragraph D. All of these things basically led you to believe that the threat had actually been made; is that correct?

A Yes, sir, it did.

Q You also -- it indicates in here that -- in paragraph E -- that you did not consider the Pisa incident, nor did you consider the Zimmerman incident in making your decision for removal; is that correct?

A That's correct.

Q You also determined in paragraph H that his threat was in violation of the TAG's workplace -- excuse me, violence in the workplace policy; is that correct?

A Yes, sir.

Q You, likewise, in paragraph three on page two indicate that, among the other factors that you were considering was the fact that he, in the meeting, the original meeting with you on 9 December that occurred between counsel and Sergeant Menke and yourself, that he was unwilling to assume any responsibility or to take positive steps to deal with the actions and behavior; is that correct?

A That is correct.

Q And paragraph five, of course, goes into







some of the other factors that we already discussed in the Douglas Factors. Paragraph six says you considered again consistent penalties, and we talked about that and your discussions with HRO. Paragraph seven on page three, the last sentence, "I have determined that, consistent with the Adjutant General's policy on violence in the workplace, removal from your technician position is the only appropriate penalty."

A Yes, sir.

Q You did carefully consider lesser penalties, however?

A Yes, I did.

Q And then the rest becomes somewhat administrative in nature. What I'd like to now talk about, Colonel, and this part is very important, so I hope that you will listen carefully to my questions. I'd like to talk about efficiency of the service and how his conduct impacted efficiency of the service. Do you understand the term "efficiency of the service"?

A Yes, sir, I do.

Q And when we talk about efficiency of the service, do you understand that to mean that the technician's ability to perform his duties and the





agency's ability to fulfill its mission?

A Yes, sir.

Q As it's been defined in the IPR?

A Yes, sir.

Q And do you also understand that when conduct occurs off duty, that the agency must establish an adequate relationship between the cause for removal and that efficiency of the service?

A Yes, sir.

Q Now, having said that, why is it that you believe that this off duty, albeit on base, but off duty conduct, the threat, so negatively impacted the efficiency of the service that it mandated removal?

A One, to me, it's a safety in the workplace issue, a safety -- you can't have -- where the two people involved work in the same shop, you can't have -- you just can't have somebody threatening your life if you're working next to them.

Q So the removal guaranteed a safe workplace?

A Yes, it did.

Q Okay. What else?

A And it sends a message to folks -- not just to these people, but sends a message out there are rules to be followed, and these rules have to be followed because order and discipline are the basic







premise, as I said, in the military. If you don't follow the rules, you don't have order, you don't have discipline, you don't have a functioning body that is effective. And a team. The teamwork. If you're working as a team, it's extremely hard to have teamwork in the same shop if you've got two people threatening one another's lives. I just don't -- I can't see that.

It's possibly maybe overdramatic here, but there's four people that trust us with their lives every time they strap a jet on, and if they knew that we're having problems in maintenance or we don't have an efficient discipline, well-oiled machine working there, the trust is in jeopardy and that's something we cannot have from the pilots. They've got to know they've got a good functioning piece of equipment, and if you have people infighting in shops, that just can't happen.

Q And what about personal responsibility? Does that play a role in this?

A That's a major role. You have to take -- none of us are perfect. We're all going to make mistakes, but it's essential that you fess up to your mistake, take the responsibility, take your licks, go back to work. Let's get back to work. We've got a

00085

REUTLINGER, EXAM BY CALL

job to do.

Q And so, for all of those reasons, you believe that your decision to remove Sergeant Menke promoted the efficiency of the service?

A I do.

Q And do you still believe that?

A Yes, sir, I do.

Q And do you believe that those same goals of guaranteeing a safe workplace and promoting good order and discipline and sending a good message that you must abide by the rules and the concept of teamwork and personal responsibility, could any or all of those have been achieved for purposes of the efficiency of the service with a lesser penalty, in your opinion?

A No. Not now, no. When I first started talking about it, I thought we possibly could, but the severity of it and the lack of those things, no, I don't.

COLONEL WARNER: Thank you. Your witness.

CROSS EXAMINATION

BY MR. CALL:

Q Good afternoon, Colonel. I'm Mr. Menke's attorney in this case. I have some questions I'd like to ask you. Let's start with the alleged event





REUTLINGER, EXAM BY CALL

that occurred on the evening of September 17th, early morning of September 18th, correct?

A Yes, sir.

Q And were you aware that Mr. Teinert had been drinking on the night in question?

A No. Just that the reports stated such.

Q At any time did you interview Mr. Teinert?

A No, I did not.

Q So you didn't interview him to assess his credibility?

A No, sir, I did not.

Q You just took what he said on its face value as being true?

A I took what was on the reports.

Q And you're referring to the report that Mr. Teinert filed, correct?

A That the security police filed.

Q Okay. Are you aware that -- as being -- the position you hold, you're also Mr. Teinert's supervisor, correct?

A Yes, I am.

Q How long have you been Mr. Teinert's supervisor?

A Boy, I don't know exactly how many years Mr. Teinert has been in the engine shop. It's been



REUTLINGER, EXAM BY CALL

ten years, plus.

Q And you're aware of the fact that Mr. Teinert has been previously reprimanded and suspended for drinking on the job, are you not?

A No, I'm not.

Q You're not aware of the fact that he was suspended for drinking on the job?

A No, I'm not aware of that.

Q Would that surprise you if he had been?

A Probably.

Q You know Mr. Teinert drinks, do you not?

A Yes, sir. Yes, I do.

Q Do you believe him to have an alcohol problem?

A Possibly. I don't know. I didn't make that determination.

Q Are you aware of the fact that Mr. Menke has made reports to Mr. McCowen that he believed that Mr. Teinert may be drinking on the job? Are you aware that that report was made to Mr. McCowen?

A Verbally, yes.

Q And you're also aware of the fact that Mr. Teinert was a little bit upset when he found out that Ron had made that report?

A I was unaware of that, no.





REUTLINGER, EXAM BY CALL

Q Now, are employees normally allowed in the NCO Club during their work hours?

A Yes, sir. We have a food portion and then there's a bar portion. The bar portion is closed during duty hours.

Q But Mr. Teinert has a key to that establishment, does he not?

A I believe so.

Q Are you aware of the fact that on several occasions he's served himself alcohol when there aren't any bartenders there?

COLONEL WARNER: Well, I'm going to object. There's no basis for that in the record. He didn't ask Mr. Teinert that. Mr. Quintana never could demonstrate that he knew what went on in there, so he's making an assumption here that he was serving himself when there's no evidence whatsoever as to what went on in that club.

HEARING OFFICER McCABE: Objection noted. You can answer the question.

THE WITNESS: No, I'm not aware.

Q (BY MR. CALL) And the NCO Club is not Mr. Teinert's assigned work area, is it?

A No.

Q Nor is it Mr. Menke's assigned work area.

is it?
A No, it is not.
Q I'm going to show you -- are you familiar with IPR-752?
A Yes, sir, I am.
Q I'm going to show you Appendix A-5, paragraph 9. Do you see where it indicates that -- paragraph 9-B where it indicates that threatening or attempting to inflict bodily harm?
A Yes, sir.
Q You see the range of penalties for that, depending on the first, second and the third offenses, correct?
A That's correct.
Q And then you see in paragraph C where it indicates "hitting, pushing or other acts without causing injury," correct?
A Yes, sir, uh-huh.
Q And the penalties for that first, second and third are greater than those for threats, correct?
A Yes, sir, they are.
Q And you see in 9-D where it indicates that hitting or pushing or other acts of violence that cause injury, their penalties are progressively







greater, correct?
A Yes, sir, they are.
Q So is it your understanding that under this policy, this policy considers threats to be less egregious than acts of physical violence?
A According to that, yes, it does.
Q Let me show you Exhibit 1, which is the zero tolerance policy.
A Yes.
Q And I'll start reading here where it says "verified." You see that? It says, "Verified threats or violent acts will result in immediate disciplinary action, to include termination." You see that?
A Yes, sir, I do.
Q So under this policy, the zero tolerance policy isn't that if a threat happens, you have to terminate, but it says that we're not going to allow it and we're going to impose some sort of disciplinary action, up to and including termination, correct?
A That's correct.
Q So under the zero tolerance policy, termination is not mandatory, correct?
A No; that is correct.





Q You indicated that you believe that physical violence was less egregious than a threat; is that correct? Is that a correct summary of your position?
A A threat on someone's life, yes.
Q But that position is at odds with the policy, is it not? Doesn't the policy seem to indicate that threats are less egregious than actual acts of physical violence?
A Yes, it does. That's what it implies, yes.
Q So your position is at odds with that policy, correct?
A Yes, it is.
Q Now, in your -- when Colonel Warner was talking to you, you said that you considered the threat as serious as a threat could come, a bodily injury. You couldn't think of a more egregious threat?
A No.
Q Let's talk about the circumstances of the alleged threat. You understand that it was a threat that took place over a telephone, correct?
A That's correct.
Q And that it was a threat that only Bob Teinert heard on his end, correct?







A Yes, sir.
Q And was it your understanding that both parties were intoxicated?
A Yes, sir.
Q Wouldn't it be a more egregious threat if the same exact facts but they were standing nose to nose and there was no phone in between them, no 15 miles to his home? That would certainly be a more egregious threat, would it not?
A Yes, sir.
Q And if he was standing there shaking his fist at him, "I'm going to kill you," that would be even more egregious, would it not?
A Yes.
Q In fact, there's a whole range of more egregious threats that could take place than a telephone threat, correct?
A Yes, but -- other than a threat -- like I says, the threat on his life, how it was given I didn't take into account. I took into account he threatened a guy's life. How he does it I didn't take into account.
Q And I understand that, and you would agree that, in judging those threats, you need to apply a subjective test, correct?

REUTLINGER, EXAM BY CALL

A Yes, sir.
Q Looking at all the circumstances right?
A Yes, sir.
Q And do you think it's reasonable to consider that threat serious, meaning that it was a legitimate threat, Mr. Menke meant it, under the circumstances of both parties were intoxicated, it was over a phone line, Mr. Teinert being approximately -- how many ever miles to his home, the parties had known each other for several years and had been friends and had prior interactions together? Did you consider those factors in determining the seriousness, if you will, of the threat?
A I take the face out of it and a threat is a threat. That's what I went down to. I took the face off of it, and I can't -- what I was considering is if the threat is made, irregardless of who makes it, I can't -- all of the circumstances going around it. I don't want to be the one to make the wrong decision, so I'll go with the boss's policy.
Q Let me have you look at the remarks to IPR-752, and in the table it indicates on 9-B that you're to look to remark 8, and remark 8 indicates that, in deciding whether a statement is a threat,





REUTLINGER, EXAM BY CALL

you need to consider the action, the apprehension of the listeners, the wording of the statement, the speaker's intent and the attending circumstances, correct?
A Yes, sir.
Q And also things like provocation and other subjective factors?
A Yes, sir.
Q By taking the face off of it, aren't you essentially ignoring the subjective test and saying a threat is a threat is a threat because I'm not going to look at those subjective factors?
A No.
Q You don't think that's making an objective threat that all threats are equal?
A All threats on somebody's life are equal.
Q So it wouldn't make a difference, then, in your book if he was standing face to face or whether he was calling from around the world on a telephone?
A No.
Q Okay. And this is the first time that Mr. Teinert has ever been accused of making a threat against someone, correct?
A Mr. Teinert?
Q Excuse me. Mr. Menke. It's the first time





REUTLINGER, EXAM BY CALL

he's ever been accused of making a threat against someone, correct?
A That I'm -- yes, that I'm aware of. Yes.
Q Here's your original decision, which -- could we put a staple in that so we don't lose the page?
MS. ELKINS: Sure.
Q (BY MR. CALL) If it's okay, I'll let you go off mine while they staple that. This is Exhibit 3. And you recognize in paragraph seven where I've got highlighted that you indicated, "I recognize and understand that normally a verbal threat would not constitute the basis for removal on the first offense," correct?
A That's correct.
Q And you also, in trying to come to that conclusion, indicate that you looked at the past record of similar incidents and the penalties imposed against those individuals, correct?
A No, I didn't. I didn't see any records. I just asked if there had been a precedent set.
Q But you asked the HR office down here and asked if there had been similar circumstances and what the penalties were in those cases, correct?
A That's correct.





REUTLINGER, EXAM BY CALL

Q And how many different instances did they tell you that were allegedly similar to this situation?
A They gave me -- they said they had three similar incidents.
Q Three similars. Okay. I'm going to work off of -- this is a document that Chief Haws faxed me about the incidents. Did he mention those employees by name?
A No, sir.
Q Let's talk about them in the order that he's given me. He's indicated that on -- did he talk to you about, on 25 August 1994, an employee, while under the influence of alcohol, made a death threat to fellow employees? The agency was preparing the proposed termination notice when he came forward and stated that he had an alcohol problem and that he had enrolled in a substance abuse program. The agency enforced a 15-day suspension and a last chance agreement. Does that refresh your recollection about that?
A Yes, sir.
Q And that case -- did that case involve someone that was on duty or off duty?
A I do not know. All I know is what you read

REUTLINGER, EXAM BY CALL

to me right there.
Q And that's essentially what Chief Haws had talked to you about?
A That's what we talked about, yes.
Q Eventually, apparently, that employee violated his last chance agreement and was terminated. Does that ring a bell to you?
A Uh-huh.
Q Do you recall whether or not that employee was on duty or off duty?
A I don't even know the name -- I don't know if they're Army Air. I don't have any idea who the people were.
Q But under a similar circumstance, a threat made with alcohol, the penalty that was imposed was a 15-day suspension, correct?
A After he took responsibility and admitted that it, in fact, happened, yes.
Q Then the next instance he indicated was that on 16 May 1996 an employee, while under the influence of alcohol, was attending a wedding after hours in the NCO Club when he confronted his supervisor, grabbed him by the lapels and made threatening remarks. That was another instance, correct?





REUTLINGER, EXAM BY CALL

A Yes.
Q And the agency proposed termination in that case, correct?
A Yes.
Q And your recollection was that the employee resigned in that case, correct?
A Yes, sir.
Q That case isn't similar to this one, is it?
A No. There's no death threat that was made.
Q No death threat. Also, it was a superior, wasn't it?
A If that's what it says.
Q That's what it says. You do recall him being a superior in the wedding incident where an employee apparently grabbed his superior --
A I don't know. I wasn't there.
Q But you would admit that threatening a superior is far different than threatening a co-worker?
A No.
Q You think they're equal?
A Yes.
Q Is it different to assault a superior rather than a co-worker?
A No.



REUTLINGER, EXAM BY CALL

Q Let me call your attention to TPR remark number 10. It indicates that a penalty should be exceeded if the injury or assault was directed at a supervisor, indicating that's more egregious conduct, does it not?
A Uh-huh.
Q So it is different to assault your superior rather than a co-worker, is it not, at least according to the TPR?
A According to that, yes, sir, it is.
Q Is your view consistent with that TPR or is it at odds with that?
A I try and follow it the best I can.
Q I'm asking you to make the judgment based off of those two instances where the TPR says that. Do you support that position that it's more egregious to assault a superior rather than a co-worker, or do you subscribe to the one you previously espoused, that it's the same?
A I'd say it's stated the same.
Q And then on another instance it indicates that the third employee, on April 12, 1997, an employee made harassing phone calls to a co-worker and her mother, making false accusations regarding employee conduct. The agency proposed termination.





REUTLINGER, EXAM BY CALL

Does that ring a bell as to what you talked with the HR department about?
A Yes. What you've got is what we talked about.
Q And that case involved a female employee who called another female employee and accused her of having an affair with her husband, correct?
A I don't know.
Q You didn't discuss that part of it?
A No, sir.
Q Do you know if it involved a death threat?
A No, I do not.
Q Did you consider any instances where employees had made threats but weren't terminated?
A None that I'm aware of.
Q You did not consider those?
A Oh, well. I've never heard it before, so no. That's why I asked HRO.
Q Did you consider any of the instances where employees actually got in physical altercations but weren't terminated?
A No.
Q In fact, you're aware of a situation where Ed Schiele assaulted another employee, are you not?
A No, I'm not.

REUTLINGER, EXAM BY CALL

Q Let me make sure. Excuse me. Ed Wesemann and Jim Lock got into a physical confrontation that involved hitting each other.
A Yes.
Q Are you aware of that situation?
A Yes, I am.
Q And neither one of those gentlemen were terminated?
A That's correct.
Q In fact, they're still here with the Guard?
A That's correct.
Q The penalty that was imposed was a three-day suspension, correct?
A No.
Q What was the penalty, as best you know?
A The penalty was a one-day suspension.
Q One-day suspension. Okay. And are you familiar with an instance where Roger Schiele and Mike Martinez got into a fight regarding a forklift?
A I've heard that there was something, but that's all I know.
Q You've heard about it?
A That's all.
Q That it did occur. Do you know if either one of them were suspended?





REUTLINGER, EXAM BY CALL

A No, I do not know.
Q They're still working for the Guard, are they not?
A Yes, they are.
Q And, in fact, you're aware of a situation where Mr. Menke was assaulted by a co-worker, Clay Zimmerman, correct?
A Yes.
Q Was Mr. Zimmerman terminated for that incident?
A No.
Q And, in fact, they continued to work together after that incident, did they not?
A Yes.
Q And so previously when you said that we can't have employees who have fought each other or threatened each other's lives working together because it affects the efficiency of the services, that's not the case, because he was working with an employee that he, in fact, had assaulted him and not been terminated, correct?
A No. I said that if you threaten somebody's life, we won't -- we will take appropriate action. Assaulting one another and fisticuffs or whatever, we will take each case, case by case.



REUTLINGER, EXAM BY CALL

Q And that's at odds with the policy, though, correct?
A No.
Q Doesn't the policy indicate that threats are less egregious than actual fisticuffs?
A Yes, sir, it does.
Q So it seems you've got it on its head, at least in the maintenance shop, with threats --
COLONEL WARNER: Objection. Argumentative.
HEARING OFFICER McCABE: Noted.
Q (BY MR. CALL) You can answer the question, if you'd like.
A No.
Q Are you aware of any newspaper articles about the alleged threat?
A No, sir.
Q Are you aware of any radio or TV news broadcasts?
A No, sir.
Q In fact, the only publicity that has resulted from this is the publicity that has been generated by the Guard's own investigation of that matter, correct?
A That's correct.





REUTLINGER, EXAM BY CALL

Q And, in fact, there was a violence in the workplace seminar a while back at the base, correct?
A Yes, sir.
Q And I think Mr. Chapman indicated that they had referred to this incident at that workshop. Isn't that correct? Did you attend the workshop? I guess I should ask you that first.
A For most of it. I wasn't at all of it.
Q You weren't at all of it. Were you there while this incident with Mr. Menke and Mr. Teinert was discussed, although maybe not by name, but the essential facts were?
A I don't think the facts were. The way I remember it, the facts weren't put out there. Just -- I think it was put out there was an incident and investigation ongoing. That's what I remember.
Q But there was some publicity by the Guard about the fact that this was going on, correct?
A Yes, sir.
Q So the notoriety that arose from it came from the Guard's own actions, correct?
A Yes.
Q In fact, this whole incident could have been kept very quiet, could it not, from the fact of this scenario, Mr. Teinert reporting the alleged

REUTLINGER, EXAM BY CALL

threat to the security police and the security police force investigating it, conducting your investigation in secret, could it not?
A It could have.
Q But, instead, it was made very public, wasn't it?
A No, not really. Not public. Not by my accord.
Q Let's talk about the people that knew about it. Strike that. Let me --
HEARING OFFICER McCABE: Where are we going with this, counsel? I don't think there's any doubt. I think both sides would stipulate that when a disciplinary action occurs in the Guard arena, it's customarily well known that a disciplinary action is ongoing.
MR. CALL: Well, the point is this, your Honor, that the law makes very clear that they have to establish a definite impact from the event, and in his original decision letter he says notoriety -- your event caused notoriety. Our contention is that it's not the event that caused the notoriety. It was a very private event, the telephone call, and the notoriety arose from the Guard's own treatment of that, and but for their treatment in that manner, the





REUTLINGER, EXAM BY CALL

notoriety would not have arisen; therefore, no impact on the Guard.
HEARING OFFICER McCABE: I understand your point.
Q (BY MR. CALL) Now, have you got Exhibit 3 in front of you?
A Yes.
Q In paragraph 2-C -- or, excuse me, 2-D, top of the second page, you indicated that you considered the fact that Mr. Jensen -- Mr. Teinert, excuse me, immediately reported the alleged threat to Mr. Jensen and then they immediately reported it to security force. How did that weigh into your decision? What information or what inference did you draw from that conclusion?
A I drew -- what I drew, the conclusion that it happened as it was in the report.
Q Because of the immediate response to it?
A Because -- I don't know how immediate, but it was -- I found it very hard for somebody to come up with a story that big in that short of time.
Q So in it you indicate that you gave weight to the fact that Mr. Teinert contemporaneously reported the death threat conversation to SRA Jensen immediately after the phone conversation, as well as



REUTLINGER, EXAM BY CALL

immediately calling central control and reporting the death threat, so there was some immediacy there?
A Yes.
Q And, in your opinion, that immediacy of immediately reporting it gave credence to that it actually occurred?
A Yes.
Q Would it have changed your conclusion if Mr. Teinert had waited a half an hour?
A Possibly.
Q If he waited an hour? The greater the time, the less likely he's being honest, or at least he's not taking the threat as serious, correct?
A Possibly.
Q And also it would go to his credibility in the fact that it would give him time to come up with a story?
A Yes, sir.
Q Correct? Some of the other witnesses that have come in here, particularly Mr. Chapman and Mr. Minns, have talked about a meeting that apparently took place on October 20th, is a kind of a rough date, where there was a meeting between yourself, Mr. McDaniel, Mr. McCowen, Mr. Minns and Mr. Bird. Do you recall that meeting?





REUTLINGER, EXAM BY CALL

A No, I do not. Not with that group.
Q When was the first meeting that you recall concerning this matter that involved Mr. Chapman and you and others?
A I don't know.
Q You indicated that you were TDY for a couple days and then come back on a Monday or Tuesday?
A That's correct. I came back to work on Monday.
Q It was immediately on that Monday that this issue was brought up, right?
A Yes, but not with those gentlemen.
Q Who was it brought up with at that time?
A Security police.
Q How long after that did you get back -- that you actually met with Mr. Chapman and some of the other chiefs?
A It was probably a week to ten days, at least.
Q And then at one point did you have a meeting with Sergeant Chapman and others where they were present and they expressed their opinions?
A Yes.
Q And who was at that meeting -- that's the

REUTLINGER, EXAM BY CALL

meeting you were referring to that was about a week to ten days after?
A I think so.
Q Who, to the best of your recollection, was present at that meeting?
A Sergeant Chapman; I believe Sergeant Quintana. I don't recall Sergeant McCowen being there. I believe I talked -- I think that was it. Sergeant McDaniel.
Q So there was the four of you there?
A Yes.
Q And at that meeting Mr. McDaniel indicated that his suggestion would be suspension; is that correct?
A That was his input, yes.
Q And did that include a last letter -- or a letter of last chance?
A No.
Q Just suspension?
A Yes.
Q Do you remember the number of days that he was suggesting?
A I don't believe he put a number on it.
Q What was Chief Minns' suggestion?
A Minns wasn't there.





REUTLINGER, EXAM BY CALL

Q He wasn't there. What about Mr. Chapman?
A Mr. Chapman?
Q What was his input?
A His input was termination.
Q And Mr. Quintana?
A Mr. Quintana I don't think gave me anything. He didn't know for sure because Quintana was not the supervisor, so he didn't state anything, really.
Q Do you recall a meeting about that time where the parties that were there expressed that -- there was essentially a tie, if you will, with half the people saying suspension and the other half saying termination, and you said, "I'll be the tie breaker. I'm going to terminate his employment"?
A No.
Q You don't recall a meeting where that was said?
A No.
Q I may have asked you this. You did review the reports that were filed by Sergeant Teinert and Airman Jensen, correct?
A The security police reports, yes.
Q Did you ever interview Ron and ask him what his version of the story was?



REUTLINGER, EXAM BY CALL

A Yes, we did.
Q When was that?
A Oh, we got -- we sat down the Monday, I believe, after the incident. No. It was a week, because Sergeant Menke had gone TDY the Monday after the incident for a week. And he'd come home. When he came home, I was -- the chief of security had a cease and desist order that he had to issue to Sergeant Menke, and that's -- we talked then.
Q And that came as kind of a surprise to Mr. Menke that he was being served with a cease and desist?
A Yes.
Q And he was a bit shocked at receiving that?
A Yes, he was.
Q And didn't he indicate, "What's this all about?"
A Yes, sir.
Q And he had the appearance of not knowing why this was being issued against him, correct?
A He had the appearance of that, yes.
Q In fact, you told him, "You better go read the report that's been filed with the security police," correct?
A Yes.





REUTLINGER, EXAM BY CALL

Q And later on, on or about October 20th, did you have another meeting with Chapman and -- excuse me -- Mr. Chapman and -- at least some of the other chiefs about what penalty was actually going to be imposed?
A No. All we did was I asked for options, what they felt were the best options.
Q Wasn't there a time when you -- before the original decision letter was issued, that you told Mr. Menke yourself personally not to worry, that he wouldn't be terminated but some other adverse action would be taken against him?
A I told him that that was a possibility.
Q When did you tell him that?
A Boy, I don't -- sometime when we talked.
Q To the best of your recollection, exactly what words did you tell him?
A I told him I was getting his side of the story, we're getting the police reports, and we're going to leave an open mind and we'll make a decision.
Q But is it your position that you never told him, "Don't worry. I'm not going to terminate you. There will be some sort of other action taken against you, but not termination"?

REUTLINGER, EXAM BY CALL

A I don't know those exact words, no.
Q Any words to the effect that he would not be terminated?
A I don't think -- I think I left the door open both ways.
Q Now, you indicated that, in your opinion, Mr. Menke didn't show any remorse or take responsibility for any of the alleged events, correct?
A That's correct.
Q Isn't it true that he did admit to you that he was using vulgar language in the bar?
A Yes.
Q So he did admit that fact?
A That's correct.
Q And, in fact, it's fairly common to hear vulgar and obscene language at the Guard base out there, isn't it?
A Yes.
Q And, in fact, hopefully not frequently, but occasionally you hear the word "fuck" with all of its various incarnations?
A Yes, I do.
Q And, in fact, have you actually used that word on occasion?





REUTLINGER, EXAM BY CALL

A Yes, I have.
Q And Mr. Menke, in his written response to you, actually admits calling Bob, doesn't he?
A Yes.
Q And he actually admitted being intoxicated, didn't he?
A Uh-huh.
Q So he is taking some responsibility for this by admitting these things that he doesn't have to admit, correct?
A That's correct.
Q Now, as to the issue of admitting the threat, were you asking Mr. -- strike that.
If, in fact, Mr. Menke did not make the threat that Mr. Teinert alleged, it would be improper for him to admit to making a threat that he didn't make, correct?
A That's true.
Q That would be false. That could get him terminated, couldn't it?
A Repeat that. I'm sorry.
Q If Mr. Menke admitted to something that he knew was not true, that would be a falsification, would it not?
A Yes.



REUTLINGER, EXAM BY CALL

Q And that would be grounds for adverse action against him by the Guard, would it not?
A Yes, it would.
Q And so you weren't asking him to lie, were you, by saying admit that it happened?
A No.
Q So it's quite possible that he was simply saying, "I can't admit to that because it didn't happen"; isn't that correct?
A That's a possibility.
Q And what did he tell you his version of the telephone call with Mr. Teinert consisted of?
A He told me his version, that what he had told -- what he had told Bob was he said to mind his P's and Q's. But that isn't what was on the report.
Q That's not at least what Mr. Teinert had reported, correct?
A That's what the security police had reported; that's correct.
Q You've heard the phrase, "Mind your P's and Q's," haven't you?
A Yes, I have.
Q And typically what does it mean to you when you've heard that?
A It's a myriad of things.





REUTLINGER, EXAM BY CALL

Q It typically means mind your business, doesn't it?
A Yes.
Q And have you ever heard Mr. Menke use that phrase?
A I have not.
Q Okay. Now, you indicated that safety was one of the concerns that you considered in the efficiency of the Guard, correct?
A Yes.
Q And, in fact, it's not a very safe work environment to have employees that are fighting, correct?
A That's correct.
Q In fact, it's quite dangerous if they're actually engaged in fisticuffs, correct?
A Yes.
Q But, as a policy, you don't automatically terminate those people that engage in fisticuffs, correct?
A That's correct.
Q You indicated also that termination of Mr. Menke would send a message to others about order and discipline, correct?
A Yes.

REUTLINGER, EXAM BY CALL

Q Is a perception of fairness an important consideration that you need to make?
A Yes, it is.
Q For guard members. So, in other words, it's efficient for the guard to appear fair to its employees, correct?
A Yes.
Q That's because they don't feel like they're working for somebody who is arbitrary and capricious and will take action against them on a whim, correct?
A That's correct.
Q It builds in some consistency, correct?
A Yes, it does.
Q Don't you think it creates a tremendous sense of unfairness and inconsistency when you have employees who are engaged in actual fisticuffs that don't get terminated and then you terminate someone who makes a telephone threat? Doesn't that appear to be inconsistent punishments?
A No, not to me.
Q How doesn't it? I'd like to hear your input on that.
A A fisticuffs is much different than a life, the way I see it, in my opinion.
Q Okay. But all threats are not -- there's a





REUTLINGER, EXAM BY CALL

range of threats, correct?
A Yes, there is.
Q And there's a range of threats to take someone's life, correct? Some being very believable and some being incredible?
A No.
Q You don't think so?
A I don't have the luxury to think so, no.
Q But you would admit that there are circumstances where a threat on a life could be completely unbelievable, correct?
A There are probably some situations like that.
Q When Colonel Warner was going through the Douglas Factors with you, he skipped over one, and I wanted to get your comment on it. That's the consistency of the penalty with the applicable agency tables of penalties. Did you consider that factor?
A Yes.
Q And, in fact, the penalty imposed in this case is not consistent with that recommended by the IPR, is it?
A It's consistent with the agency, what I got from them before. That's where I made my decision.
Q There's a distinction here. Let me clarify



REUTLINGER, EXAM BY CALL

this. I understand that they may have taken actions against other employees. The Douglas Factor in question is the consistency of the penalty with the applicable agency table of penalties. That would be Appendix A-5, those penalties set forth in TPR 9-8, correct? And 9-8 indicates that the range of penalties for a threat is a written reprimand to a 15-day suspension for a first offense, correct?
A That's correct.
Q And the penalty in this case does not conform to that recommended penalty, does it?
A No, it does not.
Q Let me have you take a look at what we'll mark as Exhibit 14, I believe. Let me have you look at Exhibit 14. Is that your signature, the second signature down?
COLONEL WARNER: Just for the record, counsel, just a little tit for tat, but you have objected all day long when you've been confronted with something you haven't seen before. We've tried to provide you with discovery. I haven't seen this before.
MR. CALL: You have, counsel. It was included in my original written response as Exhibit --





REUTLINGER, EXAM BY CALL

COLONEL WARNER: Well, it wasn't provided to me by way of discovery, but just so you understand, I have no problem with you using it.
Q (BY MR. CALL) Do you recognize that document?
A Yes, I do.
Q And that was an Outstanding Military Volunteer Service Medal award; is that correct?
A That's correct.
Q That you authorized; isn't that correct?
A Yes, I -- yes, I did.
Q Okay. And, in fact, you awarded that award to Mr. Menke in November of 1999, didn't you?
A Yes, sir.
Q Okay. And it indicates in there on the last -- it goes through Mr. Menke's achievements. The last sentence of that says, "All of these actions have left a lasting positive impression on the Salt Lake Community that will be of benefit for years to come. His actions are commendable and much deserving of this award," correct?
A Yes, sir.
HEARING OFFICER McCABE: Can I clarify a point, because I'm a little confused. Counsel, you asked a question of the colonel that he awarded this

REUTLINGER, EXAM BY CALL

November of '99. I'm just trying to figure out where you got the awarding as of November of '99 in this.

THE WITNESS: January of '99 is when I signed this.

MR. CALL: My understanding of it, your Honor, is that the award ceremony took place in November of 1999.

HEARING OFFICER McCABE: Okay. But we're talking about an award that actually started as is reflected in this document and was signed off by you, Colonel, on 19 January '99?

THE WITNESS: That's correct.

Q (BY MR. CALL) And it would have been possible for you to intercept this award and not awarded it at the November 1999 awards ceremony, correct?

A Yes. Wait a minute. No. November '99 is when we issued this award?

Q Uh-huh.

A No, I don't think so.

Q My understanding was that it was approved in January of 1999. Correct?

A That's when I submitted this paperwork, the 19th of January. It was not awarded in November '99.

Q And then it was approved by General Heaton





REUTLINGER, EXAM BY WARNER

later in the month, correct?

A In July.

Q Is that July or January? I thought that was January.

A I don't know. Could be January. Could be January.

Q Wasn't there an awards ceremony in November 1999 this year in which you participated?

A Not that I'm aware of. I do not recall that.

Q Do you recall any awards ceremony in November of '99 where some of these medals were passed out to various individuals in your department?

A I'm trying to think. I do not recall one. If -- that doesn't mean there wasn't one, but I do not recall one.

MR. CALL: That's okay. Nothing further.

FURTHER EXAMINATION

BY COLONEL WARNER:

Q Well, we'll try and end the pain here relatively quickly, Colonel, but we're going to go over just a couple of other things.

A Yes, sir.

Q If Mother Theresa, rest her soul, but if Mother Theresa earned your community service Military



REUTLINGER, EXAM BY WARNER

Outstanding Volunteer Service Medal and then threatened somebody, would that change your decision to kick her out of the Guard?

A No, sir.

Q This is an irrelevancy, is it not?

A I don't see one, but -- I don't see a relevancy to what my decision was, no.

Q Your decision wasn't based on performance?

A No, sir.

Q Your decision wasn't based on good deeds?

A No, sir, it wasn't.

Q Your decision was based on a threat?

A Yes, it was.

Q So whether or not he painted the world green, if he made the threat, that's what your decision was based on?

A That's correct.

Q You're concerned for the safety and welfare of the individuals that he worked with?

A That's where I went.

Q So he can wear this medal around all day long and it's not going to change your opinion relative to the appropriateness of the penalty; is that true?

A That's correct.





REUTLINGER, EXAM BY WARNER

Q All right. Now, let's talk about the difference between fisticuffs and pushing and threats. Counsel referred to fisticuffs -- and in some of these instances, it was really nothing more than pushing or poking; isn't that true?

A That's correct.

Q And, indeed, with Wesemann and Locke, both employees stated that it was nothing more than horseplay; is that correct?

A That is correct.

Q And that neither felt threatened, that it was not fisticuffs and that their statements were to the effect that it was poking one another; is that true?

A That's what they responded, yes.

Q It's a far cry from even fisticuffs?

A Yes, it is.

Q All right. Now, there was no automatic termination decision made here, was there?

A No, sir.

Q Indeed, you considered the full range; is that right?

A Yes, sir, I did.

Q Now, much has been made by counsel of this IPR and the table of penalties. To the best of my

REUTLINGER, EXAM BY WARNER

knowledge, it is not written in stone. Is that true?
A That's my understanding. It's a guideline.
Q In fact, let's look at the language of the TPR, since we've been looking at the language. Let's start on page 19, Appendix A, penalty section, A-1. Tell me if this is your understanding. "Determining the appropriateness of a penalty relies not only on establishing factual circumstances, but also on application of judgment and discretion."
A Yes, sir.
Q You're not obligated to rotely follow this table, are you?
A That's my understanding, yes, sir.
Q Indeed, you have the application of judgment and discretion?
A Yes, sir.
Q In other words, the TPR says, the issue should not be whether the penalty is within the permissible range that counsel has made so much issue of here, but, rather, why that particular penalty was chosen?
A Yes, sir.
Q Now, that's the very words of the TPR, is it not?
A Yes, sir, it is.





REUTLINGER, EXAM BY WARNER

Q And so it doesn't matter whether the penalty in the range of the first offense or not; it depends on why you chose it?
A Yes, sir.
Q And you chose it because of the serious -- what you perceived as the seriousness of the offense, correct?
A That's correct.
Q And its effect on the efficiency of the service?
A Yes, sir.
Q And so, notwithstanding counsel repeatedly pointed out that it didn't fit in the language of the first offense, that doesn't matter, does it?
A No, sir.
Q Indeed, let's look at some additional language. Under relevant factors, A-2, the language says, "The list is intended as a guide and should not be applied in a mechanical fashion."
A That's how I understand the TPR.
Q Well, let's continue. Under the table of penalties, A-5, quoting again, "The table of penalties provided below is a guide. It is not all inclusive. It will aid managers and supervisors in carrying out the principles of like penalties for





REUTLINGER, EXAM BY WARNER

like offenses in genuinely similar cases. The table provides suggested" -- and it is underlined, suggested. That's not my underlining. That comes in the TPR -- "penalties and should not be plead so inflexibly as to impair consideration of the factors relevant to the individual case.
Now, Colonel, if we have enough monkeys -- if we have enough bananas, we can train a monkey to rotely go down and pigeonhole offenses in the table of penalties, can we not?
A Yes, sir, we can.
Q But you are a service officer in the military of the United States. It's expected you'll exercise individual discretion of judgment, is it not?
A Yes, sir.
Q And did you try and do that to the best of your ability in this case?
A Yes. I did.
Q And when you did so, did you take into account all of the factors that we have previously discussed?
A Yes, I did.
Q And, hence, the fact that you happened to believe, based on your judgment and discretion, that





REUTLINGER, EXAM BY WARNER

the punishment, or the penalty, if you will, under 9-8, threatening or attempting to inflict bodily harm, that the suggested penalty under the first offense was not appropriate for this particular matter?
A That's correct.
Q All right. But you didn't automatically decide it had to be removal?
A No, sir.
Q Nevertheless, you certainly have the full range and the discretion, do you not?
A Yes, I do.
Q Now, let's talk about the nature of the threat. The penalty is not at odds with this table whatsoever that you've picked because you had discretion to pick any penalty; isn't that correct?
A That's correct.
Q So, to suggest that it's at odds with the table is just flat wrong; do you agree?
A I agree.
Q And, indeed, based on your judgment, this was a very serious threat?
A Yes, sir.
Q And we don't have to rehash all the reasons why, because you've already testified to that, but

REUTLINGER, EXAM BY WARNER

obviously you determined that a threat on one's life was more serious than pushing or even punching?
A Yes, sir.
Q And that's well within your discretion as the officer making that decision?
A I have that authority, yes.
Q And you tried, as best as you could, to put that into the context of other penalties that you were aware of?
A Yes, sir.
Q All right. You tried to be consistent?
A Yes, I did.
Q The fact that counsel or others may not agree with you doesn't change the fact that you did your best to be consistent?
A Yes, I did.
Q To be as fair and equitable as possible?
A Yes, sir.
Q Now, counsel talked about Menke accepting responsibility. Is admitting that he made a phone call accepting responsibility?
A I don't think so, no.
Q Particularly when he denied that he ever made any threat in the phone call?
A Yes, sir.





REUTLINGER, EXAM BY CALL

Q Particularly inasmuch as you determined in your mind that he had made a threat?
A Yes, sir.
Q So that's not exactly accepting any responsibility, is it?
A I didn't see it that way, no, sir.
Q Indeed, to this day, Sergeant Menke has never admitted that anything happened other than the phone call and he told him to mind his P's and Q's?
A That's my understanding, yes.
Q Do you have any personal animosity towards Sergeant Menke?
A None whatsoever.
Q This isn't personal to you?
A No, sir.
COLONEL WARNER: I don't have any further questions.

RECROSS EXAMINATION

BY MR. CALL:
Q Just one follow-up. In Exhibit 3, which is your original decision, you did, in fact, contrary to what you just indicated, you did consider the impact that the alleged incidents had on the reputation of the engine shop Logistic Command and the reputation on the National Guard, did you not?



REUTLINGER, EXAM BY CALL

A Yes, I did.
Q So then this issue about the medal, that does have some bearing on the fact because that does also affect the reputation of the Guard, does it not?
A Yes, on the reputation of the Guard, yes.
MR. CALL: Nothing further.
HEARING OFFICER McCABE: Before you're excused I need to ask a question, and perhaps you can answer it or perhaps we're going to have to get some further clarification. Are Air National Guard technicians governed by a labor management agreement?
THE WITNESS: No, they're not.
HEARING OFFICER McCABE: That's all I needed. Thank you very much. This witness may be excused?
COLONEL WARNER: Yes.
HEARING OFFICER McCABE: Thank you very much, Colonel. As I've told the other witnesses, this is a serious matter. If anybody wants to talk to you about it or ask you what's going on, simply indicate that it's in process and you've been advised not to discuss it.
THE WITNESS: Yes, sir.
HEARING OFFICER McCABE: Thank you very much for being here.





(Discussion off the record.)
MR. HAWS: Sir, just one procedural issue. We need to talk just a minute about your witnesses, who you're going to start with, what time we need to have people available for you.
MR. CALL: Maybe we should put this part on the record. Is your case in chief presented?
COLONEL WARNER: Uh-huh.
HEARING OFFICER McCABE: Excuse me, Colonel. I've been real good about telling other witnesses we need to make that a discernible --
COLONEL WARNER: I'm sorry. We are on the record now; is that correct?
HEARING OFFICER McCABE: Well, for that purpose, have you completed your case in chief?
COLONEL WARNER: Yes, we have. If we're on the record, we have completed our case in chief.
HEARING OFFICER McCABE: Thank you, sir.
MR. CALL: I know we're not in a court of law, but I would at this point make a motion to dismiss the case, that they have not made a prima facie case by a preponderance of the evidence that the facts did occur and that it would promote the efficiency of the service to terminate him, and that a significant or a sufficient nexus has not been met

by the State's case in chief -- or, excuse me, the agency's case in chief. We'd make that motion. I understand you may take that under advisement. I believe it needed to be made.

HEARING OFFICER McCABE: Thank you. Anything to offer on that, Colonel?

COLONEL WARNER: Yes. I could speak for 15 or 20 minutes to that motion, if you want to hear it, but I think that it goes without saying, but let me just say it. There's been nothing to rebut -- seriously rebut the evidence presented by Teinert and others that Sergeant Menke made a death threat. I haven't heard a denial from Sergeant Menke yet. I've heard nothing from anyone else to suggest that it's not absolutely true, so as far as I haven't made a prima facie case, I'm, quite frankly, surprised. Maybe I've been in a different hearing today than counsel has, but we have evidence of that. We have evidence on every issue that we talked about in opening statement. I can rehash all of that in detail, but I believe that it's relatively clear.

Colonel Reutlinger went through all of the bases why this, in fact, impacts the efficiency of the service. All of those factors to get past this kind of a motion, I suggest, is nothing more than a





prima facie showing for you to later determine the weight based on the whole case, but if you'd like me to address that further in more detail, I will.

HEARING OFFICER McCABE: No, that's fine. I'm going to take it under advisement. Again, as to the motions, if you feel compelled -- at the end of the hearing, so that we talk about it today, so you'll understand where we'd be going at the end of the hearing, customarily my goal is to render a written decision within 30 days of the date that I get the transcript, and believe you me, I try to stick with that. Ten days from when the parties get the transcripts, and we all get them at the same time, or close, what I ask the respective parties to do, the agency and the appellate, is if they have any written argument they want to make at that point, proposed findings of the fact, conclusions of law, you can submit those. And, again, I'll give 15 days in which to do that from the date that you receive the transcript. And that's 15 calendar days. I work off of a calendar, not workdays, because I can never figure out when anybody is working anymore, so it's calendar days.

And then within 15 days of receiving that, I'll endeavor, within a 30-day period, total, to make





a decision, and that decision, again, will be submitted to the Adjutant General of the State of Utah. Customarily I rely upon the State to make sure a copy of that then gets to the appellant and the parties in the case. Any problem with that approach?

MR. CALL: No. Just preserving the record, your Honor.

HEARING OFFICER McCABE: I understand. I just wanted to make sure you understood how I operated as well. If there's nothing further, we can go off the record. You can talk about what you need to do with witnesses. I'm just going to propose that we reconvene and start tomorrow at 8:30 so that everybody gets me to the plane on time. We're concluded. Thank you.

(Record closed at 5:45 p.m.)

* * * *





REPORTER'S CERTIFICATE

STATE OF UTAH )
COUNTY OF SALT LAKE ) ss.

I, RENEE L. STACY, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public for the State of Utah, do hereby certify that the foregoing transcript, consisting of pages 1 to 391, was stenographically reported by me at the time and place hereinbefore set forth; that the same was thereafter reduced to typewritten form, and that the foregoing is a true and correct transcript of those proceedings.

Dated this 10th day of February, 2000.

RENEE L. STACY, CSR, RPR

My Commission expires:
November 9, 2003

# EXHIBIT 11

## INCIDENT/COMPLAINT REPORT

**September 17, 1999**

**INCIDENT/COMPLAINT REPORT** *(Continue in "REMARKS" on reverse, if necessary)*

| INCIDENT/COMPLAINT REPORT | DATE | INCIDENT/COMPLAINT NO. | INVESTIGATION REPORT NO. |
|---|---|---|---|
| | 17 Sept 99 | 123-99 | |

[X] INFORMATION [ ] COMPLAINT [ ] COMMANDING OFFICER'S REPORT OF ACTION REQUIRED *(See reverse)*

THRU: Ronald H. Baarz,CMSGT
TO: Base Commander
FROM: 151st Security Forces Squadron "Alpha Flight"

| 1. SUBJECT | 2. GRADE | 3. SSN | 4. ORGANIZATION *(Include location and phone no.)* |
|---|---|---|---|
| | | | |

5. DESCRIPTION *(Complete on all civilians and military personnel whose identity is in question)*

| A. COLOR EYES | B. COLOR HAIR | C. COMPLEXION | D. SEX | E. DOB | F. WEIGHT | G. HEIGHT | H. IDENTIFYING MARKS *(Tattoo, scar, etc.)* |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

6. HOW DRESSED *(Military or civilian, and condition of clothing)*

7. UNDER INFLUENCE OF: [ ] ALCOHOL [ ] OTHER *(Explain in item 10)*

8. INCIDENT/COMPLAINT *(Specify type and location)*
Death Threat
HOUR: 2340
DATE: 17 Sept 99

9. RECEIVED BY *(Typed or printed name, grade, and position)*
Kevin L.Freemont,E-6,Security Controller.
[ ] IN PERSON [X] BY TELEPHONE [ ] BY MAIL

10. DETAILS OF INCIDENT *(Who, what, when, where, how? Include attitude at time of apprehension and give details if uncooperative. Attach statements of medical personnel.)*
At 2340 hrs,17 Sept 99 Kilo #1 (CSC) was informed by Robert W.Teinert from the NCO Club (Building #1624). That he was receiving threatening calls on his cell phone from Ronald J Menke. At 2343 hrs Kilo's #4/4a (SSG Morstad/SRA Davis) were dispatched to the NCO Club for statements. At 0050 hrs Kilo #2 (MSG Pitt) asked Bob Teinert to report to the Security Force Building. Kilo #2 (MSG Pitt) determined that Ronald J Menke did make death threats on Mr.Teinerts life. 0100 hrs Kilo #2 (MSG Pitt) informed the SF Commander (Capt Wall) of the problem. Also the SLC Police Dept. were dispatched to the ANG Base. At 0110 hrs SMS Lawrence D Kimpel (First Shirt/Maint) was informed of the problem with Ronald J Menke. At 0122 hrs the SLC Police Dept arrived on base. Officers (S.Williams/J.Wallace) assigned it case #99-1889147.(KLF)

11. EVALUATION: [ ] UNFOUNDED [ ] MISDEMEANOR [ ] FELONY [ ] MILITARY OFFENSE [ ] TRAFFIC

12. PERSONS RELATED TO REPORT *(Insert category of relationship letter opposite name)*
A. COMPLAINANT B. VICTIM C. SUSPECT D. WITNESS E. MP/SP/AP F. INVESTIGATED BY G. APPREHENDED BY

| | NAME | GRADE | SSN | ORGANIZATION OR ADDRESS AND PHONE NO. |
|---|---|---|---|---|
| E | Terry D.Morstad | E-5 | | 151st SFS/Ext 2327 |
| E | Brent C Davis | E-4 | | 151st SFS/Ext 2327 |
| | | | | |
| | | | | |

13. DISPOSITION OF INCIDENT/COMPLAINT
A. REFERRED TO: [ ] PATROL [ ] SEE REPORT NUMBER AT TOP OF PAGE [ ] OTHER AGENCY *(Specify)* [ ] NONE
B. OFFENDER
C. EVIDENCE *(List and describe, or summarize as appropriate)*

14. INCLOSURES *(Statements and receipts)*

15. DISTRIBUTION
1-SP Files
1-Base Commander
1-151st ARW/CA
1-151st Bus/cc
1-151st SFS/cc
1-[illegible]/cc 151st SP/cc

FOR THE COMMANDER *(Strike out if inapplicable)*
TYPED NAME, GRADE AND TITLE OF REPORTING OFFICER
Raymond A.Pitt,E-7,Flight Seargeant
SIGNATURE: Raymond A. Pitt

2-AF Form 1168
DD FORM 1569, JUL 72 (EF)
Created using PerForm Pro software.

# EXHIBIT 12

## STATEMENT OF SUSPECT/WITNESS/COMPLAINANT

**Statement of Robert W. Teinert**

**September 17, 1999**

**Statement of R.W. Teinert - EXHIBIT 12**

| STATEMENT OF SUSPECT/WITNESS/COMPLAINANT | [ ] SUSPECT<br>[X] WITNESS/COMPLAINANT | OMB No. 0701-0128<br>Expires Apr 30, 1997 |
|---|---|---|

Public reporting burden for this collection of information is estimated to average 20 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, WHS, DIOR, 1215 Jefferson Davis Highway, Suite 1204, Arlington VA 22202-4302; and to OMB, Paperwork Reduction Project (0701-0128), Washington DC 20503. Please DO NOT RETURN your form to either of these addresses. Hand your completed form to the Security Police Officer.

*PRIVACY ACT STATEMENT*

*AUTHORITY: 10 U.S.C. 8012; 44 U.S.C. 3101; and EO 9397*
*PRINCIPAL PURPOSES: Used to record information and details of criminal activity which may require investigative action by commanders, supervisors, security police, AFOSI special agents, etc.; and to provide information to appropriate individuals within DoD organizations who ensure proper legal and administrative action is taken.*
*ROUTINE USES: Information may be disclosed to local, county, state, and federal law enforcement/investigative authorities for investigation and possible criminal prosecution or civil court action. Information extracted from this form may be used in other related criminal and/or civil proceedings.*
*DISCLOSURE IS VOLUNTARY: SSN is used to positively identify the individual making the statement.*

## I. STATEMENT INFORMATION

| DATE | TIME | LOCATION AND INSTALLATION *(Bldg/Room No)* | UNIT TAKING STATEMENT | REPEAT *(If known)* |
|---|---|---|---|---|
| 12SEPT99 | | 1624 (NCO CLUB) | | OFFENSE<br>COMPLAINT |

## II. PERSONAL IDENTIFICATION *(Print or Type)*

| NAME (Last, First, Middle Initial) | SSN | STATUS/GRADE | |
|---|---|---|---|
| TENNETT ROBERT W | 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 | WG10/TSGT | |
| LOCAL ADDRESS (Include Zip Code) | DATE AND PLACE OF BIRTH (If required) | TELEPHONE HOME | DUTY |
| 366 WEST 325 SOUTH BOUNTIFUL UTAH | 07/19/61 | 801/295/0557 | 2366 |
| PERMANENT ADDRESS OR HOME OF RECORD (Include Zip Code) | MILITARY ORGANIZATION/EMPLOYER | | DEROS |
| SAME | 151 MXS | | |

SPONSOR INFORMATION

| NAME (Last, First, Middle Initial) | GRADE | SSN | ORGANIZATION | DUTY PHONE |
|---|---|---|---|---|
| | | | | |

## III. ACKNOWLEDGEMENT OF OFFENSES AND 5TH AMENDMENT/ARTICLE 31 RIGHTS ADVISEMENT *(Suspect Only)*

*I have been advised that I am suspected of the following offenses:*

| ADVISED BY *(Full Name and Rank)* | INDIVIDUAL IDENTIFIED HIMSELF/HERSELF AS A *(SP, special agent, etc.)* |
|---|---|
| | |

| SUSPECT INITIALS | *and advised me that I have the following rights according to the 5th Amendment of the U.S. Constitution/Article 31 of the Uniform Code of Military Justice.* |
|---|---|
| | I have the right to remain silent - that is to say nothing at all. |
| | Any statement I make, oral or written, may be used as evidence against me in a trial or in other judicial, non-judicial, or administrative proceedings. |
| | I have the right to consult with a lawyer. |
| | I have the right to have a lawyer present during this interview. |
| | I may obtain a civilian lawyer of my own choice at no expense the the government. |
| | I may request a lawyer any time during this interview. |
| | If I decide to answer questions with or without a lawyer present, I may stop the questioning at any time. |
| | MILITARY ONLY: If I want a military lawyer, one will be appointed for me free of charge. |
| | CIVILIANS ONLY: If I cannot afford a lawyer and want one, a lawyer will be appointed for me by civilian authorities. |

| SUSPECT INITIALS | *I have read my rights as listed above and I fully understand my rights. No promises, threats, or inducements of any kind have been made to me. No pressure or coercion has been used against me. I make the following choice. (Initial One)* |
|---|---|
| | I do not want a lawyer. I am willing to answer questions or make a statement or both, about the offense(s) under investigation. |
| | I do not want a lawyer and I do not wish to make a statement or answer any questions. |
| | I want a lawyer. I will not make any statement or answer any questions until I talk to a lawyer. |

*I fully understand my rights and that my signature does not constitute an admission of guilt.*

| SIGNATURE OF SUSPECT | SIGNATURE OF WITNESS/INTERVIEWER |
|---|---|
| | |

FORM 1168, JUL 95 *(LRA)* PREVIOUS EDITIONS ARE OBSOLETE. PAGE 1 OF PAGES

**IV. STATEMENT**

AT 10:40 ON SEPT 17, 99.
RONALD MENKE WAS HAVING 2 SHOTS OF DRINKS (1 DRINK - 1 SIDECAR) WITH HIS WIFE, WHO WAS ALSO DRINKING HEAVILY (1 BEER - 1 SHOT)
AT 23:00 WHEN RON MENKE MADE THE MOTION OF LEAVING.
I OFFERED TO (BUY HIM AND HIS WIFE A CAB,) HIS I.E.
RON SAID ("F--K YOU BOB.") AT THAT TIME SRA.
JENSEN CALLED CSC. AND REPORTED RON MENKE'S
BEHAVIER., ONCE AGAIN RON MENKE YELLED (F.--K YOU.)
AT THAT TIME RON REALIZED THAT SECURITY WAS
INVOLED. 1/2 HOUR LATER WHILE I WAS SHOOTING POOL
MY CELL PHONE RANG 2 TIMES I ANSWERED TOO A
LOUD VOICE (INCOHERINT) I HUNG-UP. (1/2 HOUR) PHONE
RECORDS WILL CORRECT MY TIME LAPSE. I ANSWERED MY
CELL PHONE TO HEAR A VOICE I RECOGNIZED RON
MENKE'S VOICE AND HIS WORDS WERE (YOUR'E DEAD, BOB
YOUR'E DEAD, I CAN DO THIS,) DIAL TONE. I THEN CALLED
CSC WITH A DEATH THREAT END RW.

LAST LINE

RT.

**V. SIGNATURE/OATH**

*"I hereby voluntarily and of my own free will make this statement without having been subjected to any coercion, unlawful influence, or unlawful inducement. I swear (or affirm) I have read this statement, initialed all pages and corrections, and it is true and correct to the best of my knowledge."*

| SIGNATURE OF PERSON MAKING STATEMENT | SIGNATURE OF WITNESS/INTERVIEWER |
|---|---|
| [signature] | [signature] Daley, SSgt |

*Subscribed and sworn to before me, a person authorized by law to administer oaths, this* 18 *day of* Sept 19 99

SIGNATURE OF PERSON ADMINISTERING OATH

[signature] Daley SSgt

**VI. INSTRUCTIONS FOR CONTINUATION PAGE(S)**

*Use plain bond paper (both sides optional). At the top right of each page, print or type "(Last name of individual making the Statement) on (Date)." At the bottom of each page, print or type: "Page ___ of ___ Pages." The individual must initial the top and bottom entries and sign his/her name at the bottom of each page.*

AF FORM 1168, JUL 95 *(REVERSE)*

PAGE 2 OF PAGES

# EXHIBIT 13

## STATEMENT OF SUSPECT/WITNESS/COMPLAINANT

### Statement of Terry D. Morstad

### September 17, 1999

MORSTAD 17 SEPT 99

## STATEMENT OF SUSPECT/WITNESS/COMPLAINANT

| | |
|---|---|
| | SUSPECT |
| X | WITNESS/COMPLAINANT |

**PRIVACY ACT STATEMENT**

*AUTHORITY: 10 U.S.C. 8013; 44 U.S.C. 3101; and EO 9397*

*PRINCIPAL PURPOSES: Used to record information and details of criminal activity which may require investigative action by commanders, supervisors, security police, AFOSI special agents, etc.; and to provide information to appropriate individuals within DoD organizations who ensure proper legal and administrative action is taken.*

*ROUTINE USES: Information may be disclosed to local, county, state, and federal law enforcement/investigative authorities for investigation and possible criminal prosecution or civil court action. Information extracted from this form may be used in other related criminal and/or civil proceedings.*

*DISCLOSURE IS VOLUNTARY: SSN is used to positively identify the individual making the statement.*

### I. STATEMENT INFORMATION

| DATE (YYYY MM DD) | TIME | LOCATION AND INSTALLATION (Bldg/Room No) | UNIT TAKING STATEMENT | REPEAT (If known) |
|---|---|---|---|---|
| 1999 09 17 | 2340 | BLDG 1624/NCO Club | 151 SFS | OFFENSE / COMPLAINT |

### II. PERSONAL IDENTIFICATION (Print or Type)

| NAME (Last, First, Middle Initial) | SSN | STATUS/GRADE | |
|---|---|---|---|
| Morstad Terry D. | 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 | E-5 | |
| LOCAL ADDRESS (Include Zip Code) | DATE AND PLACE OF BIRTH (If required) | TELEPHONE HOME | TELEPHONE DUTY |
| 765 N 2200 W SLC UT. | | (801)281-9709 | 595-2327 |
| PERMANENT ADDRESS OR HOME OF RECORD (Include Zip Code) | MILITARY ORGANIZATION/EMPLOYER | DEROS | |
| | 151 SFS | | |

**SPONSOR INFORMATION**

| NAME (Last, First, Middle Initial) | GRADE | SSN | ORGANIZATION | DUTY PHONE |
|---|---|---|---|---|
| | | | | |

### III. ACKNOWLEDGEMENT OF OFFENSES AND 5TH AMENDMENT/ARTICLE 31 RIGHTS ADVISEMENT (Suspect Only)

*I have been advised that I am suspected of the following offenses:*

| ADVISED BY (Full Name and Rank) | INDIVIDUAL IDENTIFIED HIMSELF/HERSELF AS A (SF, special agent, etc.) |
|---|---|
| | |

| SUSPECT INITIALS | *and advised me that I have the following rights according to the 5th Amendment of the U.S. Constitution/Article 31 of the Uniform Code of Military Justice.* |
|---|---|
| | I have the right to remain silent - that is to say nothing at all. |
| | Any statement I make, oral or written, may be used as evidence against me in a trial or in other judicial, non-judicial, or administrative proceedings. |
| | I have the right to consult with a lawyer. |
| | I have the right to have a lawyer present during this interview. |
| | I may obtain a civilian lawyer of my own choice at no expense to the government. |
| | I may request a lawyer any time during this interview. |
| | If I decide to answer questions with or without a lawyer present, I may stop the questioning at any time. |
| | MILITARY ONLY: If I want a military lawyer, one will be appointed for me free of charge. |
| | CIVILIANS ONLY: If I cannot afford a lawyer and want one, a lawyer will be appointed for me by civilian authorities. |

| SUSPECT INITIALS | *I have read my rights as listed above and I fully understand my rights. No promises, threats, or inducements of any kind have been made to me. No pressure or coercion has been used against me. I make the following choice. (Initial One)* |
|---|---|
| | I do not want a lawyer. I am willing to answer questions or make a statement or both, about the offense(s) under investigation. |
| | I do not want a lawyer and I do not wish to make a statement or answer any questions. |
| | I want a lawyer. I will not make any statement or answer any questions until I talk to a lawyer. |

*I fully understand my rights and that my signature does not constitute an admission of guilt.*

| SIGNATURE OF SUSPECT | SIGNATURE OF WITNESS/INTERVIEWER |
|---|---|
| | |

AF FORM 1168, APR 98 *(EF-V1)* PREVIOUS EDITIONS ARE OBSOLETE. PAGE 1 OF 2 PAGES

MORSTAD 17 SEPT 99

IV. STATEMENT

On 17 Sept. 1999 at aprox 2240 , Security Forces was called by TSG Teinert, who was at the NCO Club Bldg #1624. TSG Teinert called CSC and informed Security Forces flight SGT, (SSG Bradshaw C-flight) that SSG Ron Menke was very intoxicated and that he was going to attempt to drive home. At aprox 2345, myself (SSG Morstad) and SSG Bradshaw arrived at Bldg 1624 , the NCO Club and made contact with TSG Teinert and I asked him what the problem was. TSG Teinert stated that SSG Menke had been doing shots of alchol and was very intoxicated and was going to drive home. I (SSG Morstad) escorted SSG Menke to the lounge area of Bldg 1624. SSG Menke in my opinon was very intoxicated by the way he slurred his words and staggered when he walked. I informed SSG Menke that he was not to drive. SSG Menke stated it is that G_D Dammed Teinert who called you isn't it. I informed SSG Menke it does not matter who called us. He then stated that he was fine to drive. I informed SSG Menke that he had 3 choices (1) He could call a cab, (2) He could have a sober friend take him home or (3) myself (SSG Morstad) and SSG Bradshaw would make a Military apprehension and further call his 1ST SGT and his Commander. SSG Menke stated that Security forces would problaby let Teinert drive off the base and that he was intoxicated also. I informed SSG Menke that was not the issue, that his intoxication is the issue. I then asked SSG Menke what choice he was going to make. Mr. Darren Linsey who is a bar tender at the club stated he would take SSG Menke home. I asked SSG Menke if that would be alright. SSG Menke stated fine. At aprox 2320 Kilo #5, SSO Bloomfield called and stated that Mr Darren Linsey stopped at the gate and informed SSO Bloomfield that he (Mr. Linsey) was taking SSG Menke home. At aprox 0030 18 Sept. TSG Teinert called CSC and talked to TSG Freemont and stated that SSG Menke had called him (TSG Teinert) on his cell phone and threatened him with bodily harm. At that time, I SSG Morstad and SRA Davis were dispatched by Kilo #1, TSG Freemont to the club to take a statement from TSG Teinert. At 0050 I, SSG Morstad escorted TSG Teinert to the Security Forces BLDG to write out his statement. MSG Pitt flight SGT for Alpha Flight was informed of the situation. MSG Pitt decided to call Capt Wall (Security Forces Commander) and Salt Lake City Police Department due to SSG Menke making the calls to TSG Teinert from off the Air National Guard Base. TDM

TDM

TDM

TDM

TDM

V. OATH/SIGNATURE

*"I hereby voluntarily and of my own free will make this statement without having been subjected to any coercion, unlawful influence, or unlawful inducement. I swear (or affirm) I have read this statement, initialed all pages and corrections, and it is true and correct to the best of my knowledge."*

| SIGNATURE OF PERSON MAKING STATEMENT | SIGNATURE OF WITNESS/INTERVIEWER |
|---|---|
| Terry D Morstad | [signature], CMS |

*Subscribed and sworn to before me, a person authorized by law to administer oaths, this* 21st *day of* Sept. , 99 *(year).*

SIGNATURE OF PERSON ADMINISTERING OATH

VI. INSTRUCTIONS FOR CONTINUATION PAGE(S)

*Use plain bond paper (both sides optional). At the top right of each page, print or type "(Last name of individual making the Statement) on (Date)." At the bottom of each page, print or type: "Page ____ of ____ Pages." The individual must initial the top and bottom entries and sign his/her name at the bottom of each page.*

AF FORM 1168, APR 98 *(EF-V1)(REVERSE)* PAGE 2 OF 2 PAGES

# EXHIBIT 14

## STATEMENT OF SUSPECT/WITNESS/COMPLAINANT

**Statement of Matthew D. Jensen**

**September 18, 1999**

**Statement of M. Jensen - EXHIBIT 14**

## STATEMENT OF SUSPECT/WITNESS/COMPLAINANT

SUSPECT / WITNESS/COMPLAINANT

OMB No. 0701-0128
Expires Apr 30, 1997

Public reporting burden for this collection of information is estimated to average 20 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, WHS, DIOR, 1215 Jefferson Davis Highway, Suite 1204, Arlington VA 22202-4302; and to OMB, Paperwork Reduction Project (0701-0128), Washington DC 20503. Please DO NOT RETURN your form to either of these addresses. Hand your completed form to the Security Police Officer.

PRIVACY ACT STATEMENT

AUTHORITY: 10 U.S.C. 8012; 44 U.S.C. 3101; and EO 9397

PRINCIPAL PURPOSES: Used to record information and details of criminal activity which may require investigative action by commanders, supervisors, security police, AFOSI special agents, etc.; and to provide information to appropriate individuals within DoD organizations who ensure proper legal and administrative action is taken.

ROUTINE USES: Information may be disclosed to local, county, state, and federal law enforcement/investigative authorities for investigation and possible criminal prosecution or civil court action. Information extracted from this form may be used in other related criminal and/or civil proceedings.

DISCLOSURE IS VOLUNTARY: SSN is used to positively identify the individual making the statement.

### I. STATEMENT INFORMATION

| DATE | TIME | LOCATION AND INSTALLATION (Bldg/Room No) | UNIT TAKING STATEMENT | REPEAT (If known) |
|---|---|---|---|---|
| 19990918 | 0030 | 1624/NCO Club | 151 SFS | OFFENSE / COMPLAINT |

### II. PERSONAL IDENTIFICATION (Print or Type)

| NAME (Last, First, Middle Initial) | SSN | STATUS/GRADE |
|---|---|---|
| Jensen Matthew D | 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 | SRA |

| LOCAL ADDRESS (Include Zip Code) | DATE AND PLACE OF BIRTH (If required) | TELEPHONE HOME | TELEPHONE DUTY |
|---|---|---|---|
| Salty Grand Inn, Rm #207 | 06/11/79 Payson UT | 808-9411 | 595-2412 |

| PERMANENT ADDRESS OR HOME OF RECORD (Include Zip Code) | MILITARY ORGANIZATION/EMPLOYER | DEROS |
|---|---|---|
| P.O. Box 841 Springville UT 84663 | 151st SFS | |

SPONSOR INFORMATION

| NAME (Last, First, Middle Initial) | GRADE | SSN | ORGANIZATION | DUTY PHONE |
|---|---|---|---|---|
| | | | | |

### III. ACKNOWLEDGEMENT OF OFFENSES AND 5TH AMENDMENT/ARTICLE 31 RIGHTS ADVISEMENT (Suspect Only)

*I have been advised that I am suspected of the following offenses:*

| ADVISED BY (Full Name and Rank) | INDIVIDUAL IDENTIFIED HIMSELF/HERSELF AS A (SP, special agent, etc.) |
|---|---|
| | |

| SUSPECT INITIALS | *and advised me that I have the following rights according to the 5th Amendment of the U.S. Constitution/Article 31 of the Uniform Code of Military Justice.* |
|---|---|
| | I have the right to remain silent - that is to say nothing at all. |
| | Any statement I make, oral or written, may be used as evidence against me in a trial or in other judicial, non-judicial, or administrative proceedings. |
| | I have the right to consult with a lawyer. |
| | I have the right to have a lawyer present during this interview. |
| | I may obtain a civilian lawyer of my own choice at no expense the the government. |
| | I may request a lawyer any time during this interview. |
| | If I decide to answer questions with or without a lawyer present, I may stop the questioning at any time. |
| | MILITARY ONLY: If I want a military lawyer, one will be appointed for me free of charge. |
| | CIVILIANS ONLY: If I cannot afford a lawyer and want one, a lawyer will be appointed for me by civilian authorities. |

| SUSPECT INITIALS | *I have read my rights as listed above and I fully understand my rights. No promises, threats, or inducements of any kind have been made to me. No pressure or coercion has been used against me. I make the following choice. (Initial One)* |
|---|---|
| | I do not want a lawyer. I am willing to answer questions or make a statement or both, about the offense(s) under investigation. |
| | I do not want a lawyer and I do not wish to make a statement or answer any questions. |
| | I want a lawyer. I will not make any statement or answer any questions until I talk to a lawyer. |

*I fully understand my rights and that my signature does not constitute an admission of guilt.*

| SIGNATURE OF SUSPECT | SIGNATURE OF WITNESS/INTERVIEWER |
|---|---|
| | |

AF FORM 1168, JUL 95 *(LRA)* PREVIOUS EDITIONS ARE OBSOLETE. PAGE 1 OF PAGES

IV. STATEMENT

I arrived at the NCO club / bldg 1624 at approximitly 2030 hrs.
When I arrived at the NCO club Bob tingey was there and Ron menke and his wife were there.
Bob tingey and Ron menke had been verbaly disputting all day from what Bob had ~~[illegible]~~ MDA told me.
At approximitly 2245 Ron menke said he was going to drive home. Bob appreched him and asked him if he would like a cab. Ron replyed by saying "F--K you Bob, just F--K off."
At Approximatly 2250 I made a phone call to SFS CSC, reporting that an intoxicated man was attempting to drive home.
The Security Officers responded and allowed his freind to drive him home.
AT Approximitly 0030 Bob Tingey recived a threting phone call on his cellular phone from Ron Menke. Bob awnsed the phone and told me, that he said, "You're Dead, You are going down."
Bob tingey had recived meny calls between 2400 hrs and 0020 hrs.
We ~~[illegible]~~ MDA (Bob and myself) call SFS CSC, and reported the call.
Approximitly 0020 hrs the SFS Officers arrived and asked (Bob + myself) to fill out a statement form. MDA

Last Line

MDA

MDA

V. SIGNATURE/OATH

"I hereby voluntarily and of my own free will make this statement without having been subjected to any coercion, unlawful influence, or unlawful inducement. I swear (or affirm) I have read this statement, initialed all pages and corrections, and it is true and correct to the best of my knowledge."

Matthew D [signature]

| SIGNATURE OF PERSON MAKING STATEMENT | SIGNATURE OF WITNESS/INTERVIEWER |
| --- | --- |
| Matthew D [signature] SRA | [signature] Daley SSgt |

Subscribed and sworn to before me, a person authorized by law to administer oaths, this 18 day of Sept 19 99.

SIGNATURE OF PERSON ADMINISTERING OATH

[signature] Daley SSgt

VI. INSTRUCTIONS FOR CONTINUATION PAGE(S)

Use plain bond paper (both sides optional). At the top right of each page, print or type "(Last name of individual making the Statement) on (Date)." At the bottom of each page, print or type: Page 1 of 1 Pages." The individual must initial the top and bottom entries and sign his/her name at the bottom of each page.

AF FORM 1168, JUL 85 (REVERSE)

PAGE 2 OF PAGES

# EXHIBIT 15

## SALT LAKE POLICE REPORT

**Report of Offenses**

**September 20, 1999**

age: 1
or: AJ9912

SALT LAKE POLICE DEPARTMENT
GENERAL OFFENSE HARDCOPY

GO SL 1999-189147

on, Sep. 20 1999

1316 - 3 ASLT-INTIM/THREATS/TE

General Offense Information

Operational status : OPEN
Reported on Sep-17-1999 (Fri.) 2250
Occurred on Sep-17-1999 (Fri.) 2250
Report submitted by J73 - Wallace, Jon
Org unit : Pioneer Patrol/A/Grv
Accompanied by J76 - Williams, Sean
Located at 765 N 2200 W
Municipality : Salt Lake City Proper County : Cncl Dist 1
District : 2 Beat : 235 Grid : WES

Offenses (Completed/Attempted)
Offense : #1 1316 - 3 ASLT-INTIM/THREATS/TELEPHONIC - COMPL
Location : Govt/Pub Bldg/Grnds/Parks

General Offense Information (cont'd)
Bias : None (no bias)
Family violence : NO
IBR Clearance status : Not Applicable

Related Person(s)

Case Specific : Victim - 01 TEINERT, ROBERT
Caucasian/White MALE
Born on Jul-19-1961
Residing at 366 W 325 S , BOUNTIFUL 84010

Reference Master Name Index
TEINERT, ROBERT
Caucasian/White MALE Born on Jul-19-1961

Linkage factors
Resident status : Non-Resident
Condition : Consumed Alcohol

Case Specific : Off/Suspect - 01 MENKE, RONALD J
Caucasian/White MALE
Born on Oct-21-1956
Residing at 612 NAVAJO ST , SALT LAKE CITY 84104
Phone Numbers
Home : (801)-

Driver's license : 7477355
5'07 in height, Weighing 135 lbs

Continued ...

Hair color : Brown
Eye color : Brown
Additional remarks : ST CHARLES, MO

Reference Master Name Index
MENKE, RONALD J
Caucasian/White MALE Born on Oct-21-1956

Linkage factors
Resident status : Resident
Condition : Consumed Alcohol

Related text page(s)

Document: INITIAL R/O FIELD
Author: J73 - Wallace, Jon
Related date/time: Sep-18-99 0203

THE VICTIM AND THE SUSPECT WERE BOTH DRINKING ALCOHOL AT A BAR ON THE AIR FORCE BASE AT THIS LOCATION. THE SUSPECT WENT TO DRIVE HOME AND THE VICTIM TOLD HIM THAT HE WAS TOO DRUNK TO DRIVE SO HE (THE VICTIM) OFFERED TO PAY FOR A CAB FOR THE SUSPECT. THE SUSPECT DID NOT LIKE THAT IDEA AND INSISTED ON DRIVING. THE VICTIM CALLED THE ON DUTY SEARGENTS TO THE BAR TO HANDLE THIS SITUATION. THE SUSPECT WAS UPSET THAT THE SERGEANTS WERE CALLED BUT LEFT WITH A FRIEND, DARREN LINDSLEY. AFTER THE SUSPECT LEFT THE VICTIM RECEIVED A CALL FROM THE SUSPECT ON HIS CELL PHONE. THE SUSPECT THREATEND TO KILL THE VICTIM OVER THE INCIDENT AT THE BAR ON BASE TONIGHT. SGT. PITT SAID THAT HE WOULD LIKE THE CITY POLICE TO FOLLOW UP ON THIS INCIDENT AS WELL AS THE AIR FORCE AUTHORITIES. THIS IS NOT THE FIRST TIME THE SUSPECT AND VICTIM HAVE HAD A CONFLICT BETWEEN THEM, THERE HAS NEVER BEEN DEATH THREATS BEFORE.

ollow Up Report(s)

Continued ...

: 3
AJ9912

SALT LAKE POLICE DEPARTMENT
GENERAL OFFENSE HARDCOPY

GO SL 1999-189147

Sep. 20 1999

1316 - 3 ASLT-INTIM/THREATS/TE

llow Up # 1
signment Information
Assigned to F81 - Alcock, James Rank : Detective
Org unit : Intelligence
Capacity : Investigate/Case Manager
Assigned on Sep-20-1999 (Mon.) 0819 by D57 - Scarlet, George L
Report due on Oct-20-1999 (Wed.)

bmission Information
Follow Up completed : NO

tinued ...

# EXHIBIT 16

## CEASE AND DESIST ORDER

**September 21, 1999**

**Cease & Desist - EXHIBIT 16**

# CEASE AND DESIST

DATE 21, Sept, 1999

TO:

FROM: Robert W. Teinert

SUBJECT: Cease and Desist RE: 99-189147 / #123-99

The Respondent of this letter, Ronald S. Menke (Respondent), is hereby given notice that

as of 21, Sept, 1999, respondent's course of conduct toward

ROBERT W. TEINERT (Author's Name) is causing ROBERT W. TEINERT (Author's Name), the Author of this

letter to suffer emotional distress.

If above named Respondent continues to maintain ~~a visual or physical proximity, or~~ THREATENING ACTIONS ~~conveys~~ THREATENING verbal or written communication to, ROBERT W. TEINERT (Author's Name) it will be

considered stalking and is in violation of Salt Lake City Code 11.08.060(Crimes of Stalking).

Communication regarding: property, custody, or divorce; deemed necessary between the parties must be through respective attorney's. There should be no other communications including third party.

Signed,

[signature]

AUTHOR

Date: 21 SEPT. 1999

Served 27 Sept 99
1335 hrs.
[signature]
CSP, 1515FS

Received 27 Sept 99
1336 hrs.
[signature]

# EXHIBIT 17

## PROPOSED NOTICE OF REMOVAL

**November 16, 1999**

# State of Utah
**UTAH NATIONAL GUARD**

Michael O. Leavitt
Governor
Major General James M. Miller
Adjutant General

12953 SOUTH MINUTEMAN DRIVE
P.O. BOX 1776
DRAPER, UTAH 84020-1776
(801) 523-4402, DSN 766-4402


151 LGM/2 16 November 1999

MEMORANDUM FOR Ronald J. Menke

SUBJECT: Proposed Notice of Removal

1. This is notice that I propose to remove you from your position as Aircraft Engine Mechanic, WG-8602-10.

2. In accordance with Technician Personnel Regulation (TPR) 752, Table A-5, you are being charged with:

a. Creating a disturbance by threatening to inflict bodily harm resulting in an adverse effect on morale, production and maintenance of proper discipline. (TPR 752, A-5, Rule 9).

b. Use of insulting, abusive, offensive, or obscene language. (TPR 752, Table A-5, Rule 10b.)

3. The agency bases these charges on the following specifications.

a. On 17 September 1999, at approximately 2240 hours, you were at the NCO Club Building #1624. TSG Robert Teinert informed the Security Forces Flight Sergeant (SSG Bradshaw C-flight) that you (SSG Ronald J. Menke) appeared to be very intoxicated and that you indicated that you were going to drive home.

b. At approximately 2240 hours, SSG Teinert approached you and asked you if you would like him to call you a cab. You responded by saying, "Fuck you Bob." After SRA Jensen called Central Security Control (CSC) and reported your behavior, you once again yelled at TSG Teinert, "Fuck you".

c. SSG Morstad escorted you to the lounge area of Building #1624 and informed you that you were not to drive home and provided you with three alternative choices:

(1) You could call a cab.

(2) You could call a sober friend to drive you home.

151 LGM/2
SUBJECT: Proposed Notice of Removal

(3) SSG Morstad and SSG Bradshaw would make a military apprehension and call your First Sergeant and Flight Commander

d. Subsequent to your conversation with SSG Morstad, Mr. Darren Lindsey, a bartender at the NCO Club, also volunteered to take you home.

e. At approximately 2320 hours Mr. Lindsey stopped at the Security Gate and informed SSO Bloomfield that he would be driving you home.

f. At approximately 0030 hours, 18 September 1999, you called TSG Teinert on his cellular phone and verbally threatened him by saying, "You're dead Bob, you're dead. I can do this."

g. At approximately 0030 hours, 18 September 1999, TSG Teinert called CSC and reported that you (SSG Menke) had called TSG Teinert on his cellular phone and threatened him with bodily harm.

4. In an effort to determine what a fair and reasonable penalty would be for the violations cited in paragraph 2, the folllowing elements of your past record were considered:

a. On 16 March 1996, while deployed to Marina Di Pisa, Italy, you were involved in an incident related to the unauthorized removal of a statue. The negative press and notoriety of this incident did great harm to the reputation of the Utah National Guard.

b. In approximately March 1998, you were involved in a physical confrontation with a coworker.

While recognizing the elements cited were unrelated to the offenses in paragraph 2, I have determined to use these incidents to recommend an enhanced penalty of termination as provided for in TPR 752, Appendix A, A-3b.

5. My decision to remove you from your position as Aircraft Engine Mechanic, WG-8602-10 and terminate your employment with the Utah National Guard as a reasonable penalty for the charges outlined, is based upon a careful review of the nature and seriousness of the offense cited and, the fact that your actions have adversely affected the efficiency of the service, the employee/employer relationship, and the agency mission.

151 LGM/2
SUBJECT: Proposed Notice of Removal

6. I also considered the negative impact your actions have had on good order and discipline and on your ability to perform at a satisfactory level in your technician/supervisor position in the Logistics Management Section. I also considered the effect your actions have had on the morale and cohesion of your coworkers and the negative impact this event has had on the integrity and reputation of the LGM and the Utah National Guard.

7. In making my decision that termination is a reasonable penalty for the charges cited in paragraph 2, I also considered whether the penalty of removal was consistent with penalities imposed on other employees for the same or similar offense and that the removal penalty is provided for in the Table of Penalties outlined in Technician Personnel Regulation (TPR) 752, A-5, rule 9 and 10b.

8. Based upon my recommendation to remove you from your technician position and terminate your employment with the Utah National Guard, it is felt that while this incident is being finalized, it is in your best interest and the best interest of the Utah National Guard that you be placed in an excused non-duty pay status until this matter is resolved. This status will commence 17 November 1999. The authority to place you in this status in contained in TPR 752, 2-6.

9. During the normal work day/work week, you are directed not to enter the premises of the Utah National Guard without prior approval from the Human Resources Office, who will then make arrangements for proper escort. This action in no way infers your guilt or innocence but will help facilitate a quick resolution to the issues under investigation.

10. You have the right to review material relied on, and you should contact Carol Elkins, 523-4235 or CW5 Ralph J. Haws, 523-4227, to make arrangements to do so.

11. You have the right to reply orally or in writing to the deciding official, LTC Paul Reutlinger. If you choose to reply in writing, your written reply may be mailed to LTC Reutlinger, Utah Air National Guard, 765 North 2200 West, Salt Lake City, Utah 84116. You have fifteen (15) calendar days to respond orally or in writing. Your reply period ends fifteen days after receipt of this memoranandum. If no response has been received by that time, the deciding official will render his decision without benefit of your response.

12. The Human Resources Office can be contacted for procedural assistance. You should contact either Carol Elkins, 523-4235 or CW5 Ralph J. Haws, 523-4227. These HRO representatives can provide access to applicable regulations, and will answer questions relative to your technician rights.

151 LGM/2
SUBJECT: Proposed Notice of Removal

13. LTC Reutlinger will issue an original decision at the earliest practical date after receipt of your reply or after the period ended. If this proposed removal action is upheld by LTC Reutlinger, it will be effective on the date established in LTC Reutlinger's original decision.

ALLEN E. CHAPMAN, SMSGT, UTANG
151st Component Repair Flight Chief

I acknowledge receipt of this memorandum:

Ronald J. Menke                                        Date

EXTENDED DATE TO MEET WITH LTC REUTLINGER TO 9 DEC 99 DUE TO SSG MENKE BEING OUT OF TOWN -

Carol P. Eskins
11/16/99